UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
Albany Division

| | |
|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY,<br><br>*Plaintiff*,<br><br>v.<br><br>VILLAGE OF VOORHEESVILLE; RICHARD STRAUT, in his official capacity as Mayor; STEVE MASON, in his official capacity as Code Enforcement Officer and Building Inspector,<br><br>*Defendants.* | Civil Action No.1:25-cv-1413 (BKS/ PJE) |

## COMPLAINT

Norfolk Southern Railway Company brings this complaint against the Village of Voorheesville; Richard Straut, in his official capacity as Mayor of Voorheesville; and Steve Mason, in his official capacity as Voorheesville Code Enforcement Officer and Building Inspector.

## INTRODUCTION

1.  This action seeks relief from a municipal order that the Village of Voorheesville is using to block the construction of a new facility needed for federally approved interstate railroad operations. Because the Village's order is federally preempted on multiple grounds, the Court should declare the order void and enjoin its enforcement.

2.  Three years ago, the federal Surface Transportation Board (STB) approved a series of transactions through which Norfolk Southern acquired the right to operate its freight trains over tracks owned by various railroads, including CSX Transportation, Inc., between Voorheesville (where Norfolk Southern's and CSX's lines connect) and Ayer, Massachusetts. These rights will allow Norfolk Southern's trains to carry "double-stacked" cargo containers along this new route,

1

adding much-needed capacity to the interstate rail network. In approving the transactions, STB members emphasized the importance of getting this new service up and running.

3. To begin this new service, Norfolk Southern needs to build a new facility where trains can stop to change crews before crossing from its own network onto CSX's tracks in Voorheesville. To that end, Norfolk Southern bought a parcel of land in Voorheesville next to its existing rail line and recently started preparing the site for construction. Norfolk Southern reached out to the Village to explain its plans, to note that federal preemption exempts this project from local land-use regulations, and to express its hopes for "a long and mutually beneficial relationship with the Village of Voorheesville."

4. The Village responded by issuing a stop-work order forbidding any construction activity on the site. Village officials gave three reasons for this action: (1) Norfolk Southern's completed property purchase is a "proposed Illegal Carveout" that violates local zoning rules; (2) Norfolk Southern's "rumored, intended use" of the property to stop trains in the Village supposedly contradicts representations it made during the STB proceedings, including in a settlement agreement with the Village and CSX; and (3) this use would involve trains blocking road crossings in the Village, violating decades-old state regulatory orders.

5. None of these reasons is legitimate. Rather, they confirm that the stop-work order is preempted. *First*, the Second Circuit and the STB agree that the ICC Termination Act (ICCTA) categorically preempts local zoning and permitting requirements as applied to railroad projects. Such requirements are preempted because they would allow local actors to do precisely what Voorheesville is attempting here: impede or obstruct the construction of interstate transportation infrastructure. In defending the stop-work order under local zoning rules, the Village is trying to avoid ICCTA preemption by invoking the very scheme that ICCTA preempts. What's more, allowing

Voorheesville to veto the crew-change facility would unreasonably burden interstate rail transportation, a separate basis for preemption.

6.  *Second*, the Village's arguments about the STB settlement agreement are both mistaken and misplaced.  As Norfolk Southern has now explained to Village officials, operations at the planned crew change location will not require any trains to stop across any road crossings in Voorheesville.  Though trains will temporarily block crossings as they accelerate or decelerate through the Village, the settlement requires only that Norfolk Southern "minimize" local impacts, not that it avoid them entirely.  But even if Voorheesville could point to an actual, completed breach of the settlement agreement, the proper remedy would be to seek relief from the STB—not to use local zoning law as a pretext to engage in self-help.  Indeed, the stop-work order's nakedly pretextual nature is yet another ground for preemption.

7.  *Third*, the Village errs by invoking decades-old state regulatory orders that supposedly govern the duration of blocked road crossings in Voorheesville.  Courts across the country hold that such state and local blocked-crossing rules are preempted by either of two federal statutes that post-date the orders the Village invokes.  Under the uniform federal regulatory scheme, local governments cannot dictate when, where, and for how long trains stop on railroad tracks—let alone by using (already-preempted) local zoning law as a fig-leaf.

