**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**Albany Division**

| |
|---|
| NORFOLK SOUTHERN RAILWAY COMPANY, |
| *Plaintiff,* |
| *v.* |
| VILLAGE OF VOORHEESVILLE; RICHARD STRAUT, in his official capacity as Mayor; STEVE MASON, in his official capacity as Code Enforcement Officer and Building Inspector, |
| *Defendants.* |

No. 1:25-cv-1413-BKS-PJE

**NORFOLK SOUTHERN RAILWAY COMPANY'S**
**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

John J. Jablonski
David P. Johnson
GERBER CIANO KELLY BRADY LLP
599 Delaware Avenue, Suite 100
Buffalo, NY 14202
(716) 313-2082
jjablonski@gerberciano.com
djohnson@gerberciano.com

Tobias S. Loss-Eaton
 (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8427
tlosseaton@sidley.com

*Counsel for Norfolk Southern*
*Railway Company*

# CONTENTS

Table of Authorities ........................................................................................................... ii

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 3

      A.    Norfolk Southern's rights to operate a new route from Voorheesville ................. 3

      B.    Norfolk Southern's new crew-change facility ....................................... 4

      C.    The Village's pretextual stop-work order .............................................. 6

      D.    Procedural history. ................................................................................ 9

Argument ........................................................................................................................... 9

I.    Norfolk Southern is likely to succeed on the merits. ........................................... 9

      A.    The stop-work order and the underlying zoning laws are categorically preempted. ........................................................................................... 11

      B.    The stop-work order is preempted because it is pretextual ................... 12

II.    Norfolk Southern is likely to suffer irreparable harm absent injunctive relief. ................... 13

III.    The balance of the equities and the public interest favor relief. .......................... 16

Conclusion ....................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAR v. Hudson,*
  144 F.4th 582 (4th Cir. 2025) ..........................................................................10, 12

*Armstrong v. Exceptional Child Center, Inc.,*
  575 U.S. 320 (2015)..........................................................................................15

*Buffalo S. R.R. Inc. v. Vill. of Croton-on Hudson,*
  434 F. Supp. 2d 241 (S.D.N.Y. 2006)..............................................................11, 12

*Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.,*
  450 U.S. 311 (1981)..............................................................................................9

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin,*
  733 F.3d 393 (2d Cir. 2013)..............................................................................14

*Fetterusso v. State of N.Y.,*
  898 F.2d 322 (2d Cir. 1990)..............................................................................17

*Golden State Transit Corp. v. City of Los Angeles,*
  493 U.S. 103 (1989)..........................................................................................15

*Green Mountain R.R. v. Vermont,*
  404 F.3d 638 (2d Cir. 2005)..............................................................................10, 11

*LaForest v. Former Clean Air Holding Co.,*
  376 F.3d 48 (2d Cir. 2004)................................................................................13

*Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury,*
  445 F.3d 136 (2d Cir. 2006)..............................................................................15, 16

*Marnell v. Kingston Pub. Access Cable Comm'n,*
  No. 1:08-cv-303, 2009 WL 1811899 (N.D.N.Y. June 25, 2009) ..........................15

*McArthur v. Brabrand,*
  610 F. Supp. 3d 822 (E.D. Va. 2022) ................................................................15

*New York v. Dep't of Homeland Sec.,*
  969 F.3d 42 (2d Cir. 2020)..................................................................................9

*Norfolk S. Ry. v. Dille Rd. Recycling, LLC,*
  94 F.4th 517 (6th Cir. 2024) ..............................................................................10

*Ohio v. CSX Transp.,*
  144 S. Ct. 545 (2024), 2023 WL 8112708..........................................................4, 13

*Perkins Coie LLP v. Dep't of Justice,*
  783 F. Supp. 3d 105 (D.D.C. 2025),
  *appeal pending*, No. 25-5241 (D.C. Cir.) ..........................................................14

*Regeneron Pharms., Inc. v. Dep't of Health & Hum. Servs.,*
  510 F. Supp. 3d 29 (S.D.N.Y. 2020)..................................................................14

*Skidmore v. Norfolk S. Ry. Co.*,
    1 F.4th 206 (4th Cir. 2021) ...................................................................17

*T.W. v. N.Y. State Bd. of L. Examiners*,
    110 F.4th 71 (2d Cir. 2024), *cert. denied,* 145 S. Ct. 2700 (2025)........17

