UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NORFOLK SOUTHERN RAILWAY COMPANY,

                Plaintiff/
                Counterclaim-Defendant,

     v.

VILLAGE OF VOORHEESVILLE; RICHARD STRAUT,
in his official capacity as Mayor; STEVE MASON, in his
Official capacity as Code Enforcement Officer and Building
Inspector,

                Defendants/
                Counterclaim-Plaintiffs.

**Civil Action No. 1:25-cv-1413
(BKS/ PJE)**

---

VILLAGE OF VOORHEESVILLE,

                Defendant/Counterclaim-Plaintiff/
                Third-Party Plaintiff,

     v.

JC POPS INDUSTRIAL PARK, LLC,

                Third-Party Defendant.

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**GLEASON, DUNN, WALSH & O'SHEA**
*Attorneys for Village of Voorheesville, Richard Straut and Steve Mason*
Office and P.O. Address
300 Great Oaks Blvd., Ste. 321
Albany, New York 12203
Tel. (518) 432-7511

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT............................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

LEGAL ARGUMENT .............................................................................................................. 5

POINT I – PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
MUST BE DENIED .................................................................................................................. 5

    A. Plaintiff Cannot Show a Clear or Substantial Likelihood of Success on the Merits ...... 6

        1. Plaintiff Preemption Rights Are Superseded by the Agreement ........................ 7

        2. Plaintiff's Right to Construct and Use the Crew-Change Facility is
           Limited by the STB Decision.......................................................................... 10

        3. The SWO and Underlying Subdivision Laws are Not Preempted .................. 10

        4. Plaintiff Cannot Transfer Its Preemption Rights to JC Pops ........................... 22

    B. Plaintiff Will Not Suffer Irreparable Harm in the Absence of Injunctive Relief.......... 25

    C. A Balancing of the Hardships Warrants Denial of the Relief Requested .................... 28

    D. The Public Interest Will Not Be Served by the Issuance of the Preliminary Injunction29

CONCLUSION ...................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

Abdul Wali v. Coughlin, 754 F.2d 1015 [2d Cir. 1985] ........................................ 6

Adrian & Blissfield R. Co. v. Vill. of Blissfield, 550 F.3d 533 [6th Cir. 2008] ..................... 16, 17

Altria Group, Inc. v. Good, 555 U.S. 70 [2008] ........................................ 12

Antonyuk v. Hochul, 653 F.Supp.3d 111 [N.D.N.Y. 2022] ........................................ 29

Beal v. Stern, 184 F.3d 117 [2d Cir. 1999] ........................................ 6

Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887 [2d Cir. 2015] ........................... 29

Bery v. City of New York, 97 F.3d 689 [2d Cir. 1996] ........................................ 6

Borough of Riverdale, 4 S.T.B. 380, STB Docket No. 33466, 1999 WL 715272 [STB served

    Sept. 10, 1999] ........................................ 22

Boston and Maine Corp. and Town of Ayer, MA, 5 S.T.B. 500, STB Finance Docket No. 33971,

    2001 WL 458685 [STB served May 1, 2001] ........................................ 8, 9, 16

Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48 [2d Cir. 1979] ........ 28

Cipollone v. Liggett Group, Inc., 505 U.S. 504 [1992] ........................................ 12

Cities of Auburn and Kent, STB Finance Docket No. 33200, 1997 WL 362017 ....................... 16

City of Milwaukie, Docket No. FD 35625, 2013 WL 1221975 [STB served Mar. 25, 2013 ...... 24

Coastal Distribution, LLC v. Town of Babylon, 216 Fed.Appx. 97 [2d Cir. 2007] ................... 13

Conn. Nat'l Bank v. Germain, 503 U.S. 249 [1992] ........................................ 12

ConverDyn v. Moniz, 68 F.Supp.3d 34 [D.D.C. 2014] ........................................ 27

CSX Transp., Inc., STB Finance Docket No. 34662, 2005 WL 1024490 (S.T.B.)

    [STB served May 3, 2005] ........................................ 21

Delaware v. Surface Transp. Bd., 859 F.3d 16 [D.C. Cir. 2017] ........................................ 16

Eastside Cmty. Rail, LLC, Docket No. FD 35730, 2022 WL 696819

    [STB served Mar. 7, 2022] ........................................................................ 24

Emerson v. Kansas City S. Ry. Co., 503 F.3d 1126 [10th Cir. 2007]    15, 17, 21, 24

Florida E. Coast Ry. Co. v. City of West Palm Beach,

    266 F.3d 1324 [11th Cir. 2001] .......................................................... 12, 16, 17, 20

Florida E. Ry. Co. v. City of W. Palm Beach, 110 F.Supp.2d 1367 [S.D.Fla. 2000],

    aff'd 266 F.3d 1324 [11th Cir. 2001] .......................................................... 15, 22

Franks Inv. Co. LLC v. Union Pacific R. Co., 593 F.3d 404 [5th Cir. 2010]......................... 12, 17

Grafton and Upton Railroad Co., Docket No. FD 36464, 2024 WL 5165789

    [STB served Dec. 18, 2024]........................................................................ 24

Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638 [2d Cir. 2005].......... 10, 13, 15, 16, 17, 19

Hamilton Watch co. v. Benrus Watch Co., 206 F.2d 738 [2d Cir. 1953].................................. 28

Hi Tech Trans, LLC v. New Jersey, 382 F.3d 295 [3d Cir. 2004] ........................................ 14, 15

Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 [1990] ........................................................ 11

Island Park, LLC v. CSX Transp., 559 F.3d 96 [2d Cir. 2009]................................ 10, 13, 15, 17

Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70 [2d Cir. 1979]................................ 26

Jones v. Union Pacific Railroad Co., 79 Cal.App.4th 1053 [2000]................................ 17

Kings County, STB Finance Docket No. 32974, 1996 WL 545598, [S.T.B. 1996]..................... 16

Medtronic, Inc. v. Lohr, 518 U.S. 470 [1996] ............................................................ 10

New York Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238 [3d Cir. 2007] ........ 16, 17, 22

Norfolk Southern Ry. Co., STB Docket No. AB-290 (Sub-No. 262),

    2005 WL 3308783 [STB served Dec. 7, 2005] ...................................................... 8

Norfolk Southern Ry. Co. v. Dille Road Recycling, LLC, 94 F.4th 517 [6th Cir. 2024]............. 22

Norfolk & Western Ry. Co. v. Am. Train Dispatchers' Ass'n, 499 U.S. 117 [1991] ................... 11

N.Y. & Atlantic Ry. Co. v. Surface Transp. Bd., 635 F.3d 66 [2d Cir. 2011] ................. 12, 13, 15

PCS Phosphate Co., Inc. v. Norfolk Southern Corp.,

    559 F.3d 212 [4th Cir. 2009] ..................................................... 8, 9, 10, 16, 17, 20, 21

Regeneron Pharmaceuticals, Inc. v. U.S. Dep't of Health and Human Svcs.,

    510 F.Supp.3d 29 [S.D.N.Y. 2020] ....................................................................... 27

Resource Group Int'l Limited v. Chishti, 91 F.4th 107 [2d Cir. 2024]........................... 5

Rodriguez v. DeBuono, 175 F.3d 227 [2d Cir. 1999]................................................... 6

Salinger v. Colting, 607 F.3d 68 [2d Cir. 2010] ..................................................... 5, 28

Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 [2d Cir. 1970] ...................... 28

Sills Road Realty LLC v. Town of Brookhaven, CV 07-4584 (TCP) (ETB),

    2008 WL 11449283 [E.D.N.Y. July 18, 2008], report and rec. adopted,

    2009 WL 10708791 [E.D.N.Y. June 30, 2009............................................ 5, 26, 27

Suffolk & S.R.R. LLC - Lease & Operation Exemption-Sills Rd. Realty, LLC,

    STB Fin. Docket No. 35036, 2007 WL 3437681 [S.T.B. served Nov. 16, 2007]............ 27, 29

Sussman v. Crawford, 488 F.3d 136 [2d Cir. 2007] .................................................. 5

