EXHIBIT B

**Fed. Carr. Cas. P 37509 (S.T.B.), 2022 WL 1125011**

Surface Transportation Board (S.T.B.)

CSX CORPORATION AND CSX TRANSPORTATION, INC., ET AL.—CONTROL AND MERGER
—PAN AM SYSTEMS, INC., PAN AM RAILWAYS, INC., BOSTON AND MAINE CORPORATION,
MAINE CENTRAL RAILROAD COMPANY, NORTHERN RAILROAD, PAN AM SOUTHERN LLC,
PORTLAND TERMINAL COMPANY, SPRINGFIELD TERMINAL RAILWAY COMPANY, STONY
BROOK RAILROAD COMPANY, AND VERMONT & MASSACHUSETTS RAILROAD COMPANY

Decided: April 14, 2022
Service Date: April 14, 2022

**SURFACE TRANSPORTATION BOARD DECISION**

Docket No. FD 36472 [1]
Decision No. 9

**\*1**  By the Board, Board Members Fuchs, Hedlund, Oberman, Primus, and Schultz.

<u>Digest</u>: [2]  The Board approves, subject to conditions, the application by CSX Corporation, CSX Transportation, Inc. (CSXT), and 747 Merger Sub 2, Inc., to acquire control of seven rail carriers owned by Pan Am Systems, Inc., and Pan Am Railways, Inc., and to merge six of those railroads into CSXT. The Board also approves six related transactions, allowing Norfolk Southern Railway Company to acquire trackage rights over certain lines of four other railroads; allowing Pittsburg & Shawmut Railroad, LLC d/b/a Berkshire & Eastern Railroad, to replace Springfield Terminal as the operator of Pan Am Southern LLC; and allowing SMS Rail Lines of New York, LLC, to discontinue service and terminate its lease of a rail line between Delanson, N.Y., and Voorheesville, N.Y.

CSX Corporation (CSXC), CSX Transportation Inc. (CSXT), 747 Merger Sub 2, Inc. (747 Merger Sub 2), Pan Am Systems, Inc. (Systems), Pan Am Railways, Inc. (PAR), Boston and Maine Corporation (Boston & Maine), Maine Central Railroad Company (Maine Central), Northern Railroad (Northern), Portland Terminal Company (Portland Terminal), Springfield Terminal Railway Company (Springfield Terminal), Stony Brook Railroad Company (Stony Brook), and Vermont & Massachusetts Railroad Company (V&M) (collectively, Applicants) seek Board approval under 49 U.S.C. § § 11321-26 for: (1) CSXC, CSXT, and 747 Merger Sub 2 to control the seven railroads controlled by Systems and PAR; and (2) CSXT to merge six of the seven railroads into CSXT. This proposal is referred to as the Merger Transaction.

In addition, there are several transactions related to the Merger Transaction for which parties seek approval, including: four notices of exemption for Norfolk Southern Railway Company (NSR) to acquire trackage rights over existing lines owned by four separate railroads; a petition for exemption to allow Pittsburg & Shawmut Railroad, LLC d/b/a Berkshire & Eastern Railroad (B&E) to replace Springfield Terminal as the operator of Pan Am Southern LLC (PAS); and a notice of exemption to allow SMS Rail Lines of New York, LLC (SMS) to discontinue service and terminate its lease of a rail line known as the Voorheesville Running Track. These transactions are referred to as the Related Transactions.

The Board finds that the Merger Transaction, as conditioned by the Board herein, satisfies the standard for approval under 49 U.S.C. § 11324(d). In addition, the Board finds that the Related Transactions meet the requisite statutory standards for approval.

**BACKGROUND**

**Application.**

**\*2**  On February 25, 2021, Applicants submitted an application for the proposed Merger Transaction and requested that the Board consider the transaction as "minor" under the Board's controlling statute and rules. In Decision No. 1, served and published in the Federal Register (86 Fed. Reg. 16,009) on March 25, 2021, the Board found the proposed transaction should be classified as "significant" under 49 U.S.C. § 11325 and 49 C.F.R. § 1180.2(b), which carries different procedural and informational requirements from those of a minor transaction, including a prefiling notification requirement. The Board therefore found that Applicants' submission could not be treated as an application. However, in that same decision, the Board determined that it would consider the February 25, 2021 submission a prefiling notification (referred to herein as the Prefiling Notice), as required in ""significant" transactions, see 49 C.F.R. § 1180.4(b)(1), thus permitting Applicants to perfect their application by supplementing their submission with the requisite information for a "significant" transaction in accordance with the Board's regulations, between April 25 and June 25, 2021. The Board also required Applicants to submit the difference between the filing fee for a ""minor" transaction (which Applicants had already paid) and the fee for a ""significant" transaction.

On April 26, 2021, Applicants submitted an application for a "significant" transaction. In Decision No. 3, served May 26, 2021, the Board rejected the application, concluding that the application failed to include the information needed to satisfy the market analysis requirement for a "significant" transaction application under 49 C.F.R § 1180.7. Decision No. 3, FD 36472 et al., slip op. at 2. Specifically, the Board found that the market analysis and supporting verified statements did not sufficiently describe "the impacts of the proposed transaction—both adverse and beneficial—on inter-and intramodal competition," nor did they meet the other specific requirements for a market analysis, including the requirement for supporting data. Id. at 7 (citing 49 C.F.R. § 1180.7). Because the market analysis was incomplete, the Board also held that the Applicants' operating plan—which is also required as part of the application and must be based on the market analysis—was incomplete. Decision No. 3, FD 36472 et al., slip op. at 7 n.16. However, the Board permitted Applicants to file a revised application to remedy the deficiencies identified in Decision No. 3. Id. at 15.

**\*3**  On July 1, 2021, Applicants submitted an amended and supplemented application (Revised Application). In Decision No. 4, served and published in the Federal Register (86 Fed. Reg. 41,145) on July 30, 2021, the Board accepted the Revised Application, finding that Applicants had addressed or clarified all of the issues that the Board found insufficient in the Applicants' original market analysis, and by association, original operating plan and, as such, had provided sufficient information to satisfy the requirements of a "significant" transaction application. Accordingly, the Board also accepted the filings for the Related Transactions and issued a procedural schedule. [3]

**Applicants.**

*Systems*. Systems directly and wholly owns PAR, which in turn directly and wholly owns four rail carriers: Boston & Maine, Maine Central, Portland Terminal, and Springfield Terminal. Boston & Maine directly and wholly owns Northern, as well as a 99.27% interest in Stony Brook and a 98% interest in V&M. (Revised Appl. 6.) These seven rail carriers are referred to collectively as the PAR Railroads.

*PAR Railroads*. The PAR Railroads own rail lines and provide rail service on a freight rail network (PAR System) in New England, from Maine in the north to the Boston region in the south. [4] Springfield Terminal operates rail service on the PAR System on behalf of the PAR Railroads pursuant to leases over lines owned and leased by the other PAR Railroads. Aside from Springfield Terminal, none of the other PAR Railroads currently operates. (Revised Appl. 6.)

*PAS*. PAS, a Class II carrier, is a 50/50 joint venture between Boston & Maine and NSR. [5] (Id.) The PAS lines include two main line corridors, referred to as the Patriot Corridor and the Knowledge Corridor. The Patriot Corridor runs east-west between

milepost 467.4 at Mechanicville, N.Y., and milepost 311.97 near Willows, Mass., a distance of approximately 151.4 miles. (Id. at 39.) The Patriot Corridor includes a segment of rail line between Fitchburg, Mass., and Willows that is owned by Massachusetts Bay Transportation Authority (MBTA) and over which PAS has freight easement rights, and a segment owned by Canadian Pacific Railway Company (CP) between Mohawk Yard, N.Y., and Mechanicville and over which PAS has trackage rights. (Revised Appl., Ex. 13, Operating Plan 24.) The Patriot Corridor is sometimes referred to herein as the Northern Route.

The Knowledge Corridor runs north-south between milepost 183.4 at White River Junction, Vt., and milepost 0.0 at New Haven, Conn., a distance of approximately 183.4 miles. (Id., Ex. 13, Operating Plan 24-25.) The Knowledge Corridor includes segments of rail line owned by New England Central Railroad (NECR), a subsidiary of Genesee & Wyoming, Inc. (GWI), and the National Railroad Passenger Corporation (Amtrak), over both of which PAS has trackage rights, and a segment owned by the Massachusetts Department of Transportation (MassDOT), over which PAS has freight easement rights. (Id.)

**\*4**  Springfield Terminal, also a Class II rail carrier, operates PAS as PAS's agent. (Revised Appl. 6.) Springfield Terminal currently operates NSR trains pursuant to a haulage agreement between PAS and NSR. (Revised Appl., Ex. 13, Operating Plan 13); Norfolk S. Ry.—Joint Control & Operation/Pooling Agreement—Pan Am S. LLC (NS/Pan Am/PAS), FD 35147 et al., slip op. at 18. (STB served March 10, 2009). NSR also has reserved trackage rights on the Patriot Corridor between Mechanicville and Ayer, Mass., and rights to interchange certain traffic with other connecting regional lines. (Revised Appl., Ex. 22-E, V.S. Reishus 45); NS/Pan Am/PAS, FD 35147 et al., slip op. at 11, 14.

*CSX.* CSXT is a wholly owned subsidiary of CSXC. CSXT is a Class I rail carrier that owns and operates approximately 19,500 miles of railroad in 23 states [6] and the District of Columbia, as well as in the Canadian Provinces of Ontario and Quebec. (Revised Appl. 32.) CSXC and CSXT are referred to collectively in this decision as CSX. The CSX network includes an east-west rail line between the Boston, Mass., region and Rotterdam Junction, N.Y., via Selkirk, N.Y. (Id. at 34.) CSXT primarily interchanges traffic with Springfield Terminal/PAS at Rotterdam Junction, and with Springfield Terminal/PAR at Barbers Station, Mass. (Id. at 35.)

### Merger Transaction.

Under the proposed Merger Transaction, CSX and 747 Merger Sub 2 would acquire control of the PAR Railroads, and CSXT would merge the PAR Railroads, except V&M, into CSXT. [7]  (Revised Appl. 6-7.) As CSXT would wholly own and control Boston & Maine, CSX and 747 Merger Sub 2 also seek authority to acquire Boston & Maine's 50% ownership share in PAS. (Id. at 7-8.) Applicants state that CSXT, NSR, and GWI have entered into agreements regarding the operation of PAS upon consummation of the Merger Transaction, specifically: (1) a settlement agreement between CSXT and NSR (NSR Settlement Agreement), which includes an agreement relating to operations at Ayer; and (2) a term sheet agreement among CSXT, NSR, and GWI (GWI Term Sheet Agreement). (Id. at 8-9.) [8]  Applicants state that these two agreements contemplate transactions that are related to the Merger Transaction and require Board authorization (i.e., the Related Transactions). These Related Transactions are discussed below.

### Related Transactions.

*NSR Trackage Rights.* NSR filed four verified notices of exemption under 49 C.F.R. § 1180.2(d)(7) for overhead trackage rights pursuant to four separate trackage rights agreements with CSX, Providence & Worcester Railroad Company (P&W) (a GWI subsidiary), Boston & Maine, and PAS. [9]  Specifically:

· In Norfolk Southern Railway—Trackage Rights Exemption—CSX Transportation, Inc., Docket No. FD 36472 (Sub-No. 1), NSR seeks approximately 161.5 miles of overhead trackage rights on CSX's mainline between approximately Voorheesville,

N.Y. (at or near milepost QG 22.5) and Worcester, Mass. (at or near milepost QB 44.5) (inclusive of appurtenant passing tracks and sidings).

**\*5** · In <u>Norfolk Southern Railway—Trackage Rights Exemption— Providence & Worcester Railroad</u>, Docket No. FD 36472 (Sub-No. 2), NSR seeks approximately 2.90 miles of overhead trackage rights on P&W's mainline between a connection with the tracks of CSX at Worcester at milepost 0.0, over Track 1 extending from the east side of Green Street to the point of merger of said Track 1 and the so-called Main Track at milepost 1.05, south of Garden Street, and over the Main Track thereafter from milepost 1.05 to P&W's Gardner Branch baseline station 153+50, which is the point of connection with the tracks of Boston & Maine at Barbers Station at milepost 2.90.

· In <u>Norfolk Southern Railway—Trackage Rights Exemption—Boston & Maine Corp.</u>, Docket No. FD 36472 (Sub-No. 3), NSR seeks approximately 22.08 miles of overhead trackage rights on Boston & Maine's line from milepost X 2.92 at Barber, Mass.,[10] and connection to P&W, to milepost X 25.0 at Harvard, Mass., and connection to PAS.[11]

· In <u>Norfolk Southern Railway—Trackage Rights Exemption—Pan Am Southern LLC</u>, Docket No. FD 36472 (Sub-No. 4), NSR seeks approximately 3.01 miles of overhead trackage rights on PAS's line from milepost X 25.0 at Harvard, and connection to Boston & Maine, to milepost X 28.01 at Ayer.[12]

The combination of these four trackage rights agreements would create a new route that would allow NSR to move intermodal and automobile trains from Voorheesville in eastern New York State to Ayer (the Southern Route). Applicants state that the trackage rights comprising the Southern Route would give NSR the capability to provide double-stack intermodal service by avoiding a tunnel constraint that exists on the Patriot Corridor, i.e., the Northern Route. (Revised Appl., Ex. 12, Market Analysis 24.) Specifically, the height limitations of the Hoosac Tunnel on the Northern Route prevent NSR from double-stacking containers. (Revised Appl. 24.)[13]

NSR states that the trackage rights being acquired pursuant to these verified notices of exemption would not take effect until the Merger Transaction is approved and consummated. (NSR Notice 2 nn.1, 4, FD 36472 (Sub-No. 1); NSR Notice 2 nn.1, 4, FD 36472 (Sub-No. 2); NSR Notice 2 nn.1, 4, FD 36472 (Sub-No. 3); NSR Notice 2 nn.1, 4, FD 36472 (Sub-No. 4).)

*B&E Operating Authority*. As noted above, Springfield Terminal, an affiliate of PAR, currently operates PAS as PAS's agent. (Revised Appl. 6.) As also noted above, Springfield Terminal also operates NSR trains over the PAS-owned line between Mechanicville and Ayer pursuant to a haulage agreement between PAS and NSR. (Revised Appl., Ex. 13, Operating Plan 13.) In <u>Pittsburg & Shawmut Railroad—Operation Exemption—Pan Am Southern LLC</u>, Docket No. FD 36472 (Sub-No. 5), B&E filed a petition for exemption under 49 U.S.C. § 10502 and 49 C.F.R. part 1121 from the provisions of 49 U.S.C. § § 11323(a)(2) and 11324 to allow B&E to enter into contracts to operate on behalf of PAS, and to accept an assignment from Springfield Terminal of Springfield Terminal's current rights to operate the PAS lines. (B&E Amended Pet. 3, FD 36472 (Sub-No. 5).)[14] As such, B&E would replace Springfield Terminal as PAS's operator. B&E is a wholly owned subsidiary of GWI. B&E notes that its petition is filed as a transaction integrally related to, and dependent upon, approval of the Merger Transaction. (B&E Amended Pet. 1-2, FD 36472 (Sub-No. 5).)[15]

**\*6** *Discontinuance Authority over NSR Line*. In SMS Rail Lines of New York, LLC Discontinuance Exemption—in Albany County, N.Y., Docket No. AB 1312X, NSR filed, on behalf of SMS and with SMS's consent, a verified notice of exemption for SMS to discontinue common carrier service and terminate its lease operations over approximately 15 miles of rail line owned by NSR and located between milepost 11.00 in Voorheesville and a point 50 feet south of the centerline of the bridge at milepost 26.14 (or engineering station 6136+/-) in Delanson, N.Y., including the use of a wye track and any track leading to the Northeast Industrial Park at mileposts 12.1 and 12.29, in Albany County, N.Y. (Delanson-Voorheesville Line).[16]

According to NSR, SMS's request for discontinuance authority is related to the trackage rights NSR is seeking in Docket Nos. FD 36472 (Sub-Nos. 1-4). (SMS Notice 3 n.5, AB 1312X.) Specifically, NSR asserts that the discontinuance, along with the trackage rights it would receive, are necessary to improve NSR's ability to move intermodal traffic and automotive trains into the greater Boston marketplace. (Id.) In particular, NSR trains that utilize the proposed CSX/P&W/Boston & Maine/PAS trackage rights over the lines from Voorheesville to Ayer—i.e., the Southern Route—would enter the Southern Route from the Delanson-Voorheesville Line. (See Letter from CSX to Danielle Gosselin, Acting Director, OEA, at 5 (Apr. 7, 2021) (Env't Comment EI-30550) (herein referred to as CSX Env't Comment).) [17]

### Procedural History.

In accordance with the procedural schedule issued in Decision No. 4, comments, protests, requests for conditions, and other evidence and argument in opposition to the Revised Application or Related Transactions were filed on August 27, 2021, including from the U.S. Department of Justice (USDOJ) and the U.S. Department of Transportation (USDOT). Responses to comments, protests, requests for conditions, and other opposition, as well as rebuttals in support of the Revised Application and Related Transactions, were filed on October 18, 2021. Final briefs were filed on January 3, 2022. The Board held a public hearing on January 13-14, 2022, and supplemental pleadings were filed on January 21, 2022. Summaries of the parties' filings are contained in Appendix I. [18]

In addition, dozens of letters expressing support for the Merger Transaction were filed by or on behalf of various rail shippers; short line rail carriers; federal, state, and local politicians; regional chambers of commerce; and other interested parties. The parties that submitted letters of support are listed in Appendix II. In general, these parties support the transaction for a variety of reasons, including infrastructure investments and improvements that CSX would make to the aging PAR network; the potential for improved freight and passenger rail service; the potential for more traffic to be moved by rail, thereby reducing truck congestion; CSX's investment in upgraded and more environmentally-friendly locomotives; expanded marketing opportunities for shippers; and implementation of better technology, such as ShipCSX, which would allow shippers to better track and manage shipments.

**\*7** A few filings and letters raising concerns about the Merger Transaction and Related Transactions were also submitted. These are discussed in more detail below.

Many filings were not submitted in accordance with the due dates set forth in the procedural schedule. The Board finds that no party would be prejudiced by accepting these filings into the record. Accordingly, in the interest of a more complete record, the Board will accept these filings.

### The Merger Transaction.

Applicants assert that the PAR System is an under-resourced regional railroad and the proposed integration of the PAR System into the CSX rail network would bring substantial benefits to shippers and local communities. (Revised Appl. 2.) They further state that CSX has worked to ensure that the Merger Transaction would serve the public interest and not cause any competitive harm, specifically through the NSR Settlement Agreement and GWI Term Sheet Agreement. (Id. at 2-3.) Applicants request that the Board impose the commitments in these two agreements as conditions to approval of the Merger Transaction. (Id. at 12.) Applicants further state that the Merger Transaction would be a straight end-to-end combination of two railroad networks, the type of transaction that the Board has acknowledged is likely to improve rail operations and unlikely to have any adverse competitive effect. (Id. at 3.) They also discuss the benefits that the Merger Transaction and Related Transactions would bring and state that public support for the transactions is evidenced by the support letters that have been submitted to the Board. (Id. at 4.) For these reasons, Applicants assert that the Merger Transaction meets the requirements for approval under 49 U.S.C. § 11324(d). (Id. at 14, 18.)

Applicants assert the that protections provided in the NSR Settlement Agreement and the GWI Term Sheet Agreement will ensure that there are no anticompetitive harms resulting from the acquisition of a 50% interest in PAS. (Revised Appl. 9, 12.) Most notably, CSX states that under the GWI Term Sheet Agreement, B&E would be required to act exclusively in the interest of PAS as an independent rail carrier and provide non-discriminatory service to all carriers connecting with PAS. (Revised Appl., Ex. 22-C, V.S. Pelkey 14.) As such, CSX asserts that it would not have any control over the rates set by PAS, as rate-setting would be the exclusive responsibility of B&E. (Id., Ex. 22-C, V.S. Pelkey 12.)

CSX has also made specific commitments in its filings and entered into settlement agreements with numerous parties that had initially raised concerns about the transaction, including: CP; the State of Vermont (acting through its Agency of Transportation (VTrans)) and Vermont Rail System (VRS); Massachusetts Water Resources Authority (MWRA); the Village of Voorheesville (Voorheesville); and Republic Services, Inc., ECDC Environmental, L.C. and Devens Recycling Center, LLC (collectively, Republic Services). CSX has indicated that it also agrees to certain of Amtrak's requested conditions with respect to CSX-owned lines. Moreover, CSX has explicitly stated that "Applicants intend to fulfill all representations made throughout this proceeding, and Applicants are not opposed to the standard condition that the Board has imposed in past merger proceedings that would hold Applicants to such representations". (See CSX Reb. 103 (citing Canadian Nat'l Ry.—Control—Ill. Cent. Corp. (CN/IC), 4 S.T.B. 122, 187 (1999)).)

**\*8** USDOJ raises competitive concerns regarding the solutions proposed by Applicants to address potential competitive issues. Specifically, USDOJ states that it doubts that the Applicants' proposed contractual protections will be effective in remedying the competitive issues on the Northern and Southern Routes raised by CSX's 50% ownership of PAS. USDOJ also expresses concern that Applicants' proposed remedy of having B&E (a GWI subsidiary) serve as the operator of PAS will create a new issue regarding competition between NECR, another GWI subsidiary, and PAS on the Knowledge Corridor. (USDOJ Comment 3-4.) USDOJ proposes that the Board adopt a structural remedy, specifically, requiring CSX to divest its 50% interest in PAS to another party. (USDOJ Comment 3, 6.)

The Merger Transaction also involves a number of lines on which Amtrak passenger service and MBTA commuter rail service is provided. Accordingly, Amtrak and MBTA (along with MassDOT) request that certain conditions be imposed on the Merger Transaction that they claim are needed to ensure that these passenger and commuter services are protected.

In addition, as discussed below in the Environmental Comments section, some commenters expressed concerns about specific impacts that the transactions would have on their communities.

## DISCUSSION AND CONCLUSIONS

### Statutory Criteria.

Under 49 U.S.C. § 11323(a), certain transactions involving the merger or acquisition of control of rail carriers and/or rail properties require prior Board approval. Here, CSX seeks to acquire control of the seven railroads controlled by Systems and PAR and to merge six of the seven railroads into the CSX corporate family. Because this transaction does not involve the merger or control of two or more Class I railroads, it is governed by § 11324(d), [19] which directs the Board to approve the application unless it finds that: (1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and (2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

The Board must approve the application unless there would "likely" be anticompetitive effects of the type described in subsection 11324(d)(1) (e.g., substantial lessening of competition). 49 U.S.C. § 11324(d)(1). And, even if the Board were to find that there would be a likely and substantial lessening of competition (or a likely creation of a monopoly or restraint of trade), the Board

must approve the transaction unless the anticompetitive effects outweigh the public interest in meeting significant transportation needs, see 49 U.S.C. § 11324(d)(2), and cannot be mitigated through conditions. See Canadian Pac. Ry.—Control—Dakota, Minn. & E. R.R. (CP/DM&E), FD 35081 (STB served Sept. 30, 2008) (assessing whether a "significant" merger transaction met the criteria of § 11324(d)); see also Soo Line Corp.—Control—Cent. Me. & Que. Ry. U.S. Soo Line/CMQR), FD 36368, slip op. at 7 (STB served May 4, 2020); Norfolk S. Ry.—Acquis. & Operation—Certain Rail Lines of the Del. & Hudson Ry. (NS/D&H), FD 35873, slip op. at 14 (STB served May 15, 2015); Paducah & Louisville Ry.—Acquis.— CSX Transp., Inc., FD 34738, slip op. at 4 (STB served Nov. 18, 2005).

**\*9** Typically, the Board uses its conditioning authority to ameliorate competitive harm that would result from the transaction. See Soo Line/CMQR, FD 36368, slip op. at 4; see also Norfolk & W. Ry.—Purchase—Ill. Term. R.R., 363 I.C.C. 882, 891 (1981). In doing so, the harm caused by the transaction "must be distinguished from pre-existing disadvantages that other railroads, shippers, or communities may have been experiencing ... i.e., pre-existing disadvantages that will neither be caused nor exacerbated" by the transaction. Canadian Nat'l Ry.—Control—Duluth, Missabe & Iron Range Ry., FD 34424, slip op. at 14 (STB served Apr. 9, 2004); see also NS/D&H, FD 35873, slip op. at 14, 22 (STB served May 15, 2015). The Board's conditioning power is thus "used to preserve competitive options (not to expand them)". Burlington N. Inc.— Control & Merger —Santa Fe Pac. Corp., 10 I.C.C.2d 661, 745 (1995).

### General Competitive Analysis.

After considering the full record in this proceeding, the Board finds CSXC, CSXT, and 747 Merger Sub 2 control of the seven Systems and PAR Railroads and subsequent merger of six of those railroads into CSXT, subject to the voluntary commitments and settlement agreements to which Applicants have agreed, [20] would not likely cause a substantial lessening of competition or create a monopoly or restraint of trade. In addition, any anticompetitive effects that might be caused by this transaction, in the unlikely event they were to occur, would be outweighed by the public interest in meeting significant transportation needs. Accordingly, the Board will approve the Merger Transaction, subject to the conditions that CSX has requested be imposed as part of the agency's approval.

*PAS Capital Investments*. USDOJ raises concerns that, notwithstanding the contractual limitations to which CSX has agreed, as 50% owner, CSX would still have the ability to influence PAS decisions, such as when and where to make capital investments, that could disadvantage PAS to the benefit of CSX and its Southern Route. Specifically, USDOJ states that CSX's ownership "may give CSX the ability to influence joint venture operations notwithstanding any authority CSX may grant to B&E or any behavioral safeguards that CSX claims it will institute". (USDOJ Comment 4.)

In response to this concern, CSX in its rebuttal stated it would make the following additional commitments beyond the contractual requirements contained in the agreements submitted with the Revised Application:
(1) To recuse itself from any PAS board discussion or consideration of strategic issues that relate to CSX's Southern Route or competition between PAS and CSXT.

(2) To use accelerated arbitration to resolve any disputes that arise at the level of the PAS Management Committee over CSXT's willingness to make PAS capital expenditures. If there is a dispute, the arbitrator would determine whether the disputed capital expenditure is one that would be made by an independent investor in PAS seeking to optimize PAS's success.

