**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**Albany Division**

| | |
|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY, <br><br> *Plaintiff/* <br> *Counterclaim Defendant,* <br><br> *v.* <br><br> VILLAGE OF VOORHEESVILLE, et al., <br><br> *Defendants/* <br> *Counterclaim Plaintiffs.* | No. 1:25-cv-1413-BKS-PJE |

**NORFOLK SOUTHERN RAILWAY COMPANY'S**
**REPLY IN SUPPORT OF ITS MOTION FOR**
**A PRELIMINARY INJUNCTION**

Tobias S. Loss-Eaton
 (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8427
tlosseaton@sidley.com

John J. Jablonski
David P. Johnson
GERBER CIANO KELLY BRADY LLP
599 Delaware Avenue, Suite 100
Buffalo, NY 14202
(716) 313-2082
jjablonski@gerberciano.com

November 14, 2025

**CONTENTS**

Table of authorities ................................................................................................................ ii

Argument ............................................................................................................................... 1

I.  Norfolk Southern is likely to succeed on the merits. ...................................................... 1

      A.  The STB settlement does not defeat preemption. ..................................................... 2

          1.  The settlement is irrelevant to the stop-work order's validity. ................... 2

          2.  The STB is the proper forum to construe the settlement. ........................... 3

          3.  Norfolk Southern is not violating the settlement. ...................................... 4

      B.  The stop-work order is preempted. .......................................................................... 7

          1.  ICCTA preempts local law just as much as state law. .............................. 7

          2.  The stop-work order regulates "transportation" under ICCTA. ................. 8

          3.  The stop-work order is discriminatory. ...................................................... 9

          4.  There is no "police powers" exception to ICCTA preemption. ................. 9

      C.  The "illegal carveout" is irrelevant to preemption. ............................................... 11

II.  Norfolk Southern is likely to suffer irreparable harm absent injunctive relief. .................... 13

III.  The balance of the equities and the public interest favor relief. ........................................ 15

Conclusion ............................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAR v. Hudson*,
   144 F.4th 582 (4th Cir. 2025) ..................................................................9, 10

*Am. Rocky Mountaineer v. Grand Cnty.*,
   568 F. Supp. 3d 1231 (D. Utah 2021) ..............................................................10

*BNSF Ry. v. Hiett*,
   22 F.4th 1190 (10th Cir. 2022) ......................................................................11

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
   601 F.2d 48 (2d Cir. 1979) ..............................................................................15

*Buffalo S. R.R. v. Vill. of Croton-on Hudson*,
   434 F. Supp. 2d 241 (S.D.N.Y. 2006) ..........................................................4, 8

*California Pharmacists Ass'n v. Maxwell-Jolly*,
   563 F.3d 847 (9th Cir. 2009),
   *vacated and rev'd on other grounds*, 565 U.S. 606 (2012) ....................14

*Canadian Nat. Ry. v. City of Rockwood*,
   No. 04-40323, 2005 WL 1349077 (E.D. Mich. June 1, 2005) ...............10

*Caspar v. Snyder*,
   77 F. Supp. 3d 616 (E.D. Mich. 2015) ..........................................................14

*City of Ozark v. Union Pac. R.R.*,
   843 F.3d 1167 (8th Cir. 2016) ............................................................................8

*Coastal Distrib., LLC v. Town of Babylon*,
   216 F. App'x 97 (2d Cir. 2007) ..........................................................................7

*Commuter Rail Div. v. Union Pac. R.R.*,
   No. 1:25-cv-2439, 2025 WL 1787514 (N.D. Ill. June 27, 2025)................3

*ConverDyn v. Moniz*,
   68 F. Supp. 3d 34 (D.D.C. 2014) ......................................................................14

*Coulas Viking Partners v. Belt Ry. of Chicago*,
   No. 13 CH 28409, 2019 WL 10856582 (Ill. Cir. Ct. Mar. 19, 2019) ...........13

*Delaney v. HC2, Inc.*,
   761 F. Supp. 3d 641 (S.D.N.Y. 2025)................................................................2

*Delaware v. STB*,
   859 F.3d 16 (D.C. Cir. 2017) ..............................................................................8

*Fayus Enters. v. BNSF Ry.*,
   602 F.3d 444 (D.C. Cir. 2010) ................................................................7

*Feinerman v. Bernardi*,
   558 F. Supp. 2d 36 (D.D.C. 2008) ........................................................14

*Fla. E. Coast Ry. v. City of W. Palm Beach*,
   266 F.3d 1324 (11th Cir. 2001) ........................................................9, 13

*Florida East Coast Ry. v. City of W. Palm Beach*,
   110 F. Supp. 2d 1367 (S.D. Fla. 2000),
   *aff'd,* 266 F.3d 1324 (11th Cir. 2001) ...............................................6, 9

*Franks Inv. Co. LLC v. Union Pac. R.R.*,
   593 F.3d 404 (5th Cir. 2010) (en banc) .................................................9

*Green Mountain Railroad v. Vermont*,
   404 F.3d 638 (2d Cir. 2005) ........................................................ *passim*

