**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

NORFOLK SOUTHERN RAILWAY COMPANY,

                                        Plaintiff,                    1:25-cv-01413 (BKS/PJE)

v.

VILLAGE OF VOORHEESVILLE; RICHARD STRAUT,
in his official capacity as Mayor; and STEVE MASON, in
his official capacity as Code Enforcement Officer and
Building Inspector,

                                        Defendants.

---

**Appearances:**

*For Plaintiff:*
David Johnson
John J. Jablonski
Gerber Ciano Kelly Brady LLP
599 Delaware Avenue, Suite 100
Buffalo, NY 14202

Tobias S. Loss-Eaton
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

*For Defendants:*
John P. Calareso, Jr.
Kathryn Daniels Bobel
Gleason, Dunn, Walsh & O'Shea
300 Great Oaks Boulevard, Suite 321
Albany, NY 12203

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Norfolk Southern Railway Company seeks to build a crew-change facility to support a newly established train route. But Defendants, the Village of Voorheesville and two of its officials, issued a stop work order halting construction of that facility. So Norfolk Southern brought this action for declaratory and injunctive relief, arguing that the Village's order is preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10101 *et seq.* (Dkt. No. 1). Presently before the Court is Norfolk Southern's motion for a preliminary injunction barring Defendants from enforcing the order and underlying regulations. (Dkt. No. 10). The motion is fully briefed, and the Court heard oral argument on November 19, 2025. (Dkt. Nos. 10-3, 20, 21). For the reasons that follow, the motion is granted.

## II.    FACTS[1]

### A.    Establishment of the Southern Route

Railroads have long been subject to extensive federal regulation. *See, e.g.*, *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009). Today, the Surface Transportation Board ("STB") exercises broad authority over many aspects of rail operations. *See N.Y. & Atl. Ry. Co. v. Surface Transp. Bd.*, 635 F.3d 66, 71 (2d Cir. 2011). So when in 2021 non-party railroad CSX Transportation sought to acquire a regional New England railroad, it needed STB approval. *See CSX Corp.—Control & Merger—Pan Am Sys., Inc.*, 2022 WL 1125011, at *1–3 (S.T.B. served

---

[1] The facts are drawn from the parties' declarations and exhibits submitted in connection with this motion, as well as exhibits attached to the complaint. *See Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003). Although Defendants stated at oral argument that they believe factual disputes remain unresolved, none are material to the Court's analysis.

Apr. 14, 2022).[2] Under one of "several transactions related to" this merger, *see id.* at \*1, 4–6,

Norfolk Southern was to receive "'overhead trackage rights'—the right to operate its trains over

another railroad's lines without making stops to pick up or drop off cargo—on" certain CSX

tracks, (Dkt. No. 10-5, ¶ 3). As relevant to this dispute, a portion of those tracks included

"approximately 161.5 miles . . . on [CSX's] mainline between Voorheesville . . . and Worcester,

Massachusetts." (*Id.* (internal quotation marks omitted)).

        After learning of the proposed transaction, Voorheesville's mayor, Defendant Richard

Straut, and other Village officials had "significant concerns" that it "would exacerbate

longstanding quality-of-life and public safety concerns associated with train traffic in the

Village." (*See* Dkt. No. 20-1, ¶¶ 1–4). The Village, Norfolk Southern, and CSX entered

negotiations and reached a settlement, which they presented to the STB. (*Id.* ¶¶ 5–11; *see also*

Dkt. No. 20-2). In exchange for the Village withdrawing its objections, the railroads "offered a

series of concessions [to] mitigate any potential harm" from the transaction. (Dkt. No. 20-1, ¶¶ 5,

7–11). Specifically, as now relevant, Norfolk Southern agreed to (1) "stage its trains and

. . . operate . . . in such a manner to minimize potential impacts on the Village," and (2) "meet

with [local] public safety personnel to discuss how best to address and accommodate any public

safety challenges." (Dkt. No. 20-2, at 5). In April 2022, the STB approved this related

transaction "subject to" the settlement agreement. *See CSX Corp.*, 2022 WL 1125011, at \*43–44.

        The STB's approval allowed Norfolk Southern to establish a new route to Ayer,

Massachusetts—the "Southern Route"—over which it will "run flatbed cars carrying two sets of

cargo containers stacked atop each other." (Dkt. No. 10-5, ¶ 4 (quoting *CSX Corp.*, 2022 WL

1125011, at \*5)). To explain its plans for Southern Route operations, Norfolk Southern has

---

[2] No LEXIS citations are available to any STB decision cited in this decision.

submitted declarations from its director of strategic planning, Scott D. Plum, in support of its

motion. (Dkt. Nos. 10-5, 21-1). Plum states that, because Norfolk Southern's "overhead trackage

rights" give it the ability to use, but not stop, on CSX's tracks, it "cannot have a scheduled crew

change while its trains are operating in CSX territory." (Dkt. No. 10-5, ¶¶ 3, 6). Thus, Norfolk

Southern must conduct crew changes at a location "as close as possible to the connection with

CSX" to minimize "the likelihood that a crew will hit its hours-of-service [limit], after which the

crew members must stop working." (*Id.* ¶ 6; Dkt. No. 21-1, ¶ 3). The connection between

Norfolk Southern's and CSX's tracks is in Voorheesville. (Dkt. No. 10-5, ¶ 5).