8.  The Court should hold invalid and enjoin enforcement of the stop-work order and the underlying zoning or land-use restrictions as applied to Norfolk Southern's crew-change facility.

## PARTIES, JURISDICTION, AND VENUE

9.  Norfolk Southern is a Virginia corporation with its principal place of business in Atlanta, Georgia.  A Class 1 rail carrier, Norfolk Southern operates over 19,200 miles of track, connecting 22 states in the eastern part of the Nation by rail.

10. Voorheesville is a village within the town of New Scotland in Albany County, New York. The village, named after railroad attorney Alonzo B. Voorhees, grew up around the crossing of two railroad lines—today, the Norfolk Southern and CSX lines at issue here.

11. Richard Straut is the Mayor of Voorheesville. He is named in his official capacity.

12. Steve Mason is the Voorheesville Code Enforcement Officer and Building Inspector. He is named in his official capacity.

13. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201 and *Ex Parte Young*, 209 U.S. 123 (1908), because Norfolk Southern seeks prospective relief against the enforcement of local laws and orders that violate the Constitution and laws of the United States.

14. The Court may declare the parties' legal rights and obligations under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, because the action presents an actual controversy within the Court's jurisdiction.

15. This Court has personal jurisdiction over all defendants because they are residents of, and maintain their principal place of business in, the State of New York.

16. Venue is proper in this district and division under 28 U.S.C. § 1391(b)(1) and (2) and Local Rule 3.3 because one or more defendants resides in this district and division and a substantial part of the events or omissions giving rise to the claim occurred in this district and division.

## FACTUAL ALLEGATIONS

### I. The ICC Termination Act

17. Railroads have long been subject to one of "the most pervasive and comprehensive of federal regulatory schemes." *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). That scheme's modern centerpiece is ICCTA, enacted in 1995 to abolish the Interstate

Commerce Commission and replace it with the STB. ICCTA's "Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." H.R. Rep. No. 104-311, at 95–96 (1995).

18. ICCTA thus gives the STB "exclusive jurisdiction" over "transportation by rail carriers . . . with respect to" (among other things) rail carriers' "practices, routes, services, and facilities" as well as "construction, acquisition, operation, abandonment, or discontinuance" of railroad tracks or facilities. 49 U.S.C. § 10501(b). "Transportation" is defined broadly to include "facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." *Id.* § 10102(9)(A).

19. In these areas, ICCTA's remedies are "exclusive and preempt the remedies provided under Federal or State law," *id.* § 10501(b)—meaning the STB's authority is "exclusive and plenary." *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005). "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *See Norfolk S. Ry. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 523 (6th Cir. 2024) (brackets omitted).

20. "ICCTA produces both express and implied preemptive effects." *AAR v. Hudson*, 144 F.4th 582, 590 (4th Cir. 2025) (cleaned up). Those effects take three forms: ICCTA (1) expressly preempts state or local laws that effectively regulate "rail transportation" as defined in the statute, and it impliedly preempts laws that either (2) unreasonably burden or (3) discriminate against rail transportation. *See id.* at 590–91. The express prong is often described as "categorical" preemption, while the two implied prongs are often called "as applied" preemption. *See id.*

## II. Norfolk Southern's rights to operate a new route from Voorheesville

21. In 2022, CSX (another Class 1 rail carrier) secured STB approval to acquire Pan Am Systems, Inc., a regional railroad system operating mainly in New England. *See CSX Corp.—*

*Control & Merger—Pan Am Sys., Inc.*, 2022 WL 1125011 (S.T.B. served Apr. 14, 2022). As part of this transaction, Norfolk Southern obtained "overhead trackage rights"—the right to operate its trains over another railroad's lines without making stops to pick up or drop off cargo—on four different stretches of track, including "approximately 161.5 miles of overhead trackage rights on CSX's mainline" between Voorheesville and Worcester, Massachusetts. *Id.* at *4.