*Trans World Airlines, Inc. v. Mattox*,
    897 F.2d 773 (5th Cir. 1990), *abrogated on other grounds by*
    *Heimann v. Nat'l Elevator Indus. Pension Fund*,
    187 F.3d 493 (5th Cir. 1999) ..................................................................17

*United States v. State of New York*,
    708 F.2d 92 (2d Cir. 1983) (per curiam)................................................14

*UnitedHealthcare of New York, Inc. v. Lacewell*,
    967 F.3d 82 (2d Cir. 2020).......................................................................15

*Vermont Ry., Inc. v. Town of Shelburne*,
    287 F. Supp. 3d 493 (D. Vt. 2017), *aff'd*, 918 F.3d 82 (2d Cir. 2019) ......12

*Widakuswara v. Lake*,
    773 F. Supp. 3d 46 (S.D.N.Y. 2025)........................................................17

*Ex parte Young*,
    209 U.S. 123 (1908)................................................................................15

**Statutes**

42 U.S.C. § 1983 ...............................................................................................15, 16

49 U.S.C. § 10501(b) .......................................................................................10, 11

        § 14501 ...............................................................................................15

        § 10102(9)(A)......................................................................................10

**Administrative Proceedings**

*CSX Corp.—Control & Merger—Pan Am Sys., Inc.*,
    2022 WL 1125011 (S.T.B. served Apr. 14, 2022)..................................3, 4

Hrg. Tr., *CSX/Pan Am Merger—Application Review*,
    No. FD 36472 (Jan. 13, 2022)..................................................................4

*Mark Lange—Pet. for Decl. Order*,
    2008 WL 219583 (S.T.B. served Jan. 28, 2008)....................................12

*City of Creede—Pet. for Decl. Order.*,
    No. 34376, 2005 WL 1024483 (S.T.B. served May 3, 2005).................11

*Joint Pet. for Decl. Order—Boston & Maine Corp.*,
    No. FD 33971, 2001 WL 458685 (S.T.B. served Apr. 30, 2001).....11, 12

**Other Authorities**

H.R. Rep. No. 104-311 (1995).............................................................................9

## INTRODUCTION

This motion seeks preliminary injunctive relief from a municipal order that the Village of Voorheesville is using to block the construction of a new facility needed for federally approved interstate railroad operations.  Because the Village's order is federally preempted on multiple grounds—and will irreparably harm Norfolk Southern Railway Company by imposing unrecoverable expenses—the Court should enjoin its enforcement.

Three years ago, the federal Surface Transportation Board (STB) approved a series of transactions through which Norfolk Southern acquired the right to operate its freight trains over tracks owned by various railroads, including CSX Transportation, Inc., between Voorheesville (where Norfolk Southern's and CSX's lines connect) and Ayer, Massachusetts.  These rights will allow Norfolk Southern's trains to carry "double-stacked" cargo containers along this new route, adding much-needed capacity to the interstate rail network.  In approving the transactions, STB members emphasized the importance of getting this new service up and running.

To begin this new service, Norfolk Southern needs to build a new facility where trains can stop to change crews before crossing from its own network onto CSX's tracks in Voorheesville.  To that end, Norfolk Southern bought a parcel of land in Voorheesville next to its existing rail line and recently started preparing the site for construction.  Norfolk Southern reached out to the Village to explain its plans, to note that federal preemption exempts this project from local land-use regulations, and to express its hopes for "a long and mutually beneficial relationship with the Village of Voorheesville."

The Village responded by issuing a stop-work order forbidding any construction activity on the site.  Village officials gave three reasons for this action: (1) Norfolk Southern's completed property purchase is a "proposed Illegal Carveout" that violates local zoning rules; (2) Norfolk

Southern's "rumored, intended use" of the property to stop trains in the Village supposedly contradicts representations it made during the STB proceedings, including in a settlement agreement with the Village and CSX; and (3) this use would involve trains blocking road crossings in the Village, violating decades-old state regulatory orders.

None of these reasons is legitimate. Rather, they confirm that the stop-work order is federally preempted, meaning Norfolk Southern is likely to succeed on the merits in this action.

*First*, the Second Circuit and the STB agree that the ICC Termination Act (ICCTA) categorically preempts local zoning and permitting requirements as applied to railroad projects. In defending the stop-work order under local zoning rules, the Village is trying to avoid ICCTA preemption by invoking the very scheme that ICCTA preempts.