Swinomish Indian Tribal Community v. BNSF Ry. Co.,

    951 F.3d 1142 [9th Cir. 2020] ...................................................................... 7, 8, 9

Texas Cent. Bus. Lines Corp. v. City of Midlothian, 669 F.3d 525 [5th Cir. 2012] .................... 14

Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27 [2d Cir. 1995] .............................. 6, 26

Town of Babylon and Pinelawn Cemetery, Fed.Carr.Cas.P. 37293 (S.T.B.),

    STB Finance Docket No. 35057, 2008 WL 4377804 [STB served Sept. 26, 2008] .............. 14

Township of Woodbridge v. Consolidated Rail Corp., 2000 WL 1771044,

    [STB served Dec. 1, 2000].......................................................................... 8

Tunick v. Safir, 209 F.3d 67 [2d Cir. 2000] ...................................................... 7

In re Vermont Ry., 171 Vt. 496 [2000]................................................................. 18

Vermont Ry., Inc. v. Town of Shelburne, 918 F.3d 82 [2d Cir. 2019].................................. 12, 19

Voorheesville Rod and Gun Club, Inc. v. E.W. Tompkins Co., Inc.,

82 N.Y.2d 564 [1993] ........................................................................................ 23

Warner Vision Entm't v. Empire of Carolina, Inc., 101 F.3d 259 [2d Cir. 1999] ......... 5

Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 [2008] ............................... 28

Wright v. Giuliani, 230 F.3d 543 [2d Cir. 2000] ......................................................... 6

**Statutes**

ERISA § 514 (c)(1), 29 U.S.C. §1144(c)(1) ................................................................ 11

NYS Real Property Law §333 (1-e[ii][8] .................................................................... 23

NYS Village Law §7-732 .............................................................................................. 23

Subdivision Law §103 .................................................................................................. 23

Subdivision Law §106[1] .............................................................................................. 23

Subdivision Law §106[4] .............................................................................................. 23

49 U.S.C. §10102(8) .................................................................................................... 11

49 U.S.C. §10102(9) .................................................................................................... 14

49 U.S.C. §10102(9)(A) ............................................................................................... 13

49 U.S.C. §10102(9)(B) ............................................................................................... 13

49 U.S.C. §11321(a) formerly §11341(a) .................................................................... 11

49 U.S.C. § 10501 (b) ................................................................................ 8, 10, 11, 12, 15

49 U.S.C. § 10501 (b)(1) ........................................................................................ 10, 13, 14

49 U.S.C. §101501(b)(2) ............................................................................................. 13

**Other Authorities**

H.R.Rep. No. 104-422 [1995], reprinted in 1995 U.S.C.C.A.N. 850, 852 .................................. 15

H.R.Rep. No. 104-311, 1st Sess., p. 96 [1995] ............................................................ 18

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff Village of Voorheesville ("Village"), and Defendants/Counterclaim-Plaintiffs Richard Straut ("Straut") and Steve Mason ("Mason") (hereinafter, Village, Straut and Mason are also collectively referred to as "Defendants") in opposition to the Order to Show Cause submitted by Plaintiff/Counterclaim-Defendant Norfolk Southern Railway Company ("Plaintiff" or "NS"), seeking an order enjoining enforcement of a stop-work order issued by the Village.

Plaintiff's motion should be denied in its entirety. Plaintiff ignores critical facts that separate this case from a "typical" dispute between a rail carrier and local body. *First*, Plaintiff entered into a settlement agreement with the Village requiring it to "minimize the potential impacts on the Village" with respect to the reactivation of rail lines in the Village. Plaintiff's construction and intended use of the proposed crew-change facility are a direct violation of its obligations under that agreement and the authority granted to it by the Surface Transportation Board ("STB"). This alone requires a finding that preemption under the Interstate Commerce Commission Termination Act ("ICCTA") does not apply. *Second*, even absent the agreement, the ICCTA does not expressly or impliedly preempt the Village's actions here, nor do the Village's actions discriminate against Plaintiff. *Third*, the ICCTA does not permit Plaintiff to facilitate non-rail carriers to violate the law. *Fourth*, Plaintiff has failed to establish any of the four required elements to satisfy the applicable heightened standard: (1) a clear or substantial likelihood of success on the merits; (2) irreparable harm absent the injunction; (3) balancing of the hardship tips decidedly toward Plaintiff; and (4) that the public interest will not be disserved by the injunction.

As set forth in the Declaration of Village Mayor Straut, dated November 12, 2025 ("Straut Decl."), the Declaration of Village Code and Enforcement Officer Steve Mason, dated November

12, 2025 ("Mason Decl."), and the Declaration of the Department of Public Works Superintendent

Brett Hotaling, dated November 12, 2025 ("Hotaling Decl."), and for the reasons set forth herein,

Defendants respectfully request that the Court deny Plaintiff's request for injunctive relief.

## STATEMENT OF FACTS

The facts relevant to this motion are summarized below and are fully set forth in the Straut

Decl., Mason Decl., and the Hotaling Decl., together with the exhibits annexed thereto.

In or about May 2021, the Village became aware of a proposed transaction involving CSX

Transportation, Inc. ("CSX") and Plaintiff involving the construction of a new level junction

between existing rail lines within the Village and reactivation of Plaintiff's then-unused rail line

(Straut Decl. ¶2). This transaction required approval from the STB. During a period of public

comment on the transaction, the Village informed the STB that it opposed the transaction due to

its significant health and safety impacts (id. at ¶4). As the result of the Village's opposition to the

transaction, CSX, Plaintiff, and the Village engaged in extensive negotiations to resolve the

Village's concerns (id. at ¶5). During those negotiations, NS advised the Village that its use of lines

would be limited to travel through the Village at a speed of approximately 25 miles per hour (id.

at ¶6). Based on those representations, the Village concluded that impacts could be minimized and

the burden manageable (id. at ¶6).  As a result, the Village entered into an agreement (id. at ¶7).

The terms were memorialized in a settlement agreement among the three parties, dated

December 27, 2021 ("Agreement") (Ex. A to Straut Decl.). Plaintiff expressly agreed to "stage its

trains and to operate through the NSR Crossing in such a manner to minimize potential impacts

on the Village" and "meet with Village and County public safety personnel to discuss how best to

address and accommodate any public safety challenges that may result from the reestablishment

of" Plaintiff's use of the rail line (id. at §2(e)). In exchange, the Village agreed to "withdraw its

prior opposition to the Proposed Transaction and its request for conditions to the STB's approval" (id. at §3). The STB issued a decision granting approval for the proposed transactions explicitly stating that its approval for Plaintiff's actions was "subject to" the Agreement ("STB Decision") (Ex. B to Straut Decl. at *44). In addition, the STB stated that because of the Agreement (and agreements of this nature in other instances), it approved the proposed transaction without requiring the rail carriers to undertake additional environmental review (id. at *36).

In the summer of 2025, the Village became aware of unauthorized construction taking place within the Village, and on September 10, 2025, Mason issued a Stop Work Order ("SWO") for the construction (Mason Decl. ¶16). Later that same day, the Village received a letter from Plaintiff formally disclosing *for the first time* its intentions to construct and use a crew-change facility (i.e., a structure where Plaintiff intends to bring its trains to a complete stop in order to change crews) within the Village (id. at 17; Straut Decl. ¶¶52, 53). Not only was the crew-change facility within the Village omitted from any verbal or written communication from Plaintiff prior to that date, the use of the facility presents severe threats to the health and safety of the Village and its residents and businesses (Straut Decl. ¶¶6, 23, 24, 27).

Based on the location of the crew-change facility, trains stopping at the facility traveling in a westerly direction will block all three surface crossings within the Village for extended periods of time while the trains are brought to a stop, paused to swap out crews, and then brought back up to speed from a stop until the last of the cars at the rear of each train clears the Village crossings (id. at ¶28). Trains that stop at the facility while traveling in an easterly direction will block one or more crossing(s) to the west of the Village for the same period of time while they are stopped, and will also block crossings within the Village as the trains slow down prior to stopping, and get back up to speed (id. at ¶29). Defendants estimate that the surface crossings will be blocked for more

3

than 30 minutes in these circumstances, excluding the time during which the trains are stopped while physically blocking a crossing (id. at ¶30). Each of these scenarios will result in the Village being split in half, blocking half of the Village's residents and its businesses from Village emergency and other services (id. at ¶35). Compounding the problem, every day at least one of these specialty trains will—according to Plaintiff's own representatives—be brought to a complete stop within the Village at or about the time that the Voorheesville Elementary School releases its students for the day (id. at ¶36).