**\*10** (CSX Reb., Ex. 22-C, V.S. Pelkey 8-9.) In addition to these commitments, CSX notes that there are provisions in the NSR Settlement Agreement that give NSR the ability to force CSX to sell its interest—either to NSR or a third party—at NSR's discretion, at any point over the next seven years, at a specific price. (CSX Revised Appl., V.S. Reishus 50 (citing Section II of the NSR Settlement Agreement); CSX Br. 15.) Under the NSR Settlement Agreement, NSR would also have certain "change in control" rights that would allow NSR to take over majority control of the PAS Management Committee (which would normally

be evenly divided between CSX and NSR representatives) if CSX initiates steps to sell its 50% interest in PAS to another entity. (NSR Settlement Agreement, Section III.)

The Board finds that the combination of the NSR Settlement Agreement, in addition to the additional commitments and settlement agreements that CSX has requested be conditions to the overall Merger Transaction, are sufficient to ensure that CSX does not improperly influence PAS capital decisions in an anticompetitive manner. CSX's commitment to recuse itself from certain decisions relating to strategic issues that relate to CSX's Southern Route or competition between PAS and CSX would prevent CSX from influencing PAS decisions in a way that would solely benefit CSX. [21] NSR's purchase and change-in-control rights would also serve as a way for NSR to take remedial action if CSX acts in a manner contrary to PAS's interests. [22]

The Board recognizes that the success of these commitments is partially dependent on NSR being motivated to prevent CSX from taking actions adverse to PAS's interest. USDOJ questions whether NSR itself has a genuine interest in maintaining the viability of the PAS system, particularly the Northern Route. (See USDOJ Comment 5-6 ("The two companies may have the incentive to compete less aggressively, as they both stand to profit from higher prices and reduced service quality".) The evidence in the record suggests that NSR will have both the ability and the incentive to prevent CSX from taking actions that would impair PAS. As noted, NSR negotiated the right to force a sale of CSX's ownership of PAS at a set price, which suggests that NSR would not be satisfied with mismanagement of PAS and has a genuine interest its preservation. [23] Moreover, NSR's representative at the hearing explained that NSR would have a continuing interest in a viable Northern Route because the proposed trackage rights it would receive in the Related Transactions—to operate the two intermodal/automotive trains over the Southern Route—would not be sufficient to meet all of NSR's traffic needs. (Hr'g Tr. 785:9-11, Jan. 14, 2022.)

In addition, under their settlement agreement with CP (CP Settlement Agreement), both CSX and NSR have agreed to "[d]ischarge all commitments and representations made to the [Board in this proceeding] in relation to maintaining the competitive viability of the PAS or otherwise to mitigating any adverse competitive impacts of the Related Transaction" and to "maintain the competitive viability of the relevant [i.e., Northern] route". (See CSX Hr'g Suppl., Jan. 21, 2022, App., Section 1.1(c) and (d).) The CP Settlement Agreement also provides assurances that the Merger Transaction and Related Transactions will not ultimately undermine the PAS routes as a competitive option. (Id. at Section 1.1(d).) Thus, the CP Settlement Agreement will also help ensure that CSX and NSR work in concert to keep the Northern Route viable.

**\*11** CSX has also committed to route certain carload traffic over the Northern Route for a transitional period. (CSX Env't Comment 2 (citing Section IX of the NSR Settlement Agreement).) [24] As a result, CSX would continue to have, at the very least, a near-term financial interest in ensuring that the Northern Route remains viable.

Finally, as discussed in more detail below, CSX will be required to provide reports on PAS traffic levels over the Northern Route for at least two years as part of the Board's oversight (discussed below). These reports will allow the Board to monitor traffic levels and take appropriate action if necessary.

The Board will not impose a condition that requires CSX and NSR to make a specified level of capital investment in the Northern Route, including with respect to the Hoosac Tunnel, or maintain that line to a particular FRA track standard. (Hr'g Tr. 776-91, Jan. 14, 2022.) The primary proponent for such a condition was CP, which subsequently reached a settlement with CSX and NSR and withdrew its request. Additionally, the likelihood of raising the clearance of the Hoosac Tunnel to accommodate double-stack trains would not appear to be diminished by the Merger Transaction. As several individuals noted at the hearing, Systems has not been able to make necessary investments in its lines, [25] and it is therefore highly unlikely that Systems would be able to make much, if any, financial contribution to the Hoosac Tunnel project if it were to remain a part-owner of PAS. By contrast, CSX, a Class I carrier, will have access to more capital resources should there be sufficient demand to invest in the Hoosac Tunnel project. As discussed above, the Board finds that certain commitments and agreements CSX has entered into—such as its commitments to recuse itself from certain PAS decisions and to maintain the competitive viability of the Northern Route—will make it difficult for CSX to take actions in its own self-interest that could adversely affect the future of the Northern Route.

*PAS Rates*. Under the series of proposed transactions, B&E would become the operator of PAS on behalf of the two owners, CSX and NSR. Under the terms of both the NSR Settlement Agreement and the GWI Term Sheet Agreement, B&E would be required to operate "in a nondiscriminatory fashion," (NSR Settlement Agreement, Section 1(2)), and set rates that "advance the economic interest of PAS as an independent rail carrier," (GWI Term Sheet Agreement, Section IV-4). [26] As a result, CSX argues that it will retain no control over the rates set by PAS and that B&E will have the incentive and flexibility to compete for traffic against CSX. (Revised Appl., Ex. 12, Marketing Plan 16 & Ex. 22-C, V.S. Pelkey 11-12.) [27] Moreover, at the hearing, representatives for CSX explained that the intent of these agreements is to ensure that pricing to access PAS is neutral and non-discriminatory going forward, allowing shippers to choose among the different carriers. (See Hr'g Tr. 758-76, Jan. 14, 2022.) This will have the effect of maintaining open "gateways" to and from PAS. (Id. at 766:2-12, 793-794.)

**\*12**  The Board finds that the arrangement between CSX, NSR, and B&E, under which B&E would have independent rate-setting authority, will be sufficient to ensure that PAS rates are not set in an anticompetitive manner. These arrangements address the general concern that CSX might otherwise have both the economic incentive and the power to direct PAS to offer uncompetitive rates on the Patriot Corridor (i.e., the Northern Route) and thereby cause more traffic to shift to CSX's Southern Route. But for that uncompetitive pricing and resultant traffic shift to occur, NSR would have to refrain both from enforcing the terms of the NSR Settlement Agreement and from invoking its purchase rights. The Board concludes that such a scenario is unlikely given that, as noted, it finds that NSR will continue to have a sufficient economic incentive to preserve PAS. [28]

Moreover, B&E itself, as operator, would also have a financial incentive to oppose such anticompetitive action. Indeed, B&E would not benefit by agreeing to a demand by CSX to raise rates to a level that would force traffic *off* the B&E-operated line. Such an action would make it more difficult for B&E to earn the operating bonus that is provided for under the GWI Term Sheet Agreement [29] and would also make it more difficult for B&E to obtain a return on its investment in the PAS system. [30] There would therefore be no economic justification for B&E to agree to such a demand and, under the terms of the GWI Term Sheet Agreement, B&E has the authority to veto such a request. [31]

*PAR Gateways*. In the Revised Application, CSX also commits "to (a) keep all existing active gateways affected by the Proposed Transaction open on commercially reasonable terms, and (b) waive any right CSXT might otherwise have under the Board's rules to refuse requests by shippers to establish local, separately challengeable rates for movements on the PAR System to an interchange with another rail carrier". (Revised Appl., Ex. 22-C, V.S. Pelkey 17.) At the hearing, CSX representatives further elaborated on what this commitment would encompass, stating in particular that this commitment would apply to all traffic (any commodity) originating or terminating on the PAR System, [32] and would last in perpetuity. [33]

The Board finds that the open gateway commitment is vital to ensuring that the PAR System remains a competitive option, as it will allow other carriers that connect with the PAR System to continue offering competitive interline rates. Under this commitment, CSX has agreed to waive its right under the Board's "Bottleneck Cases" [34] to quote only long-haul rates, even when interline routes are possible. (See also Hr'g Tr. 163-64, Jan. 13, 2022.) As an example, at the hearing, there was specific discussion about the impact the open gateway commitment would have on propane shippers from Sarnia, Ontario in Canada to receivers in New England. CSX noted that although, as a result of the merger, it would be able to provide single-line service for propane shipments from Sarnia to New England, its open gateway commitment would obligate CSX to continue to offer interline rates, on "commercially reasonable" terms, from Bangor, Me. to points in New England for those shippers that still desire to ship propane using the Canadian carriers. (Hr'g Tr. 161-66, Jan. 13, 2022.)

**\*13**  In addition, CSX has committed to ensuring that all gateways on the PAR System remain open from a financial perspective. (See Hr'g Tr. 167-69, Jan. 13, 2022.) Indeed, as CSX stated at the hearing, "[o]ur commitment is we are not going to do anything either physically or financially that is going to take away a competitive option that exists today". (Id. at 168:19-22.) In particular, CSX has committed that rates to or from the PAR gateways will be ""commercially reasonable". The "commercially reasonable" requirement has been imposed as part of an open gateway condition by the Board in past merger decisions. See CN/EJ&E, FD

35087 et al., slip op. at 16, 54; CP-DM&E, FD 35081, slip op. at 5, 27; Kan. City S.—Control—Kansas City S. Ry., 7 S.T.B. at 938 (2004); Canadian Nat'l Ry.—Control—Wis. Cent. Transp. Corp., 5 S.T.B. 890, 894, 918 (2001).

*PAR Rates and Access to PAR*. CSX commits to "transitional restrictions" on the rates it will charge for future movements originating or terminating on the existing PAR System lines to and from PAS. (Revised Appl., Ex. 22-C, V.S. Pelkey 12.) The specific details of this commitment are set forth in more detail in a provision of the NSR Settlement Agreement that has been designated as confidential information in the filings with the Board. As indicated by the term "transitional," these restrictions expire after a specified period. Under this provision, the rates would also be subject to adjustments. [35] Having reviewed this particular provision, the Board finds that it would help preserve competition and would last for a sufficient time to allow parties to adapt to any changes resulting from the Merger Transaction and Related Transactions. The requirement to keep in place the PAR rates for traffic interlined with PAS will help prevent CSX from raising rates to divert traffic away from the Northern Route during the transitional period.

CSX has also made commitments that will mitigate the potential competitive harm to shippers who might otherwise lose access to PAR as a result of the merger. CSX states that there are only three shippers, located just north of Boston, whose rail alternatives will go from two (the PAR System and CSX) to one (CSX) as a result of the Merger Transaction. (Revised Appl., Ex. 22-C, V.S. Pelkey 16; Ex. 22-E, V.S. Reishus 52-59 (listing all locations which have physical access to both CSX and PAR and analyzing which locations have shippers whose service would go from two carriers to one).) CSX states that it commits to provide switching service for these 2-to-1 shippers to reach PAS to preserve those shippers' current access to multiple rail carriers. (Revised Appl., Ex. 22-C, V.S Pelkey 17.) [36] CSX also identifies other shippers in the Boston area to which it would offer switching service, even though such shippers are not necessarily currently served by both CSX and PAR. (Revised Appl., Ex. 22-E, V.S. Reishus 57-59 (shippers are listed in Table 18).)

**\*14** *NECR-PAS Competition Concerns*. USDOJ raised concerns that the Merger Transaction and Related Transactions would adversely affect competition on the ""Conn River Line". The Conn River Line (or Connecticut River Line) comprises the northern end of the Knowledge Corridor, from White River Junction, Vt., to East Northfield, Mass. [37] The line is owned by NECR, a GWI subsidiary, but PAS has trackage rights over the line. As a result of the Merger Transaction and Related Transactions, the two carriers operating over the line—NECR and B&E (on behalf of PAS)—would both be GWI subsidiaries. CSX's witness, Dr. Reishus, performed an analysis to identify potential 2-to-1 shippers on the Conn River Line. (Revised Appl., Ex. 22-E, V.S. Reishus 90-91.) CSX and NSR commit on behalf of PAS that B&E will establish rates for these customers at current levels, subject to future reasonable escalation, for as long as B&E is the operator of PAS. (Revised Appl., Ex. 22-E, V.S. Reishus 91.) [38]

VTrans and VRS own and operate rail lines, respectively, that connect with the Conn River Line: first, an approximately 102-mile rail line from Newport, Vt. to White River Junction, and second, an approximately 52-mile rail line that extends from Rutland, Vt., to Bellow Falls, Vt., and then continues across the Connecticut River to North Walpole, N.H. (VRS Reply 3.) VTrans and VRS also own and operate an approximately 128-mile rail line from Burlington, Vt., to Hoosick Junction, N.Y., where it connects with PAS's Patriot Corridor (i.e., the Northern Route). (VRS Reply 2.) VRS and VTrans have entered into a settlement agreement with CSX, NSR, and GWI (Vermont Settlement Agreement). (CSX Settlement, Jan. 3, 2022.) [39] The Vermont Settlement Agreement includes the following terms: [40]
· VRS will have overhead trackage rights between White River Junction and Bellows Falls; (Vermont Settlement Agreement, Section 2(a))

· VRS will have "service failure-related 'pop-up"D' trackage rights [41] between Bellows Falls and East Deerfield when PAS service drops below a level agreed to by VRS; (id. at Section 2(b))

· NSR's existing haulage rights from Mechanicville to Hoosick Junction will be extended to East Deerfield. These haulage rights will be subject to "price stability" [42] for so long as any GWI subsidiary operates the PAS rail lines as a contract operator; (id. at Section 4(a))

· CSX will have haulage rights between Rotterdam Junction and Hoosick Junction. These haulage rights will also be subject to "price stability" for so long as any GWI subsidiary operates the PAS rail lines as a contract operator; (id. at Section 4(b)), and

· PAS will provide price stability for interline traffic moving over PAS between Bellows Falls and PAR destinations and origins, for so long as B&E or any GWI subsidiary operates the PAS rail lines as a contract operator, (id. at Section 5).

**\*15**  The Board finds that the terms of the Vermont Settlement Agreement sufficiently address the concerns regarding competition between NECR and PAS, and, as CSX has requested, (CSX Settlement, Jan. 3, 2022), the Board will impose those terms as a condition of the Board's approval here. Two of VRS's key lines are separated by the NECR-owned segment between White River Junction and Bellows Falls; as such, VRS must rely on either NECR or PAS to provide overhead service between these points. (VRS Reply 8-9.) Under the Vermont Settlement Agreement, VRS will now be able to connect its two lines via overhead trackage rights. As such, VRS will be able to protect its own interests, even if service between NECR and PAS erodes. Similarly, the "pop-up" trackage rights that allow VRS to pick up traffic at East Deerfield will also provide VRS a safety net in the event that NECR or PAS service declines and creates congestion at the East Deerfield yard. The haulage rights and price stability provisions should also preserve VRS's ability to continue offering competitive rates and routings through Hoosick Junction, a key gateway for VRS's customers. Finally, the interline rate provision for traffic moving over PAS between Bellows Falls and PAR destinations and origins will help ensure that VRS is able to continue offering competitive rates and routings for traffic that must move over the Conn River Line. [43]

Before the Vermont Settlement Agreement was filed, USDOJ raised a concern that B&E and NECR would potentially have significant insight into each other's pricing, scheduling, and other key competitively sensitive information. (USDOJ Comment 5.) The Vermont Settlement Agreement requires that:
"CSXT, Norfolk Southern and GWI shall not permit B&E to share with any other rail carrier not in the route, including but not limited to any GWI subsidiary railroads not in the route, any VRS rate divisions, shipper or consignee identity, origin and destination points and commodities and volumes ... that come into its possession as a result of or in connection with its contract operation of PAS".

(Vermont Settlement Agreement 10.) [44]  It further states that "GWI shall cause B&E to, and VRS shall, reasonably cooperate to develop a specific mechanism for B&E to attest to its compliance with the provisions of this [[section]". (Id.) Developing mechanisms to keep B&E commercial information segregated from the rest of the GWI subsidiary railroads is critically important to preserving the competitive independence of B&E. The Board notes that B&E states that another GWI affiliate, Tazewell & Peoria Railroad, Inc., operates in a similar capacity to how B&E would operate, indicating that GWI has some experience with developing methods for keeping such information properly segregated. To ensure that B&E's independence is preserved, as part of the Board's oversight, CSX shall be required to report to the Board the protocols and implementation steps that it, NSR, and B&E are putting in place to prevent the improper sharing of competitive information. This report shall be filed six months after B&E closes on its transaction to take over PAS's operations.

**\*16**  *Divestiture*. The Board finds that the Merger Transaction, subject to the additional commitments and settlement agreements that CSX has requested be imposed as conditions to the overall Merger Transaction, would not likely cause a substantial lessening of competition or create a monopoly or restraint of trade; as such, there is no need for the Board to consider USDOJ's proposal that CSX be forced to divest the 50% ownership interest in PAS it will acquire through the transaction. Moreover, the Board is not persuaded that divestiture would provide a superior alternative to both the more narrowly tailored commitments made by CSX and the other railroads here, [45] which are targeted to address specific competitive concerns, and the Board's

continued oversight. Were the Board to require divestiture to address concerns over CSX's half-ownership of PAS or GWI's control of both NECR and PAS, the Board would essentially revise the entire structure of the Merger Transaction and Related Transactions, an approach that does not appear warranted here given the specific commitments and the Board's oversight.[46] In particular, the Board regards NSR's acquisition of trackage rights for intermodal/automotive traffic over the Southern Route as a procompetitive aspect of the proposed transaction because it could enable NSR to provide single-line service to Ayer at a lower cost. It is not clear that that those trackage rights would remain part of any restructured transaction that included a required divestiture, assuming the transaction proceeded at all. There are also lingering questions about the feasibility of divestiture as a remedy here, including whether an appropriate buyer could be located, whether an appropriate operator could be identified, and whether the alternative operator/buyer would have sufficient resources and incentives to preserve PAS as an effective alternative to CSX's Southern Route. As noted in the following section, the Merger Transaction is likely to result in important public benefits in the New England region. On balance, the Board concludes that these benefits are more likely achieved through the transaction as currently structured, with commitments, than through an uncertain divestiture requirement with unpredictable outcomes that could have potentially weakened PAS as a viable alternative.

*Benefits of the Merger Transaction and Related Transactions.* As noted, because the Board finds that the Merger Transaction, subject to the conditions that CSX has voluntarily requested be imposed as part of the agency's approval, would not likely result in a substantial lessening of competition, creation of a monopoly, or restraint of trade under 49 U.S.C. § 11324(d)(1), the Board need not reach 49 U.S.C. § 11324(d)(2), in which the agency determines whether the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs. However, even if there were any anticompetitive effects of the acquisition transaction, they would be outweighed by the public benefits of this transaction.

**\*17** One key benefit of the Merger Transaction is that it will result in much-needed capital investments in the PAR System, as well as more consistent maintenance. (Revised Appl., Ex. 13, Op. Plan 3, 48-53 (detailing the maintenance and capital investment CSX plans to make).) According to CSX, the PAR System and PAS network have been maintained for decades with limited resources, leading to subpar infrastructure that CSX intends to fix. (Id. at 48; Hr'g Tr. 100-01, Jan. 13, 2022.) At the hearing, CSX representatives stated that the company plans to spend $100 million to upgrade the PAR lines. (Hr'g Tr. 100:14-18, Jan. 13, 2022.) Many of the parties supporting the Merger Transaction also cited this as a key benefit of the merger and, at the hearing, several parties expressed concern about the continued viability of the PAR lines if the Merger Transaction were not to occur. (Hr'g Tr. 354-56, Jan. 13, 2022; Hr'g Tr. 670:5-8; 725-26, Jan. 14, 2022.) CSX has also committed to make certain infrastructure improvements in its settlement agreements with MRWA, Maine DOT, and NNEPRA.

CSX notes that it will also be available to invest more in safety. Many of the infrastructure improvements alone will enhance safety. (Revised Appl., Ex. 13, Operating Plan 48-53.) CSX also plans to implement a number of new technological safety measures, training, and procedures. (Id. at 58-59.) CSX also notes that B&E has a better safety record than the current operator, Springfield Terminal. (Revised Appl., Ex. 13, Operating Plan 40.)

The Merger Transaction is also likely to provide shippers with additional marketing opportunities. The Board has often recognized more efficient single-line service as a benefit of mergers. See CP/DM&E, FD 35081, slip op. at 11; UP/SP, 1 S.T.B. at 38. Here, CSX would be able to provide more efficient single-line service over its Southern Route once the Merger Transaction and Related Transactions are completed. At the hearing, CSX representatives specifically noted the opportunity to capture truck traffic from long-haul truck movements after it completed its planned investments.[47] (Hr'g Tr. 140-41, Jan. 13, 2022.) If this conversion from long-haul truck to rail were to occur, the Merger Transaction would have environmental benefits.

The Merger Transaction should produce other environmental benefits as well. CSX states that its locomotives are newer than those currently used by Springfield Terminal and thus more fuel efficient. (Revised Appl., Ex. 13, Operating Plan 55.) According to CSX, because of the higher horsepower of its locomotives, it can also operate with fewer locomotives than Springfield Terminal. (Id. at 56.) CSX states that it also plans to revitalize Springfield Terminal's yard fleet with switcher locomotives that will reduce emissions by 90%. (Id. at 55.)

**\*18**  Another significant benefit of the transaction involves propane shipments. Propane is a vital commodity to the New England region and the Merger Transaction will allow CSX to offer more competitive routings for propane, giving receivers more options, including when other routings are unavailable due to weather events or other disruptions. (Hr'g Tr. 154-55, Jan. 13, 2022.) There should also be benefits from NSR's ability to route its intermodal/automotive trains over the Southern Route pursuant to the Related Transactions. Because of the height restrictions on the Hoosac Tunnel, these NSR trains currently must go through a time-consuming "filet/toupee" process, in which eastbound double-stacked trains must be stopped and single-stacked, and westbound single-stacked trains must be stopped and double-stacked. (Revised Appl. 24-25.) NSR can avoid this process and provide more efficient service by using the Southern Route.

### Passenger and Commuter Rail.

As detailed in Decision No. 4, there are several passenger and commuter service carriers that operate over rail lines that are subject to the Merger Transaction and Related Transactions. (Decision No. 4, slip op. at 10-12.) Specifically, Amtrak operates the Vermonter, Valley Flyer, Springfield to New Haven (i.e., the Hartford Line), Downeaster, Adirondack, Ethan Allen, and Lake Shore Limited services. MBTA operates its Fitchburg Line, Haverhill Line, and Lowell Line commuter services. Connecticut Department of Transportation, in conjunction with CTrail and Amtrak, operates a commuter service between Springfield and New Haven. Finally, the Metropolitan Transportation Authority, through its operating agency Metro-North Railroad, operates commuter service between Waterbury, Conn., and Bridgeport, Conn.

In its Revised Application, CSX asserts that the Merger Transaction and Related Transactions would have no negative impact on passenger service operated on the rail lines affected by these proceedings. (Id., Ex. 13-C, V.S. Daly 4.) CSX further states that passenger service would benefit from the more consistent and reliable network that would result from the Merger Transaction and Related Transactions, such as greater deployment of technology and digitization of railroad operations and CSX's experience with installing and operating Positive Train Control (PTC). (Id., Ex. 13-C, V.S. Daly 4, 8-9.) CSX states that the rerouting of NSR intermodal and automobile trains from the Northern Route to the Southern Route would not impact passenger service, including the Lake Shore Limited service. (Id., Ex. 13-C, V.S. Daly 12-14.)

CSX further states that it commits to fully stepping into the shoes of Springfield Terminal regarding any agreements or commitments made by Springfield Terminal to MassDOT and MBTA, including with respect to Springfield Terminal's dispatching responsibilities. (Revised Appl., Ex. 13, Operating Plan 47.) Specifically, CSX states that dispatching operations for MBTA and MassDOT passenger trains would continue to be located in North Billerica, Mass., for the foreseeable future. (Id.; see also Hr'g Tr. 68-69, Jan. 13, 2022.) CSX also commits to continuing to route traffic from the existing CSX network onto the existing PAR/Springfield Terminal network through Barbers Station and Ayer, rather than using the Grand Junction Branch, which runs from Worcester to Framingham, Mass. (Revised Appl., Ex. 13-C, V.S. Daly 10.) CSX further states that if it sees the need in the future to consistently operate over the Grand Junction Branch, it is committed to working cooperatively with MBTA to implement capital improvements to accommodate any changes in CSXT freight service. (Id.)

**\*19**  In its reply, Amtrak requested that seven additional conditions be imposed on CSX regarding passenger service. (Amtrak Reply 21-22.) Amtrak reiterates these conditions in its Final Brief. (Amtrak Br. 8-11.) The full list of Amtrak-requested conditions is provided in Appendix 1 and are identified as Condition Nos. 1-7. The conditions, as worded by Amtrak, are as follows:
· Condition No. 1: CSX should be ordered to adhere to and fulfill the representations it has made in this proceeding regarding its undertakings and obligations if the Merger Transaction is approved, and to make regular and data-supported reporting to the Board to confirm its compliance with those representations. Specifically, CSX should be ordered:
· To comply[] with its statutory and contractual responsibilities with respect to Amtrak services.

· To maintain or improve existing passenger service, maintain a consistent and reliable network, and create a dedicated Passenger Operations team.

· Prior to initiating additional NSR intermodal/automotive service, to engage with NSR and Amtrak in "formal joint planning and joint preparation"; schedule the additional NSR service to "operate outside the current Amtrak operating windows" between the Albany area and Worcester (2:00p.m.-7:00p.m.); and "make sure that the passenger service requirements will be protected".

· To ensure that proposed traffic shifts have no impact on any passenger service on the Southern Route or the Northern Route.

· To ensure that NSR intermodal/automotive service will be scheduled to operate at a time when no Amtrak trains are scheduled to run over the Knowledge Corridor.

· To prioritize passenger train movements at CP 98 (milepost QB 98.5) in Springfield, Mass.

· To ensure that all passenger trains are handled efficiently by dispatchers on the CSX network.

· To participate in good faith discussions with the Northern New England Passenger Rail Authority (NNEPRA) and Amtrak regarding improvements to, or expansion of, the Downeaster service. To the extent not included in the above, to cooperate with any effort to increase maximum speeds for Downeaster trains and increasing Downeaster service frequencies.

· To install PTC on the PAR System line segment north of the Massachusetts/New Hampshire State line to Brunswick, Me., which hosts the Amtrak Downeaster service, and to work with Amtrak and NNEPRA on coordinating installation of PTC.