*Hardaway v. Nigrelli*,
   636 F. Supp. 3d 329 (W.D.N.Y. 2022) ...................................................1

*MCI Telecomm. v. FCC*,
   822 F.2d 80 (D.C. Cir. 1987) .................................................................4

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018) .....................................................................1

*N.Y. Elec. & Gas Corp. v. N.Y. Indep. Sys. Operator, Inc.*,
   168 F. Supp. 2d 23 (N.D.N.Y. 2001) .....................................................4

*Nat'l Commc'ns Ass'n v. AT&T Co.*,
   46 F.3d 220 (2d Cir. 1995) .....................................................................3

*Dunbar ex rel. NLRB v. Onyx Precision Servs., Inc.*,
   129 F. Supp. 2d 230 (W.D.N.Y. 2000) ...................................................1

*Norfolk S. Ry v. City of Alexandria*,
   608 F.3d 150 (4th Cir. 2010) .................................................................7

*Norfolk S. Ry. v. City of Toledo*,
   No. 3:14-cv-918, 2015 WL 45537 (N.D. Ohio Jan. 2, 2015) ..................8

*Norfolk S. Ry. v. Dille Rd. Recycling, LLC*,
   94 F.4th 517 (6th Cir. 2024) ..................................................................8

*PCS Phosphate Co. v. Norfolk S. Corp.*,
   559 F.3d 212 (4th Cir. 2009) .................................................................2

*Pennsylvania v. President*,
 930 F.3d 543 (3d Cir. 2019),
 *rev'd on other grounds*, 591 U.S. 657 (2020)......................................................................14

*Regeneron Pharms., Inc. v. HHS*,
 510 F. Supp. 3d 29 (S.D.N.Y. 2020)....................................................................................14

*Sills Road Realty LLC v. Town of Brookhaven*,
 No. CV-74584, 2008 WL 11449283 (E.D.N.Y. July 18, 2008) ...........................................13

*Smoking Everywhere, Inc. v. FDA.*,
 680 F. Supp. 2d 62 (D.D.C.),
 *aff'd*, 627 F.3d 891 (D.C. Cir. 2010) ...................................................................................14

*Swinomish Indian Tribal Cmty. v. BNSF Ry.*,
 951 F.3d 1142 (9th Cir. 2020) ..............................................................................................2

*Tomhannock, LLC v. Roustabout Res., LLC*,
 149 A.D.3d 1219 (3d Dept. 2017),
 *aff'd*, 33 N.Y.3d 1080 (2019)..........................................................................................11, 12

*United States v. Melhuish*,
 6 F.4th 380 (2d Cir. 2021) ....................................................................................................6

*United States v. State of New York*,
 708 F.2d 92 (2d Cir. 1983) (per curiam)..........................................................................13, 14

*Varsames v. Palazzolo*,
 96 F. Supp. 2d 361 (S.D.N.Y. 2000)....................................................................................15

*Vermont Ry. v. Town of Shelburne*,
 918 F.3d 82 (2d Cir. 2019)....................................................................................................7

*Voorheesville Rod & Gun Club, Inc. v. E.W. Tompkins Co.*,
 82 N.Y.2d 564 (1993) .....................................................................................................11, 12

*Ward v. Stewart*,
 133 F. Supp. 3d 455 (N.D.N.Y. 2015) ..................................................................................6

*Wright v. Giuliani*,
 230 F.3d 543 (2d Cir. 2000)..................................................................................................1

**Statutes**

49 U.S.C. § 10102(9)(A).........................................................................................................12

49 U.S.C. § 10501(b) ...........................................................................................................4, 7

**Administrative Decisions**

*BNSF Ry.—Pet. for Decl. Order*,
    No. FD 35404, 2011 WL 1564711 (S.T.B. served Apr. 21, 2011)............................................3

*Mark Lange—Pet. for Decl. Order*,
    No. 35037, 2008 WL 219583 (S.T.B. served Jan. 28, 2008)...................................................13

*Town of Smithtown—Pet. for Decl. Order*,
    No. FD 36575(1), 2024 WL 757039 (S.T.B. served Feb. 23, 2024) ......................................10

*Wichita Terminal Ass'n—Pet. for Decl. Order*,
    No. FD 35765, 2015 WL 3875937 (S.T.B. served June 23, 2015) .......................................2, 7

## ARGUMENT

Voorheesville's opposition rests on basic legal and factual errors. This case is not about compliance with the STB settlement, but whether the Village's stop-work order is preempted. These questions are unrelated—and the former is a matter for the STB. In any event, Norfolk Southern is following the settlement. Contrary to the Village's claims, trains will stop west of the Village's crossings to change crews; they will *never* "sever[] the Village in half" while stopped. *Contra* Opp. 19 (Doc. 20). On ICCTA preemption, the Village's novel arguments fly in the face of *Green Mountain Railroad v. Vermont*, 404 F.3d 638 (2d Cir. 2005). And controlling New York precedent confirms that Norfolk Southern's property purchase is valid. The Village's irreparable-harm arguments again violate circuit precedent, and its remaining assertions depend on the same factual errors about where trains will stop. A preliminary injunction is warranted.