### B.      The Proposed Crew-Change Facility

"Norfolk Southern identified a suitable site for a new crew-change facility at 1

Countryside Lane in Voorheesville"—between Hennessey Road and School Road—which it

purchased from JC Pops Industrial Park LLC. (*See id.* ¶¶ 7–8). As Norfolk Southern explains,

> Eastbound trains will stop at the facility to the west of the nearby School [Road]
> crossing, and westbound trains will stop at a concrete or rail cross tie pad (a
> "landing pad") located near [Hennessey] Road (west of the facility), in each case
> allowing the trains to swap crews without stopping across any road crossings in the
> Village.

(*Id.* ¶ 7; *see also* Dkt. No. 21-1, ¶ 5). The distance between Hennessey Road and School Road is

around 7,900 feet, just short of 1.5 miles. (*See* Dkt. No. 20-7, at 2). Although Norfolk Southern

is authorized to run trains of up to 9,000 feet (roughly 1.7 miles) on CSX tracks—and "aspires to

develop sufficient business to require trains [of] this maximum length"—"at the outset of service

on the Southern Route and for the foreseeable future," train lengths "are expected to be between

3,000 and 4,000 feet (roughly 0.56 to 0.75 miles)."[3] (Dkt. No. 21-1, ¶ 4).

---

[3] At oral argument, Norfolk Southern further explained that, although it could not commit to a "specific timeframe"
given the difficulty of predicting the demand for Southern Route service, it expects that train lengths will remain
between 3,000 and 4,000 feet for a "couple of months after the service begins, [and] probably even longer than that."

Plum explains that, as a result, "eastbound trains will not block any Village roads while stopped, no matter how long they are.[4] And as long as westbound trains are shorter than [1.5 miles], they can change crews at Hennessey Road without blocking School Road while stopped." (*Id.* ¶ 6). A 9,000-foot train could stop at the facility and "block only the crossing at Hennessey Road"; the same length train could stop at the landing pad and block only the School Road crossing. (*Id.* ¶¶ 9–10). According to Plum, "[t]here is no scenario in which a stopped train up to 9,000 feet in length will block even two crossings in the village, let alone all three," and "[s]topped trains of 3,000 to 4,000 feet in length will not block any crossings at all."[5] (*Id.* ¶¶ 11–12). Additionally, Plum asserts that a 9,000-foot train accelerating or decelerating at an average speed of 10 miles per hour would take "approximately 10 minutes to clear a crossing"; a 4,000-foot train would take "approximately 5 minutes." (*Id.* ¶ 13).

Although there are two other "track segments . . . greater than 9,000 feet in length" leading up to the Norfolk Southern-CSX connection—"located between Bozie Hollow Road and Western Avenue and between Schoharie Turnpike and Cole Road"—Plum avers that "geographical and topographical conditions render them inadequate for locating the crew-change facility."[6] (*Id.* ¶ 8; *see also* Dkt. No. 20-7, at 3).

Mayor Straut disputes several of Plum's assertions, protesting that the facility and accompanying train stops "will result in substantial disruption and pose a regular threat to the

---

[4] The Hennessey Road crossing is not located within the Village's boundaries. (*See* Dkt. No. 1-1, at 21; Dkt. No. 20-1, ¶ 29).

[5] Norfolk Southern elaborated at oral argument that it could not stop its trains any further east of School Road because doing so would "leave the back half of the [Norfolk Southern] train hanging out onto the CSX main line, which would violate [its] contract with CSX [and] potentially pose safety issues."

[6] Defendants contend that, at some point, Norfolk Southern represented to them that it was able to use these segments as alternative locations to swap crews and planned to build landing pads there. (*See* Dkt. No. 20-6, ¶¶ 20–22; Dkt. No. 20-1, ¶ 44). Norfolk Southern maintains that it never did so and only discussed those segments with the Village to explain that—consistent with its obligation to minimize impacts on the Village—it had looked for alternate locations to place the facility, but determined that none were viable. (*See* Dkt. No. 21-1, ¶ 8).

public health, safety and welfare of the Village." (Dkt. No. 20-1, ¶ 27). Straut, who is also a licensed professional engineer, avers that westward trains "will block all three . . . surface crossings within the Village for extended periods of time," and eastward trains "will block one or more crossing(s) to the west of the Village . . . for the same period of time." (*Id.* ¶¶ 1, 22, 28–29, 60). Straut states "[u]pon information and belief" that crossings "could be blocked for more than thirty . . . minutes at a time—not even counting the times when the trains are at a complete stop (and not just slowing down or speeding up) while physically blocking those crossings." (*See id.* ¶¶ 30, 33).

During this time, Straut says, "the Village will effectively be severed in half, cutting half of the Village's residents and its businesses from Village emergency and other services located on the other side of the trains." (*Id.* ¶ 35). He believes the blockages will coincide with the time at which "the Voorheesville Elementary School releases its students for the day," when "multiple school buses need to pass over" crossings.[7] (*Id.* ¶ 36). The trains "will also block bicyclists and pedestrians (including children . . . departing from school), and the thousands of cars that traverse the . . . crossings within the Village each day." (*Id.* ¶ 37). The only "other means of traversing the rail lines within the Village—an underpass maintained by CSX—is frequently blocked by tractor trailers and other vehicles [unable] to fit beneath the underpass, and is not built to accommodate all of the Village's traffic." (*Id.* ¶ 40).