22. These trackage rights created "a new route that would allow [Norfolk Southern] to move intermodal and automobile trains from Voorheesville in eastern New York State to Ayer [in Massachusetts] (the Southern Route)." *Id.* at *5. This new route would allow Norfolk Southern "to provide double-stack intermodal service"—to run flatbed cars carrying two sets of cargo containers stacked atop each other—between New York and Massachusetts. *See id.*

23. Voorheesville "is located where [Norfolk Southern's] system connects with CSX's Southern Route and will be the point at which [Norfolk Southern's] intermodal/automotive trains enter onto the CSX system under [Norfolk Southern's] proposed new trackage rights agreements." *Id.* at *65. The Norfolk Southern line connecting with CSX's tracks in Voorheesville had been unused for some time before the transaction. *Id.* at *5 n.13.

24. "Voorheesville initially expressed concern about the impact that rehabilitation of [Norfolk Southern's] track connecting to CSX's Southern Route would have on the village[.]" *Id.* at 65. To address those concerns, CSX, Norfolk Southern, and Voorheesville entered into a settlement agreement. *See id.* As relevant, the parties agreed to "work together in the design and construction of any necessary improvements … to minimize any potential impact on the Village," and Norfolk Southern agreed "to stage its trains and to operate through the [existing grade crossing at South Main Street] in such a manner to minimize potential impacts on the Village." Ex. A at 2.

25. The STB approved these transactions subject to various conditions, including the "terms of the settlement agreements entered into by CSX with … Voorheesville" and others. *CSX*, 2022 WL 1125011, at *44. In approving the transactions, the agency recognized the importance of Norfolk Southern's new route through Voorheesville. At the hearing on CSX's application, the STB's then-Vice Chair asked about the "timeline for … the re-establishment of that connection in Voorheesville," emphasizing: "You know you've got to get that set up … you've got to get Voorheesville up and running." Tr. 344–46, *Hearing on CSX/Pan Am Merger—Application Review*, No. FD 36472 (Jan. 13, 2022).

### III. Norfolk Southern's new crew-change facility

26. Operating Norfolk Southern's new route to Ayer will require a new crew-change facility in Voorheesville. As noted, Norfolk Southern's trackage rights over CSX's lines are "overhead," meaning Norfolk Southern's trains can use CSX's tracks but cannot make stops along the way. This means Norfolk Southern cannot have a scheduled crew change while its trains are operating in CSX territory. Norfolk Southern thus needs a location, as close as possible to the connection with CSX, where fresh crews can take over the trains headed onto or leaving CSX's lines.

27. Norfolk Southern identified a suitable site for a new crew-change facility at 1 Countryside Lane in Voorheesville, next to the Norfolk Southern rail line entering the Village. Eastbound trains will stop at the facility to the west of the nearby School Street crossing, and westbound trains will stop at a concrete or rail cross tie pad (a "landing pad") located near Hennesy Road (west of the facility), in each case allowing the trains to swap crews without stopping across any road crossings in the Village.

28. Norfolk Southern thus acquired a portion of the property at 1 Countryside Lane from the owner, JC Pops Industrial Park LLC, which executed and delivered to Norfolk Southern

7

a warranty deed for the property, recorded by the Albany County Clerk (Instrument No. R2025-13892).

29.  As a result, Norfolk Southern now holds fee simple title to this parcel:



30.  Norfolk Southern intends to construct the required crew-change facility on this property. To that end, Norfolk Southern's contractor has begun clearing trees and preparing the site for construction. Norfolk Southern's contractor also requested a water-line connection from the Village for this property on August 25, 2025.

31.  Norfolk Southern also sent a letter to Mr. Mason, the Village's Code Enforcement Officer and Building Inspector, on September 10. The letter explained that Norfolk Southern "is about to commence construction of a building that will support railway operation[s]," and "[w]hile Norfolk Southern is exempt from local land use regulations in connection with this project, which does not require us to seek permits, we wanted to inform you of our intention and provide you with

copies of our building plans." Ex. B. Norfolk Southern emphasized that it "look[s] forward to a long and mutually beneficial relationship with the Village of Voorheesville." *Id.*