*Second*, the Village's arguments about the STB settlement agreement are both mistaken and misplaced. As Norfolk Southern has explained to Village officials, operations at the planned crew change location will not require any trains to stop across any road crossings in Voorheesville. In any event, the proper remedy for a breach of the settlement agreement would be to seek relief from the STB—not to use local zoning law as a pretext to engage in self-help.

*Third*, the Village errs by invoking decades-old state regulatory orders that supposedly govern the duration of blocked road crossings in Voorheesville. Courts across the country hold that such state and local blocked-crossing rules are preempted by either of two federal statutes. Local governments cannot dictate when, where, and for how long trains stop on railroad tracks— let alone by using (already-preempted) local zoning law as a fig-leaf.

And allowing the stop-work order to remain in effect will irreparably harm Norfolk Southern by imposing monetary losses that it cannot recover. Though monetary losses typically are not irreparable harm, that is because such losses can usually be remedied through money damages at

the end of the case. So if money damages are not available, pecuniary harms can be irreparable. That is the case here: Although equitable relief is available in federal court against preempted local laws or orders, monetary relief is not. Thus, Norfolk Southern cannot recover any money damages from the Village in this action. And the stop-work order will cause monetary losses by forcing Norfolk Southern to rent substitute facilities in place of the crew facility and increasing the costs of construction. That establishes irreparable harm.

The Court should enjoin enforcement of the stop-work order and the underlying zoning or land-use restrictions as applied to Norfolk Southern's crew-change facility.

## BACKGROUND

### A.    Norfolk Southern's rights to operate a new route from Voorheesville

In 2022, CSX (another Class 1 rail carrier) secured STB approval to acquire Pan Am Systems, Inc., a regional railroad system operating mainly in New England. *See CSX Corp.—Control & Merger—Pan Am Sys., Inc.*, 2022 WL 1125011 (S.T.B. served Apr. 14, 2022). As part of this transaction, Norfolk Southern obtained "overhead trackage rights"—the right to operate its trains over another railroad's lines without making stops to pick up or drop off cargo—on four different stretches of track, including "approximately 161.5 miles of overhead trackage rights on CSX's mainline" between Voorheesville and Worcester, Massachusetts. *Id.* at *4.

These trackage rights created "a new route that would allow [Norfolk Southern] to move intermodal and automobile trains from Voorheesville in eastern New York State to Ayer [in Massachusetts] (the Southern Route)." *Id.* at *5. This new route would allow Norfolk Southern "to provide double-stack intermodal service"—to run flatbed cars carrying two sets of cargo containers stacked atop each other—between New York and Massachusetts. *See id.*

 Voorheesville "is located where [Norfolk Southern's] system connects with CSX's Southern Route and will be the point at which [Norfolk Southern's] intermodal/automotive trains enter

onto the CSX system under [Norfolk Southern's] proposed new trackage rights agreements." *Id.* at *65. The Norfolk Southern line connecting with CSX's tracks in Voorheesville had been unused for some time before the transaction. *Id.* at *5 n.13.

"Voorheesville initially expressed concern about the impact that rehabilitation of [Norfolk Southern's] track connecting to CSX's Southern Route would have on the village[.]" *Id.* at 65. To address those concerns, CSX, Norfolk Southern, and Voorheesville entered into a settlement agreement. *See id.* As relevant, the parties agreed to "work together in the design and construction of any necessary improvements … to minimize any potential impact on the Village," and Norfolk Southern agreed "to stage its trains and to operate through the [existing grade crossing at South Main Street] in such a manner to minimize potential impacts on the Village." Ex. A at 2.

The STB approved these transactions subject to various conditions, including the "terms of the settlement agreements entered into by CSX with … Voorheesville" and others. *CSX*, 2022 WL 1125011, at *44. In approving the transactions, the agency recognized the importance of Norfolk Southern's new route through Voorheesville. At the hearing on CSX's application, the STB's then-Vice Chair asked about the "timeline for … the re-establishment of that connection in Voorheesville," emphasizing: "You know you've got to get that set up … you've got to get Voorheesville up and running." Tr. 344–46, *Hearing on CSX/Pan Am Merger—Application Review*, No. FD 36472 (Jan. 13, 2022).