Plaintiff has informed Defendants that even though Plaintiff is approved to run trains up to 1.7 miles in length, it intends to run trains that are only 1.4 miles long (id. at ¶31). Even if that were true, however, the trains would still block all three surface crossings within the Village for extended periods of time as they are brought to a complete stop, and brought back up to speed until the last of the cars at the rear of each train clears the Village crossings (id. at ¶33). Inexplicably, Plaintiff's representatives have advised Defendants that they have identified a suitable alternate location for the crew-change facility west of the Village that would not impose as heavy a burden on the residents of the Village, yet Plaintiff does not have any plans to use that location unless longer trains are in use (id. at ¶44; Mason Decl. ¶¶19, 20; Ex. A to Mason Decl.).

The property on which Plaintiff seeks to build its crew-change facility ("Illegal Carveout") was purportedly conveyed to it by Third-Party Defendant JC Pops Industrial Park, LLC ("JC Pops") as a subdivision of JC Pops' existing property (Straut Decl. ¶14). However, subdivision approval for the Illegal Carveout was never applied for; both the Illegal Carveout and JC Pops' remaining land fail to meet the Village's minimum lot size requirements; and the filings related to the conveyance contain material misstatements and inaccuracies (Straut Decl. ¶¶14–18).

4

Prior to the commencement of this action, Defendants attempted to engage with Plaintiff to resolve these issues, but Plaintiff's representatives informed Defendants that Plaintiff is no longer willing to attempt a resolution of this issue with them, and that they would commence an action if Defendants did not lift the SWO (id. at ¶55). Defendants did not lift the SWO, and Plaintiff commenced this action (id. at ¶56, Mason Decl. ¶23).

## LEGAL ARGUMENT

### POINT I

### PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION MUST BE DENIED

A typical preliminary injunction is appropriate when a plaintiff can "show: (1) a likelihood of success on the merits, (2) that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction, (3) that the balance of hardships tips in the plaintiff's favor, and (4) that the public interest would not be disserved by the issuance of [the] injunction" (Resource Group Int'l Limited v. Chishti, 91 F.4th 107, 114 [2d Cir. 2024] [alteration in original] [internal quotation marks omitted], quoting Salinger v. Colting, 607 F.3d 68, 79–80 [2d Cir. 2010]). Its purpose "is to prevent legal harm and preserve the status quo until final determination of the action" (Sills Road Realty LLC v. Town of Brookhaven, CV 07-4584 (TCP) (ETB), 2008 WL 11449283 , at *9 [E.D.N.Y. July 18, 2008], report and rec. adopted, 2009 WL 10708791 [E.D.N.Y. June 30, 2009], citing Warner Vision Entm't v. Empire of Carolina, Inc., 101 F.3d 259, 261–62 [2d Cir. 1999]). Notably, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion" (Sussman v. Crawford, 488 F.3d 136, 139 [2d Cir. 2007] [per curium] [emphasis in original] [internal quotation marks omitted]). Here, Plaintiff has failed to meet this burden on each element; and seeks to actually alter the status quo. As such, Plaintiff's motion for a preliminary injunction should be denied.

### A. **Plaintiff Cannot Show a Clear or Substantial Likelihood of Success on the Merits.**

Plaintiff misstates its burden on the instant motion. "The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits" (Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 34 [2d Cir. 1995]). Plaintiff does not request a typical injunction. Rather, Plaintiff seeks an injunction that will allow it to take action that will alter the status quo, i.e., a mandatory injunction. "A mandatory injunction ... alter[s] the status quo by commanding some positive act (id.). "[T]his distinction is important because [the Second Circuit] has held that a mandatory injunction should issue 'only upon a *clear showing* that the moving party is entitled to the relief requested, or where *extreme or very serious damage* will result from a denial of preliminary relief'" (id. [emphasis supplied], quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 [2d Cir. 1985]). Additionally, it is well-settled that where, as here, "the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard," (Wright v. Giuliani, 230 F.3d 543, 547 [2d Cir. 2000] [internal quotation marks omitted]), and when the injunction will "provide the movant with ... relief [that] cannot be undone even if the defendant prevails at a trial on the merits, the moving party must show 'clear' or 'substantial' likelihood of success" (id., quoting Rodriguez v. DeBuono, 175 F.3d 227, 233 [2d Cir. 1999]; Beal v. Stern, 184 F.3d 117, 122 [2d Cir. 1999] [internal quotation marks omitted], quoting Bery v. City of New York, 97 F.3d 689, 693 [2d Cir. 1996]).

Specifically, Plaintiff seeks to enjoin the enforcement of an SWO issued by the Village— a government actor—plainly in furtherance of the public interest. The SWO seeks to maintain the status quo; whereas the relief sought would allow Plaintiff to alter the status quo to build and begin

6

using a crew-change facility. Moreover, granting Plaintiff the right to construct its crew-change facility will likely cede to Plaintiff relief that cannot be undone if Defendants prevail in this case, because once Plaintiff begins utilizing the crew change facility the harm to the Village will already be incurred. The relief will also require the Village to permanently expand its public water system. For all of these reasons, Plaintiff must satisfy the more demanding standard of establishing "a *clear or substantial* likelihood of success on the merits" to be entitled to a preliminary injunction (Tunick v. Safir, 209 F.3d 67, 70 [2d Cir. 2000] [emphasis supplied]).

Plaintiff asserts causes of action for: (1) categorical ICCTA preemption, (2) ICCTA preemption based on an unreasonable burden, and (3) ICCTA preemption based on discrimination (see Doc. No. 1 ["Complaint"]). Plaintiff has failed to demonstrate a "clear or substantial" likelihood of success on the merits of these causes of action and its request for preliminary injunction must be denied.

### 1. Plaintiff's Preemption Rights Are Superseded by the Agreement.

In support of its motion for preliminary relief, Plaintiff relies exclusively on the broad scope and magnitude of the statutory preemption framework. Plaintiff's motion papers are conveniently devoid of any treatment of the significance of its Agreement with Defendant or the impact of that Agreement on its alleged preemption rights. Plaintiff's Agreement with Defendants, however, is critical to this Court's analysis of this matter—and it is the primary characteristic that distinguishes this case from the cases relating to ICCTA preemption relied upon by Plaintiff. ICCTA preemption simply does not usurp the Village's actions. Plaintiff is bound by the terms of that Agreement, regardless of any preemption rights it may have had under the ICCTA.

It is well-settled that "the ICCTA's preemption applies to '*regulation*' of railroads" (Swinomish Indian Tribal Community v. BNSF Ry. Co., 951 F.3d 1142, 1157 [9th Cir. 2020],

citing 49 U.S.C. § 10501(b) [("[T]he remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."]). "Voluntary agreements between private parties … are not presumptively regulatory acts, and we are doubtful that most private contracts constitute the sort of 'regulation' expressly preempted by the statute" (PCS Phosphate Co., Inc. v. Norfolk Southern Corp., 559 F.3d 212, 218–20 [4th Cir. 2009]; Swinomish, 951 F.3d at 1158). The STB has recognized, "voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce" (Township of Woodbridge v. Consolidated Rail Corp., 2000 WL 1771044, at *3 [STB served Dec. 1, 2000]). "[A] town may seek enforcement of voluntary agreements that the town had entered into with a railroad, notwithstanding section 10501(b), because the preemption provisions *should not be used to shield the carrier from its own commitments*" (Boston and Maine Corp. and Town of Ayer, MA, 5 S.T.B. 500, STB Finance Docket No. 33971, 2001 WL 458685, at *5 [STB served May 1, 2001] [emphasis supplied]; see also Norfolk Southern Ry. Co., STB Docket No. AB-290 (Sub-No. 262), 2005 WL 3308783, at *1 [STB served Dec. 7, 2005]).