· Condition No. 2: CSX should be ordered to fully cooperate in good faith with Amtrak and third party public agencies for addition, expansion, or modification of existing intercity passenger rail services, operation of seasonal service or "extra sections" of existing regularly scheduled Amtrak trains, and/or development of new intercity passenger rail service, including but not limited to service over the Pan Am routes and CSX's Albany-Worcester route; with respect to any such request by Amtrak, all inputs and assumptions will be shared with the parties participating in any analysis or modelling (if such is required), and with the Board in any subsequent proceeding, subject to appropriate confidentiality undertakings; and with respect to the Pan Am routes and CSXT's Albany-Worcester route, the level and composition of freight traffic used in any analysis or modelling (if such is required) will be no greater than the level forecast by CSXT in their Application.

**\*20**   · Condition No. 3: CSX should be ordered to cooperate with Amtrak and third-party public agencies to identify improvements, if any, that would be required to make accelerated speeds on the Pan Am routes and CSX's Albany-Worcester route safe and practicable, and, upon agreement or an order to implement such accelerated speeds, work in good faith to make such improvements as promptly as practicable.

· Condition No. 4: CSX should be ordered not to make changes in operations on the Pan Am routes and/or CSX's Albany-Worcester route, including but not limited to changes in freight traffic volumes, scheduling, infrastructure, and dispatching that would reasonably be expected to result in the Customer On-Time Performance of Amtrak trains operating on the Pan Am routes and CSX's Albany-Worcester route falling below the minimum standard as defined in the FRA Final Rule published November 16, 2019, and that in the event CSX changes inadvertently result in an Amtrak train or Amtrak route falling below such minimum standard, CSX will be required to take such actions as may be necessary to restore the performance of such Amtrak train or Amtrak route performance to at least the minimum standard.

· Condition No. 5: CSX should be ordered to perform all non-emergency maintenance-of-way activities on the Pan Am routes and CSX's Albany-Worcester route during non-peak passenger travel periods.

· Condition No. 6: CSX should be ordered to provide for the operation of up to four weekend trips (two on Friday and two on Sunday), on a seasonal basis (summer) only, between Albany, N.Y. (Post Road Crossing) and Pittsfield, Mass. (the Berkshire Flyer service), commencing on a date ninety (90) days following written notice from Amtrak, at maximum authorized passenger

train speeds, with no required capital contribution from Amtrak for capacity related improvements, and permitting such Amtrak trains to change ends in Pittsfield on Track 1.

· Condition No. 7: The Board should retain jurisdiction to oversee compliance with these conditions.

CSX initially opposed these conditions for a variety of reasons. Among its arguments, CSX asserted that Condition No. 1 was unnecessary because any new freight service would be operated in a manner so as to not conflict with the actual operations of Amtrak trains (CSX Reb. 73); Condition No. 4 was inappropriate given that that the Board has jurisdiction to investigate on-time performance under 49 U.S.C. § 24308(f) when those figures drop below an average 80% for any two consecutive quarters (CSX Reb. 76); and that Condition No. 5 was inappropriate because it sought to address issues where the Merger Transaction and Related Transactions will have no impact (CSX Reb. 77).

**\*21** However, in its January 12, 2022 filing, CSX requests that the Board impose Condition Nos. 1-5 and 7 as conditions to the agency's approval. (CSX Mot. 1, Jan. 12, 2022.) With respect to Condition No. 6, regarding Amtrak's request that CSX be ordered to provide for the operation of the Berkshire Flyer service, CSX attaches a letter stating that it would agree to the operation of the Berkshire Flyer from Memorial Day to Columbus Day in 2022, on Amtrak's requested schedule. (CSX Mot., Att., Jan. 12, 2022.) CSX states, however, that it would need a commitment from Amtrak to install a 1,000-foot station track to mitigate freight interference. (Id.) Subsequently, CSX submitted a signed letter between CSX and Amtrak representatives that states that CSX agrees to operation of the Berkshire Flyer service in 2022 and 2023 as a "Special Train" under the same terms offered in its earlier filing, and without the need for the station track. (CSX Hr'g Suppl., Ex. B.) According to the letter, if Amtrak plans to operate the service beyond 2023, CSX and Amtrak will work cooperatively to assess the need for additional infrastructure including a station siding in Pittsfield, Mass.

Amtrak confirms that the two parties have reached an agreement that will allow for operation of the Berkshire Flyer in 2022 and 2023 and, "[t]herefore, there is no longer a need for the Board to resolve this issue". (Amtrak Hr'g Suppl. 3.) According to Amtrak, the only remaining issue is whether Condition Nos. 1-5 and 7 should also be applied to PAS-owned lines. (Hr'g Tr. 456:3-12, Jan. 14, 2022; Amtrak Hr'g Suppl. 3.) Amtrak states that there is no reason to have two different sets of conditions applicable to this single Board-approved control transaction and that neither CSX nor NSR has offered any reason for excluding PAS. (Amtrak Hr'g Suppl. 3.) CSX states that it cannot make commitments regarding PAS on behalf of its future co-owner, NSR, but notes that NSR has reached out to Amtrak and offered to engage in good faith negotiations regarding Amtrak's requested conditions. (CSX Hr'g Suppl. 4, Jan. 21, 2022.)[48]

Amtrak argues in its filings that the Board has authority under 49 U.S.C. § 11324(c) to impose conditions relating to the public interest, including passenger-rail-related conditions. (Amtrak Reply 2-5; Amtrak Hr'g Suppl. 4-6.) Amtrak claims that this view is supported by the decision in Village of Barrington v. STB, 636 F.3d 650, 653 (D.C. Cir. 2011), and the recently issued Executive Order 14036, which specifically encourages the Board to consider a carrier's fulfillment of its responsibility under 49 U.S.C. § 24308 in determining whether a merger is consistent with the public interest under 49 U.S.C. § 11323-25. (Amtrak Reply 3-4; Amtrak Hr'g Suppl. 4-6.) In response, CSX states that it does not believe that the STB has authority under 49 U.S.C. § 11324 to impose passenger-related conditions in non-major merger transactions. (CSX Hr'g Suppl. 7, Jan. 21, 2022.)[49] CSX notes that the Board in CP/DM&E, FD 35081, slip op. at 15, refused to grant passenger-related conditions in a significant transaction because the "alleged harm does not relate to competition, the major focus of our section 11324(d) analysis". (Id.) CSX also notes that the Board has stated that "the ICC, shortly after passage of the Staggers Act, concluded that its substantive, transportation-related review in [non-major] cases should focus only on the 'significant anticompetitive effects' standard in the statute". (Id., citing CN/EJ&E, FD 35087, slip op. at 31.) CSX further claims that—unlike environmental conditions—there is no legislative mandate that would allow the Board to impose such conditions unrelated to significant anticompetitive effects. (Id.)

**\*22** MassDOT/MBTA state that the Merger Transaction and Related Transactions risk harm to the public interest, including deteriorated passenger rail transportation in the Commonwealth of Massachusetts. (MassDOT/MBTA Reply 7.) They further

argue that Applicants' assurances that there will be no adverse impacts due to the Merger Transaction and Related Transactions too often devolve into vague and conclusory statements. (Id.) Like Amtrak, MassDOT/MBTA argue that there is a strong federal policy interest in protecting and promoting railroad passenger service, as demonstrated by Executive Order 14036 and the Rail Transportation Policy of 49 U.S.C. § 10101. (MassDOT/MBTA Br. 8-10.) They likewise argue that agency precedent supports the imposition of passenger-rail-related conditions in mergers, citing CSX Corp.— Control & Operating/Lease Agreements— Conrail Inc., 3 S.T.B. 196, 281 (1998).[50]

In its post-hearing supplement, CSX states that it reached out to MassDOT/MBTA after the hearing for further discussion and that, although the parties have not been able to reach an agreement, CSX is willing to agree to less-specific versions of MassDOT/MBTA's requested conditions. (CSX Hr'g Suppl. 5-6, Jan. 21, 2022.) CSX further states that NSR and B&E (as the contract operator for PAS) have indicated that they also agree to these less-specific conditions. (Id. at 5.)

Whether the Board has authority to impose conditions relating to passenger and commuter rail has been the subject of debate throughout this proceeding. Without deciding whether the Board has such authority, the Board—even if it has such authority —would not exercise its discretion to use it here.

The Board (and the courts) have repeatedly indicated that the Board should not impose a condition unless it is reasonable and bears a sufficient nexus to the proposed transaction. See United States v. Chesapeake & O. Ry., 426 U.S. 500, 514-15 (1976); Consol. Rail Corp. v. ICC, 29 F.3d 706, 714 (D.C. Cir. 1994); see also Canadian Pac. Ry.—Control—Dakota, Minn. & E. R.R., FD 35081, slip op. at 6 (STB served May 7, 2009) (finding no material error in Board's decision not to impose a condition because the proposed condition lacked a sufficient nexus to the transaction). Here, the Board concludes that the conditions sought by Amtrak and MassDOT/MBTA, but which CSX, NSR, and B&E have not agreed to, are not necessary in response to the Merger or Related Transactions.

*Amtrak Conditions*. As noted, CSX has agreed to all of Amtrak's proposed conditions as applied to lines fully owned by CSX, or that will be fully owned by CSX post-Merger Transaction, and requests that they be imposed as conditions to the Merger Transaction. (CSX Mot. 1, Jan. 12, 2022.) Accordingly, the Board will impose CSX's compliance with those agreed-upon conditions (Condition Nos. 1-5 and 7, and Condition No. 6 as modified) as conditions to approval.

**\*23**  However, Amtrak also requests that Condition Nos. 1-5 and 7 be applied to PAS-owned lines. Amtrak has failed to demonstrate that the Merger Transaction and Related Transactions would likely result in any harms to its existing passenger services that share facilities with PAS.[51]  The evidence presented by CSX, NSR, and B&E indicates that there should be no change in traffic patterns or significant volume increases on the Knowledge Corridor as a result of the Merger Transaction and Related Transactions,[52] and Amtrak has presented no evidence that suggests otherwise.[53]  Even if the Board has authority to impose passenger rail conditions in this proceeding, none of the conditions it seeks to have imposed on PAS are needed[54] because Amtrak has not demonstrated that the Merger Transaction or Related Transactions would result in any harms to its services that share rail lines with PAS.[55]

The Knowledge Corridor intersects CSX's Southern Route, on which Amtrak's Lake Shore Limited service operates, at a diamond crossing in Springfield. CSX states that it is "willing to provide CSXT's dispatchers with dispatch preview screens of the line crossing CSXT's tracks at grade in Springfield, so long as it is technologically possible". (Revised Appl., Ex. 13-C, V.S. Daly 17.) CSX argues that preview screens would allow its dispatchers to be aware of the passenger trains operating on the Knowledge Corridor that are approaching the Southern Route in Springfield, thus enabling the dispatchers to more efficiently coordinate train movements and minimize possible passenger train delays. In accordance with CSX's agreement to be held to all representations made on the record, the Board will hold CSX to this representation.

The Board also notes that there is a specific statutory mechanism for seeking redress related to intercity passenger on-time performance. See 49 U.S.C. § 24308(f). FRA has recently begun publishing on-time performance data, which allows the Board to better monitor Amtrak performance, including those services that operate over the lines at issue here.

*MassDOT/MBTA Conditions.* MassDOT and MBTA argue that two of the conditions they seek are specifically intended to ameliorate anticipated disruptions attributable to CSX and NSR's plan, under the Merger Transaction to modify the existing trackage rights cap on PAS's Island Line, a short segment of rail line between Harvard and signal CPF 312, just east of Ayer. (Revised Appl., Ex. 22-C, V.S. Pelkey 13.) [56] The first condition MBTA proposes is that it be permitted to take over the dispatching of MBTA and MassDOT-owned lines or, alternatively, that CSX employ dispatching software and technology that would allow MBTA to monitor CSX dispatching in real time. The second condition proposed by MBTA is that CSX must agree to develop a plan that would require CSX to add capacity to the MBTA-owned Ayer-Willows segment (i.e., the Island Line) when certain volume thresholds (which would be determined by MBTA) are exceeded. Under this condition, CSX would also be responsible for paying for the capital improvements needed for such capacity expansion. (MassDOT/MBTA Reply 9-10.) This is referred to herein as the Ayer-Willows Condition.

**\*24** The Board finds that MassDOT and MBTA have not demonstrated that any harms would result from the modification of the trackage rights cap that would warrant either condition. The Board notes that it would reach the same conclusion here regardless of whether it were to find that the Board had authority to impose passenger rail conditions in this proceeding. As an initial matter, lifting of the trackage rights cap appears to be more of a formality than an actual change in operations. As CSX notes in its Revised Application, the cap was imposed as part of the original PAS creation in 2009. Specifically, Springfield Terminal was granted trackage rights to move traffic over the Island Line, but these rights were capped at 2007 track levels and, not long after the formation of PAS, Springfield Terminal's traffic began to exceed the cap. (Revised Appl., Ex. 22-F, V.S. Huneke 8-9.) CSX states that the cap will be modified, which will allow current traffic volumes to move over the Island Line and to enable the development of capacity in Ayer to handle any future increase in traffic. (Revised Appl., Ex. 13, Op. Plan 44.) However, modification of the cap appears to merely be contractually formalizing what already occurs in practice. CSX states that "[r]emoval of the cap by itself will not result in any changes in overhead traffic moving through Ayer". (Revised Appl., Ex. 13, Op. Plan 45; see also Revised Appl., Ex. 22-F, V.S. Huneke 9 ("[V]olumes have been fairly stable recently ... [and the] basic stability of this traffic supports CSXT's conclusion that traffic levels are not expected to change significantly in the near future".).)

In any event, the Board finds that MBTA has not demonstrated that dispatching of commuter trains would be negatively impacted by the Merger Transaction. CSX commits that it and B&E will "fully step[]" into the shoes of Springfield Terminal when it comes to dispatching responsibilities. (Revised Appl., Ex. 13, Op. Plan 47; Ex. 13-C, V.S. Daly 10; see also Hr'g Tr. 68-69, Jan. 13, 2022.) [57] There is no indication in the record, nor do MassDOT or MBTA present any evidence, to indicate that CSX's or B&E's ability to dispatch will be less efficient than the dispatching that occurs today. In addition, CSX states several times on the record that the dispatching operations of MBTA and MassDOT passenger trains will continue to be located in North Billerica, where they are co-located with MBTA's dispatchers, for the foreseeable future. (Id.) [58] In its post-hearing supplement, CSX further states that "CSXT, NSR, and B&E commit to maintain dispatching for any Commonwealth-owned lines currently dispatched by Springfield Terminal on behalf of PAS at the Billerica Dispatch Center until such a time that the parties may mutually agree on new dispatching arrangements". (CSX Hr'g Suppl. 5, Jan. 21, 2022.) In accordance with CSX's agreement to be held to all representations made on the record, the Board will impose this representation as a condition to approval of the Merger Transaction.

**\*25** The Board also finds that MassDOT and MBTA have not demonstrated the need for the Ayer-Willows Condition, as their concern that lifting the trackage rights cap would impact the commuter service over this segment is merely speculative. CSX has presented evidence that, as part of the agreements underlying these transactions, efforts will be made to expand capacity in the Ayer region. CSX explains that the NSR Settlement Agreement includes an Ayer Operations Protocol, Engineering Planning, and Capacity Roadmap, which it refers to as the Ayer Operations Protocol. Under the Ayer Operations Protocol, CSX and NSR have established certain principles to strengthen existing operations of the PAS Network following consummation of these

transactions. In particular, the Ayer Operations Protocol includes a provision for CSX, NSR, and B&E to establish both a "static yard plan" (to govern operations at Ayer) and service metrics and goals. (See Revised Appl., Ex. 13, Op. Plan 39; see also NSR Settlement Agreement, Section 2(i).) In addition, under the Ayer Operations Protocol, CSX plans to fund the construction of certain improvements to the facilities in Ayer. (See Revised Appl., Ex. 13, Op. Plan 52 (listing the specific improvements CSX intends to make).) At the hearing, CSX's representative also explained that CSX does not plan to perform any switching at Ayer, but instead, will upgrade and use the Rigby Yard in Portland, Me., for switching, and will pre-block more traffic at the yard in Selkirk, N.Y., which is currently underutilized. (Hr'g Tr. 79-81, Jan. 13, 2022.) These steps should limit increased congestion on the Ayer-Willows segment resulting from the lifting of the trackage rights cap and the Merger Transaction in general.

However, as part of its oversight, the Board will require CSX to file with the agency the service metrics that it develops under the Ayer Operating Protocol, though CSX need not file the actual data captured by the metrics. CSX may seek confidential treatment for all or part of these filings, as needed.

The Board will not impose any of MassDOT and MBTA's remaining conditions. Some of these conditions—such as a request that PAS be required to maintain the MassDOT-owned portion of the Knowledge Corridor (from Springfield to East Northfield) to FRA Class 4 standards—involve matters that are already covered by existing contracts. Other conditions have no nexus to the Merger or Related Transaction, but rather, involve pre-existing disputes. For example, approval of the Merger Transaction and Related Transactions will not affect MassDOT and MBTA's request that the 950-foot-long "shoo fly track" at the Springfield Station not be removed (without MassDOT's written consent). The Board does not impose conditions designed to put the proponent in a better position than it occupied before the consolidation. CP/DM&E, FD 35081, slip op. at 12. [59]

**\*26**  As noted, in support of their requests for conditions, Amtrak and MassDOT and MBTA point to Executive Order 14036, which encourages the agency, in reviewing rail mergers, to consider Amtrak's statutory rights and responsibilities under 49 U.S.C. § 24308. However, the only existing Amtrak service that could arguably be adversely impacted by the Merger Transaction and Related Transactions is the Lake Shore Limited service. [60] Amtrak operates the Lake Shore Limited service between Boston and Chicago, Ill., [61] part of which runs over the Southern Route from near Albany, N.Y., to Worcester. (Revised Appl., Ex. 13-C, V.S. Daly at 6.) The addition of the NSR intermodal/automotive trains to the Southern Route, and the expected growth resulting from CSX's ability to offer single-line service over the Southern Route, will likely increase density on the line. CSX has agreed to the conditions sought by Amtrak to protect the Lake Shore Limited service, including Condition No. 1, which requires CSX: Prior to initiating additional NSR intermodal/automotive service, to engage with NSR and Amtrak in "formal joint planning and joint preparation"; schedule the additional NSR service to "operate outside the current Amtrak operating windows" between the Albany area and Worcester (2:00p.m.-7:00p.m.); and "make sure that the passenger service requirements will be protected".

(Amtrak Br. 9, Jan. 3, 2022.) As discussed, the Board will impose these terms as a condition to the transaction here (as requested by CSX) and, as such, CSX's ability to comply with its statutory responsibilities under 49 U.S.C. § 24308 regarding existing Amtrak service should not be materially impacted.

The Board recognizes the parties' demonstrated willingness to work together with respect to the agreed upon conditions and encourages continued partnership moving forward. Given the significant presence of passenger rail on the lines at issue here, the Board expects CSX to continue to partner with passenger rail and the Board expects CSX to work together in good faith with passenger rail as the parties address future growth in the region.

### Other Comments and Requested Conditions.

*Other Settlement Agreements*. CSX states that it has also reached settlement agreements with NNEPRA, Republic Services, and the Maine Department of Transportation (Maine DOT). With the exception of Republic Service, CSX has requested that these

settlement agreements be imposed as conditions. As discussed, see supra n.20, CSX has voluntarily requested that the Board impose these settlement agreements as part of its approval of the Merger Transaction. Accordingly, the Board will do so. [62]

**\*27** *Senator Susan Collins*. U.S. Senator Susan Collins of Maine filed in support of the Merger Transaction. Senator Collins noted that the transaction as the potential to benefit Maine, the Northeast, and beyond through efficiency and reliability upgrades that are important for businesses depending on rail traffic to deliver raw materials and transport products.

*Senators Christopher S. Murphy and Richard Blumenthal*. U.S. Senators Murphy and Blumenthal of Connecticut state that, if the Board approves the merger, it should include conditions that ensure fair pricing of, and open access to, freight and passenger rail service in the Northeast; require CSX to upgrade infrastructure; and ensure that CSX maintains service to existing customers. They also urge the Board to obtain written assurances from CSX that it will properly maintain the rail lines and bridges currently maintained by Pan Am. The Board has addressed these concerns as part of the competitive and passenger rail analyses above. As discussed, the Board will not impose a condition requiring CSX to make specific infrastructure investments, but the Board notes that CSX's obligations as a common carrier under 49 U.S.C. § 11101 will require it to maintain its rail lines to a level that allows it to continue providing rail service to its customers.

*Congressman Richard E. Neal*. Congressman Neal raises a number of concerns about the Merger Transaction and Related Transactions and notes that CSX has been unresponsive in the past when he has raised these issues. In particular, he raises concerns about the impact the Merger Transaction and Related Transactions would have on MBTA's commuter service, freight competition, and operations over the line that traverses the Wachusett Reservoir. The Board has addressed these concerns as part of the competitive and passenger rail analyses above. Congressman Neal's initial concerns about the impact on the Wachusett Reservoir were submitted before CSX entered into a settlement agreement with MWRA, which oversees the Wachusett Reservoir, that will require CSX to make upgrades and implement operational changes to better protect the reservoir. As such, the Board considers the concerns regarding the Wachusett Reservoir to be sufficiently resolved.

Congressman Neal also refers to an issue raised by the Town of West Springfield about CSX trains blocking a crossing, which the Board addresses below.

Lastly, the Board finds Congressman Neal's assertions that CSX has been unresponsive to his inquiries troubling. CSX claims in its rebuttal that has it engaged in a discussion with Congressman Neal regarding his concerns. (CSX Reb. 82.) The Board urges CSX to respond promptly to such inquiries from the Congressman's office.

*Congressman Chris Pappas and Congresswoman Ann McLane Kuster*. Congressman Pappas and Congresswoman Kuster discuss the state of New Hampshire's existing efforts to expand commuter rail options on rail lines that are currently owned by Pan Am, including the Capitol Corridor passenger rail project, which would extend commuter rail from Massachusetts into New Hampshire. (Pappas & Kuster Comment 1.) They request that the Board impose a condition that CSX engage in good faith negotiations over the terms of access for this potential commuter service. (Id. at 2.) In its rebuttal, CSX states that it is "willing to engage in good faith negotiations related to access over the right-of-way that will be controlled by CSXT," though it notes that it cannot make any commitments regarding PAS, as it will be only a 50% owner. (CSX Reb. 84.) CSX affirmed its commitment at the hearing. (Hr'g Tr. 53:6-15, Jan. 13, 2022.) In accordance with CSX's agreement to be held to all representations made on the record, the Board will hold CSX to its representations to engage in good-faith negotiations.

**\*28** *New Hampshire State Representative Lindsay Sabadosa*. State Representative Sabadosa raises passenger-rail-related concerns similar to those of Amtrak and MBTA. In particular, she asserts that working with CSX to expand passenger service has been difficult and she is worried that CSX's commitment to "work cooperatively" with MassDOT and MBTA is insufficient. (Sabadosa Comment 2.) As discussed above, CSX has agreed to all of Amtrak's conditions as applied to CSX's line, including Amtrak's first, second, and third requested conditions regarding expansion of passenger rail service. (The specific conditions are set forth in the Appendix.) The Board has explained that, because concerns involving passenger service over the PAS lines have an insufficient nexus to the Merger Transaction and Related Transactions, any further conditions are not warranted.

State Representative Sabadosa also notes that PTC has not been installed on the MassDOT-owned portion of the Knowledge Corridor, which carries passenger trains, and urges CSX, PAS, and MassDOT to partner and apply for funding for PTC installation. (Id. at 3.) In response, CSX notes that it does not own or control that line and that, in any event, the Merger Transaction and Related Transactions should not have any impact on efforts to install PTC on that line. CSX also states that there are existing agreements between PAS, MassDOT, and Amtrak regarding PTC and that B&E, as the new operator of PAS, will handle any existing obligations under such existing agreements. (CSX Reb. 83.) The Board will not impose a condition requiring any party to take any specific steps to install PTC on this portion of the Knowledge Corridor, but it encourages parties to work together on future efforts to do so.

Finally, State Representative Sabadosa raises concerns about the reduction in workforce. These and other labor issues are addressed in the "Labor" section below.

*Massachusetts State Representative William Straus.* State Representative Straus requests that the Board require CSX to engage in good faith negotiations with MassDOT regarding the state's interest in expanding passenger service west of Worcester and to ensure that Massachusetts shippers not be priced out of their ability to use rail due to a lack of competition. (Straus Reply 2.) CSX states that it will continue to engage in good faith negotiations with MassDOT regarding expanding existing passenger service west of Worcester and to cooperatively work on the introduction and expansion of passenger service. (CSX Reb. 85.) [63] As for pricing and competition, these concerns have been addressed as part of the competitive and passenger rail analyses above. [64]

*The Chlorine Institute.* The Chlorine Institute (CI) requests that the Board hold Applicants to all of their representations, including "representations made in settlements, agreements, or communications with any entity about the proposed transaction herein, in order to gain that party's support, to avoid that party's opposition". (CI Comment 3.) It further argues that the Board should make clear that such non-participating parties would have the ability to seek enforcement of such representations from the Board. (Id. at 3 n.3.) Lastly, CI requests that the Board require that any anticompetitive effects be fully ameliorated at the time of the transaction, "or at any time thereafter" if there is evidence that the transaction has caused "anti-competitive effects on rail transportation[] on any of the Applicants' systems". (Id. at 3.)

**\*29** Similar to its orders in other Board decisions approving merger and control transactions, the Board will order CSX and B&E to adhere to the representations that they have made on the record in this proceeding. The Board acknowledges that this type of sweeping and non-specific order may create uncertainty, particularly for CSX and B&E, because of—among other things— potential changes in circumstances (especially over the long-term), potential disagreement about whether a claimed representation should be regarded as a forecast or general claim rather than a specific commitment, and potential claims that certain unqualified representations require context found elsewhere in this voluminous record. See CSX Corp.—Control & Operating Leases/Agreements—Conrail Inc., FD 33388, slip op at 9 (Board Member Clyburn commenting) (STB served Sept. 19, 2001) (commenting on the "representations clause" the Board has used in merger decisions). The Board is concerned about this uncertainty and finds that the better practice is to impose conditions that contain more specificity (as is done elsewhere in this decision). Nonetheless, Applicants here have stated that they "intend to fulfill all representations made throughout this proceeding, and Applicants are not opposed to the standard condition that the Board has imposed in past merger proceedings that would hold Applicants to such representations". (CSX Reb. 82 (citing CN/IC, 4 S.T.B. at 187 ("Applicants must adhere to all of the representations they made on the record during the course of this proceeding, whether or not such representations are specifically referenced in this decision").).) Applicants' willingness not to oppose such a condition—on this particular record —bears on the Board's analysis of any uncertainty and potential resultant effects on Applicants' ability to plan and operate their railroads. The Board weighs the uncertainty against other values advanced by the order, including protecting the integrity of the Board's processes as well as the ability of the Board to address issues that run contrary to clear commitments on this record. Given the lack of opposition from Applicants, the Board will issue such an order. However, in any future effort to enforce a representation not specified in the ordering paragraph, the Board will take into account changed circumstances, the difference between a forecast or claim and a commitment, and the context offered by Applicants on the record.