### I.   Norfolk Southern is likely to succeed on the merits.

Norfolk Southern need not make any heightened merits showing. *Contra* Opp. 6. "An injunction that enjoins a defendant from enforcing a regulation" is prohibitory, not mandatory. *Hardaway v. Nigrelli*, 636 F. Supp. 3d 329, 336–37 (W.D.N.Y. 2022) (citation omitted). And the *status quo* here is "the state of affairs immediately preceding the allegedly illegal" stop-work order. *See Dunbar ex rel. NLRB v. Onyx Precision Servs., Inc.*, 129 F. Supp. 2d 230, 238 (W.D.N.Y. 2000); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 n.5 (2d Cir. 2018). There is also no higher standard for injunctions "affect[ing] government action." Opp. 6. The "more rigorous" standard discussed in *Wright v. Giuliani* is the usual "likely to succeed" test, as contrasted with the alternative "serious questions" standard. 230 F.3d 543, 547 (2d Cir. 2000). And the relief here can be undone, *contra* Opp. 6, because Norfolk Southern could remove its prefabricated crew building and restore the property. 2d Plum Decl. ¶ 14. Regardless, an injunction is warranted under any standard the Court might apply.

**A.     The STB settlement does not defeat preemption.**

For the Village, the "critical" merits point is that Norfolk Southern "is bound by" the STB settlement, overriding any otherwise-applicable preemption. Opp. 7. That is wrong.

**1.     The settlement is irrelevant to the stop-work order's validity.**

Norfolk Southern's compliance with the STB settlement is irrelevant to whether ICCTA preempts the stop-work order. *First*, the Village invokes the wrong remedy. Even if Norfolk Southern were violating the settlement—and even if that question were for a court to decide, rather than the STB, *see infra* § I.A.2—the Village's remedy would be a breach-of-contract suit. *See Delaney v. HC2, Inc.*, 761 F. Supp. 3d 641, 675 (S.D.N.Y. 2025) ("a breach of contract claim is available for breach of a settlement agreement"). Such a contract suit, if it had merit, might avoid ICCTA preemption because "enforcement of a voluntary agreement" is not generally "regulatory." *See PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 217–18, 221 (4th Cir. 2009).[1]

But the Village did not bring a breach claim. Nor did it go to the STB for relief. Instead, it side-stepped those legitimate processes and issued a stop-work order—a *regulatory* enforcement tool—based on alleged violations of local zoning *regulations*. *See* Doc. 1-1 at 15, 17 (stop-work order asserting violations of "Village of Voorheesville Zoning Law"). The Village cites no case suggesting that a locality can try to enforce (its own view of) a railroad contract through a regulatory scheme that ICCTA would otherwise preempt. In the Village's lead cases, the courts allowed plaintiffs to pursue "claims for breach of contract and breach of easement covenants." *PCS Phosphate*, 559 F.3d at 217–18; *Swinomish Indian Tribal Cmty. v. BNSF Ry.*, 951 F.3d 1142, 1151 (9th Cir. 2020). Unlike those plaintiffs, Voorheesville is engaged in naked self-help.

---

[1] That said, "voluntary agreements between rail carriers and state or local entities are not enforceable" if "the railroad later demonstrates that enforcement of its agreement would unreasonably interfere with the railroad's operations." *Wichita Terminal Ass'n—Pet. for Decl. Order*, No. FD 35765, 2015 WL 3875937, at *7 (S.T.B. served June 23, 2015).

*Second*, the specific promises in the STB settlement—even as the Village reads them—would not support the stop-work order. ICCTA's "voluntary agreement" exception applies only to the extent of the agreement. If a plaintiff's desired relief "goes beyond any right guaranteed by contract," ICCTA forecloses the claim to the extent of the gap. *See Commuter Rail Div. v. Union Pac. R.R.*, No. 1:25-cv-2439, 2025 WL 1787514, at *5 (N.D. Ill. June 27, 2025). Here, the right allegedly guaranteed by the settlement is avoiding "blockages of Village roads." Opp. 9. But the stop-work order addresses construction, not blocked crossings, and it was issued under local zoning laws. No one claims that Norfolk Southern ever agreed to subject itself to local zoning. This mismatch of both rights and remedies renders the STB settlement irrelevant here.

## 2.    The STB is the proper forum to construe the settlement.

If Voorheesville believes the STB settlement has been violated, the STB is the proper body to construe the agreement, assess compliance, and determine any required remedy. The STB adopted the settlement as a condition of its approval order. Opp. 3. Thus, a dispute about the settlement's meaning is essentially a dispute about the agency's own order. In this situation, the STB will interpret and enforce the agreement. *See BNSF Ry.—Pet. for Decl. Order*, No. FD 35404, 2011 WL 1564711, at *9 (S.T.B. served Apr. 21, 2011) (whether the STB or a court will enforce a settlement depends on whether it was "imposed as a condition of" the agency's order).