Straut also states that the Village had no notice or knowledge of the facility (or that trains would "stop within or adjacent to the Village") during the negotiations leading to the settlement

---

[7] At oral argument, Norfolk Southern represented that two trains are scheduled to pass through the Village each day— one eastbound at 1:45 a.m., and one westbound at 9:30 a.m. (*Cf.* Dkt. No. 20-2, at 2, 5 (settlement agreement reflecting that the overhead rights transaction would "result generally in no more than two [Norfolk Southern] revenue trains operating through [another Norfolk Southern crossing located in the Village] per day")). Norfolk Southern maintains that it structured this schedule consistent with its obligation to minimize impacts on the Village.

agreement—and that Norfolk Southern breached this agreement. (*See* Dkt. No. 20-1, ¶¶ 23, 27, 32, 43, 45–49, 53, 56, 59, 61).

### C.     The Stop Work Order

In advance of the Southern Route's opening, Norfolk Southern hired a "contractor [to] provid[e] the workforce and equipment" to construct the crew-change facility, who began "clearing trees," "prepar[ed] the site for construction," and "requested a water-line connection from the Village." (Dkt. No. 10-4, ¶¶ 2–3). But the Village soon issued a stop work order, signed by Defendant Steve Mason, the Village's code enforcement officer and building inspector, which halted all construction of the facility. (Dkt. No. 10-4, ¶ 4; *see also* Dkt. No. 1-1, at 15–17). The order reflected two violations: (1) failure to obtain a site plan review for a "[d]evelopment and building proposal[] for non-residential uses"; and (2) failure to obtain a site plan review for a "proposal[] to expand or demolish [an] existing business or industrial facilit[y] or . . . proposal[] to alter [an] existing business or industrial site[] in relation to parking access, landscaping storage or any other site feature." (Dkt. No. 1-1, at 17).

After further inquiry, the Village attorney sent Norfolk Southern a letter confirming that the order would "remain in effect." (*Id.* at 20). The letter explained, as now relevant, that the Village deemed the construction "unlawful" (notwithstanding Norfolk Southern's rail carrier status) because the owner of 1 Countryside Lane had not submitted the "appropriate applications" for a "Lot Line Amendment" or "Subdivision Review." (*See id.* at 19–20). Although the Village acknowledged that Norfolk Southern had obtained—and filed with the Albany County clerk—a deed to the land from JC Pops, (*id.* at 20; *see also* Dkt. No. 10-5, ¶ 8), it alleged that Norfolk Southern did not "accurately describe[] [to the County] what it was purporting to do," and that the conveyance would cause "1 Countryside Lane . . . to be a non-

conforming lot under current zoning" requirements, (Dkt. No. 1-1, at 20). So the Village "in no way consider[ed] [the conveyance] legitimate or recognizable." (*Id.*).

The letter stated, however, that the Village would review the "appropriate applications" submitted by "the owner of 1 Countryside Lane, or someone authorized to act on that owner's behalf." (*Id.*). As part of that process, the Village would "consider the potential impacts of the [subdivision] on the existing commercial uses operating out of 1 Countryside Lane—and the extent to which an Area Variance may be necessary." (*Id.*). Were the owner to submit an application for a "Lot Line Amendment," it would also need to obtain "a waiver . . . from the Planning Commission," which in turn would need to "determin[e] that such a waiver would not adversely affect the site development or alter the essential character of the Village." (*Id.* at 19–20 (internal quotation mark omitted)). The letter also claimed that trains stopping for the proposed crew-change facility would pose "an obvious threat to public health, safety and welfare," and that, as a result, its local regulations were not preempted by ICCTA. (*See id.* at 21–22).

Opposing Norfolk Southern's motion, Defendants reiterate much of this reasoning in support of the stop work order and provide further clarification. (*See* Dkt. No. 20-1, ¶¶ 17–18, 27, 35–40, 51, 56; Dkt. No. 20-6, ¶¶ 15, 18, 23; Dkt. No. 20-8, ¶¶ 6, 9–11, 14). Specifically, they assert that the conveyance would violate a local zoning requirement that "Large Scale Business[es]" (like JC Pops) be located on a property of at least five acres, and a local subdivision requirement prohibiting "landlocked" properties. (Dkt. No. 20-1, ¶¶ 14–16; Dkt. No. 20-6, ¶¶ 3–6). Mason contends that both requirements "are intended to protect the public health and safety." (Dkt. No. 20-6, ¶ 8).

The stop work order remains in effect. (Dkt. No. 10-4, ¶ 4; Dkt. No. 20-1, ¶ 56; Dkt. No. 20-6, ¶ 23). Mason states that he has refused to lift it because "[n]o development has been

approved for the [p]roperty in question," and "without [County] approval of any wastewater treatment system and public water service," he cannot issue a building permit or certificate of occupancy.[8] (Dkt. No. 20-6, ¶ 23).

### D.    Subsequent Developments

To resolve this dispute, Norfolk Southern representatives met twice with Village officials and discussed their concerns. (*See* Dkt. No. 20-1, ¶¶ 54–55; Dkt. No. 20-6, ¶ 19). A third meeting was scheduled and cancelled due to the Village attorney's unavailability. (*See* Dkt. No. 1-1, at 25). Because the parties could not reach a resolution, Norfolk Southern filed this action. (Dkt. No. 10-3, at 12–13; *see also* Dkt. No. 20-1, ¶ 55).