### IV. The Village's pretextual stop-work order

32. On the same day that Norfolk Southern sent him the letter, Mr. Mason issued a stop-work order for the property. *See* Ex. C. The order directed an immediate halt to "[a]ll unauthorized construction ac[t]ivity" and asserted that Norfolk Southern must "remedy the following violations … prior to the commencement of work." *Id.* It then listed two "violations"—one related to "development and building proposals for non-residential uses" and another related to "proposals to expand or demolish existing business or industrial facilities or any proposals to alter existing business or industrial sites in relation to parking access, landscaping storage or any other site feature"—and directed with respect to each: "Cease and Desist all unauthorized construction activity and apply to the Planning Commission for a Site Plan Review." *Id.*

33. In a September 25 letter, the Village's attorney, Richard C. Reilly, explained the reasons for the stop-work order and declared that it "will remain in effect." *See* Ex. D at 2. He gave three reasons.

34. *First*, Mr. Reilly asserted that Norfolk Southern's already-completed property acquisition is a "proposed Illegal Carveout from 1 Countryside Lane," which "would cause it to be a non-conforming lot under current zoning." *Id.* at 1–2. He acknowledged and did not dispute that, as a result of federal preemption, "Norfolk Southern is exempt from local land use regulations in connection with this project." *Id.* at 1. Even so, he declared, "it goes without saying that 1 Countryside Lane … is itself subject land use regulations in the Village," and "Norfolk Southern's status as a rail carrier does not eliminate the regulation that 1 Countryside Lane is subject to." *Id.* He thus deemed the "attempted Illegal Carveout" not "legitimate or recognizable." *Id.* at 2.

9

35. *Second*, and "[i]n addition to" the allegedly "Illegal Carveout," Mr. Reilly explained that the stop-work order is justified because "Norfolk Southern's rumored, intended use of the proposed 'crew training building'" is supposedly "inconsistent with Norfolk Southern's prior commitments to the Village" and the STB. *Id.* at 2. He pointed to the settlement agreement, contending that it barred Norfolk Southern from "us[ing] its proposed 'crew training building' as a location where Norfolk Southern's trains will be brought to a complete stop—and crews swapped out—within the Village." *Id.* at 3. This process, he asserted, would block road crossings in the Village, which would "effectively result in the Village being split in half." *Id.*

36. *Third*, Mr. Reilly pointed to New York State Public Service Commission orders from 1951 and 1962 that supposedly "imposed limitations on railroads operating within the Village to reduce the amount of time that vehicular traffic was stopped at crossings." *Id.* at 4. He asserted that "Norfolk Southern's apparent intent to regularly bring its 1.7 mile long specialty trains to a complete stop within, or even adjacent to, the Village" would violate "its obligations to minimize delays at crossings" under these state orders.

37. To try to resolve this dispute—and correct some apparent misunderstandings—Norfolk Southern representatives held a video call with Mayor Straut on October 2. The Norfolk Southern team explained that the railroad's plan does not involve any trains stopping across any Voorheesville streets during crew changes. Still, the Mayor declined to lift the stop-work order, instead arranging another call for October 6 (to include Mr. Reilly). He also repeated the Village's position that the property sale to Norfolk Southern had brought the remaining 1 Countryside Lane parcel (which Norfolk Southern does not own) out of compliance with local zoning laws.

38. The October 6 call was no more productive. The Mayor stated that the stop-work order would not be lifted for three reasons. First, he faulted Norfolk Southern for not providing

10

any calculations about the speed of its trains leaving the crew-change site. He reiterated the Village's view that Norfolk Southern's plan clashes with its representations during the STB proceedings. Second, he reasserted that some kind of zoning problem exists—and must be solved—with the remaining 1 Countryside Lane parcel that Norfolk Southern does not own. Third, he asserted that Norfolk Southern's property requires its own street address, including for 911 dispatching purposes. The parties then agreed to have another call on October 7.

39. On the morning of October 7, Mayor Straut emailed Norfolk Southern's representatives to say that "Mr. Reilly is not available to meet today so need to cancel the meeting," asserting: "It would be most productive if NS were to send details of the plan as we discussed at prior meetings before our next meeting." *See* Ex. E.