### B. Norfolk Southern's new crew-change facility

Operating Norfolk Southern's new route to Ayer will require a new crew-change facility in Voorheesville. As noted, Norfolk Southern's trackage rights over CSX's lines are "overhead," meaning Norfolk Southern's trains can use CSX's tracks but cannot make stops along the way. *See* Plum Decl. ¶ 6 (Ex. F). This means Norfolk Southern cannot have a scheduled crew change while its trains are operating in CSX territory. Norfolk Southern thus needs a location, as close as

possible to the connection with CSX, where fresh crews can take over the trains headed onto or leaving CSX's lines.  *Id.*

Norfolk Southern identified a suitable site for a new crew-change facility at 1 Countryside Lane in Voorheesville, next to the Norfolk Southern rail line entering the Village.  Eastbound trains will stop at the facility to the west of the nearby School Street crossing, and westbound trains will stop at a concrete or rail cross tie pad (a "landing pad") located near Hennesy Road (west of the facility), in each case allowing the trains to swap crews without stopping across any road crossings in the Village.  *Id.* ¶ 7.

Norfolk Southern thus acquired a portion of the property at 1 Countryside Lane from the owner, JC Pops Industrial Park LLC, which executed and delivered to Norfolk Southern a warranty deed for the property, recorded by the Albany County Clerk (Instrument No. R2025-13892).  *Id.* ¶ 8.

As a result, Norfolk Southern now holds fee simple title to this parcel:



Norfolk Southern intends to construct the required crew-change facility on this property. *Id.* ¶ 9. To that end, Norfolk Southern's contractor has begun clearing trees and preparing the site for construction. Norfolk Southern's contractor also requested a water-line connection from the Village for this property on August 25, 2025. Graham Decl. ¶ 3 (Ex. G).

Norfolk Southern also sent a letter to Mr. Mason, the Village's Code Enforcement Officer and Building Inspector, on September 10. The letter explained that Norfolk Southern "is about to commence construction of a building that will support railway operation[s]," and "[w]hile Norfolk Southern is exempt from local land use regulations in connection with this project, which does not require us to seek permits, we wanted to inform you of our intention and provide you with copies of our building plans." Ex. B. Norfolk Southern emphasized that it "look[s] forward to a long and mutually beneficial relationship with the Village of Voorheesville." *Id.*

### C.  The Village's pretextual stop-work order

On the same day that Norfolk Southern sent him the letter, Mr. Mason issued a stop-work order for the property. *See* Ex. C. The order directed an immediate halt to "[a]ll unauthorized construction ac[t]ivity" and asserted that Norfolk Southern must "remedy the following violations … prior to the commencement of work." *Id.* It then listed two "violations"—one related to "development and building proposals for non-residential uses" and another related to "proposals to expand or demolish existing business or industrial facilities or any proposals to alter existing business or industrial sites in relation to parking access, landscaping storage or any other site feature"—and directed with respect to each: "Cease and Desist all unauthorized construction activity and apply to the Planning Commission for a Site Plan Review." *Id.*

In a September 25 letter, the Village's attorney, Richard C. Reilly, explained the reasons for the stop-work order and declared that it "will remain in effect." *See* Ex. D at 2. He gave three reasons.

6

*First*, Mr. Reilly asserted that Norfolk Southern's already-completed property acquisition is a "proposed Illegal Carveout from 1 Countryside Lane," which "would cause it to be a non-conforming lot under current zoning." *Id.* at 1–2. He acknowledged and did not dispute that, as a result of federal preemption, "Norfolk Southern is exempt from local land use regulations in connection with this project." *Id.* at 1. Even so, he declared, "it goes without saying that 1 Countryside Lane … is itself subject land use regulations in the Village," and "Norfolk Southern's status as a rail carrier does not eliminate the regulation that 1 Countryside Lane is subject to." *Id.* He thus deemed the "attempted Illegal Carveout" not "legitimate or recognizable." *Id.* at 2.

*Second*, and "[i]n addition to" the allegedly "Illegal Carveout," Mr. Reilly explained that the stop-work order is justified because "Norfolk Southern's rumored, intended use of the proposed 'crew training building'" is supposedly "inconsistent with Norfolk Southern's prior commitments to the Village" and the STB. *Id.* at 2. He pointed to the settlement agreement, contending that it barred Norfolk Southern from "us[ing] its proposed 'crew training building' as a location where Norfolk Southern's trains will be brought to a complete stop—and crews swapped out—within the Village." *Id.* at 3. This process, he asserted, would block road crossings in the Village, which would "effectively result in the Village being split in half." *Id.*

*Third*, Mr. Reilly pointed to New York State Public Service Commission orders from 1951 and 1962 that supposedly "imposed limitations on railroads operating within the Village to reduce the amount of time that vehicular traffic was stopped at crossings." *Id.* at 4. He asserted that "Norfolk Southern's apparent intent to regularly bring its 1.7 mile long specialty trains to a complete stop within, or even adjacent to, the Village" would violate "its obligations to minimize delays at crossings" under these state orders.