Under the Agreement, Plaintiff expressly agreed to "stage its trains and to operate through the NSR Crossing in such a manner as to minimize the potential impacts on the Village" (Ex. A to the Straut Decl., Section 2(e)). Plaintiff also agreed to "meet with Village and County public safety personnel to discuss how best to address and accommodate any public safety challenges that may result from the reestablishment of" Plaintiff's connection with the CSX rail line (see id.). The Agreement sets forth the consideration exchanged by Plaintiff for the Village's withdrawal of "its prior opposition" to the proposed transaction (id., Section 3). As a direct consequence of the Agreement, the railways avoided additional environmental review of the proposed transaction,

including scrutiny of Plaintiff's proposed 200% increase in rail traffic on its unused rail line through the Village (Straut Decl. ¶12; Ex. B to the Straut Decl., at *36).

At some point, Plaintiff decided to locate a crew-change facility in the Village (Straut Decl. ¶¶14, 22). Intentional or not, Plaintiff failed to mention the crew-change facility to the Village prior to the Agreement (id. at ¶¶6, 23, 24). In fact, Plaintiff has never discussed it with the Village despite the indisputably significant impact the facility will have on the Village in the form of extended blockages of Village roads and the many consequences that ensue from those blockages (id. at ¶¶23, 27). Plaintiff simply asserts that preemption entitles it to build and operate the facility notwithstanding their obligations to "minimize potential impacts on the Village" and meet with Village public safety personnel "to discuss how to best address and accommodate any public safety challenges." Plaintiff's actions are a direct violation of the terms of the Agreement—an agreement to which both the courts and the STB have held rail carriers are bound (PCS Phosphate, 559 F.3d at 218–20; Swinomish, 951 F.3d at 1158; (Bos. & Maine, 2001 WL 458685, at *5).[1]

Like the parties in the Fourth Circuit's *PCS Phosphate* decision and the Ninth Circuit's *Swinomish* decision, Plaintiff and Defendants negotiated, contemplated and entered into an Agreement; Plaintiff received the benefit of the Agreement; and as set forth fully in Point I(A)(3)(ii)(b) and (iii) hereinbelow, the Village's actions do not constitute an "'unreasonabl[e] interference' with rail transportation such that [they are] impliedly preempted by the ICCTA" (Swinomish, 951 F.3d at 1158; PCS Phosphate, 559 F.3d at 221–22). Thus, Plaintiff is foreclosed from using the ICCTA to "shield[] it from its own commitments" (PCS Phosphate, 559 F.3d at

---

[1] These holdings "reflect[ ] the fact that market actors have incentives to enter into efficient arrangements" (PCS Phosphate, 559 F.3d at 221). If all contracts with rail carriers are unenforceable—even ones that do not constitute an unreasonable interference—Defendants submit there would be no incentive for parties to attempt to resolve issues on their own.

222). Plaintiff's application for a preliminary injunction must be denied because Plaintiff is bound by the Agreement, the Village's actions are not preempted, and Plaintiff cannot show a "clear or substantial" likelihood of success.

**2. Plaintiff's Right to Construct and Use the Crew-Change Facility is Limited by the STB Decision.**

Under the ICCTA, the "STB is vested with broad jurisdiction over transportation by rail carriers" Island Park, LLC v. CSX Transp., 559 F.3d 96, 102 [2d Cir. 2009], quoting 49 U.S.C. § 10501(b)(1)). Plaintiff's claimed authority to construct a new junction and reactivate the unused Norfolk Southern line is based on the STB Decision, however, and its authority under the STB Decision was granted "subject to" the terms of the Agreement (Ex. B to the Straut Decl. at *44). By purporting to act in violation of the Agreement, Plaintiff purports to act in contravention of the authority granted to it by the STB. Therefore, Plaintiff's application must be denied on this ground.

**3. The SWO and Underlying Subdivision Laws are Not Preempted.**

It is well-settled that federal law can preempt state law expressly or by implication (PCS Phosphate, 559 F.3d at 218). "The 'ultimate touch-stone' of preemption analysis is congressional intent: 'Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it'" (Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 641 [2d Cir. 2005], quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485–86 [1996]).

    i.    The ICCTA does not expressly preempt municipal law.

Plaintiff contends that Section 10501(b) of the ICCTA expressly preempts the Village's SWO and underlying zoning laws. Pursuant to the statute,

The jurisdiction of the [STB] over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange,

>     and other operating rules), practices, routes, services, and facilities of such
>     carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of
>     spur, industrial, team, switching, or side tracks, or facilities, even if the
>     tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under
> this part with respect to regulation of rail transportation are exclusive and preempt
> the remedies provided under Federal or *State law*.

(49 U.S.C. §10501(b) [emphasis supplied]). Plaintiff colors this provision as providing for nearly total preemption; however, the statute is not without limitations with respect to local legislation.

As an initial matter, the "State law" that is to be preempted is not defined in the statute. Where Congress has sought to "underscore its intent that [the preemption provision] be expansively applied, [it has] used . . . broad language in defining the 'State law' that would be pre-empted," such as by stating that such law included all "State action having the effect of law" (Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138–39 [1990] [internal quotation marks omitted], quoting ERISA §514(c)(1), 29 U.S.C. §1144(c)(1)). Congress did not do so here.

The ICCTA also specifically limits preemption to "Federal or *State* law,"[2] and does not reference municipal law (49 U.S.C. §10501(b) [emphasis supplied]). Congress specifically identifies when it intends for municipal law to be superseded by federal statute in the context of railroad regulation (see, e.g., 49 U.S.C. §11321(a) ["A rail carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including *State and municipal* law . . . ."] [emphasis supplied]; see also Norfolk & Western Ry. Co. v. Am. Train Dispatchers' Ass'n, 499 U.S. 117, 128–29 [1991] [discussing the far-reaching coverage of 49 U.S.C. §11321(a), formerly §11341(a), based on the "clear, broad,

---

[2] The ICCTA defines "State" as "a State of the United States and the District of Columbia" (49 U.S.C. § 10102(8)).

and unqualified" language used]). Congress did not identify "municipal" law within the scope of preemption in the relevant statute in this case.

"Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted," (Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 [1992]), and as the Second Circuit has articulated, Section 10501(b) of the ICCTA "has a clear purpose," and "explains when [the STB's] jurisdiction is exclusive and preempts other law" (N.Y. & Atlantic Ry. Co. v. Surface Transp. Bd., 635 F.3d 66, 72 [2d Cir. 2011]). By limiting the preemptive effect of the ICCTA to certain *federal* and *state* laws, Congress clearly elected to not include *municipal* laws—such as the Village's subdivision ordinance, or any of its other actions having the effect of law—within the plain reach of federal preemption. "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption'" (Franks Inv. Co. LLC v. Union Pacific R. Co., 593 F.3d 404, 407 [5th Cir. 2010], quoting Altria Group, Inc. v. Good, 555 U.S. 70, 77 [2008]). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there" (Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 [1992] [citations omitted]). Therefore, the ICCTA does not "categorically" preempt the Village's actions and relevant (health and safety) laws in this case (see Florida E. Coast Ry. Co. v. City of West Palm Beach, 266 F.3d 1324, 1328, 1331 [11th Cir. 2001]).

Though it appears that the issue has not been specifically addressed in Second Circuit decisions, the reasoning is consistent with Circuit holdings (see N.Y. & Atlantic, 635 F.3d at 72 [2d Cir. 2011] [stating that Section 10501(b) of the ICCTA "has a clear purpose," and "explains when [the STB's] jurisdiction is exclusive and preempts other law"]; see also Vermont Ry., Inc. v. Town of Shelburne, 918 F.3d 82, 86–87 [2d Cir. 2019] [explaining that the *sole* issue on appeal

was whether the town's ordinance met the police powers exception to preemption under the ICCTA]; Island Park, LLC, 559 F.3d at 106 [holding that New York State administrative order was not preempted by the ICCTA]; Coastal Distribution, LLC v. Town of Babylon, 216 Fed.Appx. 97 [2d Cir. 2007] [modifying the district court's injunction *without* addressing whether the ICCTA preempts municipal law]; Green Mountain, 404 F.3d at 644 [holding that the ICCTA preempted a Vermont *state* statute]).

     ii.    The ICCTA does not expressly preempt the SWO or subdivision law.