As to CI's specific requests, the Board also will decline to adopt CI's proposed language about ameliorating anticompetitive effects of the transactions "at any time thereafter in which the Board is presented with evidence that the proposed transaction has caused anti-competitive effects on rail transportation". The language of CI's condition is overly broad in that it seeks to guarantee a result, rather than particular actions. Moreover, it is inflexible, in that it does not recognize the potential for changed circumstances. See CSX Corp.—Control & Operating/Lease Agreements—Conrail Inc., FD 33388, slip op. at 6 (STB served Sept. 19, 2001) (finding that a railroad did not have to adhere to its prior representation to keep a rail car repair shop operational when there was no longer sufficient work to keep the shop viable), aff'd sub nom. Pennsylvania v. STB, 290 F.3d 522 (3d Cir. 2002); but see CSX Transp., Inc.—Acquisition of Operating Easement—Grand Trunk W. R.R., FD 35522 (STB served June 22, 2016) (directing CSX to comply with representation that it had made in its application). Parties are always free to seek enforcement of a merger condition and the Board can then decide, based on a developed record, whether a party has failed to comply with the merger condition. See Union Pac. Corp.—Control & Merger—S. Pac. Rail Corp., FD 32760 (STB served Jan. 31, 2018) (granting a petition for enforcement after finding that rail carrier had not adhered to merger condition).

**\*30** *Merrimack Valley Legislative Delegation*. The Merrimack Valley Legislative Delegation expresses concern about two infrastructure projections on the Haverhill Line[65] that have not yet been completed: the double-tracking of the line between Lawrence, Mass., and Wilmington, Mass., (particularly at the Andover, Mass. station), and the installation of level-boarding platforms at all stations on the Haverhill line. (Merrimack Valley Legis. Delegation Comment 1-2.) In its rebuttal, CSX states that it will "work[[] cooperatively with the Commonwealth on Commonwealth-funded projects to develop and implement operating system improvements and operational infrastructure". (CSX Reb. 79.) It also states that it will "honor any existing agreements or commitments made to MassDOT and MBTA by PAS or Springfield Terminal". (Id.) In accordance with CSX's agreement to be held to all representations made on the record, the Board will hold CSX to its commitment to work with the delegation on these improvements and to honor existing agreements and commitments.

*M4 Capital*. In its two filings, M4 Capital (M4) expresses concern about the fact that GWI will either own or operate over the entire Knowledge Corridor as well as other parallel north-south lines. M4 argues that this will make some of these lines redundant and possibly lead to one of the lines being abandoned. (M4 Comment 2, Mar. 22, 2021.)[66] M4 also argues that the Board should only approve the transactions if the entity operating PAS is not owned by GWI. (M4 Comment 2, Aug. 16, 2022.)

M4's filings were made before the Vermont Settlement agreement was reached between CSX, NSR, GWI, VRS, and VTrans. As discussed, the Board is satisfied that this agreement resolves any anticompetitive concerns from GWI's ownership of two entities, NECR and PAS, that would have authority to operate on the Conn River Line.

Aside from M4, no rail shippers or competing carriers raised any concern about GWI's ownership and/or ability to operate over the three parallel north-south lines through central New England (specifically, the P&W line from southern Connecticut to Gardner, Mass.; the NECR line from southern Connecticut to Miller Falls, Mass.; and the Knowledge Corridor). The Board finds that this would not create competitive issues. Even though B&E, a GWI subsidiary, would now be permitted to operate over the Knowledge Corridor, the sections of that line that parallel the other two GWI lines are owned by MassDOT and Amtrak for passenger rail purposes, so the possibility of this line being abandoned is not likely to be increased by the transactions. Conversely, if GWI were to decide that its P&W or NECR lines were no longer necessary, it would need to first obtain abandonment authority, which only the Board can grant.

In addition, even though B&E would be the operator of PAS, PAS will be jointly owned by CSX and NSR. Under the NSR Settlement Agreement, B&E is contractually bound "to operate PAS so that PAS provides service in a nondiscriminatory fashion to all rail carriers that have the ability to interchange traffic with PAS or otherwise connect to PAS". (See NSR Settlement Agreement, Section I.) If GWI were nonetheless to take actions to divert traffic from the Knowledge Corridor to either GWI's P&W or NECR lines, CSX and NSR would have the ability as PAS's owners to intervene.

**\*31** Furthermore, the situation M4 describes is already present on the Amtrak-owned portion of the Knowledge Corridor from New Haven to Springfield, on which another GWI subsidiary, CSO, has the right operate. And, as noted above (see supra n.43),

CSX states that it operates on the Amtrak-owned line from New Haven to Springfield via haulage arrangement with CSO and, as such, customers would continue to have two-carrier competitive between CSX and CSO even after the transactions. For these reasons, the Board finds no competitive concerns arise from GWI's ownership and/or operation of these parallel lines.

The Board further notes that there are two provisions in the GWI Term Sheet Agreement—sections V-6 and V-7—that were submitted under seal that appear to contemplate some coordination between GWI, CSX, and NSR on operational changes in the New England region. [67] One such provision includes a specific requirement that any such arrangement must not be inconsistent with any Board conditions. Some agreements entered into pursuant to these contractual provisions may require Board authority. However, other such agreements—such as haulage rights agreements or other operational agreements—may not require Board approval. As part of its oversight, the Board will require CSX to provide copies to the Board of any significant agreements made pursuant to these terms of the GWI Term Sheet Agreement that do not otherwise require Board approval (under seal, if necessary).

To the extent that M4 raises other concerns, they have been addressed as part of the Board's competitive analysis above.

*Albert Brothers, Inc*. Albert Brothers is a scrap metal shipper located in Waterbury, Conn. Albert Brothers states that it wants an assurance from CSX that it will maintain service to the Albert Brothers facility even if volumes are low and that CSX will maintain the rail line and bridge into Albert Brothers' facility. (Albert Brothers Comment 1-2.) [68] CSX responds in its post-hearing supplement that the Merger Transaction and Related Transactions will have no adverse effect on PAS operations or maintenance and that PAS will remain a rail carrier subject to the jurisdiction of the Board with a common carrier obligation. (CSX H'rg Suppl. 9.) Because PAS will continue to have a common carrier obligation to serve Albert Brothers, there is no need to require that CSX or PAS provide such assurances. As many parties in support of the transactions have noted, the replacement of Springfield Terminal with B&E is likely to result in improved service and maintenance.

*Bruce P. Fogwell, Jr*. Mr. Fogwell raises several concerns, some of which the Board has already addressed. Among his concerns is whether the rail line between Worcester and Ayer has sufficient capacity and will therefore have to be double-tracked, which would result in opposition from the adjacent communities, and potential adverse impacts on the Wachusetts Reservoir. (Fogwell Letter 5-6.) Despite Mr. Fogwell's concern, no communities along this line raised any concerns about the increased traffic on this line. In addition, CSX has entered into a settlement agreement with MWRA that requires CSX to take a number of steps to enhance safety on the segment that runs adjacent to and over the Wachusetts Reservoir. These requirements would apply even if CSX double-tracks this segment.

**\*32** Mr. Fogwell also discusses the possibility of passenger service between Worcester and Ayer on this line and states that the Board should consider imposing a condition that prevents CSX from blocking such passenger service. No party, including MBTA and Amtrak—the entities most likely to offer such passenger service—discussed the possibility of using this line for passenger service. In addition, CSX has agreed to all of Amtrak's requested conditions concerning CSX-owned lines, which would apply to this line subsequent to the Merger Transaction and Related Transactions.


## Other Issues.

*Pooling*. During the hearing, CP asserted that Applicants may also need pooling authority under 49 U.S.C. § 11322. (Hr'g Tr. 529:10-17, Jan. 13, 2022.) [69] In response, CSX argues that CP's assertion is untimely because it was raised for the first time at the hearing. (CSX Hr'g Suppl. 2-3, Jan. 21, 2022.) CSX also argues that the Merger Transaction does not fall within the definition of transactions governed by 49 U.S.C. § 11322. (Id. at 3.)

The Board agrees with CSX that the Merger Transaction is not a pooling arrangement under 49 U.S.C. § 11322. Under that provision, a railroad "may not agree to combine with another ... rail carrier to pool or divide traffic or services or any part of their earnings without the approval of the Board". 49 U.S.C. § 11322; see also CN/IC, 4 S.T.B. at 151-52 (1999) (describing

pooling as occurring when there is "a division of competitive traffic and service between two or more competing carriers".). The Board's predecessor, the Interstate Commerce Commission, held that two criteria must be present for pooling to exist: (1) the arrangement must be between competitors, and (2) the arrangement must involve some restraint or potential restraint on competition. See CN/IC, 4 S.T.B. at 152 (citing Union Pac. R.R. & Mo. Pac. R.R.— Trackage Rights over Line of Chi. & N. W. Transp. Co. between Fremont, Neb./Council Bluffs, Iowa, and Chi., Ill., 7 I.C.C.2d 177, 184 (1990)).

As CP noted at the hearing (Hr'g Tr. 527-29:, Jan. 14, 2022), in NS/Pan Am/PAS, the Board held that there was no pooling in the formation of PAS because the transaction was end-to-end and so NSR and Systems were not competitors. NS/Pan Am/ PAS, FD 35147 et al., slip op. at 20. CP argues that this would no longer be the case once CSX becomes a co-owner of PAS and so pooling authority may now be necessary. (Hr'g Tr. 529:10-17, Jan. 14, 2022.) [70] CP is correct that CSX and NSR are competitors for traffic into and out of New England and so the Board's rationale for finding that no pooling authority was needed in NS/Pan Am/PAS would no longer apply. But even so, the second criterion for a pooling arrangement would still not exist, as no part of the Merger or Related Transactions involves a restraint or potential restraint on competition. Indeed, the Board has found in this decision that the Merger Transaction and Related Transactions are sufficiently structured to ensure they will preserve competition.

**\*33** CSX and NSR are not seeking to divide traffic or services between themselves. Rather, CSX is seeking authority from the Board to acquire a one-half equity interest in a railroad, PAS. (CSX Hr'g Suppl. 3, Jan. 21, 2022.) B&E—an independent carrier —will operate the PAS line and set the rates. (See Revised Appl. 21.) CSX and NSR are also not "pooling" revenues earned from PAS, as CP seems to imply. CSX and NSR, as equal co-owners of PAS, would split the revenues earned by PAS, but again, the revenues earned will be the result of PAS acting as an independent competitor. [71] Accordingly, the Board finds that the Merger Transaction is a control transaction subject to 49 U.S.C. § 11323-25 and not a pooling arrangement subject to § 11322.

*Timing of the Transactions.* In the Revised Application, CSX states that it anticipates that the Merger Transaction and Related Transactions will all be consummated at the same time. It notes, however, that if the Merger Transaction is consummated prior to B&E taking over the operations of PAS, then CSX, NSR, and GWI have agreed that Springfield Terminal will continue to operate PAS until Springfield Terminal is replaced as the PAS operator. (Revised Appl. 9.) However, in its proposed Safety Integration Plan, CSX states unequivocally that it intends to complete the Merger Transaction before B&E takes over as PAS's operator. Specifically, CSX states:

> The amalgamation of operations through the merger of CSXT and Springfield Terminal will not occur immediately. CSXT intends to keep Springfield Terminal in place as the rail operator of the PAR System for at least several months after obtaining STB approval of the Proposed Transaction .... During this time period before a merger occurs, CSXT will have the opportunity to become closely familiar with the PAR System rail lines, practices[,] and operations before fully integrating PAR System operations into CSXT.

(CSX Proposed SIP 8.) The American Chemistry Council (ACC) raises a concern about the sequence of the transactions, stating that it would allow CSX to "control operations on PAS and the two main rail routes between New York and New England indefinitely". (ACC Reply 6.) Accordingly, ACC argues that the Board should not allow Applicants to consummate the Merger Transaction before the Related Transactions. (Id.)

In response to questions at the hearing, CSX representatives asserted that there are protections in place to ensure that there are no anti-competitive effects during any interim period between the close of the Merger Transaction and B&E taking over PAS operations. (Hr'g Tr. 173:5-8, Jan. 13, 2022.) In particular, they stated that Springfield Terminal would be run by the same people who are running it today, that the current rate structure would be kept in place, and the operating arrangements would be stable until B&E takes over operations. (Hr'g Tr. 174:10-18, Jan. 13, 2022.) Furthermore, CSX explained that the interim period

should be relatively short and that the purpose of the delay is merely to allow B&E sufficient time to negotiate the necessary labor agreements. (Hr'g Tr. 172-177, Jan. 13, 2022.)

**\*34** CSX has adequately explained why the delay in merging Springfield Terminal is necessary. Requiring CSX to delay closing on the Merger Transaction until B&E is able to commence operations would prevent CSX from beginning to implement some of its planned improvements to the PAS system—improvements that several parties noted throughout this proceeding are critically needed. Accordingly, the Board will not require CSX to delay closing on the Merger Transaction until the B&E labor negotiations are complete. However, the Board will hold CSX to its representation that it will not make any material operational changes to Springfield Terminal (other than those specifically noted on the record in this proceeding) while it continues to serve as PAS's operator during the interim period between the close of the Merger Transaction and the close of the B&E transaction. As part of its oversight condition, the Board will also require CSX, NSR, and B&E to provide a progress report, within 90 days after the effective date of this decision, addressing whether the B&E transaction has been completed; if the transaction has not been completed, CSX should explain why and shall subsequently notify the Board when the transaction has been completed.

### Related Transactions.

*B&E Operation*. Under § 10502(a), the Board must exempt a transaction or service from regulation if it finds that: (1) regulation is not necessary to carry out the rail transportation policy (RTP) of 49 U.S.C. § 10101; and (2) either (a) the transaction or service is limited in scope, or (b) regulation is not needed to protect shippers from the abuse of market power. The petition for exemption filed by B&E to allow it to enter into contracts to operate on behalf of PAS, and to accept an assignment from Springfield Terminal of Springfield Terminal's current rights to operate the PAS lines, meets the criteria for an exemption under 49 U.S.C. § 10502(a) from the requirements of § § 11323(a)(2) and 11324.

Here, an exemption from the prior approval requirements of 49 U.S.C. § 11323-25 is consistent with the standards of § 10502. [72] An exemption would promote the RTP by minimizing the need for federal regulatory control over the proposed transaction, reducing regulatory barriers to entry, and providing for the expeditious handling and resolution of proceedings. 49 U.S.C. § § 10101(2), (7), and (15). Granting an exemption in this proceeding would also help encourage and promote energy conservation, 49 U.S.C. § 10101(14), as the transaction should result in more truck traffic being converted to rail and the use of more fuel-efficient locomotives. The B&E transaction should also help foster sound economic conditions in transportation and ensure effective competition and coordination between rail carriers and other modes, 49 U.S.C. § 10101(5), as rail-to-rail competition will be adequately preserved and B&E's assumption of PAS operations should strengthen the rail system in New England and create more competition between truck and rail. Other aspects of the RTP would not be adversely affected.

**\*35** Regulation of the control transaction is also not needed to protect shippers from an abuse of market power. [73] The control transaction here is essentially a change in operators, with many shippers stating on the record that they believe the new operator, B&E, will provide superior service. To the extent that there are concerns about shippers on the Conn River Line that are jointly served by B&E and NECR, as noted above (supra pp.17-18), CSX and NSR commit on behalf of PAS that B&E will establish rates for these customers at current levels, subject to future reasonable escalation, for as long as B&E is operator of PAS. (Revised Appl., Ex. 22-E, V.S. Reishus 91.) In addition, other shippers in the region that are served by VRS but have traffic that needs to be interchanged with either NECR or PAS will be protected by the terms of the Vermont Settlement Agreement. Accordingly, based on the record, the Board finds that regulation is not necessary to protect shippers from the abuse of market power. The Board will therefore allow this petition for exemption to take effect on the effective date of this decision, subject to the employee protective conditions, discussed below.

*NSR Trackage Rights*. The notices of exemption filed by NSR to acquire overhead trackage rights pursuant to four separate trackage rights agreements with CSX, P&W, Boston & Maine, and PAS—which, together, constitute the Southern Route between Voorheesville and Ayer—meet the criteria for a class exemption under 49 C.F.R. § 1180.2(d)(7). The Board will

therefore allow these four notices of exemption to take effect on the effective date of this decision, subject to the employee protective conditions, discussed below.

*SMS Discontinuance*. The notice of exemption filed by NSR, on behalf of SMS and with SMS's consent, to discontinue common carrier service and terminate its lease operations over approximately 15 miles of rail line owned by NSR between Voorheesville and Delanson in Albany County, N.Y. meets the criteria for a class exemption under 49 C.F.R. part 1152 subpart F—Exempt Abandonments & Discontinuances of Service and Trackage Rights. The Board will therefore allow this notice of exemption to take effect on the effective date of this decision, subject to the employee protective conditions as discussed below.

### Environmental Comments.

In Decision No. 4, the Board sought public comment on its preliminary conclusion that an environmental review of the Merger Transaction and Related Transactions was not warranted because it did not appear that the thresholds in the Board's rules for triggering an environmental review under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321-4370m-12, would be met, and there was no indication of any potential for significant environmental impacts. The Board also preliminarily found that historic review under Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306113, was not warranted. The Board further directed CSX to file supplemental information on traffic projections by providing segment-specific traffic projections through 2027—five years from the anticipated date of the Board's final decision. While certain commenters and communities raised issues relating to the environmental impact of contemplated increased rail operations in response to Decision No. 4, see Decision No. 5, slip op. at 6, no commenter argued that the Board erred in preliminarily determining that the Merger Transaction and Related Transactions are subject to a categorical exclusion from environmental review. Nor did any commenter ask for preparation of an Environmental Assessment or an Environmental Impact Statement or request an historic review.

 **\*36**  CSX filed a reply to the various environmental comments noting that none of the comments invalidate the Board's preliminary conclusion that the transactions qualify for a categorical exclusion from environmental review. (CSX Env'l Reply, September 24, 2021.) CSX stated that it had made substantial progress in reaching a mutually acceptable agreement with MWRA regarding steps to reduce potential impacts on the Wachusett Reservoir from nearby rail operations. In addition, CSX detailed the actions that it had taken and would continue to take in response to the environmental concerns raised by certain communities and other local interests. (Id. at 4-12, 15-17; see also CSX Rebuttal 93-94, October 18, 2021.)

In Decision No. 5, based on its review of all of the available information, including CSX's supplemental traffic projections, the Board, in consultation with the Office of Environmental Analysis (OEA), affirmed its preliminary conclusion that no environmental or historic review is required here. Decision No. 5, slip op. at 9. As explained in more detail in Decision No. 5, the Board determined that the applicable thresholds for environmental review in the Board's regulations would not be met and that there is no need to conduct an environmental review. Id. at 9-12. The Board stated that the projected increase in rail traffic as a result of the Merger Transaction and Related Transactions of only two trains per day is well below the applicable eight-train per day threshold and explained that, given the record here, it was satisfied with CSX's evidence projecting that there would not be a 100% increase in rail traffic or gross ton miles on any segment. Moreover, the Board found that none of the concerns raised in the environmental comments involve "extraordinary circumstances" warranting an environmental review. Id. at 11. The Board noted that CSX was discussing settlement agreements with MWRA and Voorheesville and that many of the environmental concerns raised by Voorheesville, the Altamont Free Library (AFL) and the Islington Creek neighborhood in Portsmouth, N.H. largely arise from preexisting train traffic and thus are not merger related. Id. at 11-12.) The Board encouraged CSX to continue working with these parties and local communities to address their concerns, and asked CSX to promptly notify the Board if any mutually acceptable agreements were reached. Id. at 12.

After the issuance of Decision No. 5, CSX entered into a settlement agreement with MWRA, in which CSX committed to upgrades near the Wachusett Reservoir that will protect the local ecosystem. CSX also entered into a settlement agreement with Voorheesville. The Board received additional environmental comments from other parties and communities, but, as discussed

below, none of the comments include information that leads the Board to change its determination in Decision No. 5 that environmental review is not warranted.

**\*37** *Islington Creek Residents*. Several residents of Islington Creek raised concerns over noise and diesel fumes that come from idling trains at Pan Am's existing yard near Maplewood Avenue. (Islington Creek Comment 1, Sept. 1, 2021.) According to the residents, a representative of PAR previously pledged to find the best location to park its trains and to work with the community to address other concerns. The residents claimed, however, that no progress had been made and that the situation had worsened. (Id. at 2.) At the Board's January 2022 public hearing, a representative for the neighborhood stated that Islington Creek is seeking a condition that would ensure that the residents have an avenue to discuss their concerns with the operator (regardless of whether or not it is CSX). (Hr'g Tr. 662-63, Jan. 14, 2022.) The representative for the neighborhood further indicated that CSX had already reached out to the Islington Creek residents. (Hr'g Tr. 657:5-10, Jan. 14, 2022.) Given the circumstances, no condition is necessary. CSX has already engaged in discussions with the concerned Islington Creek residents, and the Board encourages CSX to continue these discussions in order to reach a mutually agreeable solution. Moreover, as the representative for the residents noted at the hearing, the Board's Rail Customer and Public Assistance (RCPA) program is available to facilitate further discussions, if necessary.

*Altamont Free Library and Village of Altamont*. As discussed in Decision No. 5, AFL stated that the NSR intermodal/automotive trains that would run through the village as a result of the transactions will block crossings, thus impeding emergency responders and creating unsafe roadway traffic backups. Decision No. 5, slip op. at 6. AFL also stated that it is concerned about the effect that these trains would have on the library building itself, which is only 20 feet from the track and located in the Altamont Train Station built in 1897. Id. On Jan. 11, 2022, the Village of Altamont (Altamont) submitted a letter expressing concern about the impact that the anticipated two additional NSR trains per day would have on a particular crossing. Altamont asked the Board to reject the transactions because of the potential impacts to the crossing. [74]

In Decision No. 5, the Board noted that CSX and NSR had met with AFL representatives in the hope of reaching a mutually acceptable resolution to the issues raised by AFL, many of which involve pre-existing conditions. (Decision No. 5, slip op. at 12.) In its post-hearing supplement, CSX states that it and NSR also reached out to Altamont to address the village's concerns, that they had an initial meeting with the mayor on January 20, 2022, and that they will continue to coordinate with Altamont during implementation of the transactions. The addition of two trains per day over a crossing that already has rail traffic does not demonstrate potentially significant merger-related effects warranting Board action, however, the Board encourages CSX and NSR to continue to negotiate with AFL and Altamont regarding potential mutually acceptable solutions to these local concerns during the implementation of the transactions. The Board's RCPA program also is available to assist in further discussions, if necessary.

**\*38** *Town of West Springfield*. The Town of West Springfield, Mass. (West Springfield) filed a letter stating that CSX trains entering the carrier's intermodal yard block a crossing at Front/Bridge Street, causing disruption to public safety services and the residents who use the crossing. (W. Springfield Letter 1.) The town claims that the frequency of these blockages has increased over the last decade and that CSX has been unwilling to work with the town to resolve its concerns. (Id. at 1-3.) West Springfield states that CSX also refused to maintain the land surrounding the yard or to cooperate on a local sewer line project. (Id. at 3.) CSX indicates that it has met repeatedly with West Springfield stakeholders, has worked in good faith to address their concerns, and is willing to continue to engage in discussions with the town. (CSX Hr'g Suppl. 9, Jan. 21, 2022.)

As West Springfield's letter states, concerns about trains blocking a crossing in West Springfield are pre-existing conditions that predate the Merger Transaction and Related Transactions. Moreover, the transactions should not materially affect the frequency or duration of those blockages. The Board encourages CSX to continue discussions with West Springfield. The Board's RCPA program is also available to facilitate further discussions, if necessary.

\* \* \*

In short, none of the environmental comments raise issues that warrant an environmental review or the imposition of environmental conditions. CSX has committed to meet with affected communities to discuss their concerns, and the Board strongly encourages CSX (and NSR where necessary) to continue such discussions in good faith.

**The SIP Process.**

Finally, CSX has prepared a SIP under the Board's regulations at 49 C.F.R. part 1106 and 49 C.F.R. § 1180.1(f)(3) and the Federal Railroad Administration (FRA) regulations at 49 C.F.R. § 244.9. The SIP is a complete written plan prepared in accordance with FRA guidelines or regulations specifying how Applicants would ensure safe operations throughout the merger-implementation process if the transactions are approved. In Decision No. 4, the Board directed Applicants to file a proposed SIP with OEA and FRA for their review by August 30, 2021, and provided that public comments on the proposed SIP should be filed by October 4, 2021. No public comments on the proposed SIP were submitted. On December 13, 2021, CSX filed a revised version of its SIP making changes reflecting discussions with FRA.

In a letter dated December 21, 2021, FRA stated that CSX had met with FRA several times regarding its proposed SIP and that CSX had satisfactorily responded to all of FRA's safety concerns in its revised version of the SIP. (See USDOT Reply, Dec. 21, 2021.) FRA explained that, if the transactions are approved, it will monitor implementation of the SIP during the operations integration period consistent with the relevant FRA and Board regulations, and provide the Board with updates, as appropriate, during the merger implementation process. (Id. at 1, 2). [75] OEA also independently reviewed the revised version of the SIP.

**\*39** The Board finds that the revised version of the SIP adequately presents a process to ensure that the Merger Transaction will be safely implemented. Accordingly, the Board will adopt the SIP and impose a condition requiring that applicants comply with the SIP and continue to coordinate with FRA until FRA informs the Board that the Merger Transaction has been safely implemented. 49 C.F.R. § 1106.4(b).