In turn—and even if Voorheesville were properly trying to enforce the settlement instead of using its zoning law as a shortcut—this issue would require referral to the STB under the primary-jurisdiction doctrine. *See Nat'l Commc'ns Ass'n v. AT&T Co.*, 46 F.3d 220, 222–23 (2d Cir. 1995). Primary jurisdiction turns on (1) whether the issue involves technical or policy considerations within the agency's expertise, (2) whether the question is particularly within the agency's discretion, (3) whether there is a substantial danger of inconsistent rulings, and (4) whether a prior

application to the agency has been made. *N.Y. Elec. & Gas Corp. v. N.Y. Indep. Sys. Operator, Inc.*, 168 F. Supp. 2d 23, 26 (N.D.N.Y. 2001). All four factors favor the STB here.

   *First*, the key settlement provision says Norfolk Southern should "minimize potential impacts on the Village." Doc. 1-1 at 6. *How* and *how much* Norfolk Southern must do so involves technical considerations within the STB's expertise and exclusive authority. *See* 49 U.S.C. § 10501(b). *Second*, since the STB adopted the settlement, its meaning is particularly within the agency's discretion. *See MCI Telecomm. v. FCC*, 822 F.2d 80, 84 (D.C. Cir. 1987) ("a reviewing court generally must defer to an agency's interpretation of a settlement agreement concerning matters within the agency's statutory field of administration"). *Third*, there is a danger of inconsistent rulings; if a court interpreted the settlement to prohibit a new crew-change facility or to restrict Norfolk Southern's operations, Norfolk Southern would likely secure a contrary order from the agency. *See supra* p. 2 n.1. *Fourth*, a prior application to the agency has been made, since the settlement was part of an existing STB proceeding.

   If anyone is going to decide whether Norfolk Southern's planned operations comply with the settlement, it must be the STB. Until that happens, Voorheesville cannot invoke the settlement to block railroad construction or operations—much less by using local zoning law. The same goes for the Village's argument that, by allegedly violating the settlement, Norfolk Southern is exceeding "the authority granted to it by the STB." Opp. 10. Whether Norfolk Southern complied with the STB's order is a question for the STB—not the Village's code enforcement officer. *See Buffalo S. R.R. v. Vill. of Croton-on Hudson*, 434 F. Supp. 2d 241, 252 (S.D.N.Y. 2006) (whether railroad's operations were unlicensed was irrelevant to ICCTA preemption).

### 3.    Norfolk Southern is not violating the settlement.

   In any event, Norfolk Southern's planned operations do not violate the settlement. The key duty is to "minimize" potential impacts on the Village. Doc. 1-1 at 6; Opp. 8. Norfolk Southern is

doing so. Contrary to the Village's claims—and as Norfolk Southern has explained to local offi-

cials—Norfolk Southern's plans do not involve trains *ever* stopping across all three Village cross-

ings. *Contra* Opp. 18. Trains traveling in either direction will stop between School Road (next to

the crew facility) and Hennessey Road (the next nearest crossing to the west, outside the Village).

2d Plum Decl. ¶ 5. Those two roads are around 7,900 feet apart, *id.* ¶ 6, so a train up to 1.5 miles

long can change crews between them without stopping across *any* roads:



Trains may need to stop across a single Village road in just one situation. The maximum

length for trains on this route is 9,000 feet. 2d Plum Decl. ¶ 4. If a westbound train between 7,900

and 9,000 feet in length needed to change crews, the tail of the train would block School Road

while stopped. *Id.* ¶ 6. But this applies only to westbound trains, only if they approach the maxi-

mum possible length, and only at School Road. And for now, this is a hypothetical: While Norfolk

Southern hopes to develop enough business to require 9,000-foot trains, train lengths for the fore-

seeable future are expected to be between 3,000 and 4,000 feet (roughly 0.56 to 0.75 miles). *Id.*

¶ 4. Such trains will never stop across any Village roads while changing crews. *Id.* ¶¶ 6, 12.

To be sure, *moving* trains will still block crossings as they pass—but not for nearly as long as the Village claims. Voorheesville's predictions of 30-minute blockages assume that trains will stop *east* of School Road "while physically blocking" one or more crossings in the Village. Opp. 4. As just explained, that is wrong. And even a 9,000-foot train averaging 10 mph while slowing down or speeding up will clear a crossing in around 10 minutes. 2d Plum Decl. ¶ 13. A 4,000-foot train averaging the same speed will take just five minutes. *Id.* And while Voorheesville says Norfolk Southern "advised" that its trains would merely pass through at 25 mph, Opp. 2, the parties did not write that restriction into the settlement, instead choosing more flexible terms.

On the true facts, the Village's "intolerable public health and safety problems," Opp. 19, melt away. The Village will never be "sever[ed] … in half" by a stopped train. *Contra id.* If School Road is blocked, detouring takes five minutes (just three minutes longer than the direct route).[2] There is also an underpass beneath the rail lines on Maple Avenue, a two-minute drive from the Main Street crossing.[3] The Village cannot point to anything out of the ordinary here.