According to Norfolk Southern's manager of construction services, Will Graham, the stop work order has imposed, and continues to impose, "continued costs related to the construction process." (Dkt. No. 10-4, ¶ 5). Specifically, Graham explains, "remobilizing the contractor's construction team will cost roughly $10,000," (*id.* ¶ 6); "resuming construction in colder weather will impose added costs of roughly $5,000 to $10,000 in the form of temporary heat or special additives to be able to pour concrete in the cold weather," (*id.* ¶ 7); were the stop work order to extend past 2025, increased prices for construction materials are "estimated to range from $5,000 to $25,000," (*id.* ¶ 8); and storing the prefabricated building to serve as the crew-change facility could cost $500 to $1,000 per month, (*id.* ¶ 9).

Plum states that the facility "will be needed as soon as work is completed to prepare the Southern Route for double-track trains by ensuring adequate clearance for the entire length of the route." (Dkt. No. 10-5, ¶ 10). At oral argument, Norfolk Southern represented that it expects this

---

[8] Defendants contend that the facility would require an expansion of the Village's public water system, (Dkt. No. 20-1, ¶ 60; Dkt. No. 20-8, ¶ 12), and also note that "[n]o new tax parcel" or "911 address" has been created for the property on which the facility will be built, (Dkt. No. 20-1, ¶ 18; *see also* Dkt. No. 20-8, ¶ 6).

work to be completed in January 2026, at which point it "will be forced to rent a hotel room that will serve as a crew reporting facility at a cost of roughly $4,500/month ($150/day)." (*Id.* ¶¶ 10–11). "Whether or not the crews report at the new facility or the hotel room," trains will run on the Southern Route, and "crews will still change out at School Road." (*See* Dkt. No. 10-5, ¶ 11).

## III.    DISCUSSION

### A.    Standard of Review

Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions. In general, a party seeking such relief must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the presence of sufficiently serious questions, that the balance of hardships tips decidedly in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.[9] *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015). "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right,'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion," *Sussman v. Crawford*, 488 F.3d 136, 139–40 (2d Cir. 2007) (per curiam) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

---

[9] However, in cases where "a preliminary injunction 'would stay government action taken in the public interest pursuant to a statutory scheme, the less rigorous burden of proof standard envisioned by the phrase "fair ground for litigation" does not apply.'" *Conn. State Police Union v. Rovella*, 36 F.4th 54, 62 (2d Cir. 2022) (alterations adopted) (quoting *Bronx Household of Faith v. Bd. of Educ. of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003)). Additionally, the Second Circuit has articulated the preliminary injunction standard slightly differently in such cases, but neither party has argued that this alternative framing applies. *See Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016) (requiring the movant to "demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction").

Preliminary injunctions are either "prohibitory or mandatory." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it," *id.*, "usually . . . by 'commanding some positive act,'" *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)). The status quo "is really the 'status quo *ante*'—that is, 'the last actual, peaceable, uncontested status which preceded the pending controversy.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (alteration adopted) (quoting *N. Am. Soccer League*, 883 F.3d at 37 & n.5).

A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits,'" *N. Am. Soccer League*, 883 F.3d at 37 (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)), and "a strong showing of irreparable harm," *Daileader*, 96 F.4th at 356 (emphasis omitted) (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)). This heightened standard "may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial."[10] *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs.*, 60 F.3d at 34–35).

Here, the parties dispute whether the requested injunction is prohibitory or mandatory. The specific relief Norfolk Southern requests is "a preliminary injunction barring enforcement of the stop-work order or the underlying zoning requirements against [it] pending final judgment."

---

[10] Norfolk Southern states that, if necessary, it "could remove its prefabricated crew building and restore the property substantially to its prior state." (*See* Dkt. No. 21-1, ¶ 14).

(Dkt. No. 10-3, at 21). Although phrased in prohibitory terms, Norfolk Southern could just as well have sought an order directing Defendants to take the "positive act" of lifting the stop work order. *Agnant*, 62 F.4th at 667; *cf. N. Am. Soccer League*, 883 F.3d at 36 n.4 (noting that "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms" (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994))). The "effect" of issuing the requested injunction would be to allow construction of the facility—the act which precipitated the parties' dispute. *N. Am. Soccer League*, 883 F.3d at 37. It would not return the parties to "the last actual, peaceable, uncontested status which preceded [this] controversy." *Daileader*, 96 F.4th at 356. Thus, the injunction appears mandatory. Ultimately, however, the Court need not decide which standard applies because, as explained below, Norfolk Southern has met either standard.

### B.    Analysis

#### 1.    Irreparable Harm

Norfolk Southern asserts that it has made a sufficient showing of irreparable harm because the economic losses resulting from the stop work order are unrecoverable. (Dkt. No. 10-3, at 17–20; Dkt. No. 21, at 19–21). Defendants respond that the economic losses are not generally irreparable, and that here they are not "certain," "imminent," or sufficient in magnitude. (Dkt. No. 20, at 31–33).