40. As explained below, it is not for the Village to judge Norfolk Southern's operational plans, much less through its zoning scheme. Thus, later on October 7, Norfolk Southern's in-house counsel emailed Mr. Reilly to explain that the Village's actions are federally preempted and improper, insisting that the Village vacate the stop-work order by 5:00 p.m. on October 8 or Norfolk Southern would be forced to seek relief in court.

41. The Village has not lifted the stop-work order as of this filing.

## COUNT I
### ICCTA Preemption—Categorical

42. Norfolk Southern realleges and incorporates the paragraphs above.

43. "The Second Circuit has plainly held that a municipality's zoning and pre-construction permit ordinances cannot be enforced against facilities for transportation by rail." *Buffalo S. R.R. Inc. v. Vill. of Croton-on Hudson*, 434 F. Supp. 2d 241, 249 (S.D.N.Y. 2006). Such "state and local permitting or preclearance requirements … are preempted because by their nature they unduly interfere with interstate commerce … by giving the local body the ability to deny the carrier

11

the right to construct facilities or conduct operations." *Green Mountain*, 404 F.3d at 642 (quoting *Joint Pet. for Decl. Order—Boston & Maine Corp.*, No. FD 33971, 2001 WL 458685, at *5 (S.T.B. Apr. 30, 2001)). Put differently, "state or local permitting or preclearance requirements of any kind that would affect rail operations (including building permits, zoning ordinances, and environmental and land use permitting requirements) are categorically preempted." *City of Creede—Pet. for Decl. Order.*, No. 34376, 2005 WL 1024483, at *4 (S.T.B. served May 3, 2005). Thus, railroads are "exempt from traditional permitting and zoning processes," and "state and local regulation cannot be used to veto or unreasonably interfere with railroad operations." *Bos. & Maine*, 2001 WL 458685, at *7.

44. The stop-work order depends on precisely the sort of local permitting and preclearance regime that ICCTA categorically preempts. The Village asserts that Norfolk Southern must obtain local approval before it can build a crew facility on its own property to support its interstate rail operations. The stop-work order thus intrudes on the STB's exclusive jurisdiction over the "construction … of … [railroad] facilities." 49 U.S.C. § 10501(b).

45. It does not matter whether Norfolk Southern's purchase or intended use of the property brings the underlying or adjacent parcel(s) out of compliance with local zoning rules. Those are the precise rules that ICCTA categorically preempts here. In any event, even some dispute about the nature of Norfolk Southern's property interest or the legality of its operations would not avoid preemption. *See Mark Lange—Pet. for Decl. Order*, 2008 WL 219583 (S.T.B. served Jan. 28, 2008) (ICCTA preempted trespass claims by neighboring landowner who allegedly owned the property at issue, because his claims would "dispossess [the railroad] of property that is being used for railroad operations"); *Buffalo S.*, 434 F. Supp. 2d at 252 ("Even if [the railroad] is operating

illegally, the site is subject to exclusive STB jurisdiction as long as [the railroad] is providing common carriage by rail.").

## COUNT II
### ICCTA Preemption—As Applied—Unreasonable Burden

46.     Norfolk Southern realleges and incorporates the paragraphs above.

47.     ICCTA also preempts any state or local action that would "unreasonably burden rail carriage." *AAR*, 144 F.4th at 591. This is generally a "fact-intensive inquiry." *Id.*

48.     By preventing Norfolk Southern from constructing and operating a crew facility in Voorheesville, close to the connection point with CSX's lines, the Village's actions would unreasonably burden Norfolk Southern's rail operations. In particular, the Village's actions would effectively eliminate Norfolk Southern's ability to commence and operate the double-stacked intermodal service over CSX's track that the STB specifically approved and lauded.

49.     The Voorheesville location was specifically chosen based on the geography and topography of the surrounding area and its distance from the previous crew change point at Binghamton, New York. The Norfolk Southern branch line that leads to the CSX line at Voorheesville traverses wetlands and grades that make other locations not feasible. The Voorheesville location's proximity to the CSX line significantly reduces the likelihood that Norfolk Southern crews will suffer an unscheduled crew change due to hours-of-service limits.