To try to resolve this dispute—and correct some apparent misunderstandings—Norfolk Southern representatives held a video call with Mayor Straut on October 2.  The Norfolk Southern team explained that the railroad's plan does not involve any trains stopping across any Voorheesville streets during crew changes.  Still, the Mayor declined to lift the stop-work order, instead arranging another call for October 6 (to include Mr. Reilly).  He also repeated the Village's position that the property sale to Norfolk Southern had brought the remaining 1 Countryside Lane parcel (which Norfolk Southern does not own) out of compliance with local zoning laws.

The October 6 call was no more productive.  The Mayor stated that the stop-work order would not be lifted for three reasons.  First, he faulted Norfolk Southern for not providing any calculations about the speed of its trains leaving the crew-change site.  He reiterated the Village's view that Norfolk Southern's plan clashes with its representations during the STB proceedings. Second, he reasserted that some kind of zoning problem exists—and must be solved—with the remaining 1 Countryside Lane parcel that Norfolk Southern does not own.  Third, he asserted that Norfolk Southern's property requires its own street address, including for 911 dispatching purposes.  The parties then agreed to have another call on October 7.

On the morning of October 7, Mayor Straut emailed Norfolk Southern's representatives to say that "Mr. Reilly is not available to meet today so need to cancel the meeting," asserting: "It would be most productive if NS were to send details of the plan as we discussed at prior meetings before our next meeting."  *See* Ex. E.

As explained below, it is not for the Village to judge Norfolk Southern's operational plans, much less through its zoning scheme.  Thus, later on October 7, Norfolk Southern's in-house counsel emailed Mr. Reilly to explain that the Village's actions are federally preempted and improper, insisting that the Village vacate the stop-work order by 5:00 p.m. on October 8 or Norfolk Southern

would be forced to seek relief in court. The Village did not do so. As of the filing of this motion, the stop-work order remains in effect.

### D.    Procedural history.

Norfolk Southern filed this action on October 9, against the Village of Voorheesville; Richard Straut, in his official capacity as Mayor of Voorheesville; and Steve Mason, in his official capacity as Voorheesville Code Enforcement Officer and Building Inspector. The complaint seeks declaratory and injunctive relief against the enforcement of the stop-work order and the underlying zoning laws as applied to Norfolk Southern's facility and property.

## ARGUMENT

"[A] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *New York v. Dep't of Homeland Sec.*, 969 F.3d 42, 58 (2d Cir. 2020) (citation omitted). Each factor favors relief here.

## I.    Norfolk Southern is likely to succeed on the merits.

Norfolk Southern is likely to show that ICCTA preempts the stop-work order and the underlying zoning laws as applied to Norfolk Southern's crew facility and property.

Railroads have long been subject to one of "the most pervasive and comprehensive of federal regulatory schemes." *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). That scheme's modern centerpiece is ICCTA, enacted in 1995 to abolish the Interstate Commerce Commission and replace it with the STB. ICCTA's "Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." H.R. Rep. No. 104-311, at 95–96 (1995).

ICCTA gives the STB "exclusive jurisdiction" over "transportation by rail carriers . . . with respect to" (among other things) rail carriers' "practices, routes, services, and facilities" as well as "construction, acquisition, operation, abandonment, or discontinuance" of railroad tracks or facilities. 49 U.S.C. § 10501(b). "Transportation" is defined broadly to include "facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." *Id.* § 10102(9)(A).

In these areas, ICCTA's remedies are "exclusive and preempt the remedies provided under Federal or State law," *id.* § 10501(b)—meaning the STB's authority is "exclusive and plenary." *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005). "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *See Norfolk S. Ry. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 523 (6th Cir. 2024) (brackets omitted).

"ICCTA produces both express and implied preemptive effects." *AAR v. Hudson*, 144 F.4th 582, 590 (4th Cir. 2025) (cleaned up). Those effects take three forms: ICCTA (1) expressly preempts state or local laws that effectively regulate "rail transportation" as defined in the statute, and it impliedly preempts laws that either (2) unreasonably burden or (3) discriminate against rail transportation. *See id.* at 590–91. The express prong is often described as "categorical" preemption, while the two implied prongs are often called "as applied" preemption. *See id.*

Here, the stop-work order and underlying zoning laws are (a) expressly preempted because they prevent the construction of a railroad facility and (b) impliedly preempted because they are being used as a pretext to interfere with rail operations.