The "STB is vested with broad jurisdiction over *transportation* by *rail carriers*" (Island Park, 559 F.3d at 102, quoting 49 U.S.C. § 10501(b)(1) [emphasis supplied]). "[T]ransportation" is defined to include "a locomotive, car, vehicle, vessel, warehouse . . . yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail," (Green Mountain, 404 F.3d at 642, quoting 49 U.S.C. § 10102(9)(A)), as well as "services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property," (49 U.S.C. § 10102(9)(B)).[3] Even if the Court decides that ICCTA preempts municipal law, generally, the ICCTA does not preempt the Village's SWO and underlying subdivision law.

    *a.  The issue in this case does not involve "transportation" by a "rail carrier."*

The STB and Second Circuit agree that before a state action is preempted under Section 10501(b)(2) of the ICCTA, "an activity must constitute 'transportation' and must be performed by, or under the auspices of, a 'rail carrier'" as set forth in 49 U.S.C. §10501(b)(1) (N.Y. & Atlantic, 635 F.3d at 71–72, quoting Town of Babylon and Pinelawn Cemetery, Fed. Carr. Cas. P

---

[3] "Federal or State" law are not preempted with respect to the actions in Section 10501(b)(2) (49 U.S.C. §10501(b) ["[T]he remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."]).

37293 (S.T.B.), STB Finance Docket No. 35057, 2008 WL 4377804, at *5 [STB served Sept. 26, 2008]). "Both the courts and the STB thus consistently find that to fall within the STB's exclusive jurisdiction, the facility or activity must satisfy both the 'transportation' and 'rail carrier' statutory requirements" (id. at 72, citing Hi Tech Trans, LLC v. New Jersey, 382 F.3d 295, 307–10 [3d Cir. 2004]). In *N.Y. & Atlantic*, the Second Circuit affirmed the STB's decision that the railroad was not entitled to federal preemption because the third-party transloading operator of the facility at issue was not a "rail carrier" under the ICCTA, despite the railroad's argument that the operator was an "*integral*" part of its services (id. at 72–73 [emphasis supplied]).

Plaintiff is a "rail carrier" as that term is defined under Section 10501(b)(1). Plaintiff has failed, however, to sufficiently demonstrate that the construction of the crew-change facility, or the operation of the same, is being performed by a "rail carrier." Because Plaintiff has not alleged this basic information—i.e., the identity of the people or entities constructing and operating the facility—the Court cannot meaningfully determine whether Plaintiff's activity meets the standard for a "rail carrier" in this context (see Texas Cent. Bus. Lines Corp. v. City of Midlothian, 669 F.3d 525, 531 [5th Cir. 2012]; Town of Babylon, 2008 WL 275697, at *3–4). Thus, it cannot be determined that preemption applies on this basis.

Even if a "rail carrier" is constructing and will operate the crew-change facility, the construction and eventual use of the facility does not fall within the definition of "transportation" under the statute because it is not "a warehouse . . . yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property" or "services related to that movement" (49 U.S.C. § 10102(9)). First, the crew-change facility will be used specifically for the rail carrier's crew, not passengers or property. Second, the ICCTA does not define "facility" to include crew-change facilities, or their construction. Courts that have addressed this question

have consistently concluded that "facility" means buildings or other structures that house *systems* and *equipment* related to railroad operation (see, e.g., N.Y. & Atlantic, 635 F.3d at 71 [noting that the STB has wide authority over transloading facilities where shipments of materials and equipment are transferred to and from the train]; Island Park, LLC, 559 F.3d at 103 [holding that the term "transportation" did not encompass the closure of a rail crossing]; Green Mountain, 404 F.3d at 638 [analyzing "facility" with regards to the site for unloading salt and cement arriving by rail]; Hi Tech Trans, LLC, 382 F.3d at 298 [related to regulation of bulk waste loading site]; Florida E. Ry. Co. v. City of W. Palm Beach, 110 F.Supp.2d 1367 [S.D. Fla. 2000], aff'd 266 F.3d 1324 [related to site for storing and distributing building materials]). Nothing in these cases indicates that a location used for crew changes is included in the definition of "facility."

Plaintiff has failed to meet its elevated burden of demonstrating a "clear or substantial" likelihood of success that preemption applies, and its motion should be denied.

### b. The Village is exercising its police powers to protect health and safety.

Assuming, *arguendo*, that ICCTA preemption applies, the SWO is an exercise of the Village's police powers under the well-settled exception to the ICCTA preemption rule. While the ICCTA contains broad language, its legislative history indicates that Congress did not intend to preempt any and all state laws that might touch upon or indirectly affect railway property (Emerson v. Kansas City S. Ry. Co., 503 F.3d 1126, 1131 [10th Cir. 2007], quoting H.R.Rep. No. 104–422, at 167 [1995], reprinted in 1995 U.S.C.C.A.N. 850, 852 ["[T]he exclusivity [of 49 U.S.C. §10501(b)] is limited to remedies with respect to rail regulation-not State and Federal law generally…. [State and federal laws] remain fully applicable unless specifically displaced, because they do not generally collide with the scheme of economic regulation (and deregulation) of rail transportation."]). Indeed, the STB recognizes that, notwithstanding the preemption framework,

"[l]ike any citizen or business, railroads have some responsibility to work with communities to seek ways to address local concerns in a way that makes sense and protects the public health and safety" with pragmatic solutions (Bos. & Maine, 2001 WL 458685, at *7).

Circuit Courts have explicitly recognized this, and noted that Congress has "narrowly tailored the ICCTA preemption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation" (PCS Phosphate, 559 F.3d at 218, quoting Florida East Coast Ry. Co., 266 F.3d at 1328, 1331; see also Delaware v. Surface Transp. Bd., 859 F.3d 16, 18 [D.C. Cir. 2017]; Adrian & Blissfield R. Co. v. Vill. of Blissfield, 550 F.3d 533, 539 [6th Cir. 2008]; New York Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 252 [3d Cir. 2007]).

For example, "local bodies retain certain police powers which protect public health and safety" (Green Mountain, 404 F.3d at 643 [quotation omitted]). The STB itself has also ruled that the ICCTA "does not usurp the right of state and local entities to impose appropriate public health and safety regulation on interstate railroads," so long as those regulations do not interfere with or unreasonably burden railroading (Kings County, STB Finance Docket No. 32974, 1996 WL 545598, at *3–4 [S.T.B. 1996]; see also Cities of Auburn and Kent, STB Finance Docket No. 33200, 1997 WL 362017, at *6 ["[E]ven in cases where we approve a construction or abandonment project, a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power."]).

Therefore, even when "transportation" by a "rail carrier" is at issue,

states and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the

16

exercise of discretion on subjective questions. Electrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption."

(Green Mountain, 404 F.3d at 643).