**Labor Protection.**

*Merger Proceeding*. Under 49 U.S.C. § 11326(a), the Board must impose labor protective conditions on its approval of the Merger Transaction. Applicants state that they do not expect the acquisition of the PAR System to impact Springfield Terminal employees involved in the operation of the PAR System lines but that, regardless, the standard labor protective conditions imposed in New York Dock Railway—Control— Brooklyn Eastern District, 360 I.C.C. 60 (1979), should apply to those employees. (Revised Appl. 26 & Ex. 22-C, V.S. Pelkey 21.) The Board will impose these labor protective conditions here.

The Brotherhood of Locomotive Engineers and Trainmen National Division (BLET) and The Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment 120 (BLET GCA 120) request that the Board order that the Merger Transaction not be permitted to proceed until all necessary implementing agreements have been reached. However, as discussed above, the Board will instead hold CSX to its representation that it will not make any material operational changes to Springfield Terminal (other than those specifically noted on the record in this proceeding) while it continues to serve as PAS's operator during the interim period between the close of the Merger Transaction and the close of the B&E transaction. As CSX notes, the New York Dock conditions also require that a carrier contemplating "a change or changes in its operations, services, facilities, or equipment as a result of a transaction which may cause the dismissal or displacement of any employees, or rearrangement of forces" shall give such employees 90-days' notice. New York Dock Railway, 360 I.C.C. at 85 (App. III, Article I, Section 4.) As such, any affected employees have labor protection even if there is no labor agreement in place.

*Trackage Rights Proceedings*. NSR states that it does not anticipate any adverse labor impacts as a result of these transactions but nonetheless agrees to the imposition of the employee protective conditions established in Norfolk & Western Railway —Trackage Rights—Burlington Northern, Inc., 354 1.C.C. 605 (1978), as modified in Mendocino Coast Railway—Lease &

Operate— California Western Railroad, 360 I.C.C. 653 (1980). (NSR Notice 6, FD 36472 (Sub-No. 1); NSR Notice 6, FD 36472 (Sub-No. 2); NSR Notice 6, FD 36472 (Sub-No. 3); NSR Notice 5-6, FD 36472 (Sub-No. 4).) The Board will impose these labor protective conditions here.

**\*40** *SMS Discontinuance Proceeding*. SMS states that it does not anticipate that any employees would be adversely affected by the proposed discontinuance but nonetheless acknowledges that the discontinuance would be subject to the labor protective conditions set forth in Oregon Short Line Railroad— Abandonment—Portion Goshen Branch Between Firth & Ammon, in Bingham & Bonneville Counties, Idaho, 360 I.C.C. 91 (1979). (SMS Notice 5, AB 1312X.) The Board will impose these labor protective conditions here.

*B&E Acquisition and Operation Proceeding*. According to B&E (which currently has no employees), although it intends to offer employment to Springfield Terminal employees working on the PAS lines with a goal of filling 159 positions, it plans to utilize fewer employees than Springfield Terminal to operate PAS. (B&E Amended Pet. 15, FD 36472 (Sub-No. 5).) According to the Revised Application, this would be a reduction from the current 214 Springfield Terminal employees that serve the PAS lines. (Revised Appl., App. 1.) B&E states that adversely affected employees would be eligible for New York Dock labor protective conditions. (B&E Amended Pet. 15-16, FD 36472 (Sub-No. 5).) In addition, it states that it intends to recognize unions currently representing Springfield Terminal's employees that would be hired by B&E, and to enter into agreements providing substantially similar terms and conditions to those contained in existing agreements. (Id. at 15.)

The New York Dock conditions provide that any employee who is terminated or furloughed as a result of a transaction shall be given hiring priority for a comparable position. New York Dock, 360 I.C.C. at 89 (App. III, Article II, Section 1). [76] However, at the hearing, CSX's CEO explicitly promised that CSX will offer employment to all individuals that B&E would not retain. Specifically, Mr. Foote stated "we plan on making sure that every Pan Am employee who wants to have a job with us will have a job with us". (Hr'g Tr. 14:17-19, Jan. 13, 2022.) When specifically asked if this statement was meant to include even those employees that B&E would not retain, Mr. Foote confirmed that is indeed the commitment:

MR. FOOTE: ... Right, we will be doing the capital work on the railroad. So those people are redundant. We will hire those people to work elsewhere on the Pan Am, and if necessary we will hire those people to work on CSX.

CHAIRMAN OBERMAN: Well are those people going to be included in the group that you say will all have jobs if they want one?

MR. FOOTE: They work for them today, they can work tomorrow, the next day. Post transaction day one they'll have a job.

**\*41** CHAIRMAN OBERMAN: And just to be specific, the ones that B&E says it doesn't need?

MR. FOOTE: Absolutely.

(Hr'g Tr. 32:7-20, Jan. 13, 2022.) Based on these comments, Allied Rail Unions (ARU) requests that the Board impose certain conditions, which overlap in part with CSX's commitments made during the hearing. In particular, ARU requests the following: Any Pan Am/Springfield Terminal employee working on the PAS lines who is not offered a position with PAS/B&E will be offered a position in his/her craft with CSXT or NSR. Any issues or disputes concerning this condition will be resolved as part of the New York Dock implementing agreement negotiations/arbitration processes.

Capital work on the PAS lines will be performed by CSXT or NSR in accordance with their collective bargaining agreements with [the Brotherhood of Maintenance of Way Employees Division/IBT and the Brotherhood of Railroad Signalmen].

(ARU Suppl. Comments 4-5.) In its post-hearing supplement, CSX states that it "has offered to provide an offer to the Springfield Terminal employees not offered a position by B&E or Springfield Terminal after the workforce has been divided. The applicant parties are unwilling to go any further". (CSX Hr'g Suppl. 10, Jan. 21, 2022.)

The Board takes representations made by merger applicants seriously, and it does not expect any issues to arise in this regard, especially where CSX has committed to providing actual offers of employment that it would not otherwise be required to make. Moreover, CSX's post-hearing supplement indicates that Applicants have "offered the maximum labor protection under the Board's rules as an additional layer of protection". (CSX Hr'g Suppl. 11, Jan. 21, 2022.) Thus, in the unlikely event that any issues arise, the situation can be addressed under the New York Dock conditions, as appropriate.

ARU also requests that CSX or NSR be required to have all capital work on the PAS lines performed by CSX or NSR. (ARU Suppl. Comments 4-5.) However, the Board finds that neither CSX nor NSR made such a commitment. As noted above, CSX representatives at the hearing noted that B&E would need fewer Springfield Terminal employees because Springfield Terminal would no longer be performing this work. (Hr'g Tr. 32.) Based on the context in which these statements were made, it was clear that CSX was referring to the fact it (along with NSR) was reserving the right for it or NSR to perform that capital work, but it was not making a commitment that this would be the case for all such work. ARU's request also goes further than the Board's standard labor protective conditions.

The unions raise a number of other labor-related concerns. First, ARU has concerns about what is not included in the meaning of "substantially similar terms and conditions" that B&E says it would include in its agreements with the current Springfield Terminal employees. BLET and BLET GCA 120 also request that B&E be required to clarify a statement in its petition for exemption about how PAR-related and PAS-related work is divided among Springfield Terminal employees. (BLET/BLET GCA 120 Reply 3.) But there is no need for the Board to intervene here, as any such disagreements should be resolved through the mandatory negotiating process set forth in the New York Dock conditions.

 **\*42**  Second, ARU argue that there is a discrepancy between B&E's assertion that it will only terminate employees that handle capital work—as these would be handled by CSX and NSR in the future—and the number of positions B&E actually proposes to retain. The discrepancy may be a function of disagreement between the unions and B&E concerning how many employees will be necessary to handle capital work. Again, this is a matter than can be resolved during the negotiations of new labor agreements. Furthermore, while the Board does not expect any adverse effects because of the employees' ability to enforce CSX's commitment to offer jobs to those employees not offered a position by B&E or Springfield Terminal, any employees who are adversely affected would be entitled to the New York Dock protective conditions as well. In addition, any concern that B&E does not have a sufficient number of employees to operate safely would be a matter for FRA and can be raised, as appropriate, as part of the ongoing SIP process. [77]

Lastly, IFPTE Local 202 urges the Board to condition approval upon recognition of existing unions representing affected employees. (IFPTE Reply 2.) The Board finds that B&E's clear and unambiguous representation on the record in this proceeding that it will formally recognize unions currently representing Springfield Terminal's employees sufficiently addresses this concern.

## Oversight.

CSX requests that the Board establish a five-year oversight period. (CSX Reb. 43.) Although the Board does not anticipate anticompetitive effects from the transfer of control subject to the conditions imposed here, it is mindful that operational difficulties can arise when implementing transactions of this scope. Accordingly, as a condition of approval, the Board will establish a five-year oversight period so that it may monitor the effectiveness of the various conditions. The Board notes that it retains jurisdiction during this oversight period to impose additional conditions and take other action following the transfer of control if, and to the extent, the Board determines it is necessary.

As noted in Decision No. 4, CSX asserts there would not be significant traffic growth during the first three years after the proposed Merger Transaction but that "[f]ollowing the integration of PAR and the implementation of the operating and infrastructure improvements, CSXT expects to see additional traffic growth opportunities over a multi-year horizon in certain areas". (Revised Appl., Ex. 22-D, V.S. Wallace 7.) Accordingly, the Board finds that an initial five-year duration is appropriate, so that the oversight period will cover the implementation phase and two years following full implementation of operating and infrastructure improvements. At the end of the five-year oversight period, the Board may elect to extend its oversight for an additional period if conditions warrant.

 **\*43**  During the oversight period, the Board will closely monitor whether applicants have adhered to the various representations made on the record in this proceeding. To accomplish this goal, the Board will order the following reporting requirements:
· Within 90 days after the effective date of this decision, CSX shall provide a progress report on whether the B&E transaction has been completed. If the B&E transaction has not been completed, CSX should explain why and subsequently notify the Board when the transaction has been completed.

· Six months after B&E closes on its transaction to take over PAS's operations, CSX shall report to the Board the protocols and implementation steps that it, NSR, and B&E are putting in place to prevent the improper sharing of competitive information.

· CSX shall provide a copy of any significant agreement reached pursuant to Section V-6 or V-7 of the GWI Term Sheet Agreement (for which Board approval is not otherwise needed).

· CSX shall also provide a copy of (1) the service metrics that it develops along with NSR and B&E for operations at the Ayer yard and (2) the performance metrics for B&E's general operations, after those metrics have been finalized.

The Board will also require CSX to provide reports every six months containing the following information:
· Traffic volume by carload and ton-miles on the Patriot Corridor (i.e., the Northern Route), broken out by carrier account, haulage partner, and commodity at the 2-digit STCC level.

· Truck-to-rail conversions on the CSX lines subject to this proceeding.

These biannual reports shall be filed starting six months from the closing date of the Merger Transaction and then for the next two years, at which point the Board will determine if reporting should continue. CSX shall meet with Board personnel to establish appropriate measures, methodologies, and reporting procedures for this monitoring.

**Conclusion.**

The Board finds that the proposed Merger Transaction, subject to all of the commitments, representations, and voluntary settlement agreements that CSX has requested be imposed as conditions, would not likely cause a substantial lessening of competition, create a monopoly, or restrain trade in freight surface transportation. Even if there were some potential anticompetitive effects, the Board finds that any such effects would be outweighed the public interest in meeting significant transportation needs. Accordingly, the Merger Transaction meets the criteria for approval under 49 U.S.C. § 11324(d). Because of this finding, the Board concludes that USDOJ's request for a condition requiring CSX to divest its 50% ownership of PAS is not warranted. Any other condition requested on the record by a party to this proceeding that has not been specifically approved in this decision will be denied. The Board also finds that the Related Transactions meet the relevant statutory or regulatory standards for approval.

 **\*44**  It is ordered:

1. The Revised Application filed by CSXC, CSXT, and 747 Merger Sub 2, Inc., to acquire control of seven rail carriers owned by Systems and PAR, and to merge six of those railroads into CSXT is approved, subject to:

· The terms of the NSR Settlement Agreement, GWI Term Sheet Agreement, CP Settlement Agreement, and Vermont Settlement Agreement;

· CSX and NSR (and any other necessary party) satisfying the commitment to modify the transaction agreements governing the joint ownership of PAS so that:

· CSX will recuse itself from any PAS board discussion or consideration of strategic issues that relate to CSX's Southern Route or competition between PAS and CSX; and

· CSX will agree to accelerated arbitration to resolve any disputes that arise at the level of the PAS Management Committee over CSX's willingness to make PAS capital expenditures and, if there is a dispute, CSX will agree that the arbitrator will determine whether the disputed capital expenditure is one that would be made by an independent investor in PAS seeking to optimize PAS's success;

· The terms of the settlement agreements entered into by CSX with NNEPRA, the Maine Department of Transportation, MWRA, and Voorheesville;

· Amtrak's requested Condition Nos. 1-5 and 7 as applied to CSX-owned lines, and Condition No. 6 as modified and agreed to by Amtrak and CSX in Exhibit B of CSX's January 21, 2022 filing; and

· Applicants are required to adhere to any and all of the representations they made on the record during the course of this proceeding, whether or not such representations are specifically referenced in this decision, including the following representations:

· CSX will "(a) keep all existing active gateways affected by the Proposed Transaction open on commercially reasonable terms, and (b) waive any right CSXT might otherwise have under the Board's rules to refuse requests by shippers to establish local, separately challengeable rates for movements on the PAR System to an interchange with another rail carrier[;]"

· CSX and NSR will ensure that B&E prices in a neutral, independent, and non-discriminatory manner, in accordance with the terms of the NSR Settlement Agreement, GWI Term Sheet Agreement, and on-the-record statements made during the Jan. 12-13, 2022 hearing;

· CSX will "provide CSXT's dispatchers with dispatch preview screens of the line crossing CSXT's tracks at grade in Springfield, so long as it is technologically possible;"

· CSX will "commit to maintain dispatching for any Commonwealth-owned lines currently dispatched by Springfield Terminal on behalf of PAS at the Billerica Dispatch Center until such a time that the parties may mutually agree on new dispatching arrangements;"

· CSX will "engage in good faith negotiations related to access over the right-of-way that will be controlled by CSXT" with the state of New Hampshire related to the state's ongoing efforts to expand commuter rail options, including the Capitol Corridor passenger rail project;

**\*45** · CSX will "work[] cooperatively with the Commonwealth on Commonwealth-funded projects to develop and implement operating system improvements and construct infrastructure" and will "honor any existing agreements or commitments made to MassDOT and MBTA by PAS or Springfield Terminal;" and

· CSX will not make any material operational changes to Springfield Terminal (other than those specifically noted on the record in this proceeding) while Springfield Terminal continues to serve as PAS's operator during the interim period between the close of the Merger Transaction and the close of the transaction in which B&E becomes the operator for PAS.

2. Approval of the Merger Transaction in Docket No. FD 36472 is subject to the employee protective conditions set out in New York Dock Railway— Control— Brooklyn Eastern District Terminal, 360 I.C.C. 60 (1979), aff'd New York Dock Railway v. United States, 609 F.2d 83 (2d Cir. 1979), and subject to Applicants' representation that they will provide an offer of employment to any Springfield Terminal employees not offered a position by B&E or Springfield Terminal after the workforce has been divided.

3. Approval of NSR's verified notices of exemption to acquire trackage rights in Docket Nos. FD 36472 (Sub-No. 1-4) are subject to the employee protective conditions set out in Norfolk & Western Railway—Trackage Rights—Burlington Northern, Inc., 354 1.C.C. 605 (1978), as modified in Mendocino Coast Railway—Lease & Operate—California Western Railroad, 360 I.C.C. 653 (1980).

4. Approval of B&E's petition for exemption for authority to operate PAS in Docket No. FD 36472 (Sub-No. 5) is subject to the employee protective conditions set out in New York Dock Railway—Control— Brooklyn Eastern District Terminal, 360 I.C.C. 60 (1979), aff'd New York Dock Railway v. United States, 609 F.2d 83 (2d Cir. 1979), and subject to Applicants' representation that they will provide an offer of employment to any Springfield Terminal employees not offered a position by B&E or Springfield Terminal after the workforce has been divided.

5. Approval of SMS's verified notice of exemption for discontinuance in Docket No. AB 1312X is subject to the employee protective conditions set out in Oregon Short Line Railroad—Abandonment—Portion Goshen Branch Between Firth & Ammon, in Bingham & Bonneville Counties, Idaho, 360 I.C.C. 91 (1979).

 **\*46**  6. Applicants must comply with the revised version of the SIP prepared under 49 C.F.R. part 1106 and 49 C.F.R. § 1180.1(p)(3) and 49 C.F.R. § 244.9, which may be updated as necessary, and must continue to coordinate with FRA in implementing the SIP during the operations integration period. The ongoing safety integration process shall continue until FRA has informed the Board that the integration of Applicants' operations has been safely completed.

7. Any condition requested by any party in this proceeding that has not been specifically approved in this decision is denied.

8. Applicants must comply with the oversight condition imposed in this decision, and, in connection therewith, must file the following documents and reports:
· Within 90 days after the effective date of this decision, CSX shall provide a progress report on whether the B&E transaction has been completed. If the B&E transaction has not been completed, CSX should explain why and subsequently notify the Board when the transaction has been completed.

· Six months after B&E closes on its transaction to take over PAS's operations, CSX shall report to the Board the protocols and implementation steps that it, NSR, and B&E are putting in place to prevent the improper sharing of competitive information.

· CSX shall provide a copy of any significant agreement reached pursuant to Section V-6 or V-7 of the GWI Term Sheet Agreement (for which Board approval is not otherwise needed).

· CSX shall also provide a copy of (1) the service metrics that it develops along with NSR and B&E for operations at the Ayer yard and (2) the performance metrics for B&E's general operations, after those metrics have been finalized.

· CSX shall file, starting six months from the closing date of the Merger Transaction and then lasting for two years (after which time the Board will determine if reporting should continue), the following data:

· Traffic volume by carload and ton-miles on the Patriot Corridor (i.e., the Northern Route), broken out by carrier account, haulage partner, and commodity at the 2-digit STCC level.

· Truck-to-rail conversions on the CSX lines subject to this proceeding.

9. Petitions for reconsideration of this decision must be filed by May 4, 2022. Requests for stay must be filed by May 4, 2022.

10. This decision will be effective on May 14, 2022.

## APPENDIX I

### Summary of Participating Parties' Filings

*ALBERT BROTHERS, INC.* Albert Brothers Inc. (Albert Brothers) is family owned industrial and retail scrap metal recycling business located in Waterbury, Conn. Albert Brothers states that PAR has historically provided below-average service and acknowledges that there are many benefits that would result from CSX taking over PAR operations. (Albert Brothers Comment 1.) However, Albert Brothers states that it wants an assurance from CSX that it will maintain service to the Albert Brothers facility. (Id. at 2.) Albert Brothers notes that it has heard that CSX has cut-off service to other low-volume shippers. It states that it could increase its rail traffic so long as it receives better service. (Id.) Albert Brothers also wants an assurance that CSX will maintain the rail line and bridge that crosses the Naugatuck River that is needed to access its facility. (Id.)

**\*47**  *ALLIED RAIL UNIONS.* The Brotherhood of Maintenance of Way Employees Division/IBT; Brotherhood of Railroad Signalmen; International Association of Sheet Metal, Air, Rail and Transportation Workers—Mechanical Division; and National Conference of Firemen and Oilers, 32BJ/SEIU (collectively, Allied Rail Unions (ARU)), [78] do not support or oppose approval of the transactions, but argue that the Board should impose certain conditions on approval. (ARU Reply 1-2.) Specifically, ARU argues that B&E's statement that it would recognize the unions currently representing Springfield Terminal employees that would be hired by B&E and would enter into agreements providing "substantially similar terms and conditions" to those in the existing agreements should be made an express condition of the approval. (Id. at 2.)

ARU also argues that the Board should require B&E to explain this statement in more detail, in particular, how B&E would depart from the terms of the existing agreements, which B&E has refused to do, particularly since it appears that B&E has already developed its employment plans in detail. (Id. at 2-3.) ARU notes that B&E has objected to ARU's discovery request seeking more information on this matter. (Id. at 3.)

Lastly, ARU argues that there is a discrepancy between B&E's assertion that it will only terminate employees that handle capital work—as that work would be handled by CSX and NSR in the future—and the number of positions B&E actually proposes to retain. Specifically, ARU argues that the number of Springfield Terminal employees that perform regular, inspection, and maintenance and repairs is nine signalmen and 32 MOW employees (with seven vacancies), but that B&E only intends to employ seven signalmen and 27 MOW employees post-merger. (Id. at 4-5.) ARU argues that that this workforce level would not be consistent with safe rail operations and that B&E should therefore be required to explain the discrepancy. (Id. at 5.)

After the hearing held in these proceedings, ARU filed supplemental comments to respond to a statement made by CSX's CEO, Jim Foote, during the hearing. ARU argues that Mr. Foote went further than CSX or B&E had stated previously by agreeing that CSX would hire employees that B&E would otherwise terminate. (ARU Suppl. Comments 2-3.) ARU argues that Mr. Foote further stated that CSX (or CSX and NSR) would hire former Springfield Terminal employees to perform capital work, which ARU states is a new commitment. (Id. at 3-4.) Accordingly, ARU request that the Board impose the following as conditions to the Merger Transaction approval:

· Any Pan Am/Springfield Terminal employee working on the PAS lines who is not offered a position with PAS/B&E will be offered a position in his/her craft with CSXT or NSR. Any issues or disputes concerning this condition will be resolved as part of the *New York Dock* implementing agreement negotiations/arbitration processes.

**\*48**  · Capital work on the PAS lines will be performed by CSXT or NSR in accordance with their collective bargaining agreements with BMWED and BRS.

(Id. at 4-5.) [79]

*ALTAMONT FREE LIBRARY*. The Altamont Free Library (AFL) raises concerns about the impact the NSR trains would have on the town of Altamont, N.Y. AFL expresses concern that the crossing at Main Street would be blocked, impeding emergency responders and creating unsafe roadway traffic backups. (AFL Reply 1.) AFL also states that it is concerned about the effect that these trains would have on the library building itself, which is located in the Altamont Train Station, was built in 1897, and is located only 20 feet from the track. (Id.)

*AMERICAN CHEMISTRY COUNCIL*. American Chemistry Council (ACC) represents the leading companies in the business of chemistry. ACC takes no position on the merits of the Merger Transaction, but it urges the Board to condition any approval on the commitments of Applicants and third parties identified in the Revised Application and on the consummation of the Related Transactions no later than the Merger Transaction. (ACC Reply 3.) ACC argues that there is some ambiguity as to whether the Applicants' commitments discussed in the Revised Application extend to third parties, in particular, NSR. (Id. at 5.) ACC also argues that the Board should not allow CSX to consummate the Merger Transaction before the Related Transactions, specifically, B&E's request for operating authority. (Id. at 5-6.)

*AMERICAN TRAIN DISPATCHERS ASSOCIATION (ADTA) and SHEET METAL, AIR, RAIL, AND TRANSPORTATION WORKERS—TRANSPORTATION DIVISION (SMART-TD)*. These two rail labor unions filed separate replies stating they take no position on whether the proposed merger should be approved, but that they both agree that the labor protective conditions that CSX, B&E, and NSR have consented to are required by law and therefore should be imposed as part of the Board's approval of these transactions. (ATDA Reply 1-2; SMART-TD Reply 1-2.)

*BRUCE P. FOGWELL, JR*. Bruce P. Fogwell, Jr., a concerned citizen, filed a letter on Jan. 21, 2022. Mr. Fogwell provides background on the Patriot Corridor Double-Stack Initiative Project, an initiative by the Commonwealth of Massachusetts with the support of the FRA, to raise clearances on the Northern Route to allow for double-stack service. (Fogwell Letter 2.) Mr. Fogwell states that if the Merger Transaction is approved, CSX would be disincentivized to contribute to the project and that CSX would also have veto power over the project. (Id. at 3-4.) Mr. Fogwell also expresses concern about the potential decline in traffic on the Northern Route. (Id. at 4-5.) He also expresses concern about the impact of increased traffic on the Worcester-Ayer line, which he claims is not adequate to handle the 9,000-foot trains that CSX plans to run on the line. He states that this could ultimately result in CSX deciding to double-track that line, resulting in opposition from the adjacent communities and concerns about the impact on the Wachusett Reservoir. (Id. at 5-6.) Mr. Fogwell also discusses the possibility of passenger service between Worcester and Ayer on this line and states that the Board should consider imposing a condition that prevents CSX from blocking such passenger service.

**\*49** *THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN NATIONAL DIVISION AND THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN GENERAL COMMITTEE OF ADJUSTMENT 120).* The Brotherhood of Locomotive Engineers and Trainmen National Division (BLET) and The Brotherhood of Locomotive Engineers and Trainmen General Committee of Adjustment 120 (BLET GCA 120) agree with the Applicants and NSR that employees affected by the Merger Transaction and related trackage rights proceedings are entitled to the standard labor protective conditions set forth in New York Dock Railway—Control—Brooklyn Eastern District, 360 I.C.C. 60 (1979), and Norfolk & Western Railway—Trackage Rights—Burlington Northern, Inc., 354 I.C.C. 605 (1978), as modified in Mendocino Coast Railway—Lease & Operate—California Western Railroad, 360 I.C.C. 653 (1980). (BLET/BLET GCA 120 Reply 2, Aug. 26, 2021.) BLET and BLET GCA-120 request that the Board order that the Merger Transaction not be permitted to proceed until all necessary implementing agreements have been reached. (Id. at 2.)

BLET and BLET GCA 120 also request that B&E be required to clarify a statement in its petition for exemption that there will be benefits from B&E's taking over operations of PAS's lines. (Id. at 3-4.) BLET and BLET GCA 120 are particularly unclear about B&E's assertion that, under its ownership, PAS employees will now be able focus solely on PAS lines rather than both PAS and PAR lines. (Id.) BLET and BLET GCA 120 assert that, contrary to B&E's statement, that is not how work is assigned to PAS and PAR employees, and thus, the supposed benefit B&E claims does not exist. (Id.)

BLET and BLET GCA 120 also express concern about B&E's statement that it intends to use a "Target Zero" safety program. BLET and BLET GCA 120 argue that Target Zero programs can be counterproductive (though they note that these are onsiderations that the Board should take into account when evaluating the Safety Integration Plan. (Id. at 4.) Instead, BLET and BLET GCA 120 urge adoption of a "non-punitive, root cause analysis-based safety program," such as the Confidential Close Call Reporting System. (Id. at 4-5.)