Voorheesville also says Norfolk Southern has identified, but refuses to use, "alternate locations for the crew-change facility, to the west" of the Village. Opp. 20; Mason Decl. ¶¶ 20–21 (Doc. 20-6). This again misunderstands the facts. As depicted above, Hennessey Road is not an "alternative" facility location; it is simply a point at the far end of the *existing* planned stop location where crews will board or deboard westbound trains, whose locomotives will be thousands of feet from the crew building. *See* 2d Plum Decl. ¶ 7. And Norfolk Southern discussed locations further west, in Guilderland and Duanesburg, *see* Mason Decl. ¶ 20, solely to explain to the Village that

---

[2] *See* Google Maps, https://shorturl.at/zA2ek. Courts may judicially notice distances reported by online maps. *United States v. Melhuish*, 6 F.4th 380, 388 (2d Cir. 2021); *Ward v. Stewart*, 133 F. Supp. 3d 455, 464 n.10 (N.D.N.Y. 2015).
[3] *See* Google Maps, https://shorturl.at/dbt7q.

these are *not* viable alternatives. *See* 2d Plum Decl. ¶ 8. Norfolk Southern never presented any of these locations as substitutes for the facility in Voorheesville. *Id.* ¶¶ 7–8.[4]

## B.    The stop-work order is preempted.

Settlement aside, Voorheesville says ICCTA preemption does not apply for various novel reasons. These arguments flatly contradict the Second Circuit's *Green Mountain* decision.

### 1.    ICCTA preempts local law just as much as state law.

Voorheesville says "ICCTA does not expressly preempt municipal law." Opp. 10. Nonsense. "It is well established that a state or local law that permits a non-federal entity to restrict or prohibit the operations of a rail carrier is preempted." *Norfolk S. Ry v. City of Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010) (affirming that ICCTA preempted city ordinance); *Vermont Ry. v. Town of Shelburne*, 918 F.3d 82, 84 (2d Cir. 2019) (same); *Coastal Distrib., LLC v. Town of Babylon*, 216 F. App'x 97, 99–100 (2d Cir. 2007) (affirming injunction against local stop-work order barring construction of new rail facility). Though ICCTA's text does not mention municipal law specifically, Opp. 11–12, it gives the STB "exclusive" jurisdiction over all listed subjects. 49 U.S.C. § 10501(b); *see Fayus Enters. v. BNSF Ry.*, 602 F.3d 444, 448 (D.C. Cir. 2010). If every town could regulate railroads, the STB's authority would not be "exclusive." ICCTA thus "reflects clear congressional intent to preempt state and local regulation." *Green Mountain*, 404 F.3d at 645.

What's more, ICCTA serves "to prevent a patchwork  of state and local regulation from unreasonably interfering with interstate commerce." *Wichita Terminal*, 2015 WL 3875937, at *7. If every village with a railroad line could impose its own regulations, the "interstate rail network could not function properly." *See id.* (ICCTA preempted a local ordinance governing crossing

---

[4] The Village also claims Norfolk Southern violated its promise to meet with local officials to discuss operational issues. Opp. 8–9. But the parties have had multiple meetings, *see* NS Br. 8, and Norfolk Southern remains open to further discussions—just not in the shadow of an illegal, pretextual stop-work order.

locations, which allegedly was a "voluntary agreement" with the railroad, because allowing such restrictions would produce a burdensome regulatory patchwork).

### 2.    The stop-work order regulates "transportation" under ICCTA.

The Village next claims that Norfolk Southern has not shown that a rail carrier is "constructing and operating" the crew facility. Opp. 14. But it admits that Norfolk Southern is a rail carrier. *Id.* And Norfolk Southern's declarations attest that "Norfolk Southern intends to construct the … crew-change facility," Plum Decl. ¶ 9, and "Norfolk Southern's contractor" is "providing the workforce and equipment" to build "Norfolk Southern's new crew-change facility," Graham Decl. ¶¶ 2–3 (Doc. 10-4). There is no mystery here. Likewise, while Voorheesville disputes that ICCTA covers a facility for freight-train crews, Opp. 14, there is no serious question that a "Crew Building easily fits within the meaning of 'transportation by rail carriers.'" *Norfolk S. Ry. v. City of Toledo*, No. 3:14-cv-918, 2015 WL 45537, at *1 (N.D. Ohio Jan. 2, 2015).

No more is required for preemption. Again, the "Second Circuit has plainly held that a municipality's zoning and pre-construction permit ordinances cannot be enforced against facilities for transportation by rail." *Buffalo S.*, 434 F. Supp. 2d at 249. Such requirements "by their nature … unduly interfere with interstate commerce," *Green Mountain*, 404 F.3d at 642, so they are preempted "categorically." *Norfolk S. Ry. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 523 (6th Cir. 2024); *City of Ozark v. Union Pac. R.R.*, 843 F.3d 1167, 1171 (8th Cir. 2016).