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction,'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam)); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 1:18-CV-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS 5396, at *4 (N.D.N.Y. Jan. 11, 2019), and "[i]n the absence of a showing or irreparable harm, a motion for a preliminary injunction should be

denied," *Rodriguez*, 175 F.3d at 234. "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *Actavis PLC*, 787 F.3d at 660 (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

Here, Norfolk Southern has sufficiently demonstrated irreparable harm. It asserts that it will suffer only pecuniary losses. (*See* Dkt. No. 10-4, ¶¶ 6–9; Dkt. No. 10-5, ¶ 11). Ordinarily, such losses are not irreparable. *Actavis PLC*, 787 F.3d at 660. Norfolk Southern, however, argues that its losses are irreparable because money damages are unrecoverable. (Dkt. No. 10-3, at 17–20 (citing *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (economic harm irreparable where Eleventh Amendment precluded award of monetary damages); and *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (same))); *see also Koons v. Att'y Gen. N.J.*, 156 F.4th 210, 273 (3d Cir. 2025) (citing *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000)); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

At oral argument, the parties agreed that Norfolk Southern cannot recover damages in this action. *See Friends of E. Hampton Airport, Inc.*, 841 F.3d at 144 ("[T]he Supreme Court has consistently recognized federal jurisdiction over *declaratory- and injunctive-relief actions* to prohibit the enforcement of state or municipal orders alleged to violate federal law." (emphasis added)); *UnitedHealthcare of N.Y., Inc. v. Lacewell*, 967 F.3d 82, 90 (2d Cir. 2020) (similar).

They also agree that no 42 U.S.C. § 1983 damages claim is available to Norfolk Southern under the Supremacy Clause or ICCTA. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989) ("[T]he Supremacy Clause, of its own force, does not create rights enforceable under § 1983." (footnote omitted)); *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (explaining that, for a statute to secure a right enforceable under § 1983, it must "'clearly and unambiguously' use[] 'rights-creating terms'" (alterations adopted) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 290 (2002))). Although Defendants cite the general rule that economic harm is not irreparable, they do not address Norfolk Southern's contention that, here, its harm is irreparable because damages are unrecoverable.[11] (*See* Dkt. No. 10-3, at 18–20; Dkt. No. 20, at 31–33). Under these circumstances, the Court concludes that Norfolk Southern's losses are irreparable because they "cannot be remedied after a final adjudication." *Salinger*, 607 F.3d at 81; *cf. New York*, 708 F.2d at 93.

These losses are also actual and imminent. *See Actavis PLC*, 787 F.3d at 660. Having already started work, without an injunction Norfolk Southern has incurred, and will continue to incur, the construction costs stemming from the delay described above. (Dkt. No. 10-4, ¶¶ 5–9). Additionally, once the Southern Route is operational, Norfolk Southern will also incur the cost of renting a hotel room to which train crews can report without the facility. (*See* Dkt. No. 10-5, ¶¶ 10–11). Defendants contend that this harm is not "certain or imminent" because Norfolk Southern previously "advised [them] that there are suitable alternate locations for the crew-change facility." (Dkt. No. 20, at 32). Norfolk Southern maintains that it never presented any

---

[11] "[I]n deciding whether a federal plaintiff has an available remedy at law that would make injunctive relief unavailable, federal courts may consider only the available *federal* legal remedies." *New York*, 708 F.2d at 93 (citing *Petroleum Exploration, Inc. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 217 (1938)); *see also Lynk v. LaPorte Superior Ct. No. 2*, 789 F.2d 554, 559–60 (7th Cir. 1986) (noting "[t]he principle of federal equity jurisprudence that only the adequacy of alternative federal remedies is to be considered when an injunction is requested").

alternate location for the facility. (Dkt. No. 21-1, ¶¶ 7–8). But even assuming Defendants' recollection is correct, the losses are certain and imminent because Norfolk Southern has already chosen a location to build its facility. In any event, Norfolk Southern confirmed in a reply declaration and at oral argument that there are no other geographically or topographically adequate locations. (*See* Dkt. No. 21-1, ¶ 8).

Finally, Defendants argue that the Court should consider the magnitude of Norfolk Southern's losses in determining whether it has made a sufficient showing of irreparable harm. (Dkt. No. 20, at 33). But they point to no Second Circuit precedent, and the Court has found none, requiring that magnitude of the harm factor into the irreparable harm determination. Thus, the Court concludes that Norfolk Southern has made a sufficiently strong showing of irreparable harm to satisfy the heightened standard for a preliminary injunction.

### 2.    Likelihood of Success on the Merits

Next, the parties dispute whether Norfolk Southern has shown a likelihood of success on the merits. Norfolk Southern contends that, under Second Circuit precedent, ICCTA preempts the stop work order. (*See* Dkt. No. 10-3, at 13–16; Dkt. No. 21, at 13–17). Defendants disagree and further argue that the Court need not reach the preemption issue for several reasons. (*See* Dkt. No. 20, at 12–31).

The laws of the United States are the "supreme Law of the Land." U.S. Const. art. VI, cl. 2. Therefore, "state [and municipal] laws that conflict with federal law are 'without effect.'" *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 479–80 (2013) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)); *see also Vt. Ry., Inc. v. Town of Shelburne*, 918 F.3d 82, 87–88 (2d Cir. 2019). In other words, "state [and local] laws that require a private party to violate federal law are pre-empted." *Bartlett*, 570 U.S. at 475 (citing *Maryland*, 451 U.S. at 746). Such laws are pre-empted when (1) Congress has defined "the extent to which its enactments pre-empt state law . . .

through explicit statutory language"; (2) the state law at issue "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively"; or (3) the state law at issue "actually conflicts with federal law [such that] it is impossible for a private party to comply with both state and federal requirements." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990); *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 108 (2d Cir. 2025).