50.     This preemption prong also considers the cumulative effect of allowing similar state or local restrictions across the rail network. Here, if every local government could use local zoning or land-use law to block the construction of railroad facilities, the interstate rail network would grind to a halt.

## COUNT III
### ICCTA Preemption—As Applied—Discrimination

51.     Norfolk Southern realleges and incorporates the paragraphs above.

52. ICCTA also preempts any state or local actions that "discriminate against rail carriers." *AAR*, 144 F.4th at 591.  This preemption prong reaches both "a state regulation that expressly singles out railroads for separate treatment" and "a facially neutral and generally applicable regulation that is allegedly being applied in a discriminatory manner, or '*as a pretext for interfering with or curtailing rail service*.'" *Id.* (emphasis added).  Even generally applicable health-and-safety regulations "may not be used simply to permit local communities to hold up or defeat the railroad's right to construct facilities used in railroad operations." *Bos. & Maine*, 2001 WL 458685, at *6; *see, e.g.*, *Vermont Ry., Inc. v. Town of Shelburne*, 287 F. Supp. 3d 493 (D. Vt. 2017) (striking down generally applicable local hazmat-storage ordinance because it was adopted to target a railroad facility), *aff'd*, 918 F.3d 82 (2d Cir. 2019).

53. The Village's actions here make clear that the zoning regulations underlying the stop-work order are being used, at least in part, as a pretext to allow the Village to try to block Norfolk Southern from expanding its operations in Voorheesville by preventing the construction of the crew-change facility.  Indeed, the Village's Mayor and attorney both explicitly justified the order by pointing to concerns wholly unrelated to zoning or land use.  These communications leave no doubt that the Village is using the order as a form of self-help to try to remedy perceived violations of the settlement agreement with Norfolk Southern.  That is improper.  Even if Norfolk Southern had violated the settlement agreement—and neither its actions nor its plans do so—the Village's remedy would be to seek relief from the STB, not to use local zoning law to block construction of a facility that is needed for STB-approved service.

54. Adding insult to injury, the Village's other non-zoning justification for the stop-work order—the assertion that Norfolk Southern's planned operations will violate state regulatory orders limiting the duration of blocked crossings—itself relies on preempted authority.  As the

federal government has explained to the Supreme Court, every "federal courts of appeals and state courts of last resort … to have considered the issue" has held that state or local blocked-crossing laws "are preempted" by ICCTA, by the Federal Railroad Safety Act, or by both. *See* Br. for United States as Amicus Curiae 20, *Ohio v. CSX Transp.*, 144 S. Ct. 545 (2024) (No. 22-459), 2023 WL 8112708, at *20 (collecting cases); *see also Ohio v. CSX Transp.*, 144 S. Ct. 545 (2024) (mem.) (denying certiorari on this question). Thus, the Village is trying to use local zoning law (which is preempted) as a pretext to regulate blocked grade crossings (which is also preempted). That is doubly improper.

## PRAYER FOR RELIEF

Norfolk Southern requests the following relief:

a. A judgment declaring that the stop-work order—and the underlying zoning or land-use restrictions, as applied to the crew-change facility—are preempted, void, and unenforceable.

b. Permanent injunctive relief restraining Defendants or their employees or agents from enforcing the stop-work order or the underlying zoning or land-use restrictions against the crew-change facility;

c. An award of attorney's fees to the extent permitted by law;

d. Its other costs expended in this matter; and

e. Any other relief to which it may be entitled.

October 9, 2025                                  Respectfully submitted,

                                                 /s/ *John J. Jablonski*
                                                 John J. Jablonski (Bar Roll No. 510921)
                                                 David P. Johnson (Bar Roll No. 700429)
                                                 GERBER CIANO KELLY BRADY LLP

599 Delaware Avenue, Suite 100
Buffalo, NY 14202
(716) 313-2082
jjablonski@gerberciano.com
djohnson@gerberciano.com

Tobias S. Loss-Eaton (*pro hac vice forthcoming*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8427
tlosseaton@sidley.com

*Counsel for Norfolk Southern Railway Company*