## A. The stop-work order and the underlying zoning laws are categorically preempted.

"The Second Circuit has plainly held that a municipality's zoning and pre-construction permit ordinances cannot be enforced against facilities for transportation by rail." *Buffalo S. R.R. Inc. v. Vill. of Croton-on Hudson*, 434 F. Supp. 2d 241, 249 (S.D.N.Y. 2006). Such "state and local permitting or preclearance requirements … are preempted because by their nature they unduly interfere with interstate commerce … by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations." *Green Mountain*, 404 F.3d at 642 (quoting *Joint Pet. for Decl. Order—Boston & Maine Corp.*, No. FD 33971, 2001 WL 458685, at *5 (S.T.B. served Apr. 30, 2001)). Put differently, "state or local permitting or preclearance requirements of any kind that would affect rail operations (including building permits, zoning ordinances, and environmental and land use permitting requirements) are categorically preempted." *City of Creede— Pet. for Decl. Order.*, No. 34376, 2005 WL 1024483, at *4 (S.T.B. served May 3, 2005). Thus, railroads are "exempt from traditional permitting and zoning processes," and "state and local regulation cannot be used to veto or unreasonably interfere with railroad operations." *Bos. & Maine*, 2001 WL 458685, at *7.

The stop-work order depends on precisely the sort of local permitting and preclearance regime that ICCTA categorically preempts. The Village asserts that Norfolk Southern must obtain local approval before it can build a crew facility on its own property to support its interstate rail operations. By demanding that Norfolk Southern "apply to the Planning Commission" before constructing the crew facility, *see* Ex. C, the stop-work order thus intrudes on the STB's exclusive jurisdiction over the "construction … of … [railroad] facilities." 49 U.S.C. § 10501(b).

It does not matter whether Norfolk Southern's purchase or intended use of the property brings the underlying or adjacent parcel(s) out of compliance with local zoning rules. Those are

the precise rules that ICCTA categorically preempts. *See Bos. & Maine*, 2001 WL 458685, at *7. In any event, even some dispute about the nature of Norfolk Southern's property interest or the legality of its operations would not avoid preemption. *See Mark Lange—Pet. for Decl. Order*, 2008 WL 219583 (S.T.B. served Jan. 28, 2008) (ICCTA preempted trespass claims by neighboring landowner who allegedly owned the property at issue, because his claims would "dispossess [the railroad] of property that is being used for railroad operations"); *Buffalo S.*, 434 F. Supp. 2d at 252 ("Even if [the railroad] is operating illegally, the site is subject to exclusive STB jurisdiction as long as [the railroad] is providing common carriage by rail.").

The stop-work order and underlying zoning laws are thus expressly preempted.

**B.     The stop-work order is preempted because it is pretextual.**

ICCTA also preempts any state or local actions that "discriminate against rail carriers." *AAR*, 144 F.4th at 591. This preemption prong reaches both "a state regulation that expressly singles out railroads for separate treatment" and "a facially neutral and generally applicable regulation that is allegedly being applied in a discriminatory manner, or '*as a pretext for interfering with or curtailing rail service.*'" *Id.* (emphasis added). Even generally applicable health-and-safety regulations "may not be used simply to permit local communities to hold up or defeat the railroad's right to construct facilities used in railroad operations." *Bos. & Maine*, 2001 WL 458685, at *6; *see, e.g.*, *Vermont Ry., Inc. v. Town of Shelburne*, 287 F. Supp. 3d 493 (D. Vt. 2017) (striking down generally applicable local ordinance because it was adopted to target a railroad facility), *aff'd*, 918 F.3d 82 (2d Cir. 2019).

The Village's actions make clear that the zoning regulations underlying the stop-work order are being used, at least in part, as a pretext to allow the Village to try to block Norfolk Southern from expanding its operations in Voorheesville by preventing the construction of the crew-change facility. Indeed, the Village's Mayor and attorney both explicitly justified the order by pointing to

concerns wholly unrelated to zoning or land use.  *See* Ex. D at 2–4; Compl. ¶ 38.  These communications leave no doubt that the Village is using the order as a form of self-help to try to remedy perceived violations of the settlement agreement with Norfolk Southern.  That is improper.  Even if Norfolk Southern had violated the settlement agreement—and neither its actions nor its plans do so—the Village's remedy would be to seek relief from the STB, not to use local zoning law to block construction of a facility that is needed for STB-approved service.