A legion of cases confirm that state or local authority is not preempted by the ICCTA when the locality acts under a traditionally local police power of zoning and health and safety regulation (see, e.g., Island Park, LLC, 559 F.3d at 106 [holding that a state law was not preempted because "the state action in this case does not interfere with railroad operations"]; Emerson, 503 F.3d at 1130, 1132–33 [holding that state tort claims for improper disposal of railroad ties were not preempted]; Franks, 593 F.3d at 410 [holding that the ICCTA does not preempt state law with a remote or incidental effect on rail transportation, and that state action enjoining the railroad from removing privately owned railroad crossings was not preempted]; PCS Phosphate, 559 F.3d at 218–20 [stating that ICCTA preemption does not displace ordinary voluntary agreements between private parties]; Adrian & Blissfield, 550 F.3d at 540–41 [holding that a state track maintenance statute requiring the railroad to pay for pedestrian crossings across its tracks was not preempted, and that imposing increased costs on railroad is not by itself enough to establish an unreasonable interference]; N.Y. Susquehanna, 500 F.3d at 252–55 [holding that fines may be imposed under state law on railroad for environmental hazards at transloading facility, and that the ICCTA would not preempt, for example, rules fining the railroad for dumping debris or harmful substances]; Florida East Coast Ry. Co., 266 F.3d at 1328, 1331 [holding that the ICCTA did not extend to traditional police power of the city's zoning and health and safety regulation]; Jones v. Union Pacific Railroad Co., 79 Cal.App.4th 1053, 1060 [2000] [holding that a state nuisance action based on train noise and fumes was not necessarily preempted if the plaintiffs can demonstrate the challenged nuisance did not further the railroad's operations]; In re Vermont Ry. 171 Vt. 496, 504

[2000] [holding that the zoning conditions imposed not on rail line but on truck traffic and environmental conditions at railroad's salt shed were not preempted]). This conclusion is confirmed by legislative history (see H.R.Rep. No 104-311, 1st Sess., p. 96 [1995] [stating that while the ICCTA is intended to preempt state economic regulation … "States retain the police powers reserved by the Constitution"]).

Here, the Village is acting squarely within its police powers issuing and enforcing the SWO. If the Court grants Plaintiff a preliminary injunction allowing Plaintiff to construct and use the crew-change facility, it will result in demonstrable and substantial harm to the Village, its residents and its businesses (Straut Decl. ¶¶27–30, 33, 35, 37–40). The purpose for the facility is for Plaintiff to slow trains to a complete stop, swap crews, and bring trains back up to speed on the rail line (see Complaint ¶3). The slowing down and re-ascent to traveling speed alone will result in all three rail surface crossings within the Village being blocked or closed for *at least* 30 minutes, two times per day (Straut Decl. ¶¶30, 36). Whereas, if Plaintiff's trains only passed through the Village at 25 miles per hour as indicated when inducing the Village to enter into the Agreement, the blockages of crossings would be significantly less impactful to the Village (id. at ¶6).

Plaintiff's trains will also necessarily be stopped on the line for a period of time for crews to change (id. at ¶22). While Plaintiff claims that its trains running on the rail line will be less than 1.5 miles long and therefore they will not be stopped across any crossings, this is disingenuous at best. The STB authorized NS to operate trains up to 1.7 miles long on this rail line, and NS has conceded that it may run trains in the future that are 1.7 miles in length (Straut Decl. ¶31; Mason Decl. ¶21). A train of 1.7 miles in length, when stopped, will sit across at least one crossing (Straut Decl. ¶29). Moreover, NS has not adhered to its prior representations and commitments in

18

connection with the Agreement; there is no reason to believe that NS will adhere to any of the commitments it makes to this Court.

Furthermore, one of Plaintiff's scheduled blockages of the Village will coincide with the release of elementary school children from school, which is less than one mile from the rail line (id. at ¶36). This is alarming not just because of the exorbitant and unmanageable impact to traffic, but also because children walking home from school may be forced to climb through the rail cars that could accelerate at any moment. Defendants are aware of this exact scenario occurring in other communities, such as in Hammond, Indiana (id. at ¶39). Plaintiff's plans will also have the clear and unalterable effect of severing the Village in half, and thus cutting half the Village off from police, fire, and other emergency services while trains slow, stop, and resume speed within the Village (id. at ¶35). These concerns are exacerbated by the fact that the sole other means of traversing the rail lines within the Village is through an underpass maintained by CSX, which is frequently blocked by tractor trailers and other vehicles that are not able to fit beneath it (id. at ¶40). It is patent that Plaintiff's plan if permitted to proceed poses dangerous and intolerable public health and safety problems.[4]

Plaintiff asks the Court to thwart a proper exercise by the Village's to "protect public health and safety," (Green Mountain, 404 F.3d at 643), which differentiates it from cases where laws were preempted despite the local body invoking public health and safety without the laws actually having an effect on health or safety. For example, in *Vermont Ry.*, the Second Circuit affirmed the

---

[4] NS represents that when traveling west, its trains will stop at a concrete "landing pad" located roughly 1.5 miles from the crew-change facility, drop its crew off on the pad, and arrange for a shuttle to pick up the crew and drop them at the crew-change facility (Complaint ¶27). However, there is no reason for the Village—or this Court—to give these representations any weight in light of NS's failure to adhere to its prior representations and the Agreement (Straut Decl. ¶34).

District Court's decision that the law affecting the rail carrier was preempted because it did "not achieve[ ] any meaningful health or safety goals" (918 F.3d at 88). In contrast, the Village's actions here are analogous to cases where the local body's actions were found to be a legitimate exercise of its police powers, and thus not preempted (see, e.g., Florida East Coast Ry. Co., 266 F.3d at 1328–29 [holding that the city's cease and desist orders to the rail carrier for its non-conformance with the city's zoning violations were not preempted by the ICCTA because the city was "acting under the traditionally local police power of zoning and health and safety regulation"]).

Further, the SWO only has a remote or incidental effect on rail transportation, (see PCS Phosphate, 559 F.3d at 218), as Plaintiff's inability to construct or use the crew-change facility only impacts the location where the trains can change crews. The SWO has no impact whatsoever on the travel of Plaintiff's trains along the rail lines or its ability to stop in other locations.

Finally, the Village's concerns could be significantly mitigated if Plaintiff simply constructed its crew-change facility elsewhere along the rail line. Critically, Plaintiff's representatives have told Defendants that there are alternate locations for the crew-change facility, to the west of the current desired location, that would minimize the impact on the Village (Answer [Doc. No. 14] ¶82; Mason Decl. ¶¶19–21). It defies logic that Plaintiff would continue with its plan to use the location at issue here which will significantly burden the health and safety of the Village—and is in violation of the parties' Agreement and the STB Decision—when there are obvious alternatives just a few miles further along the railway.

The ICCTA does not preempt the SWO or subdivision laws because the Village is properly exercising its police powers as contemplated by the courts and Plaintiff's motion must be denied.[5]

---

[5] It is also notable that Plaintiff fails to address the unresolved issue of a water-line connection for the crew-change facility. Plaintiff has not submitted proper support for such a water-line connection and there are significant deficiencies with what it has submitted such that even if

iii.    <u>The ICCTA does not impliedly preempt the SWO or subdivision laws.</u>

The generally accepted test for ICCTA implied preemption is whether "the enforcement action 'unreasonably interfer[es]' with rail transportation" or imposes an "unreasonable burden" on interstate commerce (<u>PCS Phosphate</u>, 559 F.3d at 220–21, quoting <u>CSX Transp., Inc.</u>, STB Finance Docket No. 34662, 2005 WL 1024490 (S.T.B.), at *3 [STB served May 3, 2005]). For the Court to find "'unreasonable interference' requires a factual assessment of the effect of providing the claimed remedy" (<u>id.</u>, quoting <u>Emerson</u>, 503 F.3d at 1130).

For the same reasons set forth in Point I(A)(3)(ii)(b), it cannot be said that the SWO unreasonably interferes with rail transportation or imposes an undue burden on interstate commerce. There is an alternate location suitable for Plaintiff's crew-change facility that would significantly decrease health and safety concerns of the Village; and while preparing the location for the crew-change facility may incidentally interfere with NS's business model, it has not even alleged that it would interfere with rail transportation in any way. Further, Plaintiff has failed to identify that the SWO would have *any* impact on interstate commerce whatsoever.

iv.    <u>The SWO and subdivision laws do not discriminate against rail transportation.</u>

To avoid preemption under the ICCTA, a "state action must address state concerns generally and not target the railroad industry" (<u>Norfolk Southern Ry. Co. v. Dille Road Recycling, LLC</u>, 94 F.4th 517, 526 [6th Cir. 2024]). It is still true that state "regulation is permissible where it does not interfere with interstate rail operations" (<u>N.Y. Susquehanna</u>, 500 F.3d at 252, quoting <u>Borough of Riverdale</u>, 4 S.T.B. 380, STB Docket No. 33466, 1999 WL 715272, at *5 [STB served Sept. 10, 1999]).