Lastly, BLET and BLET GCA 120 have concerns about a statement by B&E that it may require employees to use company-issued electronic devices, which BLET has argued to the FRA are unsafe. (Id. at 5.)

*CANADIAN PACIFIC RAILWAY COMPANY.* Canadian Pacific Railway Company (CP) connects with PAS at Mechanicville, N.Y., with NSR at Schenectady, N.Y., and with CSX at Albany, N.Y. (CP Comment 2.) CP states in its reply that, to access New England from the west, it utilizes both PAS's Northern Route and CSX's Southern Route, though the vast majority of its traffic moves to and from the Northern Route via the Mechanicville gateway. (Id. at 2.) CP originally raised concerns that the Merger Transaction and Related Transactions would threaten the long-term viability of the Northern Route. (Id. at 9-21.) Accordingly, it requested that the Board impose a number of conditions on its approval of the transactions that it claimed would help preserve the Northern Route as a competitive alternative. (Id. at 23-28.) However, after the hearing, CP and CSX filed supplemental comments stating that they had reached a settlement agreement. A public version of the settlement agreement is attached to CSX's post-hearing supplement. In light of the settlement agreement, CP states that it supports approval of the various transactions as conditioned and withdraws its request that the Board impose additional or different conditions. (CP Hr'g Suppl. 1.)

**\*50** *THE CHLORINE INSTITUTE.* The Chlorine Institute (CI) is a 185-member, not-for-profit trade association of chlor-alkali producers worldwide, as well as packagers, distributors, users, and suppliers. (CI Comment 1, Aug. 26, 2021.) CI requests that the Board hold Applicants to all of their representations, including "representations made in settlements, agreements, or communications with any entity about the proposed transaction herein, in order to gain that party's support, or to avoid that party's opposition". (Id. at 3.) CI claims that in some past merger proceedings, disagreements have developed over "off-the-record" representations made by applicants, including parties that ultimately did not participate in the merger proceeding. (Id. at 3 n.3.) Accordingly, CI argues that the Board should make clear that non-participating parties would have the ability to seek enforcement of such representations from the Board. (Id.) CI also requests that the Board require that any anticompetitive effects be fully ameliorated at the time of the transaction, ""or at any time thereafter" if there is evidence that the transaction has caused "anti-competitive effects on rail transportation[] on any of the Applicants' systems". (Id. at 3.)

On January 3, 2022, CI filed a letter stating that it appears that Applicants accepted CI's proposed conditions in the rebuttal. (CI Suppl. 2, Jan. 3, 2022 (citing CSX Reb. 102).) However, CI notes in a footnote that Applicants appear to limit CI's first proposed condition only to representations made on the record of this proceeding, and that the Board should also hold Applicants to any representations that a party can prove were made off-the-record and that may have induced that party not to participate herein. (Id. at 2 n.1.) CI notes that Applicants also claim to have resolved any anticompetitive impacts caused by the merger, but that CI proposes that the Board require that Applicants also ameliorate any anticompetitive effects that *the Board* determines would be caused by the merger. (Id.)

*FRIENDS OF THE SOUHEGAN VALLEY RAIL TRAIL*. Friends of the Souhegan Valley Rail Trail (FSVRT) filed a comment on November 23, 2021. It states that it was formed in 2020 "to advocate for the advancement of alternative transportation networks in the Nashua, NH region," including "establishing a paved, shared-use, active transportation path along the Hillsborough Branch Rail Line, currently owned by Pan Am Railways". (FSVRT Comment 1.) FSVRT argues that a rails-with-trails corridor will benefit the region, as well as CSX, including providing access for CSX maintenance vehicles and a safe alternative for pedestrians rather than crossing the rail line. (Id. at 2.)

 **\*51** *HOUSATONIC RAILROAD*. Housatonic Railroad (HRRC) is a Class III rail carrier which owns and operates approximately 38 miles of track in Massachusetts, approximately 84 miles of track in Connecticut, and approximately 42 miles of track in New York. HRRC interchanges with CSX at Pittsfield, Mass., and with the Providence & Worcester and PAS at Derby, Conn. HRRC supports the Merger Transaction and Related Transactions, which it asserts will "sustain and improve New England freight rail" and "benefit HRRC-served customers through improved service, reliability, and competitiveness of traffic". (HRRC Reply Aug. 27, 2021.)

*THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO*. The International Brotherhood of Electrical Workers, AFL-CIO (IBEW) states that it takes no position on whether the various transactions should be approved, but that the Board should impose the labor protective conditions agreed to by the Applicants and NSR. (IBEW Comment 1-2.) IBEW also states that the Board should condition approval of B&E's petition for exemption on its recognition of the unions that currently represent Pan Am/Springfield Terminal employees. (Id. at 2.)

*THE INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS, LOCAL 202*. The International Federation of Profession and Technical Engineers, Local 202 (IFPTE Local 202) represents a unit of approximately 20 flaggers and inspectors working for PAR. (IFPTE Local 202 Mot. 1.) [80] It states that it has concerns about the possible effects of the proposed Merger Transaction and Related Transactions, given B&E's response to the Allied Rail Unions in which B&E refused to explain what departures it intends to take from existing collective bargaining agreements. (Id. at 1-2.) As such, IFPTE Local 202 urges the Board to condition such approval upon both recognition of existing unions representing affected employees and the standard New York Dock labor protective conditions. (Id. at 2.)

*ISLINGTON CREEK RESIDENTS*. The residents of the Islington Creek neighborhood in Portsmouth, N.H., filed comments stating that they do not object to the Merger Transaction but are seeking ways to reduce impact from noise and diesel fumes that come from the rail yard near Maplewood Avenue in Portsmouth. (Islington Creek Comment 1, Sept. 1, 2021.) The Islington Creek residents state that a representative of Pan Am Railways previously committed that the company would try to make some improvements, including shutting down locomotives when the temperature is above 40 degrees. However, the Islington Creek residents state that nothing has changed and the problems have worsened. (Id. at 2.) [81]

A representative of the Islington Creek residents, Thomas Hiney, also spoke at the hearing. Mr. Hiney indicated that the Islington Creek residents are seeking a condition to the Merger Transaction that would ensure that they have an avenue for discussions with the operator (regardless of whether it is CSX), and specifically mentioned having the Board's Rail Customer and Public Assistance program serve as a potential facilitator. (Hr'g Tr. 662-63, Jan. 14, 2022.) Mr. Hiney noted that CSX had already reached out to the Islington Creek residents. (Hr'g Tr. 657:5-10, Jan. 14, 2022.)

**\*52** *M4 CAPITAL*. M4 Capital (M4) filed a reply to CSX's initial Prefiling Notice, as well as a reply to CSX's Revised Application. In its initial filing, M4 raises concern that if the Board approves B&E's operation of the PAS system, competition in central New England will suffer. (M4 Comment 2, Mar. 22, 2021). In particular, it notes that after the transactions, GWI will own or operate parallel lines in Massachusetts and Connecticut and may result in GWI abandoning one of the lines in the future. (Id.) M4 suggests that it should be permitted to purchase the line from White River Junction to New Haven (i.e., the Knowledge Corridor). [82] M4 states that it would also like to the Board to consider allowing M4 to obtain ownership of, or rights to operate, the Deerfield rail yards. (Id.) M4 seems to argue that, as an alternative, the Board should grant NECR trackage rights from Northfield to New Haven, along with ownership of the Deerfield rail yards and rights to operate east to Millers Falls and the interchange there. (Id. at 3.)

In its subsequent filing, which was made after CSX submitted its Revised Application, M4 does not reiterate its request to purchase portions of the Knowledge Corridor or that NECR be granted expanded trackage rights. Instead, M4 expresses concern that three separate GWI entities will operate over different portions of the Knowledge Corridor. (M4 Comment 1-2, Aug. 16, 2022.) M4 states that, pursuant to Executive Order 14036, the Board should preserve competitive service on the Knowledge Corridor by continuing to allow two competing carriers not under the same holding company to operate. M4 states that, as such, the Board should only allow the merger if the PAS operating entity is not owned by GWI. (Id. at 2.)

Finally, M4 states that it does not support different parts of the merger proposal, including: CSX's proposal to merge and purchase the eastern portion of PAR from Worcester to Canada; B&E's operating the PAS from Ayer to Mechanicville (i.e., the Northern Route); and B&E operating over the Knowledge Corridor. (Id.)

*MAINE DEPARTMENT OF TRANSPORTATION*. Maine Department of Transportation (Maine DOT) reached a settlement agreement with CSX, which CSX included with the Revised Application. (Revised Appl., Ex. 22-C, V.S. Pelkey, Attach. "MaineDOT Settlement Agreement".) CSXT requests that the Board impose the commitments in this Settlement Agreement as conditions to approval of the Proposed Transaction. (Revised Appl. 12.) A representative of Maine DOT also spoke at the hearing in support of the Merger Transaction.

*MASSACHUSETTS DEPARTMENT OF TRANSPORTATION AND MASSACHUSETTS BAY TRANSPORTATION AUTHORITY (MASSDOT/MBTA)*. In their joint reply, the Massachusetts Department of Transportation (MassDOT) and Massachusetts Bay Transportation Authority (MBTA) state that they take no position on whether the Merger Transaction and Related Transactions should be approved, but that the Board should impose specific conditions to address the threatened harm to the public interest. (MassDOT/MBTA Reply 3.) MassDOT/MBTA note they both own a significant number of rail lines in the Commonwealth for passenger rail and that some of these lines also host the freight carriers that are parties to these transactions. (MassDOT/MBTA Reply 3-6.) Accordingly, MassDOT/MBTA argue that the Board should consider the impact to these lines and passenger service as part of its analysis. (MassDOT/MBTA Reply 6.)

**\*53** MassDOT/MBTA state that they have had amicable discussions with CSX but state that they want specific written protective arrangements and protocols and CSX has only been willing to offer vague assurances that the Merger Transaction and Related Transactions will not materially interfere with passenger service and has only agreed to discuss service disruptions if and when they arise. (MassDOT/MBTA Reply 8.) MassDOT/MBTA want the following specific conditions to approval:
· MBTA to take over dispatching of MBTA and MassDOT-owned lines or, alternatively, CSX must employ dispatching software and technology that would allow MBTA to monitor CSX dispatching in real time. (MassDOT/MBTA Reply 9.)

· CSX must agree to develop a plan within three months after approval that would require CSX to add capacity to the MBTA-owned Ayer-Willows segment when certain volume thresholds (which would be determined by MBTA) are exceeded. [83] CSX would be responsible for paying for the capital improvements needed for such capacity expansion. (MassDOT/MBTA Reply 9-10.) This is referred to herein as the Ayer-Willows Condition.

· CSX must agree to a joint inspection of the MassDOT/MBTA-owned lines and facilities and agree to fund any repairs needed to bring the lines or facilities back up to railroad industry standards of safety or standards previously agreed to by PAS and/or PAR. (MassDOT/MBTA Reply 10.)

· CSX must commit to maintain the Knowledge Corridor to the FRA Class 4 standard, as required by existing agreements between MassDOT and PAS. (MassDOT/MBTA Reply 10-11.)

· CSX must commit to negotiate in good faith expanded passenger rail service in western Massachusetts, including, but not limited to, introduction of such passenger service identified in MassDOT's East West Rail Study on mutually acceptable terms over the former Boston & Albany main line, and the PAS main line west of Ayer. (MassDOT/MBTA Reply 11.)

· CSX must commit to reach an agreement with Amtrak on certain Amtrak and MassDOT-supported passenger train initiatives, including: the proposed Berkshire Flyer service between Albany and Pittsfield); round-trip service between Springfield and Worcester; round trip service between Albany and Worcester; and expansion or modification of existing intercity service within Massachusetts. (MassDOT/MBTA Reply 11.)

· CSX must support the continued development of a Springfield Master Plan for capital improvement investment to enhance north-south/east-west passenger service in and around Springfield Union Station. CSX must also agree not to remove the 950-foot "shoo fly" track installed as part as part of the Springfield station project without MassDOT's consent. (MassDOT/MBTA Reply 11.)

MassDOT/MBTA also state in their reply that they have concerns about CSX's traffic projections. (MassDOT/MBTA Reply 11-12.)

On September 20, 2021, MassDOT/MBTA filed a reply to CSX's supplemental traffic projections. In their response to CSX's supplemental traffic projections, MassDOT/MBTA include a verified statement from Vanasse Hangen Brustlin, Inc., discussing concerns about the limited capacity and operating windows on the Ayer-Willows segment for both increased freight activity and passenger operations. (MassDOT/MBTA Env't Resp. 3.) MassDOT/MBTA note that, post-Merger Transaction, this segment will still be owned by PAS (not CSX), and that several carriers would continue to have the right to operate over it: MBTA, CSX, PAS, and possibly NSR. As such, MassDOT/MBTA question whether CSX's traffic projections take a "holistic view" of rail operations in and around Ayer. (MassDOT/MBTA Reply to CSX Suppl. 4, Sept. 20, 2021.)

 **\*54**  In their final brief, MassDOT/MBTA reiterate that while they do not oppose the Merger Transaction and Related Transactions, they do not believe it is clear whether the Merger Transaction adequately "protects the public interest" or whether the proposed B&E operation of PAS "warrants approval under the rail transportation policy". (MassDOT/MBTA Br. 8.) They note there is a strong and growing federal policy interest in protecting and promoting passenger rail, as evidenced by Executive Order 14036. (MassDOT/MBTA Br. 8.) MassDOT/MBTA argue that the Board has authority to impose conditions to address public interest concerns, including impacts to passenger rail service. (MassDOT/MBTA Br. 9-10, 11-12.) MassDOT/MBTA note, in particular, that two of their requested conditions—requiring transfer of dispatching to MBTA and the Ayer-Willows Condition—are intended to ameliorate disruptions caused by the Merger Transaction (specifically, the lifting of the trackage rights cap at Ayer). MassDOT/MBTA argue that without such conditions, the Merger Transaction would endanger reliable commuter rail service and require ongoing Board oversight. (MassDOT/MBTA Br. 11, 12.) They request that, at a minimum, Applicants be held to the commitments that they have made on the record. (MassDOT/MBTA Br. 12.)

*MASSACHUSETTS WATER RESOURCES AUTHORITY.* Massachusetts Water Resources Authority (MWRA) is a public authority that provides wholesale water and sewer services to over three million people in the Boston area. (MWRA Letter 1, Mar. 19, 2021.) MWRA's waterworks system draws its drinking water from the Quabbin Reservoir, which is transferred to the Wachusett Reservoir prior to treatment. (Id. at 2.) The Wachusett Reservoir is adjacent to a 7.6-mile line of railroad owned by PAR. MWRA initially expressed concern about the impact that additional traffic resulting from the Merger Transaction and

Related Transactions would have on the portion of the rail line adjacent to the Wachusett Reservoir. [84] MWRA asked for a series of conditions to be imposed on the transaction to address its concerns. (See MWRA Reply 5-9 (listing all conditions MWRA originally sought).) However, on January 5, 2022, both CSX and MWRA filed letters stating that they had reached a settlement agreement. The settlement agreement is attached to CSX's January 5, 2022 filing.

*MASSACHUSETTS STATE REPRESENTATIVE WILLIAM STRAUS.* Massachusetts State Rep. William Straus, who serves as the Commonwealth of Massachusetts' House Co-Chair of the Joint Committee on Transportation, notes the significant resources that Massachusetts has poured into increasing passenger service between Boston and Worcester and states that the Board should require CSX to engage in good faith negotiations with MassDOT regarding the state's interest in augmenting existing passenger service west of Worcester. (Straus Reply 2.) He also notes the importance of the Board ensuring that Massachusetts shippers and those dependent on freight movements are not priced out due to a lack of competition. (Id.) Finally, he states that there are issues related to CSX's use of, and ownership interest in, a rail line at Beacon Park Yard in Boston that have yet to be resolved following Harvard University's purchase of CSX's easement rights in the yard. He argues that such issues need to be settled to the satisfaction of MassDOT and MBTA. (Id.) [85]

**\*55** *MERRIMACK VALLEY LEGISLATIVE DELEGATION.* The Merrimack Valley Legislative Delegation consists of Massachusetts State Senator Barry R. Finegold, State Senator Diana DiZoglio, State Senator Bruce E. Tarr, State Representative Linda Dean Campbell, State Representative Andres X. Vargas, State Representative Tram T. Nguyen, State Representative Frank A. Moran, State Representative Christina A. Minicucci, State Representative Marcos A. Devers. The delegation filed a reply to CSX's initial Prefiling Notice requesting that the Board provide "favorable consideration for the inclusion of certain Haverhill Commuter Rail Line infrastructure improvements in this acquisition". (Merrimack Valley Legislative Delegation Comment 1.) The delegation is particularly concerned about two projects that were funded by 2020 bonds issued by the state legislature. The first project involves the double-tracking of the Haverhill line from Lawrence, Mass., to Wilmington, Mass. The delegation states that although this project began in 2010, only two of the eight miles have been double-tracked. The delegation specifically wants double-tracking completed at the Andover, Mass. station. (Id. at 1-2.) The second project involves installing level-boarding platforms at all stations on the Haverhill line, making the trains more easily accessible, including for wheelchairs. (Id. at 2.)

*NATIONAL RAILROAD PASSENGER CORPORATION.* The National Railroad Passenger Corporation (Amtrak) notes that this is the first merger to be considered after President Biden's Executive Order 14036, which encourages the STB to: (a) ensure that passenger rail service is not subject to unwarranted delays due to host railroads, and (b) consider a railroad's fulfillment of its responsibility under 49 U.S.C. § 24308 when determining whether a merger is consistent with the public interest under 49 U.S.C. § § 11323-25. (Amtrak Reply 2, 4.) Amtrak also asserts that Board has legal authority to impose conditions on approval of a "significant" transaction merger. Specifically, Amtrak claims that the Board previously found that 49 U.S.C. § 11324(c) permits the agency to impose conditions relating to the public interest and that the Board's finding was upheld by the court in Village of Barrington v. STB, 636 F.3d 650, 653 (D.C. Cir. 2011). (Id. at 3.) Amtrak argues that this precedent, along with Executive Order 14036, authorize and encourage the Board to impose conditions, even if they are not directly related to traditional anticompetitive concerns. (Id. at 5.)

Amtrak explains that there are four services that it operates over the lines at issue in these proceedings: the Lake Shore Limited (Chicago-Boston) and three state supported routes in Vermont (the Vermonter, the Ethan Allen, and the Valley Flyer). (Id. at 5.) Amtrak notes that all four of these services started after the formation of Amtrak and so were only achieved due to 50 years of unprecedented public investment. (Id. at 6-8; id. at V.S. Slattery 9-11.) Amtrak argues that imposing conditions to protect these public investments is in the public interest. (Amtrak Reply 8.)

**\*56** Amtrak argues that when the Board has approved mergers without conditions to protect passenger service in the past, it is has resulted in adverse impacts on passenger rail, and Amtrak details specific examples. (Id. at 9-12.) According to Amtrak's witness, the performance of most of these affected Amtrak trains never returned to pre-transaction levels. (Amtrak Reply, V.S. Slattery 8.)

Amtrak also argues that the alleged benefits to Amtrak from the merger are illusory. (Amtrak Reply 12.) Specifically, although CSX states that it will install Positive Train Control (PTC) on the Downeaster route because of the merger, Amtrak states that this installation was already planned and is being funded by Amtrak. (Id. at 13.) Amtrak also argues that the track upgrades to the Downeaster route that CSX touts will actually be made to a different CSX line on which the Downeaster does not operate. (Id.)

Amtrak then discusses its "Amtrak Connects US" plan, in which it envisions new or improved routes on over 50 rail corridors over the next 15 years, including specific services in New England. (Amtrak Reply 14-15.) Amtrak argues that CSX has a history of opposing Amtrak's expansion plans and lists specific examples, most notably, a dispute over the proposed Berkshire Flyer service between Albany, N.Y., and Pittsfield, Mass. (Amtrak Reply 15-19.)

Amtrak also expresses concern that the increased traffic on the Southern Route will negatively impact the Lake Shore Service, which also uses that route, as well as the Valley Flyer and Vermonter services, which cross that route. (Amtrak Reply 19.) Given these concerns, Amtrak requests that the Board impose seven conditions. (Amtrak Reply 21-22.) Amtrak reiterates these conditions in its Final Brief. (Amtrak Br. 8-11.) The conditions, as worded by Amtrak, are as follows:
· Condition No. 1: CSX should be ordered to adhere to and fulfill the representations it has made in this proceeding regarding its undertakings and obligations if the Merger Transaction is approved, and to make regular and data-supported reporting to the Board to confirm its compliance with those representations. Specifically, CSX should be ordered:
· To comply[] with its statutory and contractual responsibilities with respect to Amtrak services.

· To maintain or improve existing passenger service, maintain a consistent and reliable network, and create a dedicated Passenger Operations team.

· Prior to initiating additional NSR intermodal/automotive service, to engage with NSR and Amtrak in "formal joint planning and joint preparation"; schedule the additional NSR service to "operate outside the current Amtrak operating windows" between the Albany area and Worcester (2:00p.m.-7:00p.m.); and "make sure that the passenger service requirements will be protected".

**\*57** · To ensure that proposed traffic shifts have no impact on any passenger service on the Southern Route or the Northern Route.

· To ensure that NSR intermodal/automotive service will be scheduled to operate at a time when no Amtrak trains are scheduled to run over the Knowledge Corridor.

· To prioritize passenger train movements at CP 98 (milepost QB 98.5) in Springfield, Mass.

· To ensure that all passenger trains are handled efficiently by dispatchers on the CSX network.

· To participate in good faith discussions with the Northern New England Passenger Rail Authority (NNEPRA) and Amtrak regarding improvements to, or expansion of, the Downeaster service. To the extent not included in the above, to cooperate with any effort to increase maximum speeds for Downeaster trains and increasing Downeaster service frequencies.

· To install PTC on the PAR System line segment north of the Massachusetts/New Hampshire State line to Brunswick, Me., which hosts the Amtrak Downeaster service, and to work with Amtrak and NNEPRA on coordinating installation of PTC.

· Condition No. 2: CSX should be ordered to fully cooperate in good faith with Amtrak and third party public agencies for addition, expansion, or modification of existing intercity passenger rail services, operation of seasonal service or "extra sections" of existing regularly scheduled Amtrak trains, and/or development of new intercity passenger rail service, including but not limited to service over the Pan Am routes and CSX's Albany-Worcester route; with respect to any such request by Amtrak, all

inputs and assumptions will be shared with the parties participating in any analysis or modelling (if such is required), and with the Board in any subsequent proceeding, subject to appropriate confidentiality undertakings; and with respect to the Pan Am routes and CSXT's Albany-Worcester route, the level and composition of freight traffic used in any analysis or modelling (if such is required) will be no greater than the level forecast by CSXT in their Application.

· Condition No. 3: CSX should be ordered to cooperate with Amtrak and third-party public agencies to identify improvements, if any, that would be required to make accelerated speeds on the Pan Am routes and CSX's Albany-Worcester route safe and practicable, and, upon agreement or an order to implement such accelerated speeds, work in good faith to make such improvements as promptly as practicable.

· Condition No. 4: CSX should be ordered not to make changes in operations on the Pan Am routes and/or CSX's Albany-Worcester route, including but not limited to changes in freight traffic volumes, scheduling, infrastructure, and dispatching that would reasonably be expected to result in the Customer On-Time Performance of Amtrak trains operating on the Pan Am routes and CSX's Albany-Worcester route falling below the minimum standard as defined in the FRA Final Rule published November 16, 2019, and that in the event CSX changes inadvertently result in an Amtrak train or Amtrak route falling below such minimum standard, CSX will be required to take such actions as may be necessary to restore the performance of such Amtrak train or Amtrak route performance to at least the minimum standard.

**\*58** · Condition No. 5: CSX should be ordered to perform all non-emergency maintenance-of-way activities on the Pan Am routes and CSX's Albany-Worcester route during non-peak passenger travel periods.

· Condition No. 6: CSX should be ordered to provide for the operation of up to four weekend trips (two on Friday and two on Sunday), on a seasonal basis (summer) only, between Albany, N.Y. (Post Road Crossing) and Pittsfield, Mass. (the Berkshire Flyer service), commencing on a date ninety (90) days following written notice from Amtrak, at maximum authorized passenger train speeds, with no required capital contribution from Amtrak for capacity related improvements, and permitting such Amtrak trains to change ends in Pittsfield on Track 1.

· Condition No. 7: The Board should retain jurisdiction to oversee compliance with these conditions.

On January 12, 2022, CSX filed a motion stating that it agrees to six of the seven Amtrak proposed conditions and requesting that they be imposed as part of the Board's approval. (CSX Mot. 1, Jan. 12, 2022.) The remaining condition was that CSX be ordered to allow Amtrak to implement the Berkshire Flyer service with no required capital contribution from Amtrak. (Amtrak Br. 11.) CSX included with its filing a letter from its CEO, Jim Foote, stating that CSX agrees to the operation of the Berkshire Flyer from Memorial Day to Columbus Day 2022 as a "Special Train," subject to a commitment from Amtrak to install a 1,000-foot station track to mitigate freight interference. CSX stated that this would allow all parties to better evaluate the Berkshire Flyer service. (CSX Mot., Att., Jan. 12, 2022.)

At the hearing, Amtrak's representative expressed concern about CSX making the Berkshire Flyer service contingent on Amtrak constructing the 1,000-foot station track. (Hr'g Tr. 453-54.) However, in its post-hearing supplemental comment, Amtrak stated it has reached an agreement with CSX to allow for the Berkshire Flyer service in 2022 and 2023, so there is no longer any need for the Board to resolve this issue. (Amtrak Hr'g Suppl. 3; see also CSX Hr'g Sup pl. 4-5 (stating that CSX has agreed to allow the Berkshire Flyer service to operate in 2022 and 2023 without the need for the station track).)

The only remaining issue concerns Amtrak's request that the above proposed conditions be applied not only to CSX-owned lines, but also to the PAS lines. (Hr'g Tr. 456:3-12, Jan. 14, 2022; Amtrak Hr'g Suppl. 3.) Amtrak acknowledges that because NSR is half-owner of PAS, its consent would be needed for such conditions to be imposed. Amtrak states that NSR has been unwilling to offer its consent. (Amtrak Hr'g Suppl. 3.)