In turn, the Court need not consider the Village's claim that the stop-work order "has a remote or incidental effect on rail transportation." Opp. 20. Categorical ICCTA preemption is indifferent to "the effect of the state regulation in a specific factual situation." *Delaware v. STB*, 859 F.3d 16, 19 (D.C. Cir. 2017). Anyway, the "transportation" at issue is the crew facility, and the stop-work order is blocking its construction. That effect is hardly "remote." Looking at "the travel of Plaintiff's trains along the rail lines," Opp. 20, produces the same result. Voorheesville says the

stop-work order "only impacts the location where the trains can change crews," *id.*—meaning it seeks to dictate where trains can stop. ICCTA categorically preempts local "attempts to mandate when trains can use tracks and stop on them." *Franks Inv. Co. LLC v. Union Pac. R.R.*, 593 F.3d 404, 411 (5th Cir. 2010) (en banc).

### 3.    The stop-work order is discriminatory.

Voorheesville says the stop-work order cannot be discriminatory because it rests on "generally applicable subdivision laws" that predate Norfolk Southern's project. Opp. 22. But ICCTA impliedly preempts "a facially neutral and generally applicable regulation that is allegedly being applied … as a pretext for interfering with or curtailing rail service." *AAR v. Hudson*, 144 F.4th 582, 591 (4th Cir. 2025) (cleaned up). That is the case here. The Village is using its zoning laws as a pretext to block construction of the crew facility because it wants to prevent added rail traffic. Far from disputing this, the Village embraces it, urging that the stop-work order be upheld *because* it will effectively curtail rail operations. *E.g.*, Opp. 28. That is improper.[5]

### 4.    There is no "police powers" exception to ICCTA preemption.

Voorheesville spills the most ink arguing that the stop-work order escapes preemption as "an exercise of the Village's police powers." Opp. 15. This argument starts and ends with *Green Mountain*. The Second Circuit noted there, in dicta, that "states and towns may exercise traditional police powers over the development of railroad property," including by applying "generally applicable, non-discriminatory regulations" like "[e]lectrical, plumbing and fire codes." 404 F.3d at 643. But the stop-work order *is* discriminatory, as just noted. Anyway, this principle did not save the law there—and does not help the Village here—because ICCTA categorically preempts "state

---

[5] Voorheesville relies on *Florida East Coast Railway v. City of W. Palm Beach*, 110 F. Supp. 2d 1367, 1376 (S.D. Fla. 2000), *aff'd,* 266 F.3d 1324 (11th Cir. 2001); Opp. 20, 22. But that case did not address ICCTA's discrimination prong. And it involved a tenant's activities that were "not 'rail transportation'" under ICCTA. 266 F.3d at 1336.

and local permitting or preclearance requirements." *Id.* at 642. That is, a permitting scheme "giving the local body the ability to deny the carrier the right to construct facilities" is preempted. *Id.* at 643. Thus, "*Green Mountain* does not hold that a permit requirement directly regulating railways which relates to health and safety survives preemption." *Am. Rocky Mountaineer v. Grand Cnty.*, 568 F. Supp. 3d 1231, 1239–40 (D. Utah 2021).

What's more, *Green Mountain* specifically emphasized the dangers of a local permitting scheme that involves "the exercise of discretion on subjective questions." 404 F.3d at 643. And Voorheesville insists that Norfolk Southern cannot develop its property without (among other things) "a determination that [development] would not … alter the essential character of the Village." Doc. 1-1 at 19–20 (internal quotation mark omitted). That could not be more subjective.

None of the "legion of cases" the Village cites—not one—upholds an otherwise-preempted law because it is a "police power" exercise or addresses "health and safety." *Contra* Opp. 17. Rather, "state and local governments" can "exercis[e] their police powers so long as the challenged statute or regulation would not [1] unreasonably burden rail transportation, [2] discriminate against rail carriers, or [3] impinge on the [STB's] jurisdiction." *Town of Smithtown—Pet. for Decl. Order*, No. FD 36575(1), 2024 WL 757039, at *3 (S.T.B. served Feb. 23, 2024); *accord AAR*, 144 F.4th at 592. "While the ICCTA does not preempt a local authority's traditional police powers" across the board, it "does preempt such regulations that stand as an obstacle to a carrier's ability to construct facilities." *Canadian Nat. Ry. v. City of Rockwood*, No. 04-40323, 2005 WL 1349077, at *6 (E.D. Mich. June 1, 2005) (granting injunction against zoning and permitting requirements).

As a result, the Village's arguments about the alleged burdens of Norfolk Southern's plans and the supposed ease of changing crews elsewhere, *see* Opp. 18–20, miss the point. ICCTA preemption is not a case-by-case balancing exercise that weighs local policy concerns against the

railroad's operational needs. Congress struck that balance on a national level, and with good reason. It is easy for Voorheesville to say the railroad can "simply construct[] its crew-change facility elsewhere," Opp. 20, but the next town can say the same—and the next, and the next. Thus, while the *absence* of legitimate local concerns may confirm pretextual discrimination, *see id.* at 19–20, the *presence* of such concerns does not avoid preemption. *E.g.*, *BNSF Ry. v. Hiett*, 22 F.4th 1190, 1194–96 (10th Cir. 2022) (ICCTA preempted state regulation of blocked crossings despite "legitimate safety issues"). Anyway, Norfolk Southern chose Voorheesville for specific operational reasons. It cannot change crews on the CSX line, so the crew-change point must be as close as possible to the CSX connection. *See* Plum Decl. ¶ 6 (Doc. 10-5).