ICCTA contains an express preemption clause which provides: "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). In turn, the statute confers the STB with "exclusive jurisdiction" over, among other things, "transportation by rail carriers." *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 642 (2d Cir. 2005) (quoting § 10501(b)(1)). "'Transportation' is expansively defined to include: 'a locomotive, car, vehicle, vessel, warehouse[,] yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail.'" *Id.* (quoting 49 U.S.C. § 10102(9)). Accordingly, ICCTA "preempts most pre-construction permit requirements imposed by states and localities." *Id.* (collecting cases). "[A]lthough ICCTA's pre-emption language is unquestionably broad, it does not categorically sweep up all state regulation that touches upon railroads—interference with rail transportation must always be demonstrated." *Island Park*, 559 F.3d at 104; *see also Green Mountain*, 404 F.3d at 644.

Here, Norfolk Southern's construction and operation of the crew-change facility is "transportation by [a] rail carrier[]" under ICCTA, so the stop work order and underlying regulations are preempted.[12] *See* § 10501(b)(1); *Green Mountain*, 404 F.3d at 642. Defendants

---

[12] The Court is unpersuaded by Defendants' argument that ICCTA preempts state law, not municipal law. (Dkt. No. 20, at 16–19). The Second Circuit has stated that ICCTA "reflects clear congressional intent to preempt state *and local* regulation of integral rail facilities." *Green Mountain*, 404 F.3d at 645 (emphasis added); *see also Vt. Ry., Inc.*, 918 F.3d at 88 (affirming district court's holding that ICCTA preempted a municipal ordinance).

concede that Norfolk Southern itself is a rail carrier. (Dkt. No. 20, at 20). Nevertheless, they

argue that "the Court cannot meaningfully determine whether [the relevant] activity meets the

standard for a 'rail carrier'" because Norfolk Southern has not "alleged . . . the identity of the

people or entities constructing and operating the [crew-change] facility." (*Id.*). But Norfolk

Southern has submitted a declaration reflecting that its contractor will build the facility, and

confirmed at oral argument that its own employees will run the facility. (*See* Dkt. No. 10-4, ¶¶ 2–

3). This is sufficient to show that a rail carrier is engaging in the relevant conduct. *See Coastal*

*Distrib., LLC v. Town of Babylon*, 216 F. App'x 97, 101 (2d Cir. 2007) (citing *Hi Tech Trans,*

*LLC v. New Jersey*, 382 F.3d 295, 308 (3d Cir. 2004)); *N.Y. & Atl. Ry. Co.*, 635 F.3d at 73 (citing

*Town of Babylon & Pinelawn Cemetery—Pet. for Decl. Order*, 2008 WL 275697, at *3 (S.T.B.

served Feb. 1, 2008)).

Next, that conduct—constructing and operating the crew-change facility—constitutes

"transportation" under ICCTA. As Norfolk Southern explains, its trains cannot stop on CSX

tracks, and the connection between those tracks and Norfolk Southern's tracks is in the Village.

(Dkt. No. 10-5, ¶¶ 5–6). Trains carrying property must swap crews there to ensure they continue

to run, lest their operators hit an hours-of-service limit. (*Id.* ¶ 6). Thus, this facility—built to

facilitate the crew swaps—is plainly a "facility . . . related to the movement of passengers or

property, or both, by rail." § 10102(9); *see also Norfolk S. Ry. Co. v. City of Toledo*, No.

3:14cv918, 2015 WL 45537, at *5–6, 2015 U.S. Dist. LEXIS 57, at *13 (N.D. Ohio Jan. 2, 2015)

(concluding the same as to a "[c]rew [b]uilding").

Resisting this conclusion, Defendants advance two arguments. Neither is persuasive.

First, they argue that the "facility will be used specifically for . . . crew, not passengers or

property." (Dkt. No. 20, at 20). But as just explained, the facility is plainly related to the

movement of property, even if the building itself will not store property. Second, Defendants

assert that "ICCTA does not define 'facility' to include crew-change facility, or their

construction," and courts "have consistently concluded that 'facility' means buildings or other

structures that house systems and equipment related to railroad operation." (*Id.* at 20–21

(emphases omitted)). None of the cases Defendants cite stand for the proposition that a building

is a "facility" under § 10102(9) only if it houses systems or equipment. Rather, a "facility"

includes any "structure designed to house specific operations." *See Island Park, LLC*, 559 F.3d at

103 n.9. The "structure" here is "designed to house specific [crew-change] operations," *id.*, so it

is a "facility" under § 10102(9). Norfolk Southern's building and operation of the crew-change

facility is "transportation by [a] rail carrier[]" under ICCTA. § 10501(b)(1).

Next, the Court rejects Defendants' assertion that the stop work order has only "a remote

or incidental effect on rail transportation." (Dkt. No. 20, at 26); *cf. Island Park*, 559 F.3d at 104

(requiring a showing of "interference with rail transportation"). As Norfolk Southern points out,

(Dkt. No. 21, at 14), the relevant "transportation" under ICCTA is the construction and use of the

crew-change facility, which the order entirely blocks.