Adding insult to injury, the Village's other non-zoning justification for the stop-work order—the assertion that Norfolk Southern's planned operations will violate state regulatory orders limiting the duration of blocked crossings—itself relies on preempted authority.  As the federal government has explained to the Supreme Court, every "federal courts of appeals and state courts of last resort … to have considered the issue" has held that state or local blocked-crossing laws "are preempted" by ICCTA, by the Federal Railroad Safety Act, or by both.  *See* Br. for United States as Amicus Curiae 20, *Ohio v. CSX Transp.*, 144 S. Ct. 545 (2024) (No. 22-459), 2023 WL 8112708, at *20 (collecting cases); *see also Ohio v. CSX Transp.*, 144 S. Ct. 545 (2024) (mem.) (denying certiorari on this question).  Thus, the Village is trying to use local zoning law (which is preempted) as a pretext to regulate blocked grade crossings (which is also preempted).  That is doubly improper.

The stop-work order is impliedly preempted because it is being used as a pretext to interfere with railroad operations.

## II.    Norfolk Southern is likely to suffer irreparable harm absent injunctive relief.

Without an injunction, Norfolk Southern will likely suffer irreparable harm by incurring unrecoverable costs that it would otherwise avoid.  Irreparable harm is "harm shown to be non-compensable in terms of money damages."  *LaForest v. Former Clean Air Holding Co.*, 376 F.3d

48, 55 (2d Cir. 2004). Thus, when money damages are not available, even ordinary financial harms are irreparable. And no cause of action allows for money damages here.

The Second Circuit first applied these principles in *United States v. State of New York*, 708 F.2d 92 (2d Cir. 1983) (per curiam). There, the state banned the nighttime use of an airport. When an aircraft operator (Beechcraft) sued, then-District Judge Miner held the state's order "in violation of the Supremacy Clause" and enjoined its enforcement. *Id.* at 93. The Second Circuit affirmed, agreeing that "Beechcraft's injury was irreparable even though Beechcraft's losses were only pecuniary because a suit in federal court against New York to recover the damages sustained by Beechcraft would be barred by [state sovereign immunity under] the Eleventh Amendment." *Id.* That is, the plaintiff would suffer "irreparable business damages" because "the available federal legal remedies" for the state's preempted order did not include damages. *Id.* (emphasis omitted); *accord Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013).

In turn, if a plaintiff is limited "to seeking nonmonetary equitable relief"—meaning any monetary losses are "unrecoverable"—then "these losses can constitute irreparable harm." *See Perkins Coie LLP v. Dep't of Justice*, 783 F. Supp. 3d 105, 178 (D.D.C. 2025) (cleaned up) (collecting cases), *appeal pending*, No. 25-5241 (D.C. Cir.). This rule does not turn on the amount of unrecoverable monetary losses. "Indeed, at least three circuits have held that unrecoverable damages may be irreparable harm, without reference to the amount of the loss." *Regeneron Pharms., Inc. v. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020) (collecting cases). For example, this Court granted injunctive relief against the enforcement of an unlawful local-government policy, explaining that the relevant cause of action allowed only "declaratory or injunctive relief," so "monetary damages [were] not available and, therefore, Plaintiff [would] suffer

irreparable harm absent injunctive relief." *Marnell v. Kingston Pub. Access Cable Comm'n*, No. 1:08-cv-303 (LEK/DRH), 2009 WL 1811899, at *1 (N.D.N.Y. June 25, 2009).

Likewise here, the federal cause of action available to Norfolk Southern does not allow for damages. Norfolk Southern brought this case under the equitable cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908), and *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). As *Armstrong* explains, "in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer," so "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* at 326–27 (cleaned up); *see also UnitedHealthcare of New York, Inc. v. Lacewell*, 967 F.3d 82, 90 (2d Cir. 2020). Because this cause of action is equitable, it allows only equitable remedies—meaning non-monetary relief. *See Armstrong*, 575 U.S. at 340 (Sotomayor, J., dissenting) ("equitable preemption actions" do not allow an "award of money damages"); *McArthur v. Brabrand*, 610 F. Supp. 3d 822, 847 (E.D. Va. 2022) (in an action for "injunctive relief against state actions preempted by federal law … retroactive [or] nominal damages … are not available").