---

granted the right to build, Plaintiff will not be able to secure a Certificate of Occupancy to use the crew-change facility (Hotaling Decl. ¶¶1–19).

The generally applicable subdivision laws here were in place well before Plaintiff began its construction, and were not adopted to target Plaintiff or any other rail carrier (see Florida East Coast Ry. Co., 110 F.Supp.2d at 1376 [S.D. Fla. 2000], aff'd 266 F.3d 1324 [11th Cir. 2001] [holding that the "ordinances at issue are not aimed at the railroad or rail operations, but rather are generally applicable exercises of a city's police powers to safeguard the health and safety of its citizens. If a city finds that a particular operation is being run in violation of its laws it should be able to step in, especially where … it believes the operation is having a harmful impact upon its residents"]). And as set forth hereinbefore, the Village's actions do "not significantly interfere with [Plaintiff's] ability to conduct business" (N.Y. Susquehanna, 500 F.3d at 253). Rather, Plaintiff will be required to either work with the Village to minimize the harmful effects of its plans (in compliance with the Agreement), or construct its crew-change facility elsewhere—neither of which would have any significant effect on Plaintiff's ability to conduct its business.

The SWO and underlying subdivision laws do not impermissibly discriminate against rail transportation, and preemption is also inapplicable on this ground. Accordingly, Plaintiff has failed to show a "clear or substantial" likelihood on the merits on the issue of preemption, and its application for preliminary injunction should be denied in its entirety.

### 4. Plaintiff Cannot Transfer Its Preemption Rights to JC Pops

Plaintiff improperly asks the Court to apply preemption for its proposed use of real property for a crew-change facility. This outcome would improperly confer preemption rights on a private, non-rail carrier—JC Pops—thus allowing a derogation of applicable New York state law.

It is black letter law that "[n]o plat of a subdivision of land showing lots, blocks or sites, shall be filed or recorded in the office of [a] county clerk…until it has been approved by a planning board which has been empowered to approve such plats" (NYS Village Law §7-732 (1[a]).

Further, a county clerk is precluded from accepting a deed to real property unless that deed is accompanied by a "transfer report form" which, "in the event [a] planning board or other entity is empowered to approve subdivisions, a statement indicating whether the parcel conveyed by such deed is (a) not subject to such subdivision approval or (b) such subdivision approval has been approved…." (NYS Real Property Law §333(1-e[ii][8]). The Village's Subdivision Law expressly states that "[b]efore any land is subdivided, the subdivider shall make application to the Planning Commission for and secure approval of the proposed subdivision" (Subdivision Law §103). In addition, "[n]o building permit shall be issued for any improvement on property which…has not been legally subdivided," (Subdivision Law §106[1]); and the Village Board is permitted to "maintain an action or proceeding…to compel compliance with the [Subdivision] Law …," (Subdivision Law §106[4]).

Plaintiff failed to satisfy any of the above-referenced requirements. The Illegal Carveout was an invalid transfer of land.[6] However, even if the conveyance was valid and recognizable by the Village—which Defendants do not concede—if permitted to stand it would result in both the Illegal Carveout and the portion of land retained by JC Pops to be in violation of the Village's land use regulations. Specifically, neither lot would meet the minimum lot size requirement of five acres as a Large Scale Business within the Industrial Zone (Village Zoning Law Art. I; Straut Decl. ¶5). While Plaintiff may believe it is immune from these legal requirements as a rail carrier, there can be no dispute that these laws apply to JC Pops, a non-rail carrier. That Plaintiff was the

---

[6] There is no question that the Illegal Carveout was not effectuated as a subdivision, and the Illegal Carveout was not properly transferred to Plaintiff by JC Pops (see Straut Decl. ¶¶14–18, 51, 60). It has been long-settled that a municipality in New York State can "prevent [a] purchaser [of improperly subdivision property] from developing [the] property…until the requisite subdivision approval is obtained" (Voorheesville Rod and Gun Club, Inc. v. E.W. Tompkins Co., Inc., 82 N.Y.2d 564, 572 [1993]).

purported purchaser in the alleged conveyance does not absolve JC Pops of its obligation to comply with the applicable subdivision law.

The STB has repeatedly concluded that among the limitations of preemption under the ICCTA is the principle that "[g]enerally applicable state laws governing the acquisition of property are not considered 'preclearance' or 'permitting' requirements subject to categorical preemption" (Grafton and Upton Railroad Co., Docket No. FD 36464, 2024 WL 5165789 at *6 [STB served Dec. 18, 2024]; see also City of Milwaukie, Docket No. FD 35625, 2013 WL 1221975, at *2–3 [STB served Mar. 25, 2013] [declining to rule on a preemption issue until resolution of a state property dispute by a state court, where a railroad claimed to have appropriated public]). "As the [STB] has explained, the acquisition authority that the [STB] grants [to railroads] is permissive— it allows a party to acquire…[property]—but in order to exercise that authority, the party must also obtain appropriate rights under state property and contract law…." (Eastside Cmty. Rail, LLC, Docket No. FD 35730, 2022 WL 696819, at *3 [STB served Mar. 7, 2022]).

Furthermore, the STB has made clear that the "fact that a railroad is performing rail transportation authorized by the [STB] is not license for railroads to take, or neglect to take, whatever actions they may want to take in performing their obligations" (City of Milwaukie, 2013 WL 1221975, at *2–3; see Emerson, 503 F.3d at 1132 [addressing a railroad's contention that a local government could not challenge its improper disposal of waste because the Circuit Court recognized that the railroad's "argument ha[d] no obvious limit, and if adopted would lead to absurd results"]). Defendants respectfully submit that Plaintiff's argument in this case is fundamentally no different—and, if accepted by this Court, could lead to equally "absurd results."

As reflected in its motion papers, Norfolk Southern's position seems to be that as a railroad it can (1) identify any parcel of real property it chooses; (2) offer to pay the non-rail carrier owner

of the real property sufficient money to induce him to violate applicable state and local laws (by conveying a portion of it); and (3) as long as the railroad receives and files a physical deed—including by improper means—local government is powerless to do anything about it (Plaintiff's Memorandum of Law, Doc. No. 10-3 ("It does not matter whether [the railroad's] purchase or intended use of the property brings the underlying or adjacent [non-railroad] parcel(s) out of compliance with local zoning rules"—or how severe the non-compliance by the non-railroad party will be) [emphasis supplied]). According to Plaintiff, such an acquisition of property in violation of state of local law cannot be challenged and immunizes the non-railroad party from any accountability whatsoever to local authorities; and as for the property supposedly acquired by the railroad, preemption applies. No consequence is too egregious; no harm to a community (including causing existing, non-railroad businesses to be in violation of local law) can be addressed.

Plaintiff has not identified any caselaw whatsoever that supports its unfettered and gross misapplication of federal preemption and the proposition that Norfolk Southern can cause JC Pops to violate the Village's laws without any recourse whatsoever being available to the Village. Plaintiff has not even attempted to meet its burden of establishing a clear or substantial likelihood of success on the merits of this issue. Therefore, it cannot be entitled to preliminary injunctive relief, and Plaintiff's motion must be denied.

**B. Plaintiff Will Not Suffer Irreparable Harm in the Absence of Injunctive Relief.**

Plaintiff asserts that it will suffer irreparable harm in the form of unrecoverable costs if it is not granted relief. Under the applicable heightened standard for a preliminary injunction, Plaintiff must clearly show that the harm is imminent or certain, not merely speculative (see Tom Doherty Assoc., 60 F.3d at 34, 37). "It is black letter law that 'irreparable injury means injury for which a monetary award cannot be adequate compensation'" (Sills Rd. Realty LLC v. Town of

Brookhaven, CV 07-4584 (TCP) (ETB), 2008 WL 11449283, at *12 [E.D.N.Y. July 18, 2008], report and rec. adopted, 2009 WL 10708791 [E.D.N.Y. June 30, 2009], quoting Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 [2d Cir. 1979]). "[W]here damages are clearly economic in nature, they do not justify injunctive relief" (id. [quotation omitted]).