*NEW HAMPSHIRE DEPARTMENT OF TRANSPORTATION.* New Hampshire Department of Transportation (NHDOT) states that it supports the transaction because "it would provide a continuous, single-line rail service and provide additional resources to improve and market the line with the potential to bring additional freight service to New England markets," which in turn "would take additional trucks off the road which would be beneficial for both the economy and the environment". (NHDOT Reply 1.) NHDOT also states that CSX will provide financial resources for much needed infrastructure improvements and will work to honor all agreements currently in place. (Id.)

**\*59** *NEW HAMPSHIRE STATE REPRESENTATIVE LINDSAY SABADOSA.* State Rep. Lindsay Sabadosa filed a reply to CSX's initial Prefiling Notice, in which she raises a number of concerns with the transaction, though the remedy she seeks is for the Board to classify the transaction to be classified as "significant," which the Board did in Decision No. 1. The Board summarizes her concerns nonetheless.

State Rep. Sabadosa notes that Amtrak's Valley Flyer service passes through her district. She is concerned that CSX commits to "work cooperatively" with MassDOT and MBTA to consider expansion or introduction of passenger service, but it does not to commit to actually expanding or introducing passenger service. She notes that this is important given the difficulty with CSX on introducing the Berkshire Flyer service. (Sabadosa Comment 2.)

State Rep. Sabadosa also notes that CSX does not mention PTC being installed on the MassDOT-owned line, which carries passenger trains. She urges CSX, PAS, and MassDOT to partner and apply for funding to install PTC on this line. (Id. at 3.)

Lastly, State Rep. Sabadosa expresses concern about CSX's plan to reduce the labor force in the region, referring to a concern raised by the Allied Rail Unions. In particular, she notes that CSX plans to operate the same infrastructure with a MOW workforce that is reduced by 48%. (Id.)

*NORTHERN NEW ENGLAND PASSENGER RAIL AUTHORITY.* On August 5, 2021, CSX submitted a letter informing the Board that it and the Northern New England Passenger Rail Authority (NNEPRA) had reached a settlement agreement (NNEPRA Settlement Agreement). Attached to CSX's filing was a letter from NNEPRA to CSX, dated August 3, 2021, that outlines the terms of their settlement agreement. (CSX Letter, Aug. 5, 2021.) NNEPRA is a body corporate and politic established under Maine law for the purpose of promoting passenger rail service between points within Maine and points within and outside Maine, and the state sponsor of Amtrak's Downeaster passenger rail service between Brunswick, Me., and Boston, Mass. According to NNEPRA, Downeaster trains operate over rail lines in Maine and New Hampshire that are owned and operated by PAR. (Id., Attach. at 1.) CSX requests that the Board impose the terms of the NNEPRA Settlement Agreement as a condition of the Board's approval of the Revised Application. On August 27, 2021, CSX provided a copy of a letter from NNEPRA to the Board in which NNEPRA expresses it support for the merger transaction. (CSX Letter, Aug. 27, 2021.)

*PIONEER VALLEY RAILROAD COMPANY, INC.* Pioneer Valley Railroad Company (PVRR) is a wholly owned subsidiary of Pinsly Railroad Company and a Class III rail carrier that owns and operates approximately 31 miles of track serving customers between Westfield, Mass., and Holyoke, Mass. (PVRR Notice 1.) PVRR states that, after discussions with the Applicants and SNR, it "believes that the transactions will sustain and improve rail transportation in New England, and specifically will facilitate and promote the availability of competitive rail service on the lines of PAS, with which PVRR connects in Holyoke". (PVRR Letter 1, Aug. 27, 2022.) Accordingly, PVRR supports approval. (Id.)

**\*60** *REPUBLIC SERVICES, INC., ECDC ENVIRONMENTAL, L.C. and DEVENS RECYCLING CENTER, LLC.* Republic Services, Inc., ECDC Environmental, L.C. and Devens Recycling Center, LLC (collectively, Republic Services) informed the Board that it would be filing its comment late because it was in the process of finalizing a settlement agreement with CSX. On September 9, 2021, Republic Services filed its comment informing the Board that it reached a final agreement with CSX. Given the settlement agreement, Republic Services supports the proposed Merger Transaction and states that it will "present significant opportunity for the improvement of rail service on the PAS rail lines and will benefit parties which rely on a reliable and efficient rail system". (Republic Services Comment 3.) A public version of the settlement agreement is attached to Republic Service's

Comment. However, neither CSX nor Republic Service's request that the settlement agreement be imposed as a condition to the Board's approval.

*THE STATE OF VERMONT.* The State of Vermont, acting through its Agency of Transportation (VTrans), initially filed comments opposing the Merger Transaction and the Related Transaction in which B&E seeks to become the operator of PAS. VTrans owns 305 miles of rail line in the state, all of which are operated by Vermont Rail System (VRS). VTrans, along with VRS, originally expressed concern about the impact that allowing two GWI subsidiaries, B&E and NECR, to operate over the Conn River Line would have on competition for rail service in Vermont. (VTrans Reply 4-11.) However, on January 3, 2022, CSX filed a letter stating that it, along with NSR and GWI, had reached a settlement agreement with both VTrans and VRS. A public version of the settlement agreement is attached to CSX's January 3, 2022 filing. That same day, VTrans filed a notice that it was withdrawing its earlier comments and was taking a neutral position in these proceedings, conditioned upon the Board imposing the terms of this settlement agreement as a condition of the Board's approval of the transactions.

*TOWN OF WEST SPRINGFIELD, MASS.* On January 18, 2022, the Town of West Springfield (West Springfield) filed a letter opposing the Revised Application. West Springfield states that CSX owns and operates the largest intermodal yard in New England at West Springfield. (West Springfield Letter 1.) West Springfield states that the yard creates a safety hazard for residents and that CSX has not been responsive to West Springfield's concerns. In particular, the town claims that CSX trains block a crossing at Front/Bridge Street, causing disruption to public safety services and the residents who use the crossing. The town claims that the frequency of these blockages has increased over the last decade, often occurring almost daily and lasting upwards of an hour. (Id. at 1-2.) The town states that CSX has been unwilling to participate in any measures to mitigate negative impacts on the community and only agreed to allow livestream cameras to be installed at the Front/Bridge Street crossing after MassDOT became involved. (Id. at 2-3.)

**\*61** West Springfield states that CSX also refuses to maintain the land surrounding its yard and has been difficult to work with on coordinating on a sewer line project. (Id. at 3.)

The town also joins the request from MassDOT/MBTA that the Board impose a condition requiring CSX to work with the state to expand passenger service in western Massachusetts. (Id. at 1.)

*UNITED STATES DEPARTMENT OF JUSTICE.* The U.S. Department of Justice (USDOJ) argues that the Board should consider imposing a structural remedy to address the competitive concerns raised by the Merger Transaction, such as divestiture. (USDOJ Comment 3.) USDOJ states that, based on its experience, it believes that the proposed remedies offered by the Applicants do not accord with best practices, are less likely to succeed than more robust remedies, and will not fully address the competitive concerns created by the Merger Transaction and Related Transactions. USDOJ asserts that structural remedies tend to be "cleaner, more efficient, more durable, and easier to enforce". (Id.)

USDOJ specifically cautions that CSX's 50% ownership of PAS is "likely to diminish competition between CSX and PAS on [the] parallel [Northern and Southern] [R]outes". (Id.) USDOJ further states that CSX's 50% ownership of PAS could impair the ability of NSR to compete, in that CSX could sabotage PAS's service, expecting to recapture any lost traffic on CSX's own routes. (Id.) According to USDOJ, the selection of B&E as the contract operator of PAS does not fully insulate CSX from pricing and scheduling decisions, and CSX may still have the ability to influence joint venture operations, despite "any behavioral safeguards that CSX" puts in place. (Id. at 4.)

Additionally, USDOJ argues that having B&E as the operator then raises a separate competitive concern, in that it would give GWI control of all operations on the Conn River Line and portions of the Knowledge Corridor. USDOJ states that, in effect, this reduces the number of competitors on the line from two to one. (Id. at 4.) USDOJ is highly skeptical of the efficacy of the proposed protections that would incentivize B&E and NECR to compete and notes that, even if such safeguards could be developed, such an arrangement would require constant monitoring and oversight. (Id. at 5.) USDOJ states that the NSR Settlement Agreement includes "imprecise pricing terms as well as other vague terms" and that CSX could still delay or veto

actual implementation of the remedy, particularly the operation of NSR's traffic on the CSX route. (Id.) USDOJ also notes that the NSR Settlement Agreement would require the Board to address competition issues after the fact, which could be more challenging. (Id.)

**\*62**  USDOJ also argues that the Merger Transaction and Related Transactions may "soften" competition between CSX and NSR. In particular, USDOJ notes that the two companies may have the incentive to compete less aggressively and because there is no other competitor, "it is ripe for coordination and competitive harm". (Id. at 5-6.)

Given these concerns, USDOJ states that the easiest, cleanest, and least risky solution would be to require a sale of Systems' 50% interest in PAS to a party other than CSX. (Id. at 6.) USDOJ notes that the NSR Settlement Agreement already allows NSR the ability to acquire CSX's 50% stake within the first seven years after the merger, so divestiture would merely accelerate the process by which NSR can purchase the remaining stake in PAS. (Id.) USDOJ also points out that, if the Board were to require such a sale, it could also ""select" a divestiture buyer that is unaffiliated with GWI, which would solve the concern about reduced competition on the Conn River Line. (Id.)

*U.S. REPRESENTATIVES CHRIS PAPPAS AND ANN MCLANE KUSTER*. U.S. Representatives Chris Pappas and Ann McLane Kuster represent the First and Second Congressional Districts of New Hampshire, respectively. In their comment, they request that the Board consider the impact on "a proposed commuter rail project or other possible passenger expansion projects in New Hampshire and consider imposing conditions on the merger to minimize any negative impacts". (Pappas & Kuster Comment 1.)[86]  In particular, they note that the state of New Hampshire is exploring commuter rail options that will run along lines currently owned by Pan Am, including the Capitol Corridor passenger rail project, which would extend commuter rail from Massachusetts into New Hampshire. (Id.) They state that Pan Am may have had prior agreements with possible commuter rail partners to provide access to this line for commuter rail, but that it is unclear the extent to which such prior commitments would continue after the merger is completed. As such, they request that the Board impose a condition that CSX engage in good faith negotiations over the terms of access over for this potential commuter service. (Id. at 2.)

*U.S. REPRESENTATIVE RICHARD E. NEAL*. Congressman Richard Neal of Massachusetts filed a letter on July 12, 2021 opposing the Merger Transaction. Congressman Neal expresses concern about the impact that the Merger Transaction would have on MBTA's Boston-area commuter system and the MassDOT-owned section of the Knowledge Corridor from Springfield to East Northfield. He also expresses concern about CSX's plan to increase operations over the line that runs over the Wachusett Reservoir. He states that ensuring fair competition that enables further development of passenger rail and expansion opportunities is critical to growing and expanding regional economies. Congressman Neal notes that he has expressed a number of concerns to CSX but that it has been unresponsive.

**\*63**  On January 6, 2022, Congressman Richard Neal submitted an additional comment (captioned "Written Testimony") in which he again states his opposition to the transactions. Congressman Neal states that both USDOJ and the U.S. Department of Transportation have noted that the transaction has the potential to diminish competition, which is contrary to President Biden's Executive Order 14036 seeking to promote greater competition in the economy. (Congressman Neal Written Testimony 1.) Congressman Neal also notes that the Occupational Safety and Health Administration has found CSX to have violated the Federal Rail Safety Act several times of the last few years, including most recently on July 1, 2021. (Id.) Lastly, the Congressman states that, based on his experiences in dealing with CSX, he has found it to be unresponsive to his personal requests for action on issues involving rail operations in his district and that CSX is hindering regional growth. (Id. at 2.)

Finally, Congressman Neal filed a post-hearing supplement in which he refers to the recently-submitted comments from the Town of West Springfield in which the town outlines their grievances with CSX and its unwillingness to engage on local issues. (Congressman Neal Comment 1, Jan. 21, 2022.) He also refers to a February 2021 incident in which a CSX freight train blocked the Vietnam Veterans Memorial Bridge in West Springfield, causing a 38-minute traffic stoppage at the Front/Bridge Street crossing. (Id.) He states that there is an ongoing investigation of this incident by the Massachusetts Department of Public Utilities. Congressman Neal asserts he and his staff have held discussions with CSX since the incident but that his concerns

have gone unaddressed. (Id.) He also includes a letter from a constituent that experienced a delay on Amtrak's Valley Flyer service on January 18, 2022, due to a CSX freight train blocking Amtrak's train at Springfield. He states that the increase in CSX operations that would result from the Merger Transaction could further impact passenger rail service in the greater New England region. (Id. at 1-2.)

*U.S. SENATOR SUSAN COLLINS.* U.S. Senator Susan Collins of Maine filed a letter in support of the Merger Transaction on January 11, 2022. Senator Collins notes that the transaction contemplated between CSX and Pan Am has the potential to significantly benefit Maine and the Northeast. She also notes CSX's intent to make improvements to track and locomotives to provide better service, extend positive train control on certain passenger rail lines, and make other upgrades to the rail network.

*U.S. SENATORS CHRISTOPHER S. MURPHY and RICHARD BLUMENTHAL.* U.S. Senators Christopher S. Murphy and Richard Blumenthal of Connecticut submitted a letter on January 14, 2022, in which they state that the Board should condition its merger approval so as to ensures that CSX maintains fair pricing of, and open access to, freight and passenger rail service in the Northeast; upgrades its infrastructure; and preserves service to existing customers. They further urge the Board to obtain written assurances from CSX that it will properly maintain Pan Am's rail lines and bridges.

**\*64** *UNITED STATES DEPARTMENT OF TRANSPORTATION.* The U.S. Department of Transportation (USDOT) takes no position on the final merits of the proposed transactions, but it highlights the issues that are of concern to it. (USDOT Comment 1-2, Aug. 27, 2022.) First, on safety, USDOT notes that the Federal Railroad Administration (FRA) has started to communicate with the Applicants about any potential safety issue and will work with the Board in review of the SIP. (Id. at 2.) Second, on competition, USDOT highlights Executive Order 14036 and urges the Board to "examine [competition] issues carefully, ... consistent with the principles set forth in EO 14036, and ... ensure that the promised public benefits of the transaction will actually be achieved if the proposal is approved". (Id. at 3, 6.) Third, on passenger rail, USDOT notes Amtrak's concerns and that Amtrak has correctly stated that passenger service in the New England region has been made possible through significant public investment. (Id. at 7-8.) USDOT states, in particular, that FRA estimates that Systems and its predecessors have benefitted from as many as 20 FRA-funded projects over the last 20 years, totaling more than $379 million. (Id. at 8 n.7.) Accordingly, USDOT argues that the Board should impose conditions to ensure that the existing passenger service is appropriately maintained, consistent with both EO 14036 and 49 U.S.C. § 24308. (Id. at 8.)

In its response to various comment, USDOT reiterates that if the Board does decide to permit the transaction, the Board should include specific and enforceable conditions to support present and future passenger rail operations. (USDOT Reply 1.)

USDOT also submitted a letter on December 21, 2021, regarding CSX's required Safety Integration Plan.

*VERMONT RAIL SYSTEM.* Vermont Rail System (VRS) is a business name used by six short line railroads controlled by Trans Rail Holding Company that operate in the northeast. Three VRS carriers operate over lines owned by VTrans and that connect with PAS: Vermont Railway, Inc.; Washington County Railroad Company, and Green Mountain Railroad Corporation. (VRS Reply 2-3.) VRS, along with VTrans, initially opposed the Related Transaction in which B&E seeks to become the operator of PAS. (VRS noted that it is generally supportive of CSX merging with, and assuming operation of, the PAR Railroads. (Id. at 5.)) VRS expressed concern about the impact that allowing two GWI subsidiaries, B&E and NECR, to operate over the Conn River Line would have on competition for rail service in Vermont. (Id. at 10-11.) However, on January 3, 2022, CSX filed a letter stating that it, along with NSR and GWI, had reached a settlement agreement with both VRS and VTrans. A public version of the settlement agreement is attached to CSX's January 3, 2022 filing. That same day, VTrans submitted a filing requesting leave to withdraw its prior comments opposing the B&E transaction and endorsing CSX's request that the Board impose the terms and conditions of the settlement agreement as a condition of approval of the Merger Transaction and Related Transactions.

**\*65** *VILLAGE OF ALTAMONT.* On January 11, 2022, the Village of Altamont (Altamont) submitted a letter expressing concern about the merger. Altamont is located on NSR's Delanson-Voorheesville line, on which NSR will begin routing its intermodal/ automotive trains to the Southern Route. Altamont states that it is concerned about the impact that the two additional NSR trains

will have on a crossing at Route 146 (Main Street). Altamont notes that it understands that the trains will be approximately two-miles in length, which will block the crossing and emergency responders for up to 10 minutes. Accordingly, the Village urges the Board to reject the merger application.

*VILLAGE OF VOORHEESVILLE.* The Village of Voorheesville (Voorheesville) is located where NSR's system connects with CSX's Southern Route and will be the point at which NSR's intermodal/automotive trains enter onto the CSX system under NSR's proposed new trackage rights agreements. Voorheesville initially expressed concern about the impact that rehabilitation of NSR's track connecting to CSX's Southern Route would have on the village; however, on December 23, 2021, CSX filed a letter stating that it had reached a settlement agreement with the village, with a copy of the agreement attached. [87]

## APPENDIX II

### Parties that Filed Letters in Support of the Merger Transaction.

#### *Rail Customers, Transportation and Logistic Providers, and Other Shipper Interests*

Albert Brothers, Inc.

Arrowhead Environmental Partners, LLC

Atlantic Forest Products, LLC

Atlantic Wallboard

BB&S Treated Lumber of New England

Benevento Companies

Blackline Midstream LLC

Boise Cascade Building Materials Distribution LLC

Boston Concrete Corporation

Boston Sand & Gravel Company

Broadway Street Holdings, Inc.

Broco Oil, Inc.

Brunswick Valley Lumber

Business Council of New York State, Inc., The

Catania Oils

Charter Development Company

Chemtrade Logistics Inc.

Ciment Québec Inc.

Connecticut Business and Industry Association

Cooperative Reserve Supply Inc.

Crestwood Equity Partners LP

CTS Cement Manufacturing Corporation

Cushman Lumber Company

Daaquam Lumber Maine Inc.

DP World

Eastern Propane Gas Inc.

EIMSKIP USA

F&M Tool and Plastics, Inc.

F.L. Larson Trucking, Inc.

Fabian Oil Inc.

Factor Gas Liquids Inc.

Frost Bridge Associates, LLC

GFI Partners

Granite State Concrete Company, Inc.

Greater Boston Transload, LLC

Greif, Inc.

H&T Waterbury, Inc.

Hub Group, Inc.

HUHTAMAKI

Inland Fuel Terminals, Inc.

Inteplast Group Corporation

Interoceanic Corporation

J.B. Hunt Transport, Inc.

J.D. Irving, Limited

J.D. Irving, Limited, Pulp & Paper Division

Jaguar Transport Holdings

Javelin Global Commodities (UK) Ltd.

Law Logistics

Lynch Logistics, Inc.

 **66** Maine Better Transportation Association

Maine Rail Group, Inc.

Maine Wood Treaters, Inc.

Monadnock Paper Mills, Inc.

NGL Supply Company Ltd.

One SouthCoast Chamber

Packaging Corporation of America

Parrish & Heimbecker

Pixelle Specialty Solutions, LLC

Plasmine Technology, Inc.

Poland Spring

Ray-Mont Logistics

S&R Corporation

Saint John Port Authority

Sappi North America

Smaller Manufacturers Association of CT, Inc.

Tighe Logistics Group

TurfCare Supply Corporation

US Ecology

USG Corporation

Waste Management of MA, Inc.

Waterbury Regional Chamber of Commerce

Western Massachusetts Economic Development Council

Woodland Pulp & St. Croix Tissue

Worcester Regional Chamber of Commerce

wTe Recycling, Inc.

### *Other Railroad Interests*

Milford-Bennington Railroad Company, Inc.

New Hampshire Central Railroad

New Hampshire Northcoast Company

OmniTRAX, Inc.

Rail Enterprise Group

Regional Rail LLC

### *Federal, State, and Local Officials*

**Connecticut**

Connecticut Department of Transportation

State Senator Rick Lopes

(Former) State Representative David McCluskey

Mayor Neil M. O'Leary, City of Waterbury

## Maine

U.S. Senator Susan M. Collins

U.S. Senator Angus S. King, Jr.

Governor Janet T. Mills

State Senators Troy Jackson, Eloise Vitelli, and Matthea Daughtry

State Senators Jeffrey Timberlake and Matthew Pouliot

State Representative Kathleen R.J. Dillingham

State Representative Michelle Dunphy

State Representative Ryan M. Fecteau

## Massachusetts

State Senator Michael D. Brady

State Senator Patrick M. O'Connor

State Representative Sean Garballey

(Former) State Representatives Kevin and Elizabeth Poirier

State Representative Angelo J. Puppolo, Jr.

State Representative Jeffrey N. Roy

Hugh Dunn, New Bedford, Mass., City Council

Mike Zwirko, Former President, Melrose City Council and Former Member Board of Directors, Massachusetts Municipal Association

## New Hampshire

Governor Christopher T. Sununu

New Hampshire Department of Transportation

State Senator Kevin Avard

State Senators Regina Birdsell and David Watters

State Senator Bill Gannon

State Representative John R. Cloutier

State Representative John A. Graham

State Representative Jason Osborne

Mayor Joyce Craig, City of Manchester

### New York

State Assemblywoman Carrie Woerner

Office of the County Administrator of Saratoga County

Mayor Dennis Baker, City of Mechanicville

---

### Footnotes

1    This decision embraces the following dockets: Norfolk Southern Railway—Trackage Rights Exemption—CSX Transportation, Inc., Docket No. FD 36472 (Sub-No. 1); Norfolk Southern Railway—Trackage Rights Exemption—Providence & Worcester Railroad, Docket No. FD 36472 (Sub-No. 2); Norfolk Southern Railway—Trackage Rights Exemption—Boston & Maine Corp., Docket No. FD 36472 (Sub-No. 3); Norfolk Southern Railway—Trackage Rights Exemption— Pan Am Southern LLC, Docket No. FD 36472 (Sub-No. 4); Pittsburg & Shawmut Railroad—Operation Exemption—Pan Am Southern LLC, Docket No. FD 36472 (Sub-No. 5); SMS Rail Lines of New York, LLC— Discontinuance Exemption—in Albany County, N.Y., Docket No. AB 1312X.

2    The digest constitutes no part of the decision of the Board but has been prepared for the convenience of the reader. It may not be cited to or relied upon as precedent. See Pol'y Statement on Plain Language Digs. in Decisions, EP 696 (STB served Sept. 2, 2010).

3    The Board did require CSX to update its traffic projections by providing traffic forecasts through 2027—five years after the date of the anticipated year of the issuance of a final decision from the Board, rather than the three years CSX had provided in the Revised Application. The Board requested these traffic projections so that it could fully evaluate whether the Merger Transaction and Related Transactions would have potential for environmental impacts warranting environmental review. Decision No. 4, slip op. at 26-27. For more information, see the "Environmental Comments" section below.

4    The PAR System consists of approximately 808 route miles of rail lines, including approximately 724.53 owned and leased route miles (including perpetual freight easement) and approximately 83.62 trackage-rights route miles in Massachusetts, Maine, New Hampshire, and Vermont. (Revised Appl. 32.)

5    PAS's network consists of approximately 425 route miles, including approximately 281.38 owned route miles (including perpetual freight easement) and approximately 143.62 trackage-rights route miles in Connecticut, Massachusetts, New Hampshire, New York, and Vermont. (Revised Appl. 32.)

6    The states are: Alabama, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

7    Specifically, Systems would be merged with 747 Merger Sub 1, Inc., with Systems surviving. Immediately thereafter, Systems would be merged with 747 Merger Sub 2, with 747 Merger Sub 2 surviving and the separate corporate existence of Systems ceasing. 747 Merger Sub 2, as the surviving corporation, would be renamed Pan Am Systems, Inc., and would be a wholly owned subsidiary of CSXC. Concurrent with closing, CSXC would contribute Pan Am Systems, Inc., and all of its subsidiaries to CSXT. CSXT would thereafter control the rail carrier subsidiaries of Pan Am Systems, Inc., and at a future time yet to be determined, would merge those subsidiaries, except V&M, into CSXT. Applicants do not request merger authority with respect to V&M because Boston & Maine does not wholly own V&M. (Revised Appl. 6-7.)

8    Public versions of these agreements are included as attachments to the verified statement of CSX's witness Sean Pelkey, which is included with the Revised Application. (See Revised Appl., Ex. 22-C, V.S. Pelkey, Attachs.) For simplicity, the decision from this point forward will specifically cite to the ""NSR Settlement Agreement" and "GWI Term Sheet Agreement," rather than the Revised Application in which the agreements were attached.

9    NSR has filed public and highly confidential versions of the trackage rights agreements in each of these sub-dockets.

10   In the verified notice, NSR uses milepost X 2.92 at Barber to describe the overhead trackage rights it seeks. (NSR Notice 3, FD 36472 (Sub-No. 3).) The trackage rights agreement governing this transaction refers to this point as being in Barbers Station. (Id. at Ex. 2.)

11   If the Merger Transaction is approved and consummated, this Boston & Maine line would be owned by CSXT. (Id. at 2 n.1.)

12   As noted, PAS is jointly owned by NSR and Boston & Maine. (NSR Notice 2, FD 36472 (Sub-No. 4).) If the Merger Transaction is approved and consummated, the PAS lines—including the line that is the subject of this trackage rights proceeding—would be jointly owned by NSR and CSXT. (Id. at n.1.)

13   As discussed in Decision No. 4, NSR will also need to rehabilitate an existing line of connecting track in the Village of Voorheesville for its trains to access the Southern Route, but CSX claims that no construction authority is required under 49 U.S.C. § 10901. Decision No. 4, slip op. 20 n.34 (citing CSX Envtl. Comment 5). According to NSR's representative, it will take approximately six to 12 months before NSR trains can begin using the Southern Route if approval of the transactions is granted. (Hr'g Tr. 345-46, Jan. 13, 2022.)

14   B&E filed its original petition for exemption on February 25, 2021 but filed an amended version of the petition on April 27, 2021.