> **C.    The "illegal carveout" is irrelevant to preemption.**

Voorheesville also says Norfolk Southern improperly seeks to "confer preemption rights" on JC Pops, which sold the parcel to Norfolk Southern. Opp. 22. That again confuses the issues. If the property sale brought JC Pops's parcel out of compliance with local zoning laws, the Village is free to enforce those laws *against JC Pops*. *Contra id.* at 25. But that does not mean the Village can stop Norfolk Southern from building a railroad facility on its own property.

Nor is Voorheesville correct that the sale "was an invalid transfer of land" because it did not comply with local subdivision or recordation requirements. *See* Opp. 22–24. In New York, "title to property vests upon the execution and delivery of the deed." *Tomhannock, LLC v. Roustabout Res., LLC*, 149 A.D.3d 1219, 1221 (3d Dept. 2017), *aff'd*, 33 N.Y.3d 1080 (2019). JC Pops executed and delivered a deed. *See* Plum Decl. ¶ 8. That sufficed to convey fee simple title.

Zoning regulation, by contrast, is not relevant to valid title. The Court of Appeals has so held—in a case arising in Voorheesville, no less. There, the seller contracted to transfer part of its property, but failed to "seek subdivision approval." *Voorheesville Rod & Gun Club, Inc. v. E.W. Tompkins Co.*, 82 N.Y.2d 564, 567 (1993). The lower courts held, as the Village argues here, that

this "refusal to obtain subdivision approval rendered the title unmarketable, particularly because it appeared that [buyer] would be plagued by zoning problems." *Id.* at 568. The Court of Appeals disagreed: "[M]arketability of title is concerned with impairments on title to a property, *i.e.*, the right to unencumbered ownership and possession, not with legal public regulation of the use of the property." *Id.* at 571 (citations omitted). "Accordingly, a zoning ordinance, existing at the time of the contract, which regulates only the use of the property, generally is not an encumbrance making the title unmarketable." *Id.* (citations omitted). Likewise, "recording is not required in order to transfer title to real property." *Tomhannock*, 149 A.D.3d at 1221; *contra* Opp. 23.

Remarkably, the Village cites *Voorheesville Rod & Gun*—for the exact opposite of its true holding. Opp. 23 n.6. The Village snips the Court's observation that local governments can "prevent [a] purchaser from developing property as allowed by the zoning laws until the requisite subdivision approval is obtained." 82 N.Y.2d at 572. But the Court explained in the next breath that this is *not* a basis to hold that such zoning problems impede the transfer of title in the first place. *Id.* at 573. And the Court's observation does not apply here because ICCTA preempts zoning laws that might otherwise allow a locality to prohibit such development by a railroad.

Thus, cases holding that ICCTA does not preempt "[g]enerally applicable state laws governing the acquisition of property," Opp. 24 (citation omitted), are beside the point. As just explained, New York's zoning and recordation laws do not regulate "the acquisition of property."

But even if the Village were right that JC Pops still owns the parcel, Norfolk Southern would have authority to use the property under JC Pops' ownership, akin to a tenant. And ICCTA preemption covers any "property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, *regardless of ownership or an agreement concerning use*." 49 U.S.C. § 10102(9)(A) (emphasis added). ICCTA thus protects "facilities that,

while not owned by the railroad companies, [are] nevertheless used in interstate commerce." *Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d 1324, 1336 (11th Cir. 2001).

Finally, even when a railroad's right to use property is genuinely contested, ICCTA preemption still applies. For example, a plaintiff alleged that the railroad had fenced off part of his property, next to the rail line, and occupied it with "pieces of railroad equipment." *Mark Lange— Pet. for Decl. Order*, No. 35037, 2008 WL 219583, at *1 (S.T.B. served Jan. 28, 2008). The STB held that his trespass and ejectment claims were preempted because they "would deprive [the railroad] of the ability to continue to use the property, which [it] maintains is needed for its rail operations." *Id.* at *3. Preemption applied even though the agency could "[]not discern" whether the railroad had any valid right to the property under state law. *Id.* at *4 n.5; *see also Coulas Viking Partners v. Belt Ry. of Chicago*, No. 13 CH 28409, 2019 WL 10856582, at *10 (Ill. Cir. Ct. Mar. 19, 2019) (ICCTA preempted claims that plaintiff had superior title to railroad under state law).

## II.    Norfolk Southern is likely to suffer irreparable harm absent injunctive relief.

Voorheesville's irreparable-harm arguments are replete with errors. The Village says monetary harms cannot be irreparable under *Sills Road Realty LLC v. Town of Brookhaven*, No. CV-74584, 2008 WL 11449283 (E.D.N.Y. July 18, 2008), *R&R adopted*, 2009 WL 10708791 (June 30, 2009); Opp. 25–26. But *Sills Road* does not trump *United States v. State of New York*, 708 F.2d 92 (2d Cir. 1983) (per curiam)—which Voorheesville ignores. Anyway, *Sills Road* said the plaintiffs "may be compensated monetarily" for their economic losses "should they choose to pursue an action." 2008 WL 11449283, at *12. *Sills Road* did not discuss a situation where the plaintiff's available federal cause of action does not allow money damages to begin with. *See* NS Br. 15–16.