To be sure, not every local regulation is preempted under ICCTA. In *Green Mountain*,

the Second Circuit explained:

> [S]tates and towns may exercise traditional police powers over the development of
> railroad property, at least to the extent that the regulations protect public health
> and safety, are settled and defined, can be obeyed with reasonable certainty, entail no
> extended or open-ended delays, and can be approved (or rejected) without the
> exercise of discretion on subjective questions.

404 F.3d at 643; *Vt. Ry., Inc.*, 918 F.3d at 88. Thus, "[e]lectrical, plumbing and fire codes, direct

environmental regulations enacted for the protection of the public health and safety, and other

generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption." *Green Mountain*, 404 F.3d at 643; *Island Park*, 559 F.3d at 105–06.

The stop work order here does not fall within the class of municipal regulations which survive preemption under *Green Mountain*. As explained above, Defendants issued the order because—in light of Village zoning and subdivision regulations—neither Norfolk Southern nor JC Pops sought a lot line amendment or subdivision review. (*See* Dkt. No. 1-1, at 17, 19–20; Dkt. No. 20-1, ¶¶ 14–16; Dkt. No. 20-6, ¶¶ 3–6). They advance conclusory assertions that the underlying regulations "are intended to protect the public health and safety," (Dkt. No. 20-6, ¶ 8)—without specifying how—and cite various adverse health and safety concerns they believe will result from trains decelerating, stopping, and accelerating within the Village, (*see, e.g.*, Dkt. No. 20-1, ¶¶ 22, 27–30, 33, 36–40, 60).

However, neither the review process nor the underlying regulations themselves "promote [the] public health and safety" concerns stemming from trains running through the Village. *Vt. Ry., Inc.*, 918 F.3d at 88; *Green Mountain*, 404 F.3d at 643 (requiring that regulations "protect the public health and safety to survive preemption). Rather, the review process and regulations concern only land use. Were they to remain in effect and block construction of the facility—with no other suitable location close enough to the CSX connection to change crews—Norfolk Southern would still stop trains between Hennessey Road and School Road. (Dkt. No. 10-5, ¶ 11; Dkt. No. 21-1, ¶ 8). Thus, the stop work order does not itself protect against train-related public safety concerns. The Village asserts that the underlying regulations are otherwise "intended to protect the public health and safety," (Dkt. No. 20-6, ¶ 8), but without further explanation, such a conclusory statement cannot establish that the stop work order meaningfully furthers public health and safety goals, *see Vt. Ry., Inc.*, 918 F.3d at 88.

Independently, even if the stop work order did further such goals, the review process it compels involves "the exercise of discretion on subjective questions" by Village officials. *Green Mountain*, 404 F.3d at 643. As explained in the Village attorney's letter, the review process would require Village officials to "consider the potential impacts of the [subdivision] on the existing commercial uses operating out of 1 Countryside Lane—and the extent to which an Area Variance may be necessary." (Dkt. No. 1-1, at 20). And a lot line amendment application would require the Village's planning commission to "determin[e]" whether the subdivision would "adversely affect the site development or alter the essential character of the Village." (*See id.* at 19–20 (internal quotation mark omitted)). These requirements appear facially subjective—like the *Green Mountain* regulation, they are "vague . . . and limited only by the discretion of local officials whose provincial concerns may not appreciate the need for the railroad's proposed action." *Island Park*, 559 F.3d at 106 (citing *Green Mountain*, 404 F.3d at 643). So *Green Mountain* does not save the order from preemption.

When asked at oral argument whether the review process was discretionary, Defendants did not meaningfully contend otherwise. Instead, they argued that the Court need not even address preemption. Defendants first assert that Norfolk Southern is "bound by the terms of [the settlement agreement], regardless of any preemption rights it may have" under ICCTA. (Dkt. No. 20, at 13–16). They are correct that "voluntary agreements" to which rail carriers bind themselves are ordinarily enforceable. *See PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218–20 (4th Cir. 2009); *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 287 (6th Cir. 2019). But at this stage, the Court cannot conclude that Norfolk Southern breached the terms of the

settlement agreement.[13] Those terms only required Norfolk Southern to (1) "stage its trains and . . . operate . . . in such a manner to minimize potential impacts on the Village," and (2) "meet with [local] public safety personnel to discuss how best to address and accommodate any public safety challenges." (Dkt. No. 20-2, at 5). As described above, Norfolk Southern has met with Village officials and taken steps to minimize its trains' impact on the Village by planning to construct the landing pad for westbound trains; limiting the amount of trains which will run through the Village to two per day (one in the early morning); and exploring alternate locations for crew changes outside the Village, even though those locations were ultimately inadequate. (*See* Dkt. No. 20-1, ¶¶ 54–55; Dkt. No. 20-6, ¶ 19; Dkt. No. 21-1, ¶¶ 4–6, 8–12). The settlement agreement therefore does not affect the preemption analysis.[14]

Defendants' second argument to avoid preemption, challenging whether Norfolk Southern validly purchased the land from JC Pops, fares no better. (*See* Dkt. No. 20, at 28–31). Initially, the Court notes that, in New York, "title to property vests upon the execution and delivery of the deed, and the fact that the deed may not be recorded until a later date—or at all—does not affect the validity of the conveyance." *Tomhannock, LLC v. Roustabout Res., LLC*, 149 A.D.3d 1219, 1221 (3d Dep't 2017) (citations omitted), *aff'd*, 33 N.Y.3d 1080 (2019); *see also* N.Y. Real Prop. Law § 244. The parties do not dispute that deed here was executed and delivered.