And while plaintiffs can normally seek damages for state or local violations of federal law under 42 U.S.C. § 1983, that path is not open here. The "Supremacy Clause, of its own force, does not create rights enforceable under § 1983." *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) (footnote omitted). Rather, preemption claims are cognizable under § 1983 only if the preemptive statute was intended to create individual rights. *See Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 150 (2d Cir. 2006). And the Second Circuit has held that a parallel ICCTA preemption provision, which "requires state and local authorities to refrain from regulating motor carriers," does not qualify. *See id.* (discussing 49 U.S.C. § 14501).

Under *Loyal Tire*, Norfolk Southern cannot seek money damages from Voorheesville under § 1983 for violating ICCTA's railroad preemption provision. Thus, any monetary losses likely to be caused by the Village's stop-work order are unrecoverable and, in turn, irreparable.

In particular, Norfolk Southern will incur added costs from having to find substitute facilities for crew reporting. Without the dedicated crew-change facility, Norfolk Southern will be forced to rent a hotel room to serve as a crew reporting facility, costing around $4,500 per month. Plum Decl. ¶ 11. Norfolk Southern will start incurring this cost as soon as mid-November 2025, when the new service through Voorheesville will be able to begin. *Id.* ¶ 10. Once the crew change facility is constructed, this cost will no longer be necessary. By preventing the facility's construction, the Village's stop-work order is thus imposing this cost on Norfolk Southern. And for the reasons above, this cost is unrecoverable.

In addition, the stop-work order has imposed and will impose continued costs related to the construction process. Remobilizing the contractor's construction team is estimated to cost roughly $10,000. Graham Decl. ¶ 6. Resuming construction in colder weather will also impose added costs of roughly $5,000 to $10,000 in the form of temporary heat or special additives to be able to pour concrete in the cold weather. *Id.* ¶ 7. If the stop-work order remains in place through the end of 2025, Norfolk Southern will also likely suffer price increases for construction materials, estimated to range from $5,000 to $25,000. *Id.* ¶ 8. Finally, the crew-change building is prefabricated: The manufacturer has already built it and is currently storing it. If forced to do so for an extended period, the manufacturer may charge a storage fee of $500 to $1,000 per month. *Id.* ¶ 9. All these costs will be unrecoverable, for the reasons explained.

### III.  The balance of the equities and the public interest favor relief.

The remaining factors favor injunctive relief too. As for the balance of the equities, "there is no injury to [the defendants] to weigh against that which they threaten to inflict on the [railroad].

16

Since Congress expressly preempted this area of regulation, the [defendants] are not injured by the injunction." *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990), *abrogated on other grounds by Heimann v. Nat'l Elevator Indus. Pension Fund*, 187 F.3d 493 (5th Cir. 1999). In any event, the Village's main concern seems to be that stopped trains could block its road crossings during crew changes. As noted, that is not the case. The Village will thus suffer no cognizable injury from an injunction.

Finally, "there can be no doubt that the public interest favors requiring the government to comply with the law." *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 61 (S.D.N.Y. 2025) (citation omitted). Indeed, injunctive suits like this one exist because "remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *T.W. v. N.Y. State Bd. of L. Examiners*, 110 F.4th 71, 93 (2d Cir. 2024), *cert. denied,* 145 S. Ct. 2700 (2025). An injunction will thus serve both "the overriding federal interest" embodied in the Supremacy Clause, *Fetterusso v. State of N.Y.*, 898 F.2d 322, 327 (2d Cir. 1990), and the "overwhelming national interest" in having a "a uniform regulatory scheme" for "the national rail system," *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 217 (4th Cir. 2021) (citation omitted); *see also Trans World Airlines*, 897 F.2d at 784 (public interest factor "is satisfied by the finding of Congress that exclusive federal regulation … is in the public interest").

## CONCLUSION

For these reasons, the Court should enter a preliminary injunction barring enforcement of the stop-work order or the underlying zoning requirements against Norfolk Southern pending final judgment in this case.

October 29, 2025

Respectfully submitted,

/s/ *John J. Jablonski*
John J. Jablonski
David P. Johnson
GERBER CIANO KELLY BRADY LLP
599 Delaware Avenue, Suite 100
Buffalo, NY 14202
(716) 313-2082
jjablonski@gerberciano.com
djohnson@gerberciano.com

Tobias S. Loss-Eaton
  (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C.  20005
(202) 736-8427
tlosseaton@sidley.com

*Counsel for Norfolk Southern*
*Railway Company*