First, it is not at all clear that Plaintiff will incur any damages, or that such damages are certain or imminent. Plaintiff has advised Defendants that there are a suitable alternate locations for the crew-change facility that would not impose as heavy a burden on the residents of the Village (Mason Decl. ¶¶19–21). Plaintiff has also advised Defendants that when they run longer trains up to their approved length limit 1.7 miles, they will stop elsewhere to swap crews out to reduce the health and safety concerns of the Village (Straut Decl. ¶34). Plaintiff has failed, however, to provide any reason whatsoever why they cannot stop elsewhere now despite all but conceding the impact of the crew-change facility on the Village, and that locating the crew-change facility elsewhere would significantly mitigate its alleged damages. It cannot be true that Plaintiff will be irreparably harmed if it can (and in fact, intends) to simply stop elsewhere in the future. At best, Plaintiff's assertions regarding harm are speculative and squarely insufficient to justify its requested relief.

Moreover, despite Defendants arguments to the contrary in their moving papers, the requirement that irreparable harm must be more than monetary damages has been specifically applied within the Second Circuit in almost an identical circumstance. In *Sills Rd.*, the rail carrier sought a preliminary injunction enjoining the enforcement of a cease and desist order prohibiting the construction of a rail terminal (Sills Rd., 2008 WL 11449283, at *3). Both the court and the STB found that the rail carrier failed to establish it would suffer any irreparable harm absent their intervention because "claims of opportunity costs and construction costs are strictly monetary in

nature," and thus "cannot constitute irreparable harm for purposes of a preliminary injunction application" (id. at *4, 12; Suffolk & S. R.R. LLC-Lease & Operation Exemption-Sills Rd. Realty, LLC, STB Fin. Docket No. 35036, 2007 WL 3437681, at *5 [S.T.B. served Nov. 16, 2007]). Plaintiff's alleged damages do not establish irreparable harm warranting the relief requested here.

Even if this Court is inclined to find that unrecoverable monetary damages constitute irreparable harm, contrary to Plaintiff's assertion, the magnitude of that harm is relevant to the analysis. In support of its position, Plaintiff cites to *Regeneron Pharmaceuticals, Inc. v. U.S. Dep't of Health and Human Svcs.*, 510 F.Supp.3d 29 (S.D.N.Y. 2020). However, the Court in *Regeneron* specifically *did* consider the amount of the party's alleged loss before granting the preliminary injunction (id. at 39 ["While Plaintiff is a large corporation, the magnitude of its forecast revenue loss is unquestionably 'considerable.'"]).

Plaintiff asserts that absent an injunction it will incur somewhere between $20,000 and $65,000, plus another $500 to $1,000 per month in monetary damages (see Declaration of Will Graham, Doc. No. 10-4, at ¶¶6-9). Thus, Plaintiff claims it will incur a total of between $26,000 and $77,000 in monetary damages after one year. Pecuniary damages of this magnitude do not constitute irreparable harm to one of the world's most valuable publicly traded companies with a market capitalization of over $60 billion and operating revenue for 2024 of $12.123 billion (Straut Decl. ¶57; see ConverDyn v. Moniz, 68 F.Supp.3d 34, 48 [D.D.C. 2014] ["[A]n alleged loss of $10 million per year …is not of sufficient magnitude in light of [the plaintiff's] annual revenues of $100 million."]). Thus, Plaintiff's application for a preliminary injunction must be denied for this independent reason.

**C. A Balancing of the Hardships Warrants Denial of the Relief Requested.**

When determining a motion for a preliminary injunction, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" (Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 [2008]). The plaintiff must establish that "the balance of hardships tips decidedly toward plaintiff," (Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 [2d Cir. 1970], quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 [2d Cir. 1953]), "regardless of the likelihood of success" (Salinger, 607 F.3d at 79–80). This means that even if Plaintiff can make the required showing of a clear or substantial likelihood of success, it is still required to establish that

> as compared to the hardship suffered by [Defendants] if the preliminary injunction is granted, the hardship suffered by [Plaintiff] if the preliminary injunction is denied will be so much greater that it may be characterized as a 'real hardship,' such as being 'driven out of business … before a trial could be held.'

(Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48, 58 [2d Cir. 1979]).

If this Court grants Plaintiff a preliminary injunction, Plaintiff will construct and begin using a crew-change facility which will result in significant health and safety impacts to the Village and its residents including severing the Village in half, blocking traffic for extreme periods of time, depriving half the Village of access to emergency services, and potentially forcing children to scale and navigate trains blocking their route home from school. The Village will also be required to permanently expand its public water system—negative long-term consequences notwithstanding. Conversely, denying Plaintiff a preliminary injunction will maintain the status quo. Plaintiff can continue to run trains along the rails through the Village, and the Village will not endure the substantial disruption and threat to public health and safety pending the resolution of this action. The only harm Plaintiff has alleged it will endure absent the court's intervention here is *de minimis* pecuniary loss—an outcome that falls well short from "being driven out of business … before a trial [can] be held" (id. at 58).

An objective balancing of the hardships in this instance warrants additional grounds for denial of Plaintiff's application for a preliminary injunction.

**D.  The Public Interest Will Not Be Served by the Issuance of the Preliminary Injunction.**

The "public interest is defined as the general welfare of the public that warrants recognition and protection and/or something in which the public as a whole has a stake, especially, an interest that justifies governmental regulation" (Antonyuk v. Hochul, 635 F.Supp.3d 111, 126 [N.D.N.Y. 2022] [internal quotations omitted]). The public here has a clear interest in health and safety. Permitting Plaintiff to construct and begin using the crew-change facility before the parties have an opportunity to litigate these issues is a complete disservice to public health and safety.

When presented with the same issue, the STB drew precisely the same conclusion in *Suffolk & S. R.R.* and denied the rail carrier a stay, stating that

> [w]hile petitioners cite the need for more freight facilities … the Cease and Desist Order does not prevent the facility from being constructed once appropriate approvals are obtained. Thus, any potential public benefit could still be realized. Instead*, the public interest is better served by precluding the potential evasion or misuse of the Board's processes that could result from allowing the construction and operations proposed here to proceed without [the proper required review].*

(Suffolk & S. R.R., 2007 WL 3437681, at *5 [emphasis supplied]).

The courts agree with this outcome. "The public interest is served by the enforcement of the parties' lawful agreement" Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 897 [2d Cir. 2015]). A binding Agreement exists between the parties. Plaintiff seeks to avoid its contractual obligations and, in so doing, cause significant harm to the health and safety of the Village. This is anathema to the public interest and Plaintiff's application for the same must be denied.

## CONCLUSION

Based on the foregoing and the accompanying submissions, it is respectfully requested that this Court deny Plaintiff's motion seeking a preliminary injunction in its entirety, and award such other and further relief as this Court deems just and proper.

Dated:   November 12, 2025

Respectfully submitted,

_____
John P. Calareso, Jr. -- *Bar Roll* # 511222
Kathryn D. Bobel -- *Bar Roll* # 704349
**GLEASON, DUNN, WALSH & O'SHEA, P.C.**
*Attorneys for Defendants/Counterclaim-Plaintiffs/*
*Third-Party Plaintiff*
Office and P.O. Address
300 Great Oaks Blvd., Ste. 321
Albany, New York 12203
Tel. (518) 432-7511
jcalareso@gwdo.net
kbobel@gdwo.net

To:    John J. Jablonski
       David P. Johnson
       **Gerber Ciano Kelly Brady LLP**
       *Attorneys for Plaintiff*
       599 Delaware Avenue, Suite 100
       Buffalo, New York 14202
       (716) 313-2082
       jjablonski@gerberciano.com
       djohnson@gerberciano.com

       Tobias S. Loss-Eaton
           (*pro hac vice*)
       **Sidley Austin LLP**
       *Attorneys for Plaintiff*
       1501 K Street, NW
       Washington D.C. 20005
       (202) 736-8427
       tlosseaton@sidley.com