15   CSX, NSR, and GWI have agreed that, if the Merger Transaction is consummated prior to the replacement of Springfield Terminal by B&E and the initiation of PAS operations by B&E, then Springfield Terminal would continue to operate PAS until Springfield Terminal— which would be owned by CSX—is replaced as the PAS operator. (Revised Appl. 9.)

16   SMS refers to this line as the Voorheesville Running Track.

17   The CSX Environmental Comment is attached as Exhibit 4-A to the Revised Application.

18   In accordance with 49 U.S.C. § 11325(c)(2) and 49 C.F.R. § 1180.4(d), the procedural schedule also allowed for parties to file responsive (including inconsistent) applications, which were due on September 28, 2021, but none were filed.

The procedural schedule also included due dates for submission of environmental-related comments and the proposed Safety Integration Plan, which are discussed in more detail below.

19    As noted, the Board found in <u>Decision No. 1</u> that the Merger Transaction should be classified as a "significant" transaction, not a "minor" transaction, under 49 C.F.R. § 1180.2.

20    In prior merger proceedings, the Board—without making a specific finding that without conditions, a merger would violate criteria in subsection 11324(d)—has often imposed commitments, representations, and settlement agreements as conditions to the Board's approval when merger applicants have requested that the Board do so, even when those commitments, representations, and agreements are not specifically intended to ameliorate competitive harms. <u>See e.g.</u>, <u>NS/Pan Am/PAS</u>, FD 35147 et al., slip op. at 18 (imposing terms of a settlement agreement involving commuter rail "because the parties have requested it".). The Board will likewise do so here because such agreed-upon requests for conditions to the proposed merger transaction effectively become part of the merger proposal itself. Similarly, here, the Board need not find that, without conditions, the merger would violate criteria in subsection 11324(d) because the commitments, representations, and settlement agreements requested and agreed to by the applicants—which will be treated as part of the merger proposal—mitigate any likely anticompetitive effect of the merger proposal, and, even if an anticompetitive effect were to occur, it would be outweighed by associated public benefits.

21    CSX also stated that, as an alternative to the recusal and arbitration provisions, it would be willing to appoint an independent fiduciary to serve in CSX's place on the PAS Board. (CSX Reb., V.S. Pelkey 9.) In light of the other commitments to which CSX has agreed, the Board finds such a condition unnecessary.

22    USDOJ also argues that the NSR Settlement Agreement includes "vague terms (e.g., 'reasonable schedule and operating plan') and allows CSX to delay or veto the actual implementation of the remedy, particularly the operation of NS traffic on the CSX route". (USDOJ Comment 5 (citing NSR Settlement Agreement, Section IV(2)).) USDOJ's concern seems to be that CSX could interfere with NSR's trackage rights over the Southern Route. However, as CSX notes, trackage rights agreements are common in the railroad industry and often imposed as a remedy to preserve competition in mergers. (CSX Reb. 46.) There is also a term in each of the trackage rights agreements requiring that NSR and CSX trains "be operated without prejudice or partiality to either Party and in such manner as shall afford the most economical and efficient manner of movement of all traffic". (NS Notice, Ex. 2, Article 11-D, FD 36472 (Sub-No. 1).) Trackage rights disputes are relatively rare, and the Board is confident that NSR will be in a strong position to seek appropriate enforcement and remedies should disputes arise.

23    As part of its purchase rights, NSR also has a right of first refusal if CSX receives an offer for its 50% interest in PAS. NSR's purchase rights and right of first refusal are set forth in more detail in the NSR Settlement Agreement, Section II.

24    The length of the transitional period is submitted as confidential information, but the Board finds that it is of a sufficient period of years to ensure that CSX would continue to have an interest in maintaining the Northern Route for the reasonably foreseeable future.

25    (Hr'g Tr. 70-99 (CSX representative describing where PAR network needs upgrades); 354-56; 670:5-8; 725-26, Jan. 13-14, 2022.)

26    Both settlement agreements specify that the "NSR Joint Use Agreement" will be an exception to the requirement that B&E set rates in a non-discriminatory fashion. The NSR Joint Use Agreement, part of the series of agreements entered into by Systems and NSR to create PAS in 2009, generally governs the use of the PAS lines. (A copy of the agreement is included with the Revised Application. (<u>See</u> Revised Appl. Vol. II.)) It includes the grant by PAS of haulage rights to NSR between certain points on the Northern Route. (<u>See</u> NSR Joint Use Agreement, Section 2(b).) Pursuant to the NSR Settlement Agreement (Section I(3)(c)(i)) and the GWI Term Sheet Agreement (Section IV-4), B&E's authority to set rates would not apply to the NSR Joint Use Agreement (i.e., traffic that it would move for NSR in haulage service).

(See also Hr'g Tr. 279-280, Jan. 13, 2022 (CSX representative explaining that it would "inherit" agreements that set forth existing haulage rates).)

27    CSX acknowledges that there are some shippers located in Springfield, Mass., and Holyoke, Mass., that currently have potential access to both CSX and PAS. (Revised Appl., V.S. Reishus 85.) CSX's witness, Dr. Reishus, argues that these are not 2-to-1 shippers because, after the Merger Transaction, they will continue to have potential access to both CSX and PAS and that CSX will retain no pricing or operational control with respect to PAS and PAS will continue to serve as an economically independent rail option in New England. (Revised Appl., V.S Reishus 85.)

28    Although the terms of the NSR Settlement Agreement and GWI Term Sheet agreement apply only to B&E as the operator of PAS, should CSX and NSR attempt to replace B&E, the new PAS operator would have to be approved by the Board. In such a scenario, because the parties represented that the intent of the parties is to ensure that prices for accessing PAS will be neutral and non-discriminatory and because the Board considers this assurance integral for minimizing any anticompetitive effects of the merger as it relates to access to PAS, the Board expects that CSX and NSR would require the next operator to be bound by similar protections aimed at preserving competition and will take the existence of such a requirement into consideration in any such future transaction.

29    B&E's compensation as a contract operator is tied to performance incentives. (Revised Appl., Ex. 12, Marketing Plan 24.) Specifically, the B&E operating bonus would be paid out on a graduated scale based on PAS's operating ratio. (B&E Reb., V.S. Wagner 3.)

30    B&E states that it intends to invest $20 million for the acquisition of locomotives and the purchase or lease of maintenance-of-way equipment prior to its start-up on the PAS lines. (B&E Reb., V.S. Wagner 3.)

31    As discussed below, the Board notes further that, under the settlement agreement with Vermont and VRS, CSX and NSR have committed that PAS will offer price stability for certain VRS traffic, meaning that CSX, NSR, and B&E are contractually bound to keep some PAS rates in place.

32    (See Hr'g Tr. 164-166, Jan. 13, 2022.)

33    (See Hr'g Tr. 170:4-7, Jan. 13, 2022

(CHAIRMAN OBERMAN: But whatever those commitments are, what we've just been talking about about keeping the gateways open, and having equalized pricing, that is in perpetuity.

MR. FOOTE: Yes.).)

34    Cent. Power & Light Co. v. S. Pac. Transp. Co., 1 S.T.B. 1059 (1996) ("Bottleneck I"), modified in part, 2 S.T.B. 235 (1997) ("Bottleneck II"), aff'd sub nom. MidAmerican Energy Co. v. STB, 169 F.3d 1099 (8th Cir. 1999), cert. denied, 528 U.S. 950 (1999)).

35    The length of the transitional period and the manner of these adjustments was also designated as confidential information, though the Board has reviewed them and finds they are reasonable.

36    Attached to Mr. Pelkey's verified statement are e-mail messages between CSX representatives and the three shippers in which CSX representatives state their commitment to offering switching service. (Revised Appl., Ex. 22-C, V.S. Pelkey, Att. "Email Correspondence with 2-to-1 Shippers".) None of these shippers has expressed concern with the Merger Transaction.

37    The Board notes that the name "Conn River Line" is sometime also intended to include the portion of the Knowledge Corridor between East Northfield and central Massachusetts.

38     CSX notes that it agrees to provide such protection even though it does not believe that such protection is needed because B&E will operate PAS independently from the other GWI railroads. (Revised Appl., V.S. Reishus 91.)

39     For simplicity, the decision from this point forward will cite specifically to the "Vermont Settlement Agreement," rather than the CSX filing in which the agreement was attached.

40     Prior to the Vermont Settlement Agreement, CSX and NSR had made a number of commitments detailed in the Revised Application aimed at ensuring that B&E's operation of PAS would not have an adverse impact on VRS's access to other rail connections. (See Revised Appl, Ex. 22-C, V.S. Pelkey 18-19.) For example, CSX states in the Revised Application that it and NSR agree that PAS will provide haulage for VTrans between East Deerfield and Bellow Falls. (Id. at 18.) Although not specified, the Board assumes that the parties intend for the terms of the Vermont Settlement Agreement to supersede these commitments, which were not included in the Vermont Settlement Agreement. Accordingly, these commitments or representations will not be imposed as conditions to the Board's approval.

41     The term "service failure-related 'pop-up"D' trackage rights is not stated in the Vermont Settlement Agreement but is B&E's description of those terms. (See B&E H'rg Exhibits, Jan. 14, 2022 (slide 6).) (Although B&E submitted these exhibits only in FD 36472 (Sub-No. 5), the Board has placed the exhibits in the primary docket as well.)

42     The Vermont Settlement Agreement defines "price stability" to mean that pricing for an individual movement shall be consistent with the then-current pricing by car type, commodity, and ownership, subject to annual adjustments tied to a mutually agreed-upon index, though not at a level below the current rate. (Vermont Settlement Agreement, Section 4(a) n.2.)

43     The Board notes that CSX has identified the section of the Knowledge Corridor from Springfield, Mass., to New Haven, Conn., as another location at which there would now be two GWI carriers providing service if the Merger Transaction and Related Transactions are approved: B&E (as operator of PAS) and Connecticut Southern Railroad Inc. (CSO). (Revised Appl., Ex. 22-E, V.S. Reishus 88-90.) However, as noted in Decision No. 4, CSX has explained that it also operates on the line via a haulage arrangement with CSO. (Decision No. 4 (citing Revised Appl., Ex. 22-E, V.S. Reishus 88.)) Accordingly, CSX states that customers on this line would continue to benefit from two-carrier competition even after the transactions. Decision No. 4, slip op. at 16 n.25.

       CSX also identifies Gardner, Mass., and Millers Falls, Mass. as points on the Patriot Corridor (i.e., the Northern Route) that could be served by both PAS and a GWI subsidiary. (Revised Appl., Ex. 22-E, V.S. Reishus 87-88.) CSX's witness, Dr. Reishus, provides explanations (under seal) as to why neither locations will result in the loss of competitive rail service as a result of the Merger Transaction and Related Transactions. (Id.) The Board finds Dr. Reishus' explanations reasonable.

44     See also Railroad Operating Agreement, Section 7(f) (requiring B&E to establish appropriate information barriers and not share information it obtains when providing haulage service). The Railroad Operating Agreement (ROA) was entered into by CSX, NSR, and B&E and governs B&E's duties as PAS's operator. A confidential version of the ROA was included with CSX's December 29, 2021 filing.

45     Conditions must also be narrowly tailored to remedy adverse effects. See UP/SP, 1 S.T.B. at 418; see also Kan. City S. —Control—Kan. City S. Ry., 7 S.T.B. at 986 (finding requested conditions would not be imposed, even if there were competitive concerns, because they were not narrowly tailored).

46     In rejecting divestiture here, the Board also notes that it closely scrutinizes conditions that could alter the competitive balance otherwise to be realized from a merger, including whether those conditions could have unpredictable effects. UP/SP, 1 S.T.B. at 418; see also Union Pac. Corp.—Control—Mo. Pac. Corp. (UP/MP), 366 I.C.C. 462, 564 (1982) (finding the agency "should not use our conditioning powers to make consolidation proceedings vehicles for rail system restructuring".).

47    CSX representatives also indicated a willingness to share information on truck-to-rail conversions resulting from the Merger Transaction as part of the post-merger oversight. (Hr'g Tr. 143:5-21, Jan. 13, 2022.) As discussed below, the Board will include this as part of the oversight reporting requirements.

48    CSX also filed a letter on August 5, 2021, stating that it had reached a settlement agreement with the Northern New England Passenger Rail Authority (NNEPRA), the Maine state sponsor of Amtrak's Downeaster passenger rail service between Brunswick, Me., and Boston. On August 27, 2021, CSX provided a copy of a letter from NNEPRA in which NNEPRA expresses it support for the Merger Transaction. (CSX Letter, Aug. 27, 2021.) As discussed above, because CSX and NNEPRA have requested this agreement imposed as a condition to approval of the Merger Transaction, the Board will do so.

49    On February 10, 2022, the Board entered memoranda into Docket No. FD 36472 from each of the Board Members stating that they had received prohibited ex parte communications in the form of letters from the North Atlantic Rail Alliance, Inc. (NAR). Copies of the letters were attached to the memoranda. NAR states that one of its top priorities is re-establishing fast, frequent, and reliable service from Pittsfield, Mass. and Springfield, Mass. to Boston. On April 13, 2022, the Board also received a letter from Congressman James P. McGovern of Massachusetts, in which he asks the Board to pay close attention to the impact of any further rail consolidation on passenger rail priorities before issuing a decision. Among other things, he also discusses the importance of certain passenger rail proposals in the region and the need for a proposed use agreement that will encourage cooperation on such projects.

50    The Board notes that this case involved a major merger under 49 U.S.C. § 11324(b) and 49 C.F.R. § 1180.2(a).

51    Amtrak's Ethan Allen and Adirondack services operate over the far western end of the PAS-owned Patriot Corridor for only a short distance. On the Knowledge Corridor, Amtrak operates the Vermonter and the Valley Flyer. (The Vermonter runs between Washington, D.C., and St. Albans, Vt., and the Valley Flyer service runs between New Haven and Greenfield, Mass.) However, Amtrak owns, maintains, and dispatches the section of the Knowledge Corridor between New Haven and Springfield, while MassDOT owns the segment between Springfield and East Northfield. (Revised Appl., Ex. 13-C, V.S. Daly 4-5.) The only part of the Knowledge Corridor not owned by Amtrak or MassDOT is between East Northfield and White River Junction, which is owned by NECR and over which PAS has trackage rights.

52    See CSX Traffic Suppl., V.S. Wallace, Ex. 4, Aug. 19, 2021.

53    The Board notes that CSX's traffic projections were submitted prior to the Vermont Settlement having been reached and that, under this settlement, VRS will now have trackage rights on the Conn River Line from Greenfield to White River Junction, over which Amtrak operates the Vermonter service. However, Amtrak submitted filings subsequent to the Vermont Settlement being filed and did not raise any concerns. There is also no indication that these VRS trains would impact the Vermonter service.

54    Because it finds that Amtrak has not demonstrated the need for any conditions to be imposed on PAS, the Board also need not address CSX's remaining arguments (discussed above) as to why passenger-related conditions are not necessary or appropriate here.

55    Amtrak also states that Condition Nos. 1-5 and 7 should apply to "CSXT rail lines that are not part of 'the existing CSXT network,'" which Amtrak states CSX excluded in its January 12, 2022 letter. (See Amtrak Hr'g Suppl. 3 (arguing that CSXT has not "offered a justification for limiting conditions applicable to its lines to its existing network".).) Amtrak has not defined the additional lines sufficiently to warrant an expansion of these conditions and, to the extent Amtrak seeks to apply the conditions to lines not yet owned by CSX, the proposal lacks a sufficient nexus to the Merger and Related Transactions.

56    As discussed in Decision No. 4, CSX explains in its Revised Application that when PAS was created, PAS granted Springfield Terminal overhead trackage rights over the Island Line, allowing Springfield Terminal to connect the northern lines of the PAR System to CSX, but the trackage rights had a volume cap that today is consistently exceeded.

(Revised Appl., Ex. 12, Market Analysis 25.) CSX states that as part of the NSR Settlement Agreement, CSX and NSR will modify that volume cap and replace it with a process that would allow the current traffic volume to move on overhead trackage rights and provide capacity to handle any increase in that traffic. (Id.) This agreement, called the Ayer Operations Protocol, is part of the NSR Settlement Agreement.

57      See also ROA, Section 9(d)(v) ("CSXT (or Springfield Terminal) shall provide Berkshire & Eastern, at no cost to Pan Am Southern or Berkshire & Eastern, with a desk, related office facilities and all required equipment, IT, utilities and access as required at Springfield Terminal's existing dispatching center in North Billerica, MA (the "Dispatch Facilities") for so long as CSXT (or Springfield Terminal) also performs dispatch of other CSXT owned or controlled rail lines at that facility".)

58      Some dispatching for MBTA and MassDOT is currently performed by Springfield Terminal, but whether Springfield Terminal is doing so on behalf of PAR or PAS depends on which of the two owns or holds the freight easement over a line. CSX commits "that the Springfield Terminal dispatching operations of MBTA and MassDOT passenger trains will continue to be located for the foreseeable future in North Billerica, MA, where MBTA's contractor Keolis also dispatches contiguous line segments". (CSX Reb. 64.) Because CSX makes no distinction in this commitment between Springfield Terminal dispatching that is done on behalf of PAR or PAS, the Board understands CSX's commitment to require that any dispatching that is performed for MBTA or MassDOT will remain in North Billerica, regardless of whether the dispatching is being performed by CSX or B&E post-transaction.

59      The Board notes that MassDOT and MBTA seek a condition requiring that they and CSX conduct a joint inspection of MBTA-owned and MassDOT-owned railroad facilities currently maintained by PAR or PAS and, essentially, catalog those facilities where upgrades are needed to bring the facility up to appropriate industry standards. (MassDOT/MBTA Reply 10.) Although CSX correctly notes that its maintenance responsibilities regarding these lines are governed by existing agreements that do not require such an inspection, the request by MassDOT and MBTA is understandable given CSX's extensive presentation at the hearing of the poor condition of the PAR lines. (Hr'g Tr. 70-89, Jan. 13, 2022; see also CSX Exhibits, Jan. 14, 2022.) Accordingly, although a formal condition is not warranted, the Board strongly encourages CSX to participate in such a joint inspection.

60      As noted, NNEPRA, which operates the Downeaster service, has entered into a settlement agreement with CSX and therefore supports the Merger Transaction. The Adirondack and Ethan Allen services only briefly run over PAS's Patriot Corridor in the Albany area and should not experience any notable effects from these transactions. The Vermonter, Valley Flyer, and Springfield to New Haven service (i.e., the Hartford Line) all operate over the Knowledge Corridor, which also hosts PAS, but, as noted above, these services should not be significantly impacted by the fact that B&E will replace Springfield Terminal as the operator of PAS.

61      Some of the Lake Shore Limited trains run from Chicago to New York City, rather than Boston. See Amtrak, Lake Shore Limited, https://www.amtrak.com/lake-shore-limited-train (last visited April 11, 2022).

62      CSX also entered into settlement agreements with MWRA and Voorheesville. The Board addresses these agreements in the Environmental Comments section below.

63      CSX has agreed to Amtrak's request to allow for the Berkshire Flyer service in 2022 and 2023. (See CSX Hr'g Suppl. 4-5, Jan. 21, 2022.)

64      State Representative Straus also mentions a dispute between CSX and MassDOT and MBTA relating to CSX's use of, and ownership interest in, a rail line at Beacon Park Yard in Boston that was purchased by Harvard University. (Straus Reply 2.) CSX states that it is unaware of any issues raised by MassDOT but that it will discuss the matter further with MassDOT. (CSX Reb. 86.) Because MassDOT and MBTA themselves have raised no concerns, the Board will not address this issue further.

65    MBTA operates the Haverhill Line commuter service between Haverhill, Mass., and Boston North Station, on a line segment owned and maintained by MBTA, over which a PAR subsidiary holds a perpetual freight easement. (Revised Appl., Ex. 13-C, V.S. Daly 7.)

66    M4 initially indicated a desire to purchase a portion of the Knowledge Corridor or, alternatively, that NECR be granted trackage rights over the corridor. (M4 Comment 3, Mar. 22, 2021.) However, it appears M4 subsequently abandoned such a request, as no further mention of this concept was made in its reply to the Revised Application or in a responsive application, and instead, it appears that M4 merely objects to the Merger Transaction and Related Transactions being approved. (M4 Comment 1-2, Aug. 16, 2022.)

67    While attempting to avoid references to confidential or highly confidential information in Board decisions, the Board reserves the right to rely upon and disclose such information in decisions when necessary. In this case, the Board determined that it could not adequately present its findings with respect to the issues without disclosing certain information.

68    On April 8, 2022, a letter was filed by Neil O'Leary, the Mayor of Waterbury, Conn., reiterating the same points made by Albert Brothers in its comment.

69    CP originally argued that, if required, pooling authority would serve as a separate statutory basis for the Board to impose conditions. However, as noted, CP subsequently entered into a settlement agreement with CSX and NSR and accordingly withdrew its request for the Board to impose conditions (other than the CP Settlement Agreement).

70    The issue in NS-Pan Am/PAS involved whether one particular contract, the Divisions Agreement, would require pooling authority. The Divisions Agreement involved the process by which Springfield Terminal would establish rates, transportation contracts, and ancillary charges for PAS, including rates and contracts for through movements. NS/Pan Am/PAS, FD 35147 et al., slip op. at 20.

71    Another potential pooling concern with the Divisions Agreement in NS/Pan Am/PAS had to do with the fact that Springfield Terminal would be the operator for both PAS and PAR, which were connecting carriers. As such, the Divisions Agreement set forth a methodology for how Springfield Terminal revenues would be allocated between PAR and PAS. Here, after the merger, that situation will no longer exist: B&E will be providing service on behalf of PAS, and CSX will be providing service on its own lines (in place of PAR).

72    To the extent that any of the conditions being imposed by the Board indirectly implicate the Related Transactions, the Board's oversight and enforcement as part of the Merger Transaction approval is appropriate. Although B&E and NSR are not Applicants in the Merger Transaction proceeding, they are parties to certain settlement agreements that the Board is imposing as conditions to the Merger Transaction, including the NSR Settlement Agreement and the GWI Term Sheet Agreement.

73    Given this finding, the Board need not determine whether the transaction is limited in scope.

74    On April 4, 2022, a letter was filed by New York State Assemblywoman Patricia Fahy, encouraging the Board to give consideration to Altamont's feedback.

75    FRA states that its ongoing monitoring would focus on capital projects, Amtrak's Downeaster service, the Wachusett Reservoir, track improvements, and signals and dispatching. (USDOT Reply, Dec. 21, 2021.)

76    Specifically, Article II, Section 1 of the New York Docket conditions states: "Any employee who is terminated or furloughed as a result of a transaction shall, if he so requests, be granted priority of employment or reemployment to fill a position comparable to that which he held when his employment was terminated or he was furloughed, even though in a different craft or class, on the railroad which he is, or by training or retraining physically and mentally can become,

qualified, not, however, in contravention of collective bargaining agreements relating thereto". New York Dock, 360 I.C.C. at 85 (App. I, Article II, Section 1).

77    BLET and BLET GCA 120 also raise safety-related concerns about B&E's statement that it intends to implement a "Target Zero" safety program and require employees to use company-issued electronic devices. (BLET/BLET GCA 120 Reply 5.) These safety-related concerns are additional matters that should be raised with FRA during the ongoing SIP process.

78    ARU note that there is no formal organization known as the "Allied Rail Unions"; rather that name has been adopted by these organizations for collective reference in this proceeding and that each organization is a separate participant in this proceeding. (ARU Reply 1 n.1.)

79    Although both filings were submitted on January 21, 2022, CSX's post-hearing supplement was received after ARU's filing. In its post-hearing supplement, CSX responds to the merits of ARU's filing in a section titled "Late-Filed Comments". (CSX Hearing Suppl. 8-10.) On January 24, 2022, ARU filed a reply to CSX's post-hearing supplement, objecting to CSX's characterization of the ARU filing as "late-filed". ARU also argues that CSX's reply to ARU's supplement comments was improper, as the Board did not allow for replies to post-hearing supplements, and as a result, the Board should strike this portion of CSX's post-hearing supplement. Alternatively, ARU argues that the Board should permit ARU's substantive reply to CSX's post-hearing supplement, in which ARU claims that it has accurately described Mr. Foote's commitments and that CSX should be bound to these commitments. (ARU Reply to CSX Hearing Suppl. 2-3.)

ARU's supplemental comments were properly filed as a response to new information that was provided at the hearing. However, the Board will not strike the portions of CSX's post-hearing supplement addressing the labor issue. The Board finds that such information was also properly filed as a clarification to statements made at the hearing (even if it was framed as a response to ARU's supplemental comments). As such, the Board will also include ARU's substantive reply to CSX's post-hearing supplement as part of the record.

80    IFPTE Local 202 notes that it filed its comments despite not having filed a notice of intent to participate as set forth in the procedural schedule in Decision No. 4 and, therefore, requests leave to submit its comments. Although the filing of a notice of intent to participate is encouraged for any party wishing to participate in proceedings such as this, it is not a requirement. Accordingly, IFPTE Local 202's request is moot.

81    The Islington Creek residents made a subsequent filing on January 27, 2022. Although this filing was made outside the statutorily prescribed 180-day period, see 49 U.S.C. § 11325(c)(3), it mainly reiterates Islington Creek's prior arguments.

82    In its filings, M4 appears to refer to the Knowledge Corridor as the Conn River Line. However, throughout this proceeding, the Board has referred to the Conn River Line as comprised of only the NECR-owned section of the Knowledge Corridor, from East Northfield to White River Junction.

83    The Ayer-Willow segment is used by MBTA to provide its Fitchburg Line commuter service. (MassDOT/MBTA Reply to CSX Suppl. 3, Sept. 20, 2021.)

84    This segment, often referred to by the parties as the Reservoir Segment, runs from approximately Milepost 6 to Milepost 13.58 on PAS's line between Harvard, Mass., and Barbers Station, Mass.

85    State Representative Straus also argues that the Board should not separately consider "CSX's participation in Pan Am Southern and CSX's purchase of Pan Am Railways". (Straus Reply 2.) CSX's Revised Application seeks approval for its acquisition of Systems, which includes Systems' complete interests in both PAS and PAR.

86    Congressman Pappas also submitted a letter on August 27, 2021, in which he forwarded comments from the residents of the Islington Creek neighborhood. The Islington Creek neighborhood filed these comments itself on September 1, 2021.

87    A corrected version of the filing was submitted on December 27, 2021.

**Fed. Carr. Cas. P 37509 (S.T.B.), 2022 WL 1125011**

**End of Document**                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.