The Village also claims "the magnitude" of Norfolk Southern's "unrecoverable monetary damages" is insufficient to justify injunctive relief because Norfolk Southern is a valuable, profitable company. Opp. 27. *New York* forecloses this argument too. The Second Circuit affirmed that

13

"Beechcraft's injury was irreparable even though [its] losses were only pecuniary"—without discussing the amount of those losses, their proportion to Beechcraft's revenues, or their broader effect on its finances. *See* 708 F.2d at 93. And Beechcraft was not a small company either.[6] Under *New York*, then, "any loss of income suffered by a plaintiff is irreparable *per se.*" *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) (citing *New York* for this point); *Caspar v. Snyder*, 77 F. Supp. 3d 616, 641 (E.D. Mich. 2015) (same).

And that makes sense. The point of a preliminary injunction is to prevent injuries that cannot be remedied by a final judgment. If losses are unrecoverable through damages, they cannot be remedied later. That is why other circuits agree "that unrecoverable damages may be irreparable harm, without reference to the amount of the loss." *Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020) (citing cases); *see also Pennsylvania v. President*, 930 F.3d 543, 574 (3d Cir. 2019) (holding that plaintiffs "will suffer irreparable harm" because they "cannot collect money damages," without quantifying those losses), *rev'd on other grounds*, 591 U.S. 657 (2020); *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (same), *vacated and rev'd on other grounds*, 565 U.S. 606 (2012).[7]

Finally, Voorheesville questions whether Norfolk Southern "will incur any damages" because trains can supposedly just "stop elsewhere to swap crews." Opp. 26. This argument relies on the factual errors already explained: There are no "suitable alternate locations" for the facility. *Supra* p. 6. Anyway, the irreparable-harm inquiry asks what losses the plaintiff would avoid

---

[6] Beechcraft, "one of the 'Big Three' in the field of general aviation manufacturing," Beechcraft: A History, https://shorturl.at/OKLhS, was purchased by Raytheon in 1980 for $800 million ($2.4 billion in 2023 dollars). *Olive Ann Beech: Queen of the Aircraft Industry*, Profectus Magazine (Mar. 8, 2023), https://shorturl.at/9R952.

[7] The Village cites a D.C. case holding that monetary losses are irreparable only if both unrecoverable *and* significant to the plaintiff's finances. *See ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014); Opp. 27. But *ConverDyn* reflects a deep *intra*-district split. While some D.C. cases agree, others hold that "any economic loss" that "can never be recovered" is irreparable. *Smoking Everywhere, Inc. v. FDA.*, 680 F. Supp. 2d 62, 77 (D.D.C.), *aff'd*, 627 F.3d 891 (D.C. Cir. 2010). Anyway, the Second Circuit has not adopted *ConverDyn*'s rule.

through an injunction—not what losses it would avoid if it acquiesced to the unlawful action it seeks to enjoin.

### III.    The balance of the equities and the public interest favor relief.

The Village's balance-of-hardships and public-interest arguments depend largely on the same factual errors already discussed. Opp. 28–29. Since the Village will not be cut in half by stopped trains, these arguments are mistaken. Voorheesville also says it should not be "required to permanently expand its public water system—negative long-term consequences notwithstanding." *Id.* But the Village identifies no such consequences, and the requested injunction does not address the water system anyway. The Village also says the public interest favors enforcing "the parties' lawful agreement." *Id.* at 29. But as explained, the stop-work order does not and cannot enforce the settlement, and Norfolk Southern is not violating it in any event. And the Village overlooks the strong public interests in (i) the government following the law and (ii) a uniform federal regulatory scheme for the interstate rail network. *See* NS Br. 17.[8]

**CONCLUSION**

For these reasons, the Court should grant the preliminary injunction.

November 14, 2025                              Respectfully submitted,

                                              /s/ *John J. Jablonski*
Tobias S. Loss-Eaton                          John J. Jablonski
  (*pro hac vice*)                            David P. Johnson
SIDLEY AUSTIN LLP                             GERBER CIANO KELLY BRADY LLP
1501 K Street, NW                             599 Delaware Avenue, Suite 100
Washington, D.C. 20005                        Buffalo, NY 14202
(202) 736-8427                                (716) 313-2082
tlosseaton@sidley.com                         jjablonski@gerberciano.com

*Counsel for Norfolk Southern Railway Company*

---

[8] The Village says Norfolk Southern must show a hardship equivalent to "being driven out of business." Opp. 28 (cleaned up). Again, the Village has misread cases talking about the heightened showing required where the plaintiff has established only "serious questions," not likely success, on the merits. *See Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 57–58 (2d Cir. 1979); *see supra* p. 1. That heightened showing is "not necessary" if a plaintiff is "likely to succeed on the merits." *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 368 (S.D.N.Y. 2000).