But in any event, ICCTA's "transportation" definition includes facilities related to the movement of property by rail "regardless of ownership or an agreement concerning use." *See* § 10102(9). So even if Defendants are correct that the conveyance was invalid—and JC Pops still

---

[13] For the same reason, Defendants' argument that Norfolk Southern has violated the STB's decision made subject to the settlement agreement also falls short. (*See* Dkt. No. 20, at 16).

[14] Still, the Court expects Norfolk Southern to continue to abide by the agreement.

owns the land on which the crew-change facility will be built—Norfolk Southern's construction and use of that facility still constitutes "transportation by [a] rail carrier[]" under § 10501(b)(1). *See Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1336 (11th Cir. 2001) ("Congress employed [the phrase "regardless of ownership or agreement concerning use" to encompass] facilities that, while not owned by the railroad companies, were nevertheless used in interstate commerce for the benefit of . . . the railroad companies themselves."). As a result, notwithstanding Defendants' undisputed ability to enforce the regulations against JC Pops, (*see* Dkt. No. 21, at 17), the stop work order is still preempted.

In sum, even assuming the heightened preliminary injunction standard applies, Norfolk Southern has made a clear showing that its categorical ICCTA preemption claim is likely to succeed.[15]

### 3.    Balance of Hardships and Public Interest

Finally, the parties dispute whether the final two preliminary injunction factors—the balance of hardships and public interest, *Daileader*, 96 F.4th at 356—favor an injunction. (*See* Dkt. No. 10-3, at 20–21; Dkt. No. 20, at 33–35; Dkt. No. 21, at 21). These factors merge when the government is the opposing party. *See New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "The balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration adopted) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)). Furthermore, "the court must ensure that

---

[15] The Court therefore declines to consider Norfolk Southern's alternative preemption arguments. (*See* Dkt. No. 10-3, at 16–17; Dkt. No. 21, at 15).

the 'public interest would not be disserved' by the issuance of a preliminary injunction."

*Salinger*, 607 F.3d at 80 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Here, in the absence of an injunction, Norfolk Southern would endure the irreparable harm described above. Even assuming Defendants are correct about the disruptions they claim will result from trains passing through the Village, their hardships and public interest arguments related to such disruptions are inapposite. As explained above, Plum states that, once the Southern Route is operational, Norfolk Southern will run trains through and swap crews in the Village whether the facility is constructed or not. (*See* Dkt. No. 10-5, ¶¶ 10–11). So an injunction allowing construction to proceed, even if "wrongly" issued, *Goldman, Sachs & Co.*, 922 F. Supp. 2d at 444, would not itself "cause [any train-related] injury" which would not occur otherwise, *see Schenker v. E. I. Du Pont De Nemours & Co.*, 304 F.2d 880, 880–81 (2d Cir. 1962) (per curiam). Additionally, the Court notes that Norfolk Southern represented in reply and at oral argument that only trains less than 1.5 miles will pass through the town for the "foreseeable future," and then only twice a day (one of those times at 1:45 a.m.). (Dkt. No. 21-1, ¶ 4).

Defendants also assert that an injunction would force a permanent expansion of the Village's water system. (Dkt. No. 20, at 34). But Norfolk Southern has not requested any such expansion from the Court, (*see* Dkt. No. 21, at 21), and the injunction will be limited only to Defendants' ability to enforce the stop work order. Further, Plum has confirmed that, should the Village prevail in this litigation, Norfolk Southern can remove the facility and "restore the property substantially to its prior state." (Dkt. No. 21-1, ¶ 14). So an injunction would not grant "relief [which] cannot be undone if the [Village] ultimately wins on the merits." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022); *cf. Diversified Mortg. Invs. v. U.S. Life Ins. Co. of N.Y.*, 544

F.2d 571, 576 (2d Cir. 1976) (cautioning against preliminary injunctions that "grant relief properly awarded only in a final judgment").

In light of the above, the balance of hardships tips in Norfolk Southern's favor. This is especially true considering the strong public interests in "requiring the government to comply with the law," *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 61 (S.D.N.Y. 2025) (quoting *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020)), and preventing "the Village [from] assert[ing] regulatory authority in a circumstance where Congress wants that authority to rest solely with the STB," *Buffalo S. R.R. Inc. v. Village of Croton-on-Hudson*, 434 F. Supp. 2d 241, 255 (S.D.N.Y. 2006). The Village undoubtedly has an interest in protecting public health and safety. *See Coastal Distrib., LLC*, 216 F. App'x at 101; *Green Mountain*, 404 F.3d at 643. But as discussed above, whether the Court issues an injunction has no bearing on most of the potential health and safety concerns—from trains decelerating, stopping, and accelerating to swap crews—of which the Village complains. Therefore, the final two preliminary injunction factors weigh in favor of granting Norfolk Southern's motion.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Norfolk Southern's motion for a preliminary injunction (Dkt. No. 10) is **GRANTED**; and it is further

**ORDERED** that Defendants are immediately enjoined and restrained from enforcing the stop work order and underlying zoning requirements preventing Norfolk Southern from constructing the crew-change facility.

**IT IS SO ORDERED.**

Dated:  December 3, 